Case No. 26-11284

---

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

HEALTHY GULF, HABITAT RECOVERY PROJECT, CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, and TURTLE ISLAND RESTORATION NETWORK,

*Petitioners,*

v.

U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; BUREAU OF OCEAN ENERGY MANAGEMENT; and MATTHEW GIACONA, in his official capacity as Director of the Bureau of Ocean Energy Management,

*Respondents,*

BP EXPLORATION & PRODUCTION INC.,

*Intervenor-Respondent.*

---

**PETITIONERS' OPPOSITION TO RESPONDENTS' AND INTERVENOR-RESPONDENT'S MOTIONS TO DISMISS OR TRANSFER**

---

Rumela Roy
EARTHJUSTICE
1125 17th Street, Suite 1010
Denver, CO 80202
303-623-9466 Telephone
415-217-2040 Fax
rroy@earthjustice.org

Brettny Hardy
EARTHJUSTICE
180 Steuart St. #194330
San Francisco, CA 94105
415-217-2000 Telephone
415-217-2040 Fax
bhardy@earthjustice.org

*Counsel for Petitioners*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ....... iii

INTRODUCTION ....... 1

BACKGROUND ....... 2

I. OUTER CONTINENTAL SHELF LANDS ACT ....... 2

II. THE BP DEEPWATER HORIZON DISASTER ....... 6

III. BP'S KASKIDA PROJECT ....... 8

IV. THE BUREAU'S TREATMENT OF ALABAMA AS AN AFFECTED STATE ....... 11

ARGUMENT ....... 13

I. THIS PETITION BELONGS IN THIS COURT BECAUSE ALABAMA IS AN AFFECTED STATE. ....... 13

A. "Affected States" encompass more than just the most adjacent state. ....... 16

B. Alabama is an affected state under Sections 1331(f)(4) and (f)(5). ....... 19

1. The Bureau designated or found that Alabama is an affected state during its review of the Project. ....... 21

2. The record supports the Bureau's designation or finding that Alabama is an affected state. ....... 25

3. The Bureau and BP's *post-hoc* arguments contradict OCSLA. ....... 27

II. IN THE ALTERNATIVE, THE COURT SHOULD CARRY THE BUREAU AND BP'S MOTIONS TO DISMISS OR TRANSFER WITH THE CASE. ....... 32

III. DISMISSAL IS NOT WARRANTED HERE. ....... 33

CONCLUSION ....... 35

CERTIFICATE OF COMPLIANCE ........................................................ 37

APPENDIX ........................................................................................... 38

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Becker v. Comm'r of Internal Revenue*,
852 F.2d 524 (11th Cir. 1988) ....................................................33, 34

*Campos Ruiz v. U.S. Atty. Gen.*,
852 F. App'x 416 (11th Cir. 2021) ....................................................33

*CBS Inc. v. PrimeTime 24 Joint Venture*,
245 F.3d 1217 (11th Cir. 2001) ....................................................17

*Citizens for Clean Air & Clean Water in Brazoria Cty. v. U.S. Dep't of Transp.*,
No. 25-60202 (5th Cir. Aug. 12, 2026) ....................................................17

*Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*,
684 F.3d 1242 (11th Cir. 2012) ....................................................14

*Ethyl Corp. v. Env't Prot. Agency*,
541 F.2d 1 (D.C. Cir. 1976) ....................................................21, 23, 28

*Fed. Power Comm'n v. Texaco, Inc.*,
377 U.S. 33 (1964) ....................................................34

*Fla. Manufactured Hous. Ass'n v. Cisneros*,
53 F.3d 1565 (11th Cir. 1995) ....................................................29

*Friends of Richards-Gebaur Airport v. F.A.A.*,
251 F.3d 1178 (8th Cir. 2001) ....................................................21, 25

*Ga. Republican Party v. Sec. & Exch. Comm'n*,
888 F.3d 1198 (11th Cir. 2018) ....................................................34

*Gulf Restoration Network v. Salazar*,
683 F.3d 158 (5th Cir. 2012) ....................................................3, 13, 14

*ITT Base Servs. v. Hickson*,
155 F.3d 1272 (11th Cir. 1998) ....................................................34

*Managed Care Advisory Group, LLC v. United Healthcare of N.C.*,
No. 21-10247, 2022 WL 792267 (11th Cir. March 16, 2022) ....................................................33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins.*,
463 U.S. 29 (1983) .......... 29

*Nat'l Fed'n of the Blind v. U.S. AbilityOne Comm'n*,
421 F.Supp.3d 102 (D. Md. 2019) .......... 20, 28

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*,
21 F.Supp.3d 657 (E.D. La. 2014) .......... 6

*Organic Cannibis Foun., LLC v. Comm'r of Internal Revenue*,
962 F.3d 1082 (9th Cir. 2020) .......... 28

*Payroll Mgmt., Inc. v. Lexington Ins.*,
566 F. App'x 796 (11th Cir. 2014) .......... 33

*Rafferty v. Denny's, Inc.*,
13 F.4th 1166 (11th Cir. 2021) .......... 30

*Rock v. Ray Anthony Int'l, LLC*,
380 F. App'x 875 (11th Cir. 2010) .......... 30

*Snyder Oil Corp. v. Samedan Oil Corp.*,
208 F.3d 521 (5th Cir. 2000) .......... 18

*Sunshine State Reg'l Ctr., Inc. v. Dir., US Citizenship & Immigr. Servs.*,
143 F.4th 1331 (11th Cir. 2025) .......... 20

*United States v. Birk*,
797 F.2d 199 (5th Cir. 1986) .......... 20, 21, 23, 28

*United States v. Eason*,
953 F.3d 1184 (11th Cir. 2020) .......... 18

*United States v. Oviedo*,
No. 21-13046, 2022 WL 16985106 (11th Cir. Nov. 17, 2022) .......... 32

**Statutes**

28 U.S.C. § 1631 .......... 33

43 U.S.C. § 1331 .......... *passim*

43 U.S.C. § 1332 ....................4, 14, 15, 16

43 U.S.C. § 1334 ....................3

43 U.S.C. § 1337 ....................2

43 U.S.C. § 1340 ....................2

43 U.S.C. § 1344 ....................2

43 U.S.C. § 1345 ....................4, 15, 17

43 U.S.C. § 1349 ....................*passim*

43 U.S.C. § 1351 ....................*passim*

**Other Authorities**

30 C.F.R. § 550.101 ....................3

30 C.F.R. § 550.105 ....................4, 14, 30

30 C.F.R. § 550.267 ....................*passim*

30 C.F.R. § 550.270 ....................5, 23, 30

30 C.F.R. § 550.271 ....................5, 23, 30

30 C.F.R. § 550.272 ....................5, 23, 30

H.R. Conf. Rep. 95-1474 (1978)....................6, 15, 17

H.R. Rep. No. 95-590 (1977)....................*passim*

## INTRODUCTION

This petition challenges the Bureau of Ocean Energy Management's ("the Bureau") approval of BP Exploration & Production Inc.'s ("BP") development plan for the Kaskida Project ("the Project") to drill several wells in dangerous, ultra-deep waters under high-pressure conditions. BP will drill in waters over 1,000 feet deeper than where BP's Deepwater Horizon disaster occurred and under extreme pressure conditions, all of which make a blowout and major oil spill six to seven times more likely than the odds of an accident at the Deepwater Horizon site. Worse, BP has failed to show it learned any lessons from the disaster. BP's plan shows it does not have the training, equipment, or planning necessary to prevent another catastrophe.

The Outer Continental Shelf Lands Act ("OCSLA") requires Petitioners to bring this petition "in a United States court of appeals for a circuit in which an affected State is located." 43 U.S.C. § 1349(c)(2). Record evidence demonstrates that, prior to litigation, the Bureau—pursuant to and consistent with OCSLA's definition of "affected State"—determined that Alabama is an affected state for this Project. Petitioners accordingly properly filed this petition in this Court.

Now, as a litigation tactic, the Bureau has abruptly reversed course and asserts that only Louisiana is an affected state. The Court should reject this *post-hoc* change in position. First, the Bureau and BP's new, narrowed interpretation of

"affected State" contradicts the statute's language and purpose to involve all affected states, not just the most adjacent state, into offshore development processes. Second, OCSLA's definition of "affected State" directs the Bureau to determine which states are affected states, and record evidence establishes that the Bureau did so. The Bureau consistently treated Alabama as an affected state for this Project and followed all OCSLA requirements regarding "affected States" for Alabama. The Court should therefore deny the Bureau and BP's motions.

In the alternative, the Court should carry the motions with the case, to allow for full development of record evidence relevant to the question of which states are "affected States."

## BACKGROUND

### I. Outer Continental Shelf Lands Act

OCSLA governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf ("OCS"). *See* 43 U.S.C. § 1331 *et seq.* The OCS extends from the outer boundary of state waters to the outer boundary of the United States' Exclusive Economic Zone, typically 200 nautical miles from shore. *Id*. OCSLA prescribes four stages for OCS development: (1) five-year leasing programs, *id.* § 1344; (2) lease sales, *id*. § 1337; (3) exploration plans, *id*. § 1340; and (4) development and production plans, *id*. § 1351.

Congress charges the Secretary of the Interior with administering OCSLA. *Id.* § 1334(a). The Secretary delegated the authority to regulate OCS exploration, development, and production operations to the Bureau. 30 C.F.R. § 550.101.

OCSLA provides that "[a]ny action … to approve … any development and production plan … shall be subject to judicial review only in a United States court of appeals for a circuit in which an affected State is located." 43 U.S.C. § 1349(c)(2); *see Gulf Restoration Network v. Salazar*, 683 F.3d 158, 169-71 (5th Cir. 2012) (development operations coordination documents are a "modified form" of development and production plans, so Section 1349(c)(2) applies). Under OCSLA, an "affected State" means any State:

> (1) the laws of which are declared … to be the law of the United States for the portion of the outer Continental Shelf on which such activity is, or is proposed to be, conducted;
> (2) which is, or is proposed to be, directly connected by transportation facilities to any artificial island or structure …;
> (3) which is receiving, or in accordnace [sic] with the proposed activity will receive, oil for processing, refining, or transshipment which was extracted from the outer Continental Shelf and transported directly to such State by means of vessels or by a combination of means including vessels;
> (4) which is designated by the Secretary as a State in which there is a substantial probability of significant impact on or damage to the coastal, marine, or human environment, or a State in which there will be significant changes in the social, governmental, or economic infrastructure, resulting from the exploration, development, and production of oil and gas anywhere on the outer Continental Shelf; or
> (5) in which the Secretary finds that because of such activity there is, or will be, a significant risk of serious damage, due to factors such as prevailing winds and currents, to the marine or coastal environment in

> the event of any oilspill [sic], blowout, or release of oil or gas from vessels, pipelines, or other transshipment facilities.

43 U.S.C. § 1331(f); 30 C.F.R. § 550.105 (Bureau's OCSLA regulations providing same definition).

In enacting OCSLA, Congress recognized that "exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States, and on other affected States." 43 U.S.C. § 1332(4). Congress stated that affected states "are entitled to an opportunity to participate … in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf." *Id.* § 1332(4)(C).

For each of the four stages for offshore development, OCSLA provides requirements regarding affected states that the Bureau must follow. At the development and production stage, lessees submit development and production plans pursuant to their leases. *Id.* § 1351. Governors of affected states are authorized to submit recommendations to the Bureau regarding proposed plans. *Id.* § 1345(a). OCSLA specifically requires the Bureau, upon receipt of a plan, to submit the plan to the Governor of any affected state. *Id.* § 1351(a)(3); 30 C.F.R. § 550.267(a)(1). The Governor has 60 days from the date of receipt to submit comments. 43 U.S.C. § 1351(g); 30 C.F.R. § 550.267(a)(1).

OCSLA also separately requires the Bureau to send the plan to each affected state's Coastal Zone Management Act ("CZMA") agency. 30 C.F.R. § 550.267(a)(3). The Bureau may not approve a plan that has not received CZMA consistency concurrence from all affected states with a coastal zone management program. 43 U.S.C. § 1351(h)(1)(B); 30 C.F.R. §§ 550.270(a)(2), 550.271(b), 550.272 (requiring consistency concurrence from each "affected State" prior to development plan approval); *see also* 43 U.S.C. § 1351(d).[1]

OCSLA's "affected State" provisions were added in 1978 to ensure "affected States' needs" are adequately considered in OCS development. H.R. Rep. No. 95-590, at 46 (1977). Legislative history shows that states had significant concerns regarding environmental and economic impacts from OCS development:

> State and local governments argued that it was their beaches, estuaries, and other shoreline areas which could be severely damaged by an OCS-related spill. It was their onshore coastal lands which would be the sites for the necessary support facilities. It was their coastal communities which would experience possible 'boom town' effects from the offshore development. … [The OCS leasing and development process] is, many coastal state governors argued, a process in which the affected governments had no true participation and no access to important data.

*Id.* at 89; *see id.* at 313 ("Offshore development may be entirely in federal waters, but the support facilities and personnel will all be based onshore."). The 1978

[1] If a state does not concur or cannot be conclusively presumed to concur, the Bureau may approve the plan if the Secretary of Commerce makes a finding that the plan is consistent with CZMA's objectives or is necessary in the interest of national security. 43 U.S.C. § 1351(h)(1)(B), (C).

amendments were intended to alleviate these concerns. *See, e.g.*, *id.* at 50 ("major purpose" of amendments was to "involve the states … in the entire exploitation process to a greater degree"); *id.* at 54 ("Decisionmaking for the development of offshore oil and gas must be opened so that the coastal and other states affected by offshore oil and gas activities may participate in the process on a regular basis").

The 1977 House Report recognized that development and production plans are "key OCS decisions" with "perhaps … the most significant effects" that require input from affected states. *Id.* at 50, 165. Because the plans reflect important decisions regarding whether to "order a platform, seek related onshore support facilities, and commence substantial development and production," OCSLA is designed to "supply needed information to affected States" during this stage. *Id.* at 165; *see* H.R. Conf. Rep. 95-1474, at 106 (1978) (OCSLA "is intended to insure that Governors of affected States … have a leading role in OCS decisions and particularly as to … development and production plans").

## II. <u>The BP Deepwater Horizon Disaster</u>

In April 2010, while drilling the Macondo oil well in Gulf waters off Louisiana, the Deepwater Horizon rig—leased and operated by BP—exploded, killing eleven people and causing the biggest environmental disaster in Gulf history. *See generally In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F.Supp.3d 657 (E.D. La. 2014). The explosion

caused oil to gush from the seabed for months, until the well finally was capped in mid-July. The result was the largest oil spill in U.S. history and a clean-up and containment effort that enlisted 50,000 workers.

BP's plan to drill the Macondo well stated that "it is unlikely that an accidental oil spill release would occur" and that, "due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected." Decl. of Rumela Roy, Ex. 1. The Minerals Management Service ("MMS")—the precursor to the Bureau—approved the plan without requiring any detailed project-specific National Environmental Policy Act ("NEPA") review, concluding that BP's project would not "result in individually or cumulatively significant environmental effects." *Id.* Ex. 2, at 9, 19. Unfortunately, both BP and MMS were wrong.

As a result of Deepwater Horizon, five million barrels of oil flowed freely into the Gulf, and responders released approximately 47 thousand barrels of chemical dispersants into Gulf waters. BOEM003545.[2] This had, and continues to have, devastating impacts on the entire Gulf region. Oil washed onto at least 1,300 miles of coastline from Texas to Florida. Roy Decl. Ex. 3, at 2-3. Beaches and fisheries were closed in Alabama, Florida, Louisiana, and Mississippi, impacting tourism, recreation, and fisheries. *Id.* at 2-18 to 2-19.

[2] The accompanying Appendix includes record excerpts cited.

The regional economic impact of the spill included more than 25,000 lost jobs, as well as financial losses totaling $2.3 billion for industry, $1.2 billion in total value added or gross regional product, $700 million in labor income, and $160 million in state and local tax revenues. BOEM021039. The spill also severely impacted "ecologically, recreationally, and commercially important species and their habitats in the Gulf of Mexico and along the coastal areas of Alabama, Florida, Louisiana, Mississippi, and Texas." Roy Decl. Ex. 4, at 1. The spill caused death or serious harm to trillions of animals throughout the Gulf. *Id.* Ex. 5. Harms from Deepwater Horizon persist to this day. *See, e.g.*, BOEM003701-07 (the spill may have irreversibly damaged marshes in Alabama, Louisiana, and Mississippi).

## III. <u>BP's Kaskida Project</u>

This Project risks another major disaster. It is a massive oil and gas development and production project located in the Central Gulf planning area that will drill under hazardous, high-pressure conditions. BOEM001878, BOEM001899, BOEM001924; Doc. 28 ("Bureau Br."), Ex. A ("Appx"), Appx-73. This would be BP's first drilling project into a new oil reserve in the Gulf since the Deepwater Horizon disaster. Roy Decl. Ex. 6. Yet BP has not demonstrated it has the experience, capability, or equipment necessary to handle the risky operations.




**Figure 1.** The Project's location. Appx-45.




**Figure 2.** The Bureau's planning areas in the Gulf. Roy Decl. Ex. 7.

The Bureau's March 13, 2026 approval of the Project allows BP to drill six development wells and four back-up wells in ultra-deep water (over 6,000 feet), Appx-73, to tap oil deposits under extremely high pressures. In comparison, the Macondo wells that led to the Deepwater Horizon disaster were located in shallower water (about 5,000 feet). BOEM021890. The geological conditions for the Macondo wells did not require high-pressure equipment capable of handling more than 15,000 pounds per square inch, *id.*, while this Project necessitates equipment for pressures up to 20,000 pounds per square inch (equivalent to about the weight of a London double-decker bus on something the size of a postage stamp), BOEM002000-01.

These conditions make it *six to seven times more likely* that an oil well blowout will occur for this Project than for the Macondo wells that caused Deepwater Horizon. BOEM021890. An uncontrolled blowout would likely lead to a worst-case spill event like Deepwater Horizon. *Id*. Moreover, high-pressure drilling is still a nascent operation. This Project will be one of the first in the region requiring equipment capable of handling pressures up to 20,000 pounds per square inch. BOEM021038.

BP has not demonstrated that it has the capability to handle these unique conditions. Error and lack of experience led to Deepwater Horizon. Yet BP failed to show for this Project that: it has the necessary experience, training, and expertise

to drill high-pressure wells; the equipment BP plans to use is safe, appropriate, and available; or that BP's worst-case oil spill modeling is accurate. BOEM021877-93. Furthermore, BP failed to include required information in its development plan regarding well locations and depths, safety features of drillships it will use, information about new and unusual technologies it will use, and other essential data. *Id.*

## IV. The Bureau's Treatment of Alabama as an Affected State

BP will use "onshore support facilities in Louisiana and Mobile, Alabama" for the Project, including the Mobile port for subsea logistics support. Appx-39-40. In addition, BP indicates that even oil spills far less severe in magnitude and duration than its modeled worst-case spill event from the Project could reach Alabama. *See* Appx-40. "In the event of a spill [impacting Alabama]," BP would deploy "cleanup or recovery activities in Alabama." Appx-40-44. BP will utilize "[p]rimary response equipment" from Mobile, Alabama among other locations to contain and clean up spills. BOEM001898.

"In accordance with 30 C.F.R. § 550.267(a)(1)" (requiring the Bureau to notify "the Governor of each affected State"), the Bureau sent BP's development plan to the Alabama Governor's office and allowed 60 days for comment. Appx-

49.[3] The Alabama Governor's office sent a response letter to the Bureau, in which it asked to be kept informed about any revisions to BP's plan. Appx-52-53.

In addition, BP submitted CZMA consistency certifications for Alabama, Louisiana, and Texas. Appx-37-44; BOEM001847-70. The Bureau sought and received CZMA consistency concurrences from all three states for the Project. Appx-48, 50-51, 85. Alabama's concurrence was conditional upon BP's compliance with the state's coastal area management program conditions and water quality regulations. BOEM002019-21. The Alabama CZMA agency also asked the Bureau to review a letter from the Alabama Oil and Gas Board, where the Board noted that the Project could impact unique and sensitive chemosynthetic communities[4] and asked the Bureau to enforce restrictions to protect such communities. BOEM002021. The Board indicated it considered the Project to be located "in the Federal waters off Alabama's coast." *Id.*

More generally, OCS development in the Gulf directly impacts all Gulf states economically. In 2024, there were 8,001-14,000 OCS-related jobs in

---

[3] The Bureau addressed the letter to the Alabama Department of Conservation and Natural Resources, an executive and administrative department under the Governor. *See* Appx-52 (Alabama Governor's name stamped on Department's response letter); Doc. 27, Record Index 1 (Bureau's letter title includes "ALGovltr," demonstrating it is for the Governor; Department response letter's title includes "ALGOV," demonstrating it is from the Governor).

[4] Chemosynthetic communities refer to deep-sea organisms that use energy released by inorganic chemical reactions for food.

Alabama. Roy Decl. Ex. 8, at 11-3. Alabama also receives revenue from OCS leasing in the Gulf pursuant to OCSLA Section 1337(g) and the Gulf of Mexico Energy Security Act ("GOMESA"). *Id.* at 11-6.




**Figure 3.** OCS-related oil and gas employment by state in 2024. *Id.* at 11-3.

## ARGUMENT

### I. This Petition Belongs in this Court Because Alabama Is an Affected State.

The Bureau's approval of this Project can only be challenged in a circuit court "in which an affected State is located." 43 U.S.C. § 1349(c)(2); *see Gulf*

*Restoration Network*, 683 F.3d at 169-71. This petition belongs here because Alabama is an "affected State" located within this Circuit.

The meaning of "affected State" is an issue of first impression. While courts have exercised jurisdiction under Section 1349(c)(2), no court has had occasion to examine and resolve contested readings of "affected State." *See, e.g.*, *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1246 (11th Cir. 2012) (exercising jurisdiction under Section 1349(c)(2) without discussing affected states); *Gulf Restoration Network*, 683 F.3d at 169 (stating the Circuit includes "the allegedly affected state of Louisiana" without discussing why Louisiana, or other states, are affected).

The plain language and legislative history of OCSLA make clear that "affected State" must be construed broadly. Both the statute and regulations define "affected State" to include those states which are adjacent to operations, that receive oil by pipeline or vessel for refining or transport, or that the Bureau determines could face significant impacts to their environment or social and economic infrastructure. 43 U.S.C. § 1331(f); 30 C.F.R. § 550.105. OCSLA broadly recognizes that OCS development has "significant impacts" on many states, including "coastal and non-coastal areas of the coastal States, and on other affected States." 43 U.S.C. § 1332(4).

Legislative history shows that affected states were concerned about a wide range of OCS-related impacts, including from spills and "onshore support facilities" on their lands. *See* H.R. Rep. No. 95-590, at 89, 165, 313. To ameliorate these significant concerns, Congress required the Bureau to provide affected states with the ability to participate in OCS development. *See, e.g.*, 43 U.S.C. §§ 1332(4), 1345(a), 1351(a)(3), (g); H.R. Rep. No. 95-590, at 50, 54. Because development and production have "the most significant effects," Congress recognized the importance of affected states' input into development and production plans. H.R. Rep. No. 95-590, at 50, 165; H.R. Conf. Rep. 95-1474, at 106.

The Bureau and BP advance improperly narrow interpretations of "affected States" that are inconsistent with this language and intent of OCSLA.

First, the Bureau and BP claim that *only* Louisiana is an affected state for the Project. Bureau Br. 1; Doc. 26 ("BP Br."), at 1. As a practical matter, this conflates affected states with adjacent states: although Louisiana is geographically closest to the location of the Project, the statute's definition of "affected State" sweeps far broader than the most adjacent state and instead recognizes a wide range of practical impacts that can "affect" a state.

Second, the Bureau and BP's interpretation of "affected State" directly contradicts the approach the agency itself took during its consideration of BP's plan, where it repeatedly treated Alabama as an affected state under OCSLA. That

original determination is aligned with the "affected State" definition and OCSLA's purpose to provide impacted states with the opportunity to engage in OCS processes. By contrast, the Bureau's new *post-hoc* litigating arguments elevate from over function and contravene both the language and intent of Congress' capacious "affected State" definition. Indeed, under BP's interpretation, *no state would ever be an affected state* under Sections 1331(f)(4) and (f)(5) in most if not all circumstances, which reads these two factors out of the definition.

### A. "Affected States" encompass more than just the most adjacent state.

Contrary to the Bureau and BP's reading that only Louisiana is an affected state, "affected State" is far broader than the most adjacent state. *See, e.g.*, 43 U.S.C. § 1331(f) (providing four factors other than adjacency to define "affected State"). OCSLA is clear that "affected State" must be interpreted broadly to cover all kinds of impacted states, including not only non-adjacent coastal states but also non-coastal states. *Id.* § 1332(4); *see* H.R. Rep. No. 95-590, at 54 (recognizing "coastal and other states affected by offshore oil and gas activities" must be allowed to participate in OCSLA processes as affected states). Indeed, "affected State" covers even those states that may be thousands of miles away that will receive oil for "processing, refining, or transshipment" through vessel transport. 43 U.S.C. § 1331(f)(3). Congress intended the "affected State" provisions to address states' varied concerns about issues that impact more than just the most adjacent

state—such as oil spills, use of onshore support facilities, and economic effects. H.R. Rep. No. 95-590, at 89.

"When Congress takes the trouble to define the terms it uses, a court must respect its definitions as virtually conclusive. We may deviate from a statutory definition only when applying the definition would be incompatible with Congress's regulatory scheme or would destroy one of the statute's major purposes." *Citizens for Clean Air & Clean Water in Brazoria Cty. v. U.S. Dep't of Transp.*, No. 25-60202 (5th Cir. Aug. 12, 2026), Doc. 108-1, at 13 (cleaned up) (quoting *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59 (2024)). Nothing in OCSLA supports that "affected State" should be construed so narrowly such that only the most adjacent state would be an affected state for development projects. To the contrary, OCSLA specifically recognizes the importance of involving "any" affected states in the development and production stage. 43 U.S.C. §§ 1345(a), 1351(a)(3), (g); *see CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001) ("any" means "every" or "all," and is "an expansive modifier ... instead of a restrictive one"); *see also* H.R. Conf. Rep. 95-1474, at 106; H.R. Rep. No. 95-590, at 165.

A broad interpretation of "affected State" also makes logical sense. As shown by the widespread environmental and economic impacts of the BP Deepwater Horizon disaster on all Gulf states, impacts from oil and gas projects do

not stop at the most adjacent state's border. *See supra* pp. 6-8. Generally, OCS leasing and development also supports over 8,000 jobs in each Gulf state. *See supra* Figure 3. By focusing myopically on Louisiana, the Bureau and BP impermissibly read out the remaining four factors in the "affected State" definition, contravening "the well-established rule of statutory construction that we must give effect to every word of a statute when possible." *United States v. Eason*, 953 F.3d 1184, 1191 (11th Cir. 2020) (citation omitted).

Regardless, Alabama is *an* adjacent state for the Project. In arguing that only Louisiana is adjacent, the Bureau and BP rely solely on caselaw involving choice of law. Bureau Br. 9-14; BP Br. 9-14. In those disputes, the courts had to choose only one state's law to apply; therefore, in interpreting adjacency under OCSLA, the courts had to determine which one state is the most adjacent. *See, e.g.*, *Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521, 522-23 (5th Cir. 2000). Here, on the other hand, this Court need not determine which one state's law to apply; rather, the inquiry underlying the "affected State" determination in Section 1331(f)(1) is whether a state can qualify as an adjacent state, among potentially many adjacent states.

As the Bureau and BP recognize, the President has not yet officially designated adjacent states under Section 1333(a)(2). Bureau Br. 9; BP Br. 9. However, the Bureau has partitioned the OCS into 26 planning areas where leasing

directly impacts the economies and environments of neighboring states. The Bureau has stated that one of the main purposes of planning areas is to facilitate "coordination with state and local governments." Roy Decl. Ex. 7. This Project will take place on leases in the Central Gulf planning area, BOEM001878, BOEM001899, BOEM001924, Appx-73, which is adjacent to the states of Alabama, Louisiana, and Mississippi, *see supra* Figure 2.

Thus, although Louisiana is geographically closest to the Project's location, it is unreasonable to claim that only Louisiana would be affected here.

**B. Alabama is an affected state under Sections 1331(f)(4) and (f)(5).**

Even if Alabama is not an adjacent state, the record evidence makes clear that the Bureau designated or found Alabama to be an affected state during its review of BP's plan. Sections 1331(f)(4) and (f)(5) both direct *the Bureau* to determine which states are affected states. *See* 43 U.S.C. § 1331(f)(4)-(5). Here, the Bureau plainly and repeatedly determined that Alabama is an affected state under at least one of these two factors.

Section 1331(f)(4) provides that a state is an affected state if it is "designated by the [Bureau] as a State in which there is a substantial probability of significant impact on or damage to the coastal, marine, or human environment, or a State in which there will be significant changes in the social, governmental, or economic

infrastructure, resulting from the exploration, development, and production of oil and gas anywhere on the outer Continental Shelf." 43 U.S.C. § 1331(f)(4).

"Designate" means "[t]o choose (someone or something) for a particular job or purpose." *Sunshine State Reg'l Ctr., Inc. v. Dir., US Citizenship & Immigr. Servs.*, 143 F.4th 1331, 1343 (11th Cir. 2025) (citing *Designate*, Black's Law Dictionary (12th ed. 2024)). Courts do not require agency designations to be formal. In *United States v. Birk*, the Fifth Circuit "ha[d] no difficulty concluding" that an agency designates something "not solely through ministerial acts, but by its informal conduct as well." 797 F.2d 199, 203-04 (5th Cir. 1986). The court held that, since the agency had treated a person as an "official guest" by taking measures to insure his safety, that conduct in itself more than adequately demonstrated that the state had designated the person as an "official guest." *Id.*; *see also Nat'l Fed'n of the Blind v. U.S. AbilityOne Comm'n*, 421 F.Supp.3d 102, 126 (D. Md. 2019) (noting that agency's practice was to "designate" central nonprofit agencies informally, and rejecting plaintiff's argument that more formal designations were required).

Section 1331(f)(5) provides that a state is an affected state if the Bureau "finds that … there is, or will be, a significant risk of serious damage … to the marine or coastal environment" in the state "in the event of any oilspill [sic], blowout, or release of oil or gas." 43 U.S.C. § 1331(f)(5).

Courts do not require agencies to make formal or explicit findings to determine that the agency finding had occurred. *See, e.g.*, *Ethyl Corp. v. Env't Prot. Agency*, 541 F.2d 1, 12 fn.15 (D.C. Cir. 1976) ("It is well established that ultimate [agency] findings do not have to be expressed at all, let alone be expressed in the language of the statute. Rather, absent compelling countervailing considerations, an ultimate finding will be implied from the action taken."); *Friends of Richards-Gebaur Airport v. F.A.A.*, 251 F.3d 1178, 1195 (8th Cir. 2001) (where statute required agency to find that a waiver "is necessary to advance [national] civil aviation interests" in order to make that waiver, agency did not need to couch its findings in the language of the statute, and the record also provided support that the waiver would result in aviation benefits).

The record demonstrates that the Bureau consistently *designated* (under Section 1331(f)(4)) or *found* (under Section 1331(f)(5)) Alabama to be an affected state.

1. The Bureau designated or found that Alabama is an affected state during its review of the Project.

The Bureau consistently treated Alabama as an affected state during its review and approval of the BP plan. *See Birk*, 797 F.2d at 203-04 (designation occurs through ministerial acts and/or informal conduct); *Ethyl Corp.*, 541 F.2d at 12 fn.15 (findings implied from agency action taken).

First, the Bureau followed *all* the requirements in OCSLA for affected states with respect to Alabama during the development and production stage. OCSLA requires the Bureau to submit development plans to Governors of affected States and provide such Governors with 60 days to comment. 43 U.S.C. § 1351(a)(3), (g); 30 C.F.R. § 550.267(a)(1) (Bureau's OCSLA regulations incorporating these requirements). Here, the Bureau submitted the plan to the Governor of Alabama and explicitly provided the Governor with 60 days to comment. Appx-49. Indeed, the Bureau's letter specifically states that the plan was sent to the Governor "in accordance with 30 CFR 550.267(a)(1)"—i.e., *the OCSLA requirement* that such plans be sent to Governors of affected states. *Id*. The Bureau's letters to parties other than the Alabama Governor did not include this language or a specified 60-day comment period, which further shows that the Bureau understood that this letter to the Governor was sent under OCSLA Sections 1351(a)(3) and (g) and OCSLA regulation 30 C.F.R. § 550.267(a)(1). *Compare* Appx-49 (letter to Alabama Governor) *with* Appx-48, 50-51 (letters to the CZMA agencies for Alabama, Louisiana, and Texas, which do not include the "in accordance with 30 CFR 550.267(a)(1)" language or the 60-day comment period).

The Bureau also sent the plan to Alabama's CZMA agency, Appx-48, in accordance with its OCSLA regulations that separately require the Bureau to send the plan to each "affected State's" CZMA agency, 30 C.F.R. § 550.267(a)(3), and

require CZMA consistency concurrences from "affected States" before plans can be approved, 30 C.F.R. §§ 550.270(a)(2), 550.271(b), 550.272; *see* 43 U.S.C. § 1351(h)(1)(B). In approving BP's plan, the Bureau recognized that "proposed activities must be 'fully consistent' with enforceable policies of a State's coastal management program," and noted that it had sought and obtained CZMA consistency concurrence from Alabama. Appx-85. In an internal document, the Bureau recognized that the Alabama Governor and Alabama's CZMA agency had concurred in "[r]equired [s]tate [r]eviews" for the Project; by contrast, the agency noted that these state reviews were "[n]ot required" for Mississippi and Florida. BOEM002072-73; *see* Appx-69 (in "CZM information" section, checking "not applicable" for Mississippi and Florida and "yes" for Alabama, Louisiana, and Texas to denote receipt of BP's CZMA consistency certifications for these three states).

The Bureau therefore took several official actions that show that the agency designated or found Alabama to be an affected state. Even if the Bureau's actions could be characterized as informal conduct, the conduct itself makes plain that the Bureau designated or found Alabama to be an affected state. *Birk*, 797 F.2d at 203-04; *Ethyl Corp.*, 541 F.2d at 12 fn.15.

<u>Second</u>, Alabama understood that the Bureau had designated or found it to be an affected state for this Project. Alabama responded to the Bureau's letters

submitting BP's plan to the Governor under 30 C.F.R. § 550.267(a)(1) and seeking CZMA consistency concurrence from the state under 30 C.F.R. § 550.267(a)(3). The Alabama CZMA agency's consistency concurrence was conditional upon BP's compliance with the state's coastal area management program conditions and water quality regulations. BOEM002019. Alabama also asked the Bureau to enforce any needed restrictions to protect chemosynthetic communities impacted by the Project, and further indicated it considered the Project to be located "in the Federal waters off Alabama's coast." BOEM002021. Moreover, contrary to the Bureau's claim, Bureau Br. 21, the Alabama Governor did not suggest that Alabama is not an affected state. Instead, the Governor asked the Bureau to send any revisions to BP's plan, which shows that the Project remained of interest to the Governor. Appx-53. The record therefore shows that the Bureau and Alabama recognized that the Bureau had determined it to be an affected state.

Third, the review process for BP's plan is not the first time the Bureau has recognized Alabama as an affected state for development in the area where this Project sits. During the lease sale stage, the Bureau consistently designates Alabama as an affected state for leases in the Central Gulf planning area, which is where this Project is located. *See, e.g.*, Roy Decl. Ex. 9, at 18 (in regionwide Gulf lease sale, listing Alabama as an affected state); *id.* Ex. 10, at 23 (same); *id.* Ex. 11, at 25 (in lease sale within the Central Gulf planning area, listing Alabama as an

affected state); *id.* Ex. 12, at 10 (same). These explicit determinations that Alabama is an affected state for Central Gulf leasing are consistent with the Bureau's recognition here that Alabama is an affected state for this Project.

2. The record supports the Bureau's designation or finding that Alabama is an affected state.

The available record supports the Bureau's designation or finding that this Project poses a substantial probability of significant impacts or changes, or carries significant risk of serious damage by spills, to Alabama. 43 U.S.C. § 1331(f)(4)-(5); *see, e.g.*, *Friends of Richards-Gebaur Airport*, 251 F.3d at 1195.

As the Bureau and BP acknowledge, BP will use onshore support facilities in Alabama for the Project. *See supra* p. 11; Bureau Br. 20; BP Br. 24. And, as explained below, BP's plan acknowledges that even oil spills from the Project that are much smaller in magnitude than the worst-case spill event modeled by BP could reach Alabama, triggering clean up and recovery in Alabama. Appx-40-44. BP also plans to deploy primary oil spill response equipment from Alabama. BOEM001898.

The Project's use of Alabama as a site for onshore support facilities and primary oil spill response deployment could result in significant impacts on the state's coasts or changes on the state's economic infrastructure, and oil spills from the Project could significantly damage the state's coastal, marine, and human

environment.[5] So, the record supports the designation that the Project would result in "substantial probability of significant impact on or damage to" Alabama or "significant changes" to Alabama. 43 U.S.C. § 1331(f)(4); *see* H.R. Rep. No. 95-590, at 89, 165 (recognizing that affected states are impacted by OCS spills and onshore support facilities on their lands).

The record also supports the finding that there is a significant risk of serious damage "in the event of any oilspill [sic], blowout, or release of oil or gas" from the Project. 43 U.S.C. § 1331(f)(5). As noted above, BP acknowledges that Alabama would be impacted by spills from the Project. The Bureau downplays the risk of spills by noting, *post hoc*, that BP estimates a less than 0.5% conditional probability that an oil spill would reach Alabama's Mobile or Baldwin counties within 30 days of a spill. Bureau Br. 17. This ignores that, under BP's own modeling, a worst-case spill event would last 100, not 30, days—meaning that the risk to Alabama is far greater than the Bureau suggests. BOEM021885, BOEM022511. Moreover, BP's modeling underestimates worst-case spill events. *See* BOEM021879-80, BOEM021885-86.

---

[5] BP's assertion in its consistency certification that it does not expect significant impacts on Alabama from *routine* activities does not mean that there would be no significant impacts on or changes to the state from *all* Project-related activities, including those arising from emergencies, accidents, and non-routine events. *Cf.* Bureau Br. 17.

It is well-established that the BP Deepwater Horizon disaster severely impacted and continues to impact all the Gulf states, including Alabama and Florida. *See supra* pp. 6-8. This Project poses even greater risks. *See* BOEM003545 (five million barrels of oil spilled during Deepwater Horizon), BOEM021885-86 (BP estimated 45,000 barrels of oil would be spilled per day during a worst-case spill event, which means 4.5 million barrels would be spilled over 100 days), BOEM021886 (operator for a similar ultra-deep water, high-pressure drilling project in the Gulf estimated a worst-case spill for that project would last 177 days and release 5.9 million barrels of oil). As this region learned from Deepwater Horizon, oil spills can and do extend far beyond early assumptions. The Court need not credit arguments that ignore reality and assert there could be no significant risk of impacts to Alabama from this Project.

3. <u>The Bureau and BP's *post-hoc* arguments contradict OCSLA.</u>

The Bureau and BP's efforts to disavow the agency's designation or finding of Alabama as an affected state fail.

<u>First,</u> BP claims that "no state satisfies" Section 1331(f)(4) or (f)(5)—i.e., that the Bureau has allegedly made no designations or findings that any state would be significantly impacted or changed from the Project. BP Br. 18-20. To support this argument, BP incorrectly suggests that only hyper-formal designations and findings under Section 1331(f)(4) or (f)(5) would qualify a state as affected. *Id.*

Given that the Bureau suggests it does "not typically make a discrete, written finding" as to how a state was determined to be an affected state, this would essentially mean that *no state is ever an affected state* under Sections 1331(f)(4) and (f)(5) in most if not all circumstances. Bureau Br. Ex. D, at ¶ 3. BP's interpretation in practice would read these two factors out of the definition and run counter to the definition of "designate" and "find." *See Birk*, 797 F.2d at 203-04 (agency designations can occur through agency's informal conduct); *Nat'l Fed'n of the Blind*, 421 F.Supp.3d at 126 (rejecting argument that agency cannot make designation through an informal process); *Ethyl Corp.*, 541 F.2d at 12 fn.15 (agency findings implied from agency action taken).[6]

Second, the Bureau and BP point to outdated agency guidance, a Notice to Lessees ("NTL") from 2008, which is based on regulations no longer in effect and provides guidance from MMS, an agency that no longer exists. Appx-1. Relying solely on this outdated guidance, the Bureau now claims that it applied a "broader understanding of who is an 'affected state' than what is provided in OCSLA" and designated Alabama as an affected state not under OCSLA, but under a "separate

[6] BP's citation to *Organic Cannibis Foun., LLC v. Comm'r of Internal Revenue* is misplaced. BP Br. 19. That case did not address OCSLA or informal conduct of an agency. Instead, the narrow issue was whether a "mailbox" rule applied if a taxpayer used a delivery service that the Internal Revenue Service had not formally designated for receipt. 962 F.3d 1082, 1090 (9th Cir. 2020). There was no occasion for the court to define the term "designate."

and discrete definition[]" provided in the NTL. Bureau Br. 19-20. This argument is plainly contrary to record evidence, which demonstrates in no uncertain terms that the Bureau determined Alabama was an affected state under OCSLA for this Project. *See supra* pp. 21-27. The Bureau even attempts to backpedal its own citation to 30 C.F.R. § 550.267(a)(1) in its letter to the Alabama Governor, Appx-49, by claiming that the citation is inconsistent with its "practice." Bureau Br. 20. This assertion about the agency's "practice" appears nowhere in the record but is only offered now, more than a year after the agency's review. The Bureau's letter speaks for itself.

The Court should reject the Bureau's impermissible *post-hoc* attempt to reinterpret the record. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins.*, 463 U.S. 29, 50 (1983) ("courts may not accept … counsel's *post hoc* rationalizations for agency action"); *Fla. Manufactured Hous. Ass'n v. Cisneros*, 53 F.3d 1565, 1574 (11th Cir. 1995) (rejecting agency interpretation of a jurisdictional provision because "agency's *post hoc* 'convenient litigating position' … is wholly unsupported by prior regulations, interpretations, rulings, or administrative practices").

Moreover, the Bureau characterizes the guidance definition as inconsistent with the definition of "affected State" in both OCSLA and the Bureau's regulations. Bureau Br. 19-20 (suggesting that the NTL definition is "broader" and

"separate and discrete" from the OCSLA definition). But the Bureau cannot rely on an inconsistent guidance document's definition to meet OCSLA's requirements. *See, e.g.*, *Rock v. Ray Anthony Int'l, LLC*, 380 F. App'x 875, 878 fn.4 (11th Cir. 2010) (agency guidance is "not binding" and must be consistent with statute to be owed any deference); *Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1178-90 (11th Cir. 2021) (finding that guidance that was inconsistent with regulation is not owed any deference).

The Bureau attempts to sidestep this issue by mischaracterizing the NTL definition as pertaining to CZMA, rather than OCSLA. But OCSLA—not CZMA—requires the Bureau to send development and production plans to "the Governor of any affected State" and provide these Governors with 60 days to comment. 43 U.S.C. § 1351(a)(3), (g); 30 C.F.R. § 550.267(a)(1). Moreover, the Bureau's implementing OCSLA regulations require it to disapprove plans that have not received consistency concurrence under CZMA from "affected States." 30 C.F.R. §§ 550.270(a)(2), 550.271(b), 550.272; *see* 30 C.F.R. §§ 550.105 (regulations incorporating and using OCSLA definition of "affected State").[7] As those regulations underscore, the obligation to seek consistency concurrence arises under—and is a precondition for the Bureau's approvals—under OCSLA.

[7] In contrast, neither CZMA nor its regulations use or independently define the term "affected State" in the context of consistency reviews for OCS development.

Accordingly, the agency's determination that Alabama is an affected state was made under OCSLA.

Finally, contrary to the Bureau's characterization, Bureau Br. 19-20, it did not determine Alabama is an affected state under a "broader" definition than OCSLA's definition. The NTL guidance definition provided that a state is an affected state if the project "propose[s] to use a service or supply base within [the] State's coastal zone." Appx-28. The Bureau claims it determined Alabama is an affected state under the NTL because BP would use a service or supply base within Alabama's coastal zone. Bureau Br. 20. But designating Alabama as an affected state for this reason is consistent with Section 1331(f)(4) because OCSLA's statutory definition *includes* changes to Alabama's infrastructure (via the use of supply or support bases in Alabama) that would occur as a result of OCS development. *See* 43 U.S.C. § 1331(f)(4). In fact, Congress explicitly recognized that OCSLA's "affected State" provisions are intended to cover those states whose lands would be used for "onshore support facilities" for OCS projects. *See* H.R. Rep. No. 95-590, at 89 (recognizing that states whose lands would be used for necessary "support facilities" for OCS projects are affected by OCS development), 313 (same), 165 (indicating that "affected States" include those that would be impacted by development projects' "related onshore support facilities"). Here, the undisputed and critical fact (under either the NTL definition or Section 1331(f)(4))

is the same: BP will use—in BP's own words—"onshore support facilities in … Mobile, Alabama," Appx-40, including the port for subsea logistics support and for deployment of primary oil spill response equipment, Appx-39-44; BOEM001898.

In sum, through its conduct and its actions, the Bureau designated or found Alabama to be an affected state under Section 1331(f)(4) or (f)(5).

## II. In the Alternative, the Court Should Carry the Bureau and BP's Motions to Dismiss or Transfer with the Case.

Although the existing record amply demonstrates that Alabama is an affected state, to the extent this Court has remaining factual questions, it should carry the Bureau and BP's motions with the case to allow for full development of the record evidence pertaining to this issue. As the Bureau admits, the question before this Court is highly dependent on factual record evidence, *see* Doc. 12-1, at 6. Petitioners have identified several potentially relevant documents that are missing from the record and unavailable to Petitioners. Most importantly, because the Bureau has excluded BP's worst-case oil spill scenario modeling report from the record as proprietary information, the current record does not paint a full picture of the scope or extent of impacts from the Project's potential spills.

This Court often carries jurisdictional issues with the case, even after respondents or appellees file a motion to dismiss. *E.g.*, *United States v. Oviedo*, No. 21-13046, 2022 WL 16985106, at *1-2 (11th Cir. Nov. 17, 2022) (Court ordered that the government's motion to dismiss for untimeliness be carried with

the case for "careful review"); *Managed Care Advisory Group, LLC v. United Healthcare of N.C.*, No. 21-10247, 2022 WL 792267, at *1 (11th Cir. March 16, 2022) (carrying jurisdictional issue raised by the Court and in a subsequent motion to dismiss with the case); *Campos Ruiz v. U.S. Atty. Gen.*, 852 F. App'x 416, 418 (11th Cir. 2021) (Court carried the issue of whether it had subject matter jurisdiction to the merits stage); *Payroll Mgmt., Inc. v. Lexington Ins.*, 566 F. App'x 796, 798 (11th Cir. 2014) (Court carried issue of subject matter jurisdiction with the case). The Court should do the same here if it has any remaining questions.

## III. <u>Dismissal Is Not Warranted Here.</u>

For the reasons discussed above, this petition belongs in this Court. However, if this Court determines that Alabama is not an affected state, it should not dismiss the petition. Under 28 U.S.C. § 1631, if a court finds that it lacks jurisdiction to review a petition, the court "shall, if it is in the interest of justice, transfer such action … to any other such court … in which the action … could have been brought at the time it was filed."

This Circuit applies Section 1631 in equal measure whether it determines jurisdiction or venue is improper and has repeatedly transferred petitions in the "interest of justice" where "the time for filing a new appeal [in another court] has expired" and "because of the importance of the right of appellate review." *Becker*

*v. Comm'r of Internal Revenue*, 852 F.2d 524, 526 (11th Cir. 1988); *see, e.g.*, *Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1205 (11th Cir. 2018) ("Because [petitioners] could not refile their petition in a proper venue due to the fact that it is now well outside the 60-day filing period, … we conclude that it is in the interest of justice to transfer the appeal."); *ITT Base Servs. v. Hickson*, 155 F.3d 1272, 1276 (11th Cir. 1998) (transferring petition because "[a]ny appeal to the appropriate district court would probably be time-barred if we were to dismiss this case"). Contrary to BP's assertion, nothing in *Fed. Power Comm'n v. Texaco, Inc.* suggests that appellate courts cannot transfer petitions in the interest of justice. 377 U.S. 33, 39 (1964). *Texaco* found there was a lack of venue, but the question of whether to transfer was not before the court.

Here, it would be in the interest of justice to transfer, regardless of whether the "affected State" inquiry goes to venue or jurisdiction. *See* BP Br. 8 fn.2 (recognizing the provision goes to venue); Bureau Br. 21-23 (arguing that the provision is jurisdictional). The time for filing a new petition has expired. 43 U.S.C. § 1349(c)(3). Dismissal would undermine the "right of appellate review," *Becker*, 852 F.2d at 526, by preventing Petitioners from challenging the approval of a highly risky project. It was also "very understandable" for Petitioners to file in this Court, *ITT Base Servs.*, 155 F.3d at 1276, because, based on all evidence available to Petitioners, the Bureau and BP treated Alabama as an affected state,

and no prior court has had occasion to resolve contested readings of "affected State." *See supra* pp. 14, 21-27. As a result, it would be in the interest of justice to transfer rather than dismiss this petition.

## CONCLUSION

For the foregoing reasons, this Court should deny the Bureau and BP's motions to dismiss or transfer. In the alternative, the Court should carry the motions with the case.

Dated this 14th day of August, 2026.

Respectfully submitted,

*/s/ Brettny Hardy*
Brettny Hardy
EARTHJUSTICE
180 Steuart St. #194330
San Francisco, CA 94105
415-217-2000 Telephone
415-217-2040 Fax
bhardy@earthjustice.org

Rumela Roy
EARTHJUSTICE
1125 17th Street, Suite 1010
Denver, CO 80202
303-623-9466 Telephone
415-217-2040 Fax
rroy@earthjustice.org

*Attorneys for Healthy Gulf, Habitat Recovery Project, Center for Biological*

*Diversity, Sierra Club, and Turtle Island Restoration Network*

**CERTIFICATE OF COMPLIANCE**

I hereby certify:

1. This document complies with the type-volume limitation of this Court's order granting Petitioners' motion for enlargement of the word limit, Doc. 38, because, excluding the parts of the document exempted by Rule 32(f), this document contains 7,791 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Brettny Hardy*
Brettny Hardy

# APPENDIX

# APPENDIX

# Excerpts of Administrative Record

## Table of Contents


| Doc # | Document | AR Bates No. |
|---|---|---|
| 1. | Excerpts of DOCD Appx. H | BOEM001847-70; |
| 2. | Excerpts of DOCD Appx. I | BOEM001878;<br>BOEM001898-99;<br>BOEM001924; |
| 3. | Excerpts of DOCD Appx. J | BOEM002000-01 |
| 4. | Two Letters (1) Anthony Scott Hughes (Ala. Dep't of Env'l Mgmt.) Re: consistency determination; (2) Butch Gregory (State Oil and Gas Board of Ala.) Re: review comments | BOEM002019-21 |
| 5. | e-Approval Checklist | BOEM002072-73 |
| 6. | Excerpts of Earthjustice Public Comment Letter Attachments | BOEM003545;<br>BOEM003701-07 |
| 7. | Earthjustice et al. Public Comment Letter | BOEM021038-95 |
| 8. | Earthjustice et al. Supplemental Comment Letter | BOEM021869-93 |
| 9. | Excerpts of Site-Specific Environmental Assessment | BOEM022511 |

# Coastal Zone Management Consistency Certification
# State of Louisiana

Initial Development Operations Coordination Document (DOCD)
Type of OCS Plan

Keathley Canyon Blocks 292 and 293
Area and Block

OCS-G 25792 and Expired
Lease Numbers

The proposed activities described in detail in this OCS Plan comply with Louisiana's approved Coastal Resource Program and will be conducted in a manner consistent with such Program.

BP Exploration & Production Inc.
Lessee or Operator

Betsy Cleland
Certifying Official

02/05/2025
Date

# Evaluation of Consistency with the Enforceable Policies of the Louisiana Coastal Resource Program

## 1 Background

BP Exploration & Production Inc. (bp) is submitting an Initial Development Operations Coordination Document (DOCD) for Keathley Canyon (KC) Blocks 292 (KC 292) and 293 (KC 293), Gulf of Mexico, Outer Continental Shelf (OCS)-G-25792 (for KC 292). The lease for KC 293 is expired. Under this DOCD, bp proposes to drill six wells at two drill centers (DC1 and DC2), install a semi-submersible floating production unit (FPU) with 12 mooring lines, and associated subsea infrastructure.

This document evaluates bp's DOCD for any reasonably foreseeable coastal effects on the land, water uses, or natural resources of the coastal zone of Louisiana, and evaluates the consistency of bp's DOCD with the enforceable policies of the Louisiana Coastal Resource Program (LCRP). The analysis, compliant with the Coastal Zone Management Act, is submitted pursuant to 15 Code of Federal Regulations (CFR) 930.76 and is supported by documentation provided in the Environmental Impact Analysis (EIA). The EIA provides an environmental impacts analysis for the drilling, FPU installation, and subsea installation activities based on the locations in KC 292 and KC 293 and is included in DOCD Appendix I. The EIA was prepared in accordance with applicable regulations, including 30 CFR 550.242 and 550.261 as well as Notice to Lessees and Operators (NTL) 2008-G04, extended by NTL BOEM 2015-N02, and BOEM 2015-N01.

The proposed activities will be conducted in accordance with Bureau of Ocean Energy Management (BOEM), Bureau of Safety and Environmental Enforcement (BSEE), and U.S. Environmental Protection Agency regulations, applicable NTLs, conditions in the approved permits, and lease stipulations. Required federal permits will be obtained, and activities are expected to be conducted in compliance with such regulations, NTLs, conditions, and stipulations.

The proposed activities will occur in Federal OCS waters, approximately 186 statute miles (299 km) from the nearest Louisiana shoreline (**Figure 1**). A dynamic positioning (DP) drillship is anticipated to be on site for approximately 125 days per well for well drilling and 75 days for completion activities. Installation of the FPU and subsea infrastructure will be accomplished with a DP installation vessel. The installation of the proposed FPU and subsea equipment is estimated to be conducted between 2026 and 2027 with production commencing in 2028 and continuing until approximately 2053. There are 12 mooring anchors associated with this plan.

Land-based support activities will be from Louisiana, Texas, and Alabama. No new expansion of facilities or personnel for shorebases is anticipated to result from this exploration project. No significant impacts on the State of Louisiana are expected from routine activities as described in bp's DOCD.

Spill response-related activities for the proposed activities under bp's DOCD are governed by the bp Regional Oil Spill Response Plan (ROSRP) filed on behalf of several affiliated companies, including BP Exploration & Production Inc. (Operator No. 02481). The ROSRP was confirmed in compliance and approved by BSEE on 6 November 2023. bp (Operator No. 02481) has demonstrated oil spill financial responsibility for the facilities proposed in the DOCD, according to 30 CFR Part 553 and NTL No. 2008-N05, "Guidelines for Oil Spill Financial Responsibility for Covered Facilities."




Figure 1. Location of Keathley Canyon Blocks 292 and 293 relative to the Louisiana shoreline and offshore bathymetric contours.

As discussed in Section A.9.2 of the EIA (Large Oil Spill [Worst Case Discharge]), the trajectory of a hypothetical spill in KC 292 and KC 293, projected using information in the 30-day Oil Spill Risk Analysis model for the Gulf of Mexico (see Ji et al., 2004), indicates there is up to a 4% conditional probability of a spill contacting the Louisiana shoreline within 30 days of a spill. Using Launch Point W026 (as indicated in Ji et al., 2004), the model predicts potential shoreline contact within 30 days of a spill ranging from Cameron County, Texas to Terrebonne Parish, Louisiana.

# 2 Louisiana Coastal Resource Program Guidelines

Pursuant to the Louisiana State and Local Resources Management Act of 1978, as amended (Act 361, La. R.S. 49:214.21 et seq.), the Office of Coastal Management of the Louisiana Department of Natural Resources has created guidelines to implement the LCRP (LAC 43:I.Chapter 7). The guidelines are organized as a set of performance standards that are used to evaluate the impacts of a proposed action on coastal resources. All guidelines applicable to bp's proposed project in KC 292 and KC 293 are summarized in the following sections.

## §701. Guidelines Applicable to All Uses

*A.* *The guidelines must be read in their entirety. Any proposed use may be subject to the requirements of more than one guideline or section of guidelines and all applicable guidelines must be complied with.*

The guidelines have been read in their entirety in preparation of this consistency analysis for the KC 292 and KC 293 project, and bp expects to comply with all applicable guidelines.

*B.* *Conformance with applicable water and air quality laws, standards, and regulations, and with those other laws, standards and regulations which have been incorporated into the coastal resources program shall be deemed in conformance with the program except to the extent that these guidelines would impose additional requirements.*

Addressed in DOCD Sections 6, 7, and 8 and Appendix I.

*C.* *The guidelines include both general provisions applicable to all uses and specific provisions applicable only to certain types of uses. The general guidelines apply in all situations. The specific guidelines apply only to the situations they address. Specific and general guidelines should be interpreted to be consistent with each other. In the event there is an inconsistency, the specific should prevail.*

The guidelines have been read in their entirety, and all applicable guidelines are summarized and addressed herein.

*F.* *Information regarding the following general factors shall be utilized by the permitting authority in evaluating whether the proposed use is in compliance with the guidelines:*

1. *type, nature, and location of use;*
2. *elevation, soil, and water conditions and flood and storm hazard characteristics of site;*
3. *techniques and materials used in construction, operation, and maintenance of use;*
4. *existing drainage patterns and water regimes of surrounding area including flow, circulation, quality, quantity, and salinity; and impacts on them;*

5. *availability of feasible alternative sites or methods of implementing the use;*
6. *designation of the area for certain uses as part of a local program;*
7. *economic need for use and extent of impacts of use on economy of locality;*
8. *extent of resulting public and private benefits;*
9. *extent of coastal water dependency of the use;*
10. *existence of necessary infrastructure to support the use and public costs resulting from use;*
11. *extent of impacts on existing and traditional uses of the area and on future uses for which the area is suited;*
12. *proximity to and extent of impacts on important natural features such as beaches, barrier islands, tidal passes, wildlife and aquatic habitats, and forest lands;*
13. *the extent to which regional, state, and national interests are served including the national interest in resources and the siting of facilities in the coastal zone as identified in the coastal resources program;*
14. *proximity to, and extent of impacts on, special areas, particular areas, or other areas of particular concern of the state program or local programs;*
15. *likelihood of; and extent of impacts of; resulting secondary impacts and cumulative impacts;*
16. *proximity to and extent of impacts on public lands or works, or historic, recreational, or cultural resources;*
17. *extent of impacts on navigation, fishing, public access, and recreational opportunities;*
18. *extent of compatibility with natural and cultural setting; and*
19. *extent of long-term benefits or adverse impacts.*

Addressed in DOCD Sections 1, 5, and 9, and Appendix I.

G. *It is the policy of the coastal resources program to avoid the following adverse impacts. To this end, all uses, and activities shall be planned, sited, designed, constructed, operated, and maintained to avoid to the maximum extent practicable significant:*

1. *reductions in the natural supply of sediment and nutrients to the coastal system by alterations of freshwater flow;*
2. *adverse economic impacts on the locality of the use and affected governmental bodies;*
3. *detrimental discharges of inorganic nutrient compounds into coastal waters;*
4. *alterations in the natural concentration of oxygen in coastal waters;*
5. *destruction or adverse alterations of streams, wetland, tidal passes, inshore waters and water bottoms, beaches, dunes, barrier islands, and other natural biologically valuable areas or protective coastal features;*
6. *adverse disruption of existing social patterns;*
7. *alterations of the natural temperature regime of coastal waters;*
8. *detrimental changes in existing salinity regimes;*
9. *detrimental changes in littoral and sediment transport processes;*

10. *adverse effects of cumulative impacts;*
11. *detrimental discharges of suspended solids into coastal waters, including turbidity resulting from dredging;*
12. *reductions or blockage of water flow or natural circulation patterns within or into an estuarine system or a wetland forest;*
13. *discharges of pathogens or toxic substances into coastal waters;*
14. *adverse alteration or destruction of archaeological, historical, or other cultural resources;*
15. *fostering of detrimental secondary impacts in undisturbed or biologically highly productive wetland areas;*
16. *adverse alteration or destruction of unique or valuable habitats, critical habitat for endangered species, important wildlife or fishery breeding or nursery areas, designated wildlife management or sanctuary areas, or forestlands;*
17. *adverse alteration or destruction of public parks, shoreline access points, public works, designated recreation areas, scenic rivers, or other areas of public use and concern;*
18. *adverse disruptions of coastal wildlife and fishery migratory patterns;*
19. *land loss, erosion, and subsidence;*
20. *increases in the potential for flood, hurricane, and other storm damage, or increases in the likelihood that damage will occur from such hazards; and*
21. *reduction in the long-term biological productivity of the coastal ecosystem.*

Addressed in DOCD Sections 5 and 6, and Appendix I.

*I.* *Uses shall to the maximum extent practicable be designed and carried out to permit multiple concurrent uses which are appropriate for the location and to avoid unnecessary conflicts with other uses of the vicinity.*

Addressed in DOCD Sections 1 and 2.

### §703. Guidelines for Levees

Not applicable.

### §705. Guidelines for Linear Facilities

Not applicable.

### §707. Guidelines for Dredged Spoil Deposition

Not applicable.

### §709. Guidelines for Shoreline Modification

Not applicable.

### §711. Guidelines for Surface Alterations

Not applicable. Surface alterations to shorebases are not required for this project.

## §713. Guidelines for Hydrologic and Sediment Transport Modifications

Not applicable.

## §715. Guidelines for Disposal of Wastes

*A. The location and operation of waste storage, treatment, and disposal facilities shall be avoided in wetlands to the maximum extent practicable, and best practical techniques shall be used to minimize adverse impacts which may result from such use.*

Addressed in DOCD Sections 7 and 13, and Appendices F and I.

*B. The generation, transportation, treatment, storage, and disposal of hazardous wastes shall be pursuant to the substantive requirements of the Department of Environmental Quality adopted pursuant to the provisions of R.S. 30:217, et seq.; as amended and approved pursuant to the Resource Conservation and Recovery Act of 1976 P.L. 94-580, as amended, and of the Office of Conservation for injection below surface.*

Addressed in DOCD Sections 7 and 13, and Appendices F and I.

*C. Waste facilities located in wetlands shall be designed and built to withstand all expectable adverse conditions without releasing pollutants.*

Not applicable.

*D. Waste facilities shall be designed and constructed using best practical techniques to prevent leaching, control leachate production, and prevent the movement of leachate away from the facility.*

Not applicable.

*E. The use of overland flow systems for nontoxic, biodegradable wastes, and the use of sump lagoons and reservoirs utilizing aquatic vegetation to remove pollutants and nutrients shall be encouraged.*

Not applicable.

*F. All waste disposal sites shall be marked and, to the maximum extent practicable, all components of waste shall be identified.*

Not applicable.

*G. Waste facilities in wetlands with identifiable pollution problems that are not feasible and practical to correct shall be closed and either removed or sealed and shall be properly revegetated using the best practical techniques.*

Not applicable.

*H. Waste shall be disposed of only at approved disposal sites.*

Addressed in DOCD Sections 7 and 13, and Appendices D and I.

*I. Radioactive wastes shall not be temporarily or permanently disposed of in the coastal zone.*

Radioactive wastes may be generated during the completion phase of the project and are addressed in DOCD Sections 7 and 13, and Appendix D.

## §717. Guidelines for Uses that Result in the Alteration of Waters Draining into Coastal Waters

Not applicable.

## §719. Guidelines for Oil, Gas, and Other Mineral Activities

*A. Geophysical surveying shall utilize the best practical techniques to minimize disturbance or damage to wetlands, fish and wildlife, and other coastal resources.*

Not applicable; all geophysical survey work related to this project was conducted on the OCS in KC 292 and KC 293, approximately 186 statute miles (299 km) from the nearest Louisiana shoreline. Geological and geophysical information is provided in DOCD Section 3.

*B. To the maximum extent practicable, the number of mineral exploration and production sites in wetland areas requiring floatation access shall be held to the minimum number, consistent with good recovery and conservation practices and the need for energy development, by directional drilling, multiple use of existing access canals, and other practical techniques.*

Not applicable; all drilling activities related to this project will be conducted on the OCS in KC 292 and KC 293, approximately 186 statute miles (299 km) from the nearest Louisiana shoreline.

*C. Exploration, production, and refining activities shall, to the maximum extent practicable, be located away from critical wildlife areas and vegetation areas. Mineral operations in wildlife preserves and management areas shall be conducted in strict accordance with the requirements of the wildlife management body.*

Addressed in DOCD Sections 1, 5, and 9, and Appendix I. No activities will be conducted in wildlife preserves or management areas. All drilling and installation activities related to this project will be conducted on the OCS in KC 292 and KC 293. Shore-based support will originate from Louisiana. The nearest Louisiana shoreline is approximately 186 statute miles (299 km) from the project area.

During a large-scale incident, a few of Louisiana’s Wildlife Refuges, Wilderness Areas, State Parks, and other protected areas that could potentially be affected by oiling within 30 days of a large spill (per the 30-day Oil Spill Risk Analysis presented by Ji et al., 2004). Potentially affected areas, along with the natural resources found in each area, are provided in **Table 1**.

D. *Mineral exploration and production facilities shall be to the maximum extent practicable designed, constructed, and maintained in such a manner to maintain natural water flow regimes, avoid blocking surface drainage, and avoid erosion.*

Not applicable; all drilling and installation activities related to this project will be conducted on the OCS in KC 292 and KC 293, approximately 186 statute miles (299 km) from the nearest Louisiana shoreline.

E. *Access routes to mineral exploration, production, and refining sites shall be designed and aligned so as to avoid adverse impacts on critical wildlife and vegetation areas to the maximum extent practicable.*

Addressed in DOCD Sections 13 and 14, and Appendix I.

F. *Drilling and production sites shall be prepared, constructed, and operated using the best practical techniques to prevent the release of pollutants or toxic substances into the environment.*

Addressed in DOCD Sections 1, 2, 8, and 9.

G. *All drilling activities, supplies, and equipment shall be kept on barges, on drilling rigs, within ring levees, or on the well site.*

Addressed in DOCD Section 1.

H. *Drilling ring levees shall to the maximum extent practicable be replaced with small production levees or removed entirely.*

Not applicable; no drilling ring levees will be used during the proposed activities.

I. *All drilling, and production equipment, structures, and storage facilities shall be designed and constructed utilizing best practical techniques to withstand all expectable adverse conditions without releasing pollutants.*

Addressed in DOCD Sections 1 and Appendix I.

J. *Mineral exploration, production, and refining facilities shall be designed and constructed using best practical techniques to minimize adverse environmental impacts.*

Addressed in DOCD Sections 1 and 2, and Appendix I.

K. *Effective environmental protection and emergency or contingency plans shall be developed and complied with for all mineral operations.*

Addressed in DOCD Sections 1, 2, 3, and 8, and Appendices G and I.

L. *The use of dispersants, emulsifiers, and other similar chemical agents on oil spills is prohibited without the prior approval of the Coast Guard or Environmental Protection Agency on-scene coordinator, in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan.*

Addressed in DOCD Appendix I.

*M.* *Mineral exploration and production sites shall be cleared, revegetated, detoxified, and otherwise restored as near as practicable to their original condition upon termination of operations to the maximum extent practicable.*

Addressed in DOCD Section 1 and Appendix I.

*N.* *The creation of underwater obstructions which adversely affect fishing or navigation shall be avoided to the maximum extent practicable.*

Addressed in DOCD Section 1.

Table 1. Louisiana Wildlife Refuges, Wilderness Areas, State Parks, and other protected areas and natural resources within the geographic range of potential shoreline oil contact within 30 days of a large discharge event based on Oil Spill Risk Analysis Launch Point W026 (as referenced from Ji et al., 2004).

| Wildlife Refuge, Wilderness Area, State or National Park | Resource Description |
|---|---|
| Cameron Parish | |
| Lacassine National Wildlife Refuge (NWR) | Established in 1937, Lacassine NWR is approximately 35,000 acres of freshwater marsh. Approximately half of the acreage of the NWR is natural freshwater marsh and open water. Notable wildlife includes nesting colonies of wading and water birds, alligators, eagles, falcons, and Louisiana black bears as well as wintering populations of several species of ducks. The NWR is known for vast numbers of pintails congregating each winter. The NWR is available for a multitude of recreational opportunities, including fishing, hunting, boating, and hiking (U.S. Fish and Wildlife Service [USFWS], n.d. - a). |
| Peveto Woods Bird and Wildlife Sanctuary | A bird sanctuary owned by the Baton Rouge Audubon Society; this sanctuary is a 40-acre tract of coastal land in Cameron Parish. During the spring and fall migrations, the sanctuary is home to numerous species of songbirds. It is estimated that nearly 2 million birds seek refuge in the sanctuary each year before and after their trans-Gulf migrations. The sanctuary is also used by numerous species of butterflies, including the migratory Monarch butterfly (Baton Rouge Audubon Society, 2022). |
| Rockefeller Wildlife Refuge and Game Preserve | Rockefeller Wildlife Refuge, located in eastern Cameron and western Vermilion Parishes, is owned, and maintained by the State of Louisiana. The refuge is a flat, treeless area with highly organic soils that are capable of producing immense quantities of waterfowl foods in the form of annual emergent and submerged aquatics. When deeded to the state, the refuge encompassed approximately 86,000 acres, but beach erosion has taken a heavy toll, and the most recent surveys indicate only 76,042 acres remain. This area borders the Gulf of Mexico for 26.5 miles and extends inland toward the Grand Chenier Ridge, a stranded beach ridge 6 miles (10 km) from the Gulf of Mexico. Common resident animals include Mottled Ducks, nutria, muskrat, rails, raccoon, mink, otter, opossum, white-tailed deer, and alligators. An abundant fisheries population provides recreational opportunities to fishermen seeking shrimp, redfish, speckled trout, black drum, and largemouth bass, among others (Louisiana Department of Wildlife and Fisheries, n.d. - a). |
| Sabine NWR | Sabine NWR includes 124,511 acres of fresh, intermediate, and brackish marshes that provide habitat for waterfowl and other birds. Designated as an Internationally Important Bird Area, the refuge is known to provide habitat for more than 300 species of birds, 26 species of mammals, 41 species of reptiles and amphibians, 132 species of fish, and 68 species of marine invertebrates. Common bird species include Mottled Ducks, Great Egrets, Neotropic Cormorants, Snowy Egrets, and various species of wading birds and shorebirds. American alligators are known to be very common in the refuge as well (USFWS, n.d. - b). |

Table 1. (Continued).

| Wildlife Refuge, Wilderness Area, State or National Park | Resource Description |
|---|---|
| Vermilion Parish | |
| Paul J. Rainey Wildlife Refuge and Game Preserve | Paul J. Rainey Wildlife Refuge and Game Preserve is a privately owned 26,000-acre coastal wetland in Vermilion Parish owned by the National Audubon Society. Formerly open to gas drilling, hydrocarbon exploration ended in 1999. Notable faunae include deer, muskrats, otters, geese, and numerous other species of birds. No hunting or fishing is currently allowed in the Preserve (National Audubon Society, n.d.). |
| Rockefeller Wildlife Refuge and Game Preserve | See description under Cameron Parish. |
| State Wildlife Refuge | State Wildlife Refuge is a 13,000-acre tract owned by the State of Louisiana. Located on the southwest shore of Vermilion Bay, the focus of the refuge is on natural resource conservation. The refuge is an important waterfowl wintering area and serves as habitat for numerous species of shorebirds, wading birds, alligators, shrimp, fish, and crabs. Mammals such as raccoons, muskrats, nutria, mink, and deer are common as well (Louisiana Department of Wildlife and Fisheries, n.d. - b). |
| Iberia Parish | |
| Shell Key National Wildlife Refuge | Shell Keys National Wildlife Refuge has supported large-but-limited colonies of nesting seabirds. Because of erosion from hurricanes and other storms only one islet, composed almost entirely of seashells, remains. Birds known to nest here include royal terns, sandwich terns, black skimmers and laughing gulls. In addition, the islet is used as a loafing area by white pelicans, brown pelicans, terns and gulls. Storms have eroded the island to such an extent that no known nesting has occurred since 1992 (USFWS, n.d. - c). |
| Marsh Island Wildlife Refuge | Marsh Island is close to 71,000 acres; it currently measures approximately 20 miles east to west and 11 miles north to south. Habitat on this refuge is mainly brackish to intermediate marsh and flat, with very few remaining trees. Marsh Island is an extremely important refuge as it supports a wide array of animal species throughout the year. The island serves as crucial wintering habitat to numerous waterfowl, wading and shorebirds, and birds of prey. This refuge also serves as essential habitat for commercially important fish species, as well as alligators and furbearers. In the Vermilion Bay area, much of the recreational and commercial harvests of shrimp and blue crab depend on the nursery habitats provided by Marsh Island (Louisiana Department of Wildlife and Fisheries, n.d. - c). |
| Terrebonne Parish | |
| Isle Dernieres Barrier Islands Refuge | This refuge is made up of three barrier islands offshore of Terrebonne Parish: Wine Island, Whiskey Island, and Raccoon Island, for a total of approximately 630 acres. The primary management goal of the refuge is to provide and protect habitat for nesting waterbirds. Raccoon Island is one of the most important waterbird nesting sites on the Gulf coast (Louisiana Department of Wildlife and Fisheries, n.d. - d). |
| Mandalay NWR | Mandalay NWR was established in 1996 as 4,419 acres of freshwater marsh and cypress-tupelo swamp. Access to the refuge is by boat only. Popular activities in the refuge include wildlife observation, boating, fishing, and hunting. The refuge proves important habitat for wintering waterfowl of the Mississippi flyway. Other notable wildlife includes ducks, white tailed deer, alligators, and numerous bird species, including herons, egrets, and eagles (USFWS, n.d. - d). |

Table 1. (Continued).

| Wildlife Refuge, Wilderness Area, State or National Park | Resource Description |
|---|---|
| Point-aux-Chenes Wildlife Management Area (WMA) | Point-aux-Chenes WMA is a 35,000-acre marshland owned and operated by the Louisiana Department of Wildlife and Fisheries. Access to the WMA typically is limited to boats as there are no roads through the marshland. Notable game species present in the WMA include waterfowl, deer, rabbit, squirrels, rails, gallinules, and snipe. Both saltwater and freshwater fishing in the WMA is considered excellent due to the nearby Timbalier and Terrebonne Bay watersheds. Annual lotteries are held by the Louisiana Department of Wildlife and Fisheries for a waterfowl hunt exclusively for physically challenged hunters and a deer hunt for youth (Louisiana Department of Wildlife and Fisheries, n.d. - e). |

# 3 Consistency Certification

The analysis indicates that bp's DOCD for KC 292 and KC 293 is consistent with the enforceable policies of the LCRP according to the guidelines provided by the LCRP. Routine operations will have limited environmental impacts in the immediate vicinity of the drilling and installation activities. Land-based support activities will originate from Louisiana.

In the event of an accidental spill, bp will implement the measures of its ROSRP, which details plans and procedures for containment, recovery, and removal of an oil spill. This project is expected to conform to existing regulatory requirements. The DOCD describes the project and related activities, and the EIA analyzes potential environmental impacts from an unplanned release. The intent and requirements of enforceable Louisiana Statutes have been considered and discussed as well as other information requirements of Louisiana. A Coastal Zone Management Act consistency certification according to 16 U.S.C. 1456(c)(3)(B) and 15 CFR 930.76(c) for Louisiana is provided on the cover page.

# 4 References

Baton Rouge Audubon Society. 2022. Peveto Woods Sanctuary. http://www.braudubon.org/conservation/sanctuaries.

Ji, Z.-G., W.R. Johnson, C.F. Marshall, and E.M. Lear. 2004. Oil-Spill Risk Analysis: Contingency Planning Statistics for Gulf of Mexico OCS Activities. U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region. New Orleans, LA. OCS Report MMS 2004-026. 62 pp.

Louisiana Department of Wildlife and Fisheries. n.d. - a. Rockefeller Wildlife Refuge and Game Preserve. http://www.wlf.louisiana.gov/refuge/rockefeller-wildlife-refuge.

Louisiana Department of Wildlife and Fisheries. n.d - b. State Wildlife Refuge. https://www.wlf.louisiana.gov/page/state-wildlife-refuge.

Louisiana Department of Wildlife and Fisheries. n.d. - c. Marsh Island Wildlife Refuge WMA. https://www.wlf.louisiana.gov/page/marsh-island-refuge

Louisiana Department of Wildlife and Fisheries. n.d. - d. Isle Dernieres Barrier Islands Refuge. https://www.wlf.louisiana.gov/page/isle-dernieres-barrier-islands-refuge.

Louisiana Department of Wildlife and Fisheries. n.d. - e. Point-aux-Chenes WMA. https://www.wlf.louisiana.gov/page/pointeauxchenes.

National Audubon Society. n.d. Paul J. Rainey Wildlife Sanctuary. http://la.audubon.org/conversation/paul-j-rainey-wildlife-sanctuary.

U.S. Fish and Wildlife Service. n.d. - a. Lacassine National Wildlife Refuge. https://www.fws.gov/refuge/Lacassine/.

U.S. Fish and Wildlife Service. n.d. - b. Sabine National Wildlife Refuge. https://www.fws.gov/refuge/sabine/.

U.S. Fish and Wildlife Service. n.d. - c. Shell Key National Wildlife Refuge. https://www.fws.gov/refuge/shell-key

U.S. Fish and Wildlife Service. n.d. - d. Mandalay National Wildlife Refuge. https://www.fws.gov/refuge/mandalay.

# Coastal Zone Management Consistency Certification
# State of Texas

Initial Development Operations Coordination Document (DOCD)
Type of OCS Plan

Keathley Canyon Blocks 292 and 293
Area and Block

OCS-G 25792 and Expired
Lease Numbers

The proposed activities described in detail in this OCS Plan comply with Texas's approved Coastal Management Program and will be conducted in a manner consistent with such Program.

BP Exploration & Production Inc.
Lessee or Operator

Betsy Cleland
Certifying Official

02/05/2025
Date

# Evaluation of Consistency with the Enforceable Policies of the Texas Coastal Management Program

## 1 Background

BP Exploration & Production Inc. (bp) is submitting an Initial Development Operations Coordination Document (DOCD) for Keathley Canyon (KC) Blocks 292 (KC 292) and 293 (KC 293), Gulf of Mexico, Outer Continental Shelf (OCS)-G-25792 (for KC 292). The lease for KC 293 is expired. Under this DOCD, bp proposes to drill six wells at two drill centers (DC1 and DC2), install a semi-submersible floating production unit (FPU) with 12 mooring lines, and associated subsea infrastructure.

This document evaluates bp's DOCD for any reasonably foreseeable coastal effects on the land, water uses, or natural resources of the coastal zone of Texas, and evaluates the consistency of bp's DOCD with the enforceable policies of the Texas Coastal Management Program (CMP). The analysis, compliant with the Coastal Zone Management Act, is submitted pursuant to 15 Code of Federal Regulations (CFR) 930.76 and is supported by documentation provided in the Environmental Impact Analysis (EIA). The EIA provides an environmental impacts analysis for the drilling, FPU installation, and subsea installation activities based on the locations in KC 292 and KC 293 and is included in DOCD Appendix I. The EIA was prepared in accordance with applicable regulations, including 30 CFR 550.242 and 550.261 as well as Notice to Lessees and Operators (NTL) 2008-G04, extended by NTL BOEM 2015-N02, and BOEM 2015-N01.

The proposed activities will be conducted in accordance with Bureau of Ocean Energy Management (BOEM), Bureau of Safety and Environmental Enforcement (BSEE), and U.S. Environmental Protection Agency (EPA) regulations, applicable NTLs, conditions in the approved permits, and lease stipulations. Required federal permits will be obtained, and activities are expected to be conducted in compliance with such regulations, NTLs, conditions, and stipulations.

The proposed activities will occur in Federal OCS waters, approximately 215 statute miles (346 km) from the nearest Texas shoreline**.** A dynamic positioning (DP) drillship is anticipated to be on site for approximately 125 days per well for well drilling and 75 days for completion activities. Installation of the FPU and subsea infrastructure will be accomplished with a DP installation vessel. The installation of the proposed FPU and subsea equipment is estimated to be conducted between 2026 and 2027 with production commencing in 2028 and continuing until approximately 2053. There are 12 mooring anchors associated with this plan.

Following construction of the FPU at a shipyard (most likely in Asia), it will be transported to Corpus Christi, Texas for final preparations prior to being towed to the project location. Corpus Christi is located approximately 308 statute miles (496 km) from the project area.. No new expansion of facilities or personnel for shorebases is anticipated to result from this exploration project. No significant impacts on the State of Texas are expected from routine activities as described in bp's DOCD.

Spill response-related activities for the proposed activities under bp's DOCD are governed by the bp Regional Oil Spill Response Plan (ROSRP) filed on behalf of several affiliated companies, including BP Exploration & Production Inc. (Operator No. 02481). The ROSRP was confirmed in compliance and approved by BSEE on 6 November 2023. bp (Operator No. 02481) has demonstrated oil spill financial

responsibility for the facilities proposed in the DOCD, according to 30 CFR Part 553 and NTL No. 2008-N05, "Guidelines for Oil Spill Financial Responsibility for Covered Facilities."

As discussed in Section A.9.2 of the EIA (Large Oil Spill [Worst Case Discharge]), the trajectory of a hypothetical spill in KC 292 and KC 293, projected using information in the 30-day Oil Spill Risk Analysis model for the Gulf of Mexico (see Ji et al., 2004), indicates there is up to a 3% conditional probability of a spill contacting the Texas shoreline within 30 days of a spill. Using Launch Point W026 (as indicated in Ji et al., 2004), the model predicts potential shoreline contact within 30 days of a spill ranging from Cameron County, Texas to Terrebonne Parish, Louisiana.

# 2 Texas Coastal Management Program Guidelines

Pursuant to the Coastal Coordination Act of 1991 (33 Tex. Nat. Res. Code Ann §201 et seq.), as amended by HB 3226 (1995), the Texas Coastal Coordination Council (CCC) has created a uniform set of coastal goals and polices to implement the Texas CMP. The CMP goals and policies reflect the state's priorities in balancing economic development with resource protection and provide consistent guidelines for coordinated management of the coast. The goals of the CMP guide the interpretation and implementation of the program.

The CMP's enforceable policies are detailed in 31 TAC §§26.15 - 26.34. They are uniform, established, enforceable policies used by networked agencies to guide government decision-making that may affect Coastal Natural Research Areas (CNRAs). These policies do not impose or create new requirements beyond the existing legal authority of any state agency or local government and the policies may not be applied in a manner that would result in a taking, damage, or destruction of property without adequate compensation. Enforceable policies are central to implementing federal consistency. All relevant enforceable policies identified in the CMP that are related to OCS Plans were considered in certifying consistency for Texas.

## §26.15 Policy for Major Actions

(a) *For purposes of this section, "major action" means an individual agency or subdivision action listed in §29.11 of this title (relating to Actions and Rules Subject to the Coastal Management Program), §30.12 of this title (relating to Federal Listed Activities Subject to CZMA Review), or §29.60 of this title (relating to Local Government Actions Subject to the Coastal Management Program), relating to an activity for which a federal environmental impact statement under the National Environmental Policy Act, 42 United States Code Annotated, §4321, et seq is required.*

(b) *Prior to taking a major action, the agencies and subdivisions having jurisdiction over the activity shall meet and coordinate their major actions relating to the activity. The agencies and subdivisions shall, to the greatest extent practicable, consider the cumulative and secondary adverse effects, as described in the federal environmental impact assessment process, of each major action relating to the activity.*

Addressed in DOCD Appendix I.

(c) *No agency or subdivision shall take a major action that is inconsistent with the goals and policies of this chapter. In addition, an agency or subdivision shall avoid and otherwise minimize the cumulative adverse effects to coastal natural resource areas of each of its major actions relating to the activity.*

bp expects to comply with all applicable guidelines. Adverse effects and mitigation measures are addressed in DOCD Appendix I.

**§26.16 Policies for Construction of Electric Generating and Transmission Facilities**

Not applicable.

**§26.17 Policies for Construction, Operation, and Maintenance of Oil and Gas Exploration and Production Facilities**

*(a) Oil and gas exploration and production on submerged lands shall comply with the policies in this section.*

*(1) In or near critical areas, facilities shall be located and operated and geophysical and other operations shall be located and conducted in such a manner as to avoid and otherwise minimize adverse effects, including those from the disposal of solid waste and disturbance resulting from the operation of vessels and wheeled or tracked vehicles, whether on areas under lease, easement, or permit or on or across access routes thereto. Where practicable, buffer zones for critical areas shall be established and directional drilling or other methods to avoid disturbance, such as pooling or unitization, shall be employed.*

Addressed in DOCD Sections 7 and 8; Appendix I.

*(2) Lessees, easement holders, and permittees shall construct facilities in a manner that avoids impoundment or draining of coastal wetlands, if practicable, and shall mitigate any adverse effects on coastal wetlands impounded or drained in accordance with the sequencing requirements in this section.*

Not applicable.

*(3) Upon completion or cessation of operations, lessees, easement holders, and permittees shall remove facilities and restore any significantly degraded areas to pre-project conditions as closely as practicable, unless facilities can be used for maintenance or enhancement of CNRAs or unless restoration activities would further degrade CNRAs.*

Not applicable.

*(b) To the extent applicable to the public beach, the policies in this section are supplemental to any further restrictions or requirements relating to the beach access and use rights of the public.*

Not applicable.

*(c) The GLO and SLB shall comply with the policies in this section when approving oil, gas, and other mineral lease plans of operation and granting surface leases, easements, and permits and adopting rules under the Texas Natural Resources Code, Chapters 32, 33 and 51 - 53, governing oil and gas exploration and production on submerged lands.*

Not applicable.

**§26.18 Policies for Discharges of Wastewater and Disposal of Waste from Oil and Gas Exploration and Production Activities**

*(a) Disposal of oil and gas waste in the coastal zone shall comply with the policies in this section.*

*(1) No new commercial oil and gas waste disposal pit shall be located in any CNRA.*

Not applicable.

*(2) Oil and gas waste disposal pits shall be designed to prevent releases of pollutants that adversely affect coastal waters or critical areas.*

Not applicable.

*(b) Discharge of oil and gas exploration and production wastewater in the coastal zone shall comply with the following policies.*

Not applicable.

*(1) All discharges shall comply with all provisions of surface water quality standards established by the TCEQ under §26.21 of this title (relating to Policies for Discharge of Municipal and Industrial Wastewater to Coastal Waters).*

Addressed in DOCD Section 7 and Appendix I.

*(2) To the greatest extent practicable, new wastewater outfalls shall be located where the discharge will not adversely affect critical areas. Existing wastewater outfalls that adversely affect critical areas shall be either discontinued or relocated so as not to adversely affect critical areas within two years of the effective date of this section.*

Not applicable.

*(3) The RRC shall notify the TCEQ and the TPWD upon receipt of an application for a new permit to discharge produced waters to waters under tidal influence. In determining compliance with the policies in this section, the RRC shall consider the effects of salinity from the discharge.*

Not applicable.

*(c) The RRC shall comply with the policies in this section when issuing permits and adopting rules under the Texas Natural Resources Code, Chapter 91, for oil and gas waste, and under Texas Water Code, Chapter 26, and the Texas Natural Resources Code, Chapter 91, for oil and gas wastewater discharges.*

Not applicable.

**§26.19 Policies for Construction and Operation of Solid Waste Treatment, Storage, and Disposal Facilities**

Not applicable.

**§26.20 Policies for Prevention, Response and Remediation of Oil Spills**

(a) *The GLO regulations governing prevention of, response to and remediation of coastal oil spills shall provide for measures to prevent coastal oil spills and to ensure adequate response and removal actions. The GLO regulations for certification of vessels and facilities that handle oil shall be designed to ensure that vessels and facilities are capable of prompt response and adequate removal of unauthorized discharges of oil. The GLO regulations adopted pursuant to the Oil Spill Prevention and Response Act (OSPRA), Texas Natural Resources Code, Chapter 40, shall be consistent with the State Coastal Discharge Contingency Plan adopted pursuant to OSPRA; and the National Contingency Plan adopted pursuant to the Federal Water Pollution Control Act, 33 United States Code Annotated, Chapter 26.*

Addressed in DOCD Section 9 and Appendix I.

(b) *Natural Resource Damage Assessment. GLO rules under OSPRA governing the assessment of damages to natural resources injured as the result of an unauthorized discharge of oil into coastal waters shall provide for reasonable and rational procedures for assessing damages and shall take into account the unique circumstances of the spill incident. The costs of assessing the damages shall not be disproportionate to the value of the injured resources. Plans for the restoration, rehabilitation, replacement or acquisition of equivalent resources shall provide for participation by the public and shall be designed to promote the restoration of the injured resources with all deliberate speed. The GLO rules shall be consistent with other state rules and policies and with the CMP goals and policies.*

bp acknowledges GLO's rules and expects to comply with all applicable guidelines.

**§26.21 Policies for Discharge of Municipal and Industrial Wastewater to Coastal Waters**

(a) *TCEQ rules shall:*

(1) *comply with the requirements of the Clean Water Act, 33 United States Code Annotated, §§1251 et seq, and implementing regulations at Code of Federal Regulations, Title 40, which include establishing surface water quality standards in order to protect designated uses of coastal waters, including the protection of uses for water supply, recreational purposes, and propagation and protection of terrestrial and aquatic life, and establishing water-quality-based effluent limits, including toxicity monitoring and specific toxicity or chemical limits as necessary to protect designated uses of coastal waters;*

(2) *provide for the assessment of water quality on a coastal watershed basis as required by the Texas Water Code, §26.0135(d);*

(3) *to the greatest extent practicable, provide that all permits for the discharge of wastewater within a given watershed or region of a single watershed contain the same expiration date in order to evaluate the combined effects of permitted discharges on water quality within that watershed or region;*

(4) *identify and rank waters that are not attaining designated uses and establish total maximum daily pollutant loads in accordance with those rankings using scientifically valid models*

*calibrated and validated with monitored data and with public input from affected stakeholders; and*

*(5) require that increases in pollutant loads to coastal waters shall not:*

*(A) impair designated uses of coastal waters; or*

*(B) result in degradation of coastal waters that exceed fishable/swimmable quality except in cases where lowering coastal water quality is necessary for important economic or social development.*

*(b) Discharge of municipal and industrial wastewater in the coastal zone shall comply with the following policies.*

*(1) Discharges shall comply with water-quality-based effluent limits.*

*(2) Discharges that increase pollutant loadings to coastal waters shall not impair designated uses of coastal waters and shall not significantly degrade coastal water quality unless necessary for important economic or social development.*

*(3) To the greatest extent practicable, new wastewater outfalls shall be located where they will not adversely affect critical areas.*

*(c) The TCEQ shall comply with the policies in this section when adopting rules and authorizing wastewater discharges under Texas Water Code, Chapter 26.*

*(d) The TCEQ shall consult with the Texas Department of State Health Services when reviewing permit applications for wastewater discharges that may significantly adversely affect oyster reefs.*

Addressed in DOCD Sections 7, 8, and 9; Appendix I.

The project duration is anticipated to be approximately 125 days per well for well drilling and 75 days for completion activities. The installation of the proposed FPU and subsea equipment is estimated to be conducted between 2026 and 2027 with production commencing in 2028 and continuing until approximately 2053. The project area is 215 statute miles (346 km) from the nearest Texas shoreline.

**§26.22 Policies for Nonpoint Source (NPS) Water Pollution**

*(a) State agencies and subdivisions with authority to manage NPS pollution shall cooperate in the development and implementation of a coordinated program to reduce NPS pollution in order to restore and protect coastal waters.*

*(b) In an area that the TSSWCB identifies as having or having the potential to develop agricultural or silvicultural NPS water quality problems or an area within the coastal zone, the TSSWCB shall establish a water quality management plan certification program that provides, through the local soil and water conservation district, for the development, supervision, and monitoring of voluntary individual water quality management plans for agricultural and silvicultural lands. Each plan must be developed, maintained, and implemented under rules and criteria adopted by*

*the TSSWCB and discharges under such a plan may not cause a violation of state water quality standards established by the TCEQ. The TSSWCB's rules shall certify a plan that satisfies the TSSWCB rules and criteria and discharges which do not cause a violation of state water quality standards established by the TCEQ. This policy is not intended, nor shall it be interpreted, to require the TSSWCB to establish non-voluntary requirements for the development, maintenance, or implementation of individual water quality management plans.*

*(c) TCEQ rules under Texas Health and Safety Code, Chapter 366, governing on-site sewage disposal systems, and TCEQ rules under Texas Water Code, Chapter 26, Subchapter I, governing underground storage tanks, shall require that on-site disposal systems and underground storage tanks be located, designed, operated, inspected, and maintained so as to prevent releases of pollutants that may adversely affect coastal waters.*

*(d) This policy shall not be interpreted or applied so as to require that either a National Pollution Discharge Elimination System (NPDES) permit for stormwater discharges issued under the Clean Water Act, §402(p), or an NPDES permit for a concentrated animal feeding operation, requiring no discharge up to and including a 25-year, 24-hour frequency storm, provide additional NPS pollution control measures in addition to those required in the permit.*

Addressed in DOCD Sections 7, 8, and 9; Appendix I.

The project duration is anticipated to be approximately 125 days per well for well drilling and 75 days for completion activities. The installation of the proposed FPU and subsea equipment is estimated to be conducted between 2026 and 2027 with production commencing in 2028 and continuing until approximately 2053. The project area is 215 statute miles (346 km) from the nearest Texas shoreline.

**§26.23 Policies for Development in Critical Areas**

Not applicable.

**§26.24 Policies for Construction of Waterfront Facilities and Other Structures on Submerged Lands**

Not applicable.

**§26.25 Policies for Dredging and Dredged Material Disposal and Placement**

Not applicable.

**§26.26 Policies for Construction in the Beach/Dune System**

Not applicable.

**§26.27 Policies for Development in Coastal Hazard Areas**

Not applicable.

**§26.28 Policies for Development Within Coastal Barrier Resource System Units and Otherwise Protected Areas on Coastal Barriers**

Not applicable.

**§26.29 Policies for Development in State Parks, Wildlife Management Areas or Preserves**

Not applicable.

**§26.30 Policies for Alteration of Coastal Historic Areas**

Not applicable.

**§26.31 Policies for Transportation Projects**

Not applicable.

**§26.32 Policies for Emission of Air Pollutants**

*TCEQ rules under Texas Health and Safety Code, Chapter 382, governing emissions of air pollutants, shall comply with regulations at Code of Federal Regulations, Title 40, adopted pursuant to the Clean Air Act, 42 United States Code Annotated, §§7401, et seq, to protect and enhance air quality in the coastal area so as to protect CNRAs and promote the public health, safety, and welfare.*

Addressed in DOCD Section 8 and Appendix I.

The project duration is anticipated to be approximately 125 days per well for well drilling and 75 days for completion activities. The installation of the proposed FPU and subsea equipment is estimated to be conducted between 2026 and 2027 with production commencing in 2028 and continuing until approximately 2053. The project area is 215 statute miles (346 km) from the nearest Texas shoreline.

**§26.33 Policies for Appropriations of Water**

Not applicable.

**§26.34 Policies for Levee and Flood Control Projects**

Not applicable.

# 3 Consistency Certification

The analysis indicates that bp's DOCD for KC 292 and KC 293 is consistent with the enforceable policies of the Texas CMP. Routine operations will have limited environmental impacts in the immediate vicinity of the drilling and installation activities. Land-based support activities will originate from Texas, Alabama, and Louisiana. Land-based activities from Texas will include final preparations of the FPU in Corpus Christi, Texas prior to being towed to the project location.

In the event of an accidental spill, bp will implement the measures of its ROSRP, which details plans and procedures for containment, recovery, and removal of an oil spill. This project is expected to conform to existing regulatory requirements. The DOCD describes the project and related activities, and the EIA analyzes potential environmental impacts from an unplanned release. The intent and requirements of all enforceable Texas policies have been considered and discussed as well as other information requirements of Texas. A Coastal Zone Management Act consistency certification according to 16 U.S. Code 1456(c)(3)(B) and 15 CFR 930.76(c) for Texas is provided on the cover page.

# 4 References

Ji, Z.-G., W.R. Johnson, C.F. Marshall, and E.M. Lear. 2004. Oil-Spill Risk Analysis: Contingency Planning Statistics for Gulf of Mexico OCS Activities. U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region. New Orleans, LA. OCS Report MMS 2004-026. 62 pp.

# Introduction

BP Exploration & Production Inc. (bp) is submitting an Initial Development Operations Coordination Document (DOCD) for Keathley Canyon (KC) Blocks 292 (KC 292) and 293 (KC 293), Gulf of America, Outer Continental Shelf (OCS)-G-25792 (for KC 292). The lease for KC 293 is expired[1]. Under this DOCD, bp proposes to drill six wells at two drill centers (DC1 and DC2), install a semi-submersible floating production unit (FPU) with 12 mooring lines, and install associated subsea infrastructure, including manifolds and pipelines. If applicable for the proposed project, bp expects to comply with the Final Rule presented in 89 FR 71076 regarding the use of new or unusual technology.

The project area is located within the Central Gulf of America OCS Planning Area, approximately 186 statute miles (299 kilometers [km]) from the nearest shoreline (Isles Dernières, Louisiana), 216 statute miles (348 km) from the regional onshore support base (Port Fourchon, Louisiana), and 225 statute miles (410 km) from the helicopter base at Houma, Louisiana (**Figure 1**). The FPU will be mobilized from Corpus Christi, Texas, approximately 308 miles (496 km) from the project area. Subsea logistics support will at least partially be from Mobile, Alabama, approximately 386 mi (621 km) from the project area. The water depth at the proposed project location is approximately 1,753 to 1,882 m (5,750 to 6,175 ft).

A dynamically positioned (DP) drillship is anticipated to be on site for approximately 125 days per well for well drilling and 75 days for completion activities. Installation of the FPU and subsea infrastructure will be accomplished with a DP installation vessel. The installation of the proposed FPU and subsea equipment is estimated to be conducted between 2026 and 2027 with production commencing in 2028 and continuing until approximately 2053. There are 12 mooring anchors associated with this plan.

The Environmental Impact Analysis (EIA) for this DOCD was prepared for submittal to the Bureau of Ocean Energy Management (BOEM) in accordance with applicable regulations, including Title 30 Code of Federal Regulations (CFR) section (§) 550.242 and § 550.261. The EIA is a project- and site-specific analysis of the potential environmental impacts of bp's planned activities. The EIA complies with guidance provided in existing Notices to Lessees and Operators (NTLs) issued by BOEM and its predecessors, Minerals Management Service (MMS) and Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE), including NTLs 2008-G04 (extended by 2015-N02) and 2015-N01. Potential impacts have been analyzed at a broader level in the 2024--2029 Programmatic Environmental Impact Statement (EIS) for the OCS Oil and Gas Leasing Program (BOEM, 2023a), the 2025 NMFS Biological Opinion (NMFS, 2025a), and in multi-sale EISs for the Western and Central Gulf of America Planning Areas (BOEM, 2012a,b; 2013; 2014a; 2015; 2016b; 2017; 2023b). The most recent multi-sale EIS contains updated environmental baseline information in light of the Macondo (*Deepwater Horizon*) incident and addresses potential impacts of a catastrophic spill (BOEM, 2012a,b; 2013; 2014a; 2015; 2016b; 2017). The National Marine Fisheries Service (NMFS) Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of America assesses impacts and requires additional mitigation measures for protected species (NMFS, 2025a). The analyses and relevant information from those documents are incorporated in this EIA by reference.

[1] The lease for KC 293 has expired and a Right of Use and Easement will be submitted under separate cover for activities proposed on Lease OCS G26739, KC 293.

first the n-alkanes and then the light aromatics from the oil. Other petroleum components are biodegraded more slowly (National Research Council, 2003a). Photo-oxidation attacks mainly the medium and high molecular weight PAHs in the oil on the water surface (Prince, 2014).

Spill Response. All proposed activities and facilities in this DOCD will be covered by the Gulf of Mexico ROSRP filed by BP America Inc. (Operator No. 21372) under cover letter dated 7 October 2024 on behalf of several companies listed in the plan including BP Exploration & Production Inc. (Operator No. 02481) and approved by BSEE on 10 January 2025.

The bp ROSRP includes information about enhanced measures for responding to a spill in open water, near shore spill response, and shoreline spill response based on lessons learned from the *Deepwater Horizon* oil spill. In compliance with the requirements of 30 CFR Part 254 and related NTLs, bp's ROSRP includes the following:

- Provisions to maintain access to a supply of dispersant and fire boom for use in the event of an uncontrolled, long-term blowout, for the length of time required to drill a relief well;
- Contingencies for maintaining an ongoing response for the length of time required to drill a relief well;
- A description of the measures and equipment necessary to maximize the effectiveness and efficiency of the response equipment used to recover the discharge on the water's surface. The description will include methods to increase encounter rates, the use of vessel tracking, and the use of remote sensing technologies;
- Information on remote sensing technology and equipment to be used to track oil slicks, including oil spill detection systems and remote thickness detection systems (such as X-band/infrared systems);
- Information pertaining to the use of vessel tracking systems and communication systems between response vessels and spotter personnel;
- A shoreline protection strategy that is consistent with applicable area contingency plans; and
- For operations using a subsea BOP or a surface BOP on a floating facility, a discussion regarding strategies and plans related to source abatement and control for blowouts from drilling.

As a member of the Marine Spill Response Corporation, Clean Gulf Associates, and a client of the National Response Corporation, bp would utilize oil spill response organization personnel and equipment in the event of an oil spill in the Gulf of America. Primary response equipment for the activation of bp's ROSRP is located in Houma, Louisiana; Lake Charles, Louisiana; Galveston, Texas; Pensacola, Florida; Mobile, Alabama; Pascagoula, Mississippi; Ft. Jackson, Louisiana; Venice, Louisiana; and Corpus Christi, Texas. The preplanned staging area for this DOCD is Port Fourchon, Louisiana.

See DOCD Appendix G for a detailed description of bp's ROSRP and site-specific responses for an oil spill associated with this project.

# B. Affected Environment

The project area is in the central Gulf of America, approximately 186 statute miles (299 km) from the nearest shoreline (Isles Dernières, Louisiana), 216 statute miles (348 km) from the onshore support base at Port Fourchon, Louisiana, and 225 statute miles (410 km) from the helicopter base at Houma, Louisiana (**Figure 1**). The FPU will be mobilized from Corpus Christi, Texas, approximately 308 miles (496 km) from the project area. Subsea logistics support will at least partially be from Mobile, Alabama, approximately 386 mi (621 km) from the project area. The water depth at the location of the proposed activities ranges from approximately 1,753 to 1,882 m (5,750 to 6,175 ft) (**Figure 2**).

The seafloor in the vicinity of the proposed activities is expected to be composed of very soft to soft pelagic to hemipelagic clays, silts, and mud flow deposits, along with potential drill cuttings from well KC 292 #1 (bp, 2024a,b). Additional information on autonomous underwater vehicle interpretation of the seafloor sediments is provided in bp (2024a,b).

A detailed description of the regional affected environment, including meteorology, oceanography, geology, air and water quality, benthic communities, threatened and endangered species, biologically sensitive resources, archaeological resources, socioeconomic conditions, and other marine uses is provided in recent EISs (BOEM, 2012a; 2013; 2014a; 2015; 2016b; 2017, 2023a,b). These regional descriptions, applicable to KC 292 and KC 293, remain valid and are incorporated by reference. General background information is presented in the following sections, and brief descriptions of each potentially affected resource, including site-specific and new information if available, are presented in **Section C**.

### Impacts of Floating Production Unit and Vessel Presence, Marine Sound, and Lights

NMFS (2024, 2025a) lists Rice's whales in the functional hearing group of low frequency cetaceans (baleen whales), with an estimated hearing sensitivity from 7 Hz to 35 kHz. Noise produced by the FPU, installation vessels, drilling rig and project-associated vessels may be emitted at levels that could potentially disturb individual whales or mask the sounds animals would normally produce or hear. Sound associated with drilling activities is relatively low in intensity relative to impulsive sources such as airgun sound, and an individual animal's sound exposure would be transient. As discussed in **Section A.1**, an actively drilling rig may produce broadband (10 Hz to 10 kHz) SPL source levels ranging from approximately 180 to 190 dB re 1 µPa m (Hildebrand, 2005). Frequencies <1,000 Hz produced by the drilling operations are more likely to be perceived by low-frequency cetaceans, such as the Rice's whale.

NMFS (2024a) presents criteria that are used to determine physiological (i.e., auditory injury) thresholds for marine mammals. For low-frequency cetaceans, specifically the Rice's whale, permanent and temporary threshold shift onset from non-impulsive sources is estimated to occur at $SEL_{24h}$ of 197 dB re 1 $\mu Pa^2$ s and 177 re 1 $\mu Pa^2$ s, respectively. Given the non-impulsive nature of drilling sound and the estimate source levels, Rice's whales are unlikely to be exposed to noise above the PTS threshold. While sound during FPU, installation vessel, and drilling operations may exceed the TTS threshold, it is expected that, due to the relatively stationary nature of the FPU and drilling and construction vessels, Rice's whales would move away from the proposed operations area, reducing the duration that individuals are exposed to project-related underwater sound, further reducing the likelihood of auditory injuries being realized. Additionally, the project area is in the Central Gulf of America OCS Planning Area, approximately 186 statute miles (299 kilometers [km]) from the nearest shoreline in Louisiana in water depths ranging from approximately 1,753 to 1,882 m (5,750 to 6,175 ft) which is outside the main range identified for this species (88 FR 47453; NOAA Fisheries, 2023a) so it is unlikely this species will be exposed to FPU, installation vessel, and drilling sound associated with the project. Therefore, due to the short propagation distance of above-threshold $SEL_{24h,}$ the stationary nature of the proposed activites, and the low likelihood of encountering this species in the proejct area, it is not expected that any Rice's whales will receive exposure levels necessary for the onset of auditory threshold shifts.

Received SPL of 120 dB re 1 µPa from non-impulsive, continuous sources are considered high enough to elicit the onset of a behavioral reaction in some marine mammal species. The 120-dB isopleth may extend tens to hundreds of kilometers from the source depending on the propagation environment. However, exposure to SPL of 120 dB re 1 µPa does not alone equate to a behavioral response or a biological consequence; rather it represents the level at which onset of a behavioral response may occur that, more importantly, may not result in biologically significant responses (Southall et al., 2016; Ellison et al., 2012).

Drilling-related sound associated with this project may contribute to increases in the ambient sound environment of the region but are not expected to cause sound-related impacts to Rice's whales. FPU, installation vessels, and drilling rig lighting and presence are not expected to impact Rice's whales (BOEM, 2017).

**United States Department of the Interior**

BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT
Gulf of Mexico OCS Region
1201 Elmwood Park Boulevard
New Orleans, LA 70123-2394

In Reply Refer To: GE 1065A
eDWOP Submittal ID: 367171167

Mrs. Betsy Cleland
BP Exploration & Production Inc.
501 Westlake Park Blvd.
Houston, Texas 77079

| | | |
|---|---|---|
| Re: | Operator: | BP Exploration & Production Inc. |
| | Project: | Kaskida |
| | Unit: | Keathley Canyon (KC) Block 292 Unit (Kaskida Unit) |
| | Area/Block/Lease: | KC Block 246, OCS-G25789 |
| | | KC Block 247, OCS-G25790 |
| | | KC Block 290, OCS-G19544 |
| | | KC Block 291, OCS-G19545 |
| | | KC Block 292, OCS-G25792 |
| | | KC Block 335, OCS-G17603 |
| | | KC Block 336, OCS-G19555 |
| | Document: | Initial Conceptual Plan (Rev.1 December 1, 2023, Rev.2 January 19, 2024) |

Dear Mrs. Cleland:

On December 1, 2023, BP Exploration & Production Inc. (BP) transmitted for review the Initial Conceptual Plan (C Plan) via TIMS Web DWOP System for the Keathley Canyon (KC) Block 292 Unit (Kaskida Unit), Unit Agreement Number 754307002, Kaskida Project. Subsequently, BP submitted updates of the C Plan on January 19, 2024 due to BSEE Request for Information.

The proposed Project consists of developing the oil and gas reserves with a phased approach in approximately 5,600-6,200 feet water depth in Kaskida Unit. The subsea development will be tied back to a new Semi-submersible Floating Production Unit (FPU) to be located in KC Block 293. The proposed subsea development consists of six (6) subsea production wells, two (2) drill centers (DC), two (2) production manifolds, one (1) subsea booster pump connected to the new host platform via 9.625-inch wet insulated dual flowlines and steel catenary risers (SCR) system. Oil and Gas produced from the Kaskida field will be transported via export pipelines to shore in the regional US Gulf Coast. The wells will be controlled via an electro-hydraulic control system with one dynamic umbilical that carries all power, hydraulics, and chemicals to DC1 and then a static umbilical with same cross section will carry the services to DC2.

The estimated Shut-in Tubing Pressure (SITP) for the Kaskida Field is 14,927 psi, based upon PVT data from the K4 appraisal well. However, the design SITP includes a calculated bullhead margin of 1,682 psi

to account for kill operations on a shut in well. This results in a Design SITP of 16,609 psi at the wellhead and requires 20,000 psi rated working pressure equipment to for the Project. Therefore, in accordance with 30 CFR 250.804(b)(1), the Kaskida Project is considered as a High Pressure High Temperature (HPHT) Project. In accordance with 30 CFR 250.287 and 30 CFR 250.804(a), a DWOP must be submitted to address the non-conventional production or completion technology, including the use of subsurface safety valves and related equipment in a HPHT environment.

The HPHT equipment qualification and barrier technology for the Kaskida Field development is identified for four main modes of operations: Drilling, Completion, Production, and Intervention which further are categorized into systems, assemblies, component, or equipment. BP intends to follow the applicable sections of 30 CFR Part 250, NTL No. 2019-G02, and NTL No. 2019-G03 to submit the HP Equipment submittals for each 20K/HPHT System, in multiple parts, associated with the proposed concepts of the equipment design verification analysis and design validation testing, including the Independent Third Party (I3P) agent nomination package to perform the I3P verification.

The Kaskida 20K System and associated assemblies for each mode of operation are listed below. The detailed component or equipment list will be specified in each respective Equipment Conceptual Plans.

- Part 1 – Wellhead System (UA)
- Part 2 – Drilling System (DR)
- Part 3 – Well Control / MODU System (RG)
- Part 4 – Completions System (CW)
- Part 5 – Subsea Production System
- Part 6 – Umbilical, Risers & Flowlines
- Part 7 – Facility (Non-HPHT, not applicable)
- Part 8 – Intervention System (UR)
- Part 9 – Subsea Well Response System (WI)

BP is evaluating use of Managed Pressure Drilling (MPD) during drilling operations. The MPD system may be deployed with the 15k MODU, or the 20k MODU, or both. Unless the MPD system will be rated for HPHT Environments it is not considered New Technology. Non-HPHT MPD systems should be submitted for review under the appropriate district permit to BSEE Lafayette District Office for approval.

We have completed our review of this submittal and BSEE considers this Initial C Plan as '**Reviewed by BSEE**'. This letter provides BP guidance for the application and approval process for the Kaskida Project. Per 30 CFR 250.290, "You may not complete any production well or install the subsea wellhead and well safety control system (often called the tree) before BSEE has approved the Conceptual Plan. This letter is not a Conceptual Plan approval letter but an acknowledgement of BSEE Review. That is, BSEE reviewed BP's Initial C Plan and is providing the guidance for BP to complete the Conceptual Plan approval process.

This Initial C Plan letter does not address the HPHT equipment design, verification, or validation for the components that will be submitted separately in future. These future HPHT Equipment C Plans will be addressed separately, as they are submitted. If warranted, Conceptual Plan approval for the Kaskida Project will be granted only after all outstanding Site Specific HPHT Equipment C Plans, I3P Reports, and Well Design Reports have been marked "Reviewed" by BSEE. The approval of the Conceptual Plan does not imply any authority over permit approvals pertaining to pipeline, structure, facility, and production safety system, APDs, or APMs.

JEFFERY W. KITCHENS
ACTING DIRECTOR

ADEM

Alabama Department of Environmental Management
adem.alabama.gov
1400 Coliseum Blvd. 36110-2400 ▪ Post Office Box 301463
Montgomery, Alabama 36130-1463
(334) 271-7700 ▪ FAX (334) 271-7950

KAY IVEY
GOVERNOR

June 3, 2025

Leslie Wilson
Lead Regulatory Specialist
Gulf of America, OCS Region
Bureau of Ocean Energy Management
1201 Elmwood Park Boulevard
New Orleans, Louisiana 70123-2394

Betsy Cleland
Regulatory Lead
BP Exploration & Production Inc.
501 Westlake Park Boulevard
Houston, Texas 77079

RE: State of Alabama Coastal Consistency Concurrence
BP Exploration & Production Inc. - Initial Development Operations Coordination Document (DOCD)
OCS-G25792 Keathley Canyon Area Block 292 & OCS-G26739 (Expired) Keathley Canyon Area Block 293
BOEM Control No.: N-10256
Alabama Department of Environmental Management (ADEM) Tracking Code: ACAMP-2025-161-FC-OCS-BOEM

Dear Ms. Wilson and Ms. Cleland:

On May 1, 2025, the ADEM received certification that BP Exploration & Production Inc.'s proposal, referenced above, is consistent with the Alabama Coastal Area Management Program (ACAMP). Public noticing requirements under Title 15 C.F.R. §930.77 have been completed. Pursuant to Title 15 C.F.R. §930.78, by this letter the ADEM hereby notifies all that it **concurs** with the certification, conditional upon continued compliance with the ACAMP and the following conditions:

1. Pursuant to ADEM Admin. Code r.335-8-2-.01(1), to protect water quality all necessary permits are obtained from EPA for discharges into Federal Waters.

2. Pursuant to ADEM Admin. Code r.335-8-2-.01(1), to protect water quality discharges associated with this activity must not result in a violation of Water Quality Standards in state waters.

In addition to the comments above, please review the enclosed Geological Survey of Alabama comment that the project occurs in an area that may contain concentrations of chemosynthetic communities.

Contact the Mobile-Coastal office anytime with questions. Any correspondence related to this decision should be sent to the email inbox coastal@adem.alabama.gov. Always reference the ADEM tracking code located at the top of this document when corresponding.

Sincerely,

Anthony Scott Hughes, Chief
Field Operations Division

ASH/jsb/an

cc: BOEM | Nikki Charpentier - (Nicole.Charpentier@boem.gov)
BOEM | Laura Christensen – (Laura.Christensen@boem.gov)
BOEM | Leslie Wilson – (Leslie.Wilson@boem.gov)
Governor's Office | Casey Rogers – (Casey.Rogers@governor.alabama.gov)
GSA | Butch Gregory. - (bgregory@ogb.state.al.us)
DCNR.Coastal@dcnr.alabama.gov

File: CZCERT/2061

# *STATE OIL AND GAS BOARD OF ALABAMA*

***OIL AND GAS BOARD***
*Charles E. (Ward) Pearson, Chairman*
*Stephen P. French, Vice-Chairman*
*Jamie N. Ison, Member*
*Berry H. (Nick) Tew, Jr., Secretary*
*S. Marvin Rogers, General Counsel*

*420 Hackberry Lane*
*P.O. Box 869999*
*Tuscaloosa, Alabama 35486-6999*
*Phone (205)349-2852*
*Fax (205)349-2861*
*www.ogb.state.al.us*

***Berry H. (Nick) Tew, Jr.***
*Oil and Gas Supervisor*

May 28, 2025

Mr. J. Scott Brown, Chief
Mobile Field Office
ADEM, Coastal/Facility Section
3664 Dauphin Street, Suite B
Mobile, AL 36608

Re: BP Exploration & Production Inc.
2025-161
OCS Federal Waters Keathley Canyon Area Blocks 292 & 293
Initial DOCD

Dear Mr. Brown:

We have reviewed the above-captioned document and have the following comments on this material.

Under this proposed Initial DOCD, BP Exploration & Production Inc. proposes to drill six development wells. The proposed activities would occur in an area that may contain chemosynthetic communities. We believe that the Bureau of Ocean Energy Management should enforce any reasonable restrictions that are necessary to protect these unique and sensitive communities from any potential adverse impact due to the proposed oil and gas operations contained in the proposed Initial DOCD. Failure to institute proper and reasonable restrictions could result in irreparable damage to these fragile and biologically complex environments.

We appreciate the opportunity to review BP Exploration & Production Inc.'s Initial DOCD and look forward to safe, successful operations in the Federal waters off Alabama's coast.

Very truly yours,

Butch Gregory

Butch Gregory
Engineering Manager

**e-APPROVAL CHECKLIST**

| N-10256 and RUE G30441– Kaskida FPU, 2 Drill Centers & Drilling 6 development wells with 4 back ups | Yes | No | N/R |
|---|---|---|---|
| | | | |
| Description of activities Subsea Wells DC1 A, DC1 B, DC1 C, DC1 D, DC1 E, DC2 A, DC2 B, DC2 C, DC2 D and DC2 E with SHL and BHL in KC 292/OCS-G 25792; Drill Centers (DC 1 & DC 2) in KC 292; Kaskida FPU in KC 293 (RUE OCS-G 30441) with permanent anchors in KC 292, 293, 336 (G19555), and 337 (G37608). | X | | |
| Contact email included | X | | |
| **Miscellaneous** | | | |
| Designated Operator (from TIMS) of all leases or portions DES OPER/LESSEE of KC 292, 336 & 337 – NO Additional Lessees. KC 293 – unleased, RUE to be approved | X | | |
| If Right-of-Use and Easement is needed, is it approved? RUE G30441 & plan will be approved concurrently | X | | |
| Bonding OK (All necessary bonds received) GEN BONDING (ADEV) | X | | |
| Plans Checklist included (All items checked OK) | X | | |
| Any necessary enclosures attached | X | | |
| **Necessary Reviews Included** | | | |
| All external reviews (CZM, Governor, etc.) received without any concerns or else concerns have been resolved CZM is REQ'D - NMFS not Required | X | | |
| All necessary internal MMS reviews completed without any unresolved requests for additional info or required modification of plan | X | | |
| All mitigations from reviews included (If not, why not) | X | | |
| All reviews include mitigations as identified in review questions (No missing mits) | X | | |
| **Required Internal MMS Reviews Included** | | | |

| | Yes | No | N/R | EA Coord. Review | X | | |
|---|---|---|---|---|---|---|---|
| Geophysical MIT 14.01 | X | | X | NEPA (CER or EA) EA | X | | |
| Geological MIT 8.03 & 14.01 | X | | X | Air Quality NO MIT | X | | |
| Plan Completeness Review | X | | | Arch NO MIT | X | | |
| Plans OPA Review APPROVED OSRP on 8/8/2022 with 423,000 drilling and 118,000 production; OSRP non-reg. Update In Compliance 1/10/2025 (no change in WCD vols) | X | | | Chemo NO MIT | X | | |
| OPA WCD Verification Review BOEM ACCEPTS OPERATOR'S WCD drilling volume of 45,000 in plan. | X | | | Nepa Oil Spill Analysis | X | | |
| NTL 2010 N06 Pending Plan Review | X | | | Pinnacle | | | X |
| General Plan Review | X | | | Topo Feature | | | X |
| NEW TECHNOLOGY Review | | | X | "Large Source" Review | | | X |
| OSTS Existing Platform Notification | | | X | Artificial Reef | | | X |
| NO Pipelines w/in 500ft./ NO Anchor radii affect activities NO MIT | X | | | CZM Info Review | | | X |
| Development | X | | | Potentially Sensitive HRF | | | X |
| Unitization 754307002 | X | | | Flower Gardens NMS | | | X |
| Rate Control Notification | | | X | Marine Minerals Sand/Sediment | | | X |
| Supplemental Bonding Per RMOG/ORD even though lease has no addl lessee, oper. not on bankruptcy list, Wells will be assessed at APD submittal, No addl bonding req. at plan stage/approval, **Mit 20.04**; PA Liability $13,249,500 for G25792 | X | | | FWS Denver | | | X |
| Eglin AFB | | | X | OE FWS Class 1 Analysis | | | X |
| NAS Pensacola (Military) (Info only) | | | X | Water Quality NO MIT | X | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Affects MC 252 area/block | | | X | NMFS ESA MTT 28.001 and 28.12 | X | | |
| Affects Mexico Transboundary line | | | X | 30 CFR 250.285(c) FO Plans | | | X |

**Required State Reviews Included**

| | N/R | P/R | Concurred | Presumed | Objected |
|---|---|---|---|---|---|
| Texas CZM | | | X | | |
| Louisiana CZM | | | X | | |
| Louisiana Governor's Office | X | | | | |
| Mississippi CZM | X | | | | |
| Alabama CZM | | | X | | |
| Alabama Governor's Office | | | X | | |
| Florida CZM Mit | X | | | | |
| Florida Governor's Office | X | | | | |

N/R = Not required P/R = Pending review Wilson

www.nature.com/scientificreports

SCIENTIFIC REPORTS

OPEN

# The impact of the *Deepwater Horizon* blowout on historic shipwreck-associated sediment microbiomes in the northern Gulf of Mexico

Received: 2 October 2017
Accepted: 1 June 2018
Published online: 28 June 2018

**Leila J. Hamdan[1], Jennifer L. Salerno[2], Allen Reed[3], Samantha B. Joye[4] & Melanie Damour[5]**

**More than 2,000 historic shipwrecks spanning 500 years of history, rest on the Gulf of Mexico seafloor. Shipwrecks serve as artificial reefs and hotspots of biodiversity by providing hard substrate, something rare in deep ocean regions. The *Deepwater Horizon* (DWH) spill discharged crude oil into the deep Gulf. Because of physical, biological, and chemical interactions, DWH oil was deposited on the seafloor, where historic shipwrecks are present. This study examined sediment microbiomes at seven historic shipwrecks. Steel-hulled, World War II-era shipwrecks and wooden-hulled, 19th century shipwrecks within and outside of the surface oiled area and subsurface plume were examined. Analysis of 16S rRNA sequence libraries, sediment radiocarbon age data, sedimentation rates, and hydrocarbons revealed that the German U-boat *U*-166 and the wooden-hulled sailing vessel known as the Mardi Gras Wreck, both in the Mississippi Canyon leasing area, were exposed to deposited oil during a rapid sedimentation event. Impacts to shipwreck microbiomes included a significant increase in Piscirickettsiaceae-related sequences in surface sediments, and reduced biodiversity relative to unimpacted sites. This study is the first to address the impact of the spill on shipwreck-associated microbiomes, and to explore how shipwrecks themselves influence microbiome diversity in the deep sea.**

The *Deepwater Horizon* (DWH) spill of 2010 resulted in an uncontrolled release of 5 million barrels of oil[1]. Approximately 47 thousand barrels of the dispersants Corexit 9500 and 9527 were applied at the surface and the wellhead to break up slicks and retain oil below the surface in dispersed plumes[2]. The spill introduced oil and chemical dispersants into marine environments. Together, this caused a deep-water infusion of pollutants[3] that persisted for months. Discharged pollutants from the spill were deposited to the seabed, in association with residual dispersant and pelagic biomass, via marine oil snow across 8,400 $km^2$ [1,3–6].

An estimated 11–30% of oil from the DWH spill remains unaccounted for[4,7]. It is possible that the ‘missing oil’ was deposited on the seafloor or to coastal beaches and marshes where it remains difficult to track. The mechanisms for transfer of discharged oil to the seafloor was through interaction with suspended particulate organic matter and inorganic minerals in the water column[4,5], and through bacterio- and phytoplankton production of exopolymeric substances during oil degradation[3,5]. Both processes reflect the “marine oil snow sedimentation and flocculent accumulation” (MOSSFA) which efficiently transfers oil from the water column to the seabed. Oil transported to the seafloor via these mechanisms occurred during massive sedimentation events. Understanding the spatial deposition and longevity of oil on the seafloor remains an important challenge in understanding the long-term consequences of the spill.

Using data from the Natural Resource Damage Assessment (NRDA), Stout *et al.*[6] described a footprint of DWH spill-derived hydrocarbons across a 2280 $km^2$ area of seafloor in the Mississippi Canyon leasing area, a subset of the area noted above. The footprint was still evident in 2014. DWH-derived pollutants impacted fauna,

[1]University of Southern Mississippi, Ocean Springs, MS, 39564, USA. [2]George Mason University, Manassas, VA, 20110, USA. [3]U.S. Naval Research Laboratory, Stennis Space Center, Stennis, MS, 39529, USA. [4]University of Georgia, Athens, GA, 30602, USA. [5]Bureau of Ocean Energy Management, New Orleans, LA, 70123, USA. Correspondence and requests for materials should be addressed to L.J.H. (email: leila.hamdan@usm.edu)

SCIENTIFIC REPORTS

OPEN

# Thresholds in marsh resilience to the *Deepwater Horizon* oil spill

Brian R. Silliman[1], Philip M. Dixon[2], Cameron Wobus[3], Qiang He[1], Pedro Daleo[1,4], Brent B. Hughes[1,5], Matthew Rissing[3], Jonathan M. Willis[6] & Mark W. Hester[6]

Received: 22 April 2016
Accepted: 05 August 2016
Published: 28 September 2016

**Ecosystem boundary retreat due to human-induced pressure is a generally observed phenomenon. However, studies that document thresholds beyond which internal resistance mechanisms are overwhelmed are uncommon. Following the *Deepwater Horizon* (DWH) oil spill, field studies from a few sites suggested that oiling of salt marshes could lead to a biogeomorphic feedback where plant death resulted in increased marsh erosion. We tested for spatial generality of and thresholds in this effect across 103 salt marsh sites spanning ~430 kilometers of shoreline in coastal Louisiana, Alabama, and Mississippi, using data collected as part of the natural resource damage assessment (NRDA). Our analyses revealed a threshold for oil impacts on marsh edge erosion, with higher erosion rates occurring for ~1–2 years after the spill at sites with the highest amounts of plant stem oiling (90–100%). These results provide compelling evidence showing large-scale ecosystem loss following the *Deepwater Horizon* oil spill. More broadly, these findings provide rare empirical evidence identifying a geomorphologic threshold in the resistance of an ecosystem to increasing intensity of human-induced disturbance.**

Human-driven environmental changes such as global warming, pollution, overharvesting, and acidification have increased the amount and number of stressors ecosystems experience, leading to large declines in many marine, freshwater, and terrestrial communities[1,2]. The response of ecosystems to these stressors varies from strong resistance to drastic declines in habitat coverage to transformation into an alternate stable state[3–5]. In the southeastern United States, for example, the combination of extreme drought and intensified consumer grazing pressure has generated threshold levels of stress and subsequent die-off of large areas of marsh plant communities[6]. The system has recovered in most areas, however, and has not transitioned into an alternate stable state, most likely because powerful positive interactions and spatial processes facilitate plant recolonization of denuded tidal flats[7].

One key to conserving and protecting these threatened ecosystems is to identify and guard against the exceedance of ecosystem thresholds – the point at which a small change in an environmental stressor produces a cascading decline in ecosystem cover and health[8]. Although a significant body of theoretical and modeling evidence suggests that thresholds in ecosystem resistance to disturbance are likely to occur in many habitats[9], empirical data that link these inflection points to specific levels of large-scale disturbances are rare (but see ref. 10).

For many estuarine ecosystems, especially those governed by biogeomorphic feedbacks, habitat edges are the nexus for ecosystem growth and decline. Both biotic and abiotic stressors, such as consumer fronts[11] and wave stress[12], are typically concentrated at habitat edges, and these edges are often the primary point of habitat decline if the edge is in retreat[13,14]. In the Gulf of Mexico, for example, extremely rapid marsh loss (40 $km^2$ $yr^{-1}$ from 1985 to 2010)[15] is driven by the synergistic impacts of decreased sedimentation from land-use change and river channelization, subsidence-enhanced relative sea-level rise, and changes in hydrologic connectivity[16,17]. Marsh edge erosion rates are particularly high in these areas[18], raising concern as to how an already stressed system may respond to a major disturbance.

In the summer of 2010, oil released from the DWH disaster was found on more than 700 km of salt marsh shorelines across the Gulf of Mexico[19]. Given the microtidal regime of the Gulf, this oil was generally most

[1]Division of Marine Science and Conservation, Nicholas School of the Environment, Duke University, 135 Duke Marine Lab Road, Beaufort, NC 28516, USA. [2]Department of Statistics, Snedecor Hall, Iowa State University, Ames, IA 50011-1210, USA. [3]Abt Associates, 1881 Ninth Street, Suite 201, Boulder, CO 80302, USA. [4]Instituto de Investigaciones Marinas y Costeras (IIMyC), UNMDP, CONICET, CC1260 Correo Central, B7600WAG, Mar del Plata, Argentina. [5]Department of Ecology and Evolutionary Biology, University of California, Santa Cruz, 100 Shaffer Road, Santa Cruz, CA 96060, USA. [6]Institute for Coastal and Water Research, Department of Biology, University of Louisiana at Lafayette, Lafayette, LA 70504, USA. Correspondence and requests for materials should be addressed to B.R.S. (email: Brian.Silliman@Duke.edu)




**Figure 1. Map of all survey sites.** Figure created using ArcGIS, 10.3, (http://desktop.arcgis.com/en/arcmap/).

concentrated along the marsh edge, often visible as a black belt along the shoreline that was ~5–15 meters in width[3]. Oiling of marshes from the DWH spill thus created a concentrated disturbance on the ecosystem's already stressed edge. Field studies at a limited number of sites indicated that heavy levels of oiling led to elevated erosion rates, most likely because plant death resulted in decreased soil strength and reduced resistance to wave erosion[3,4,20,21]. A substantial amount of the marsh shoreline oiling, however, was characterized as light to intermediate[19], and little is known about the impact of oiling on marsh edge erosion across a range of oiling levels.

In this study, we examined the relationship between plant stem oiling and marsh erosion rates Gulf-wide to test for thresholds in the functional relationship between degree of plant oiling and erosion rates. We analyzed data collected for the Coastal Wetland Vegetation (CWV) survey as part of the NRDA process[22]. Data were collected across 103 sites (Fig. 1) across the states of Louisiana, Alabama, and Mississippi and spanning 5 categories of oiling defined by the percentage of stem height oiled (0%, 0.1–10%, 10.1–50%, 50.1–90% or 90.1–100%; here after, 0%, 0–10%, 10–50%, 50–90%, 90–100%). At each site, cumulative erosion was monitored based on field surveys of marsh retreat relative to a datum established in fall 2010 (Louisiana sites) or spring 2011 (Alabama and Mississippi sites) and remeasured in fall 2011, fall 2012 and fall 2013. As previous field experiments have shown that: (1) accelerated erosion rates are associated with belowground plant mortality[3], and (2) mortality of both aboveground[23] and belowground biomass[3,24] are pronounced at the heaviest oiling levels, our hypotheses were that erosion rates would be positively correlated with degree of plant oiling, and that this response might exhibit threshold behavior at the highest (90–100%) stem oiling level.

## Results

Analyzing all sites across the three states in spring 2011 and fall 2013 (total sample sizes ranged from 96 to 103 sites; see Methods), we detected differences in erosion rate among the stem oiling levels (Kruskal-Wallis; $p = 0.0021$). Specifically, the total erosion in marshes with 90–100% stem oiling was more than three times higher than in marshes with no stem oiling (Fig. 2A; Table S1A). When we accounted for potential confounding effects of variation in wave exposure among marsh sites, the mean erosion rate in the 90–100% stem oiling level was 1.4 m/yr higher than expected, while the mean erosion rates in the other four stem oiling levels were lower than expected (Fig. 2B; Table S1B). Examination of annualized erosion rates revealed that erosion at sites with the highest stem oiling levels was 3.4 m/yr larger than expected ($p = 0.027$) during the 2011–2012 survey period, but was indistinguishable from other oiling levels during 2012–2013 (Fig. 2C; Table S2).

We observed the same patterns when the analysis was restricted only to sites in Louisiana, which had a longer sampling period and comprised the majority of our study sites (see Methods). The mean cumulative (2010–2013) erosion rate in the 90–100% stem oiling level was 4.0 m/yr, significantly higher than mean erosion rates of 1.4 to 2.1 m/yr in the other oiling levels (Kruskal-Wallis; $p = 0.033$; Figure S1A). After adjustment for wave energy, the erosion rate in the 90–100% stem oiling level was 1.6 m/yr more than expected, but this difference was not statistically significant ($p = 0.13$). Using just the Louisiana sites, on a year-by-year basis, mean wave-adjusted erosion rates in the highest stem oiling level were 1.6 m/yr higher than expected from fall 2010–fall 2011 ($p = 0.040$; Figure S2, Table S4). For fall 2011–fall 2012, the difference was 3.0 m/yr ($p = 0.068$). By the third year of the study (fall 2012–fall 2013), erosion rates for the highest oiling level were no longer elevated relative to the other levels.

To evaluate whether accelerated erosion at high stem oiling sites was correlated with loss of belowground biomass at those sites, we compared total belowground biomass in unoiled vs heavily oiled sites for the fall 2010 sampling event. This sampling date in 2010 was ~5 months after the oiling occurred, but before heavily oiled marsh edges were lost to erosion and the marsh platform lowered to elevations where marsh plants drown[3,23]. In fall 2010, the mean total belowground biomass in the sites with the heaviest (90–100%) stem oiling was approximately 13,000 $g/m^3$, ~30% lower than the mean total belowground biomass in the unoiled sites (~19,000 $g/m^3$, $p = 0.036$; Fig. 2D). Because the NRDA protocol for measuring total belowground biomass included both live




**Figure 2.** (**A**) Box plots of *unadjusted* erosion rates (m/yr) in each stem oiling category for all sites. (**B**) Mean excess erosion (m/yr) for each stem oiling category. Excess erosion is the difference between the observed mean erosion for that stem oiling category and the expected mean *wave-adjusted* erosion rate if there were no differences in erosion among the stem oiling categories. The vertical lines are the central 95% randomization distributions for excess erosion in each stem oiling category. When the vertical line does not cross 0, the *p*-value for the comparison of that stem oiling category to the overall erosion rate is less than 0.05. (**C**) Mean excess erosion (m/yr) by stem oiling category in 2011–2012 and 2012–2013 for all sites. Symbols as in Fig. 2B. (**D**) Box plot comparing total belowground biomass between the 0% and 90.1–100% oiling categories in CWV plots nearest to the marsh edge in Fall 2010.

and dead root material, this analysis should be considered a conservative estimate of how oiling influenced the live plant roots that are critical for providing soil strength in these environments. Another recent study[24] that evaluated live belowground biomass as a function of qualitative oiling severity found significant reductions in live belowground biomass at the heaviest oiling levels.

Consistent with field evidence for reduced belowground biomass following the DWH spill, a meta-analysis of seven published studies investigating oiling impacts on *Spartina* spp. also revealed a consistent pattern of negative impacts of heavy oiling on belowground plant biomass. Averaged across all studies, we found a significantly negative effect of oiling on *Spartina* spp. belowground biomass (Hedges' $g = -1.379$, 95% $CI = -1.99$ to $-0.77$, $P < 0.0001$; Fig. 3).

## Discussion

The results of our regional-scale analysis reveal that accelerated marsh erosion reported in small-scale studies[3,20,25] after the DWH spill also occurred extensively across the larger area of impacted coastal marshes. We observed this effect even when erosion rates were adjusted to correct for the effects of wave exposure on marsh edge erosion. Our analysis across the full range of stem oiling levels further demonstrated that Gulf Coast salt marsh ecosystems exhibited a threshold behavior in response to increasing oil disturbance: there was no observable difference in erosion rate relative to unoiled marshes at the low to moderately high stem oiling levels, but statistically significant increases in erosion rate at the highest stem oil levels (90–100% stem oiling). Because past experimental transplant studies at similarly eroded areas along marsh edges have shown that marsh plants cannot regrow due to inundation stress (i.e., after erosion the marsh platform goes from being intertidal to being primarily submerged)[3], it is very likely that these disturbance-enhanced erosion rates have led to irreversible land loss along affected marsh edges of the Gulf of Mexico. However, to fully assess whether a tipping point, and not just a threshold was reached, we suggest that plant recovery patterns at these sites should be further monitored.

It is very likely that the death of belowground plant material at the highest levels of stem oiling triggered the observed increases in erosion rate at the heavily oiled sites. This contention is supported by: 1) past studies




**Figure 3. Meta-analysis results testing for the mean effect of oiling on *Spartina* spp. belowground biomass.** The mean effect size (Hedges' $g \pm 95\%$ *CI*) are reported, with negative values indicating negative effects of oiling on belowground biomass. 95% CI that do not overlap with the zero line indicate significant effects.

that demonstrate reductions in soil strength and/or irreversible marsh platform erosion when the belowground root network is compromised on eroding marsh edges[3,24]; 2) previous studies that have documented significant die-back of belowground plant material as a result of heavy oiling, as revealed in our meta-analysis; and 3) vegetation survey results from the CWV survey that evince a significantly negative effect of heavy oiling on both aboveground[23] and belowground biomass (Fig. 2D). The high level of resistance these marshes displayed to oil-induced, elevated erosion is predicted by past studies that have assessed potential for oiling impacts with small-scale oil addition studies in wetlands[25,26]. In these studies, belowground plant material – which is anticipated to be the key component underlying the protective effects of marshes – was resilient to oiling and only exhibited complete mortality in heaviest oiling treatments – a pattern we also observed in our study.

The combination of our regional-scale survey results with many small-scale, comparative studies indicating that the presence of live belowground plant material reduces erosion stress along marsh edges, challenges a recent experimental study[27], which concluded that wetland plants do not protect against shoreline erosion. Resolving whether the wetland-protective paradigm is indeed robust, as suggested by the results of our large-scale survey, or should be reconsidered, as suggested by this experimental study[27], will require further experimental studies conducted at larger scales that test for context dependency of plant protective effects and the relative contribution of belowground and aboveground plant material to any effect detected.

Approximately 18 months after the DWH spill, the increased erosion rates in the highest stem oiling level were no longer detected. This observed cessation of elevated erosion rates is consistent with results from a more process-oriented, but smaller scale study of the impacts of heavy oiling on shoreline erosion rates following the DWH disaster[3]. It is also consistent with plant health observations[23,26,28,29], where the majority of significant reductions to plant health and productivity due to oiling occurred through 2012. Return to background erosion rates thus likely occurred as the erosive front intersected live root mats generated from re-growing and/or surviving areas of marsh plants that were not as severely impacted by oiling. This cessation of elevated erosion rates does not erase the accelerated and permanent loss of marshes that occurred for ~ 1.5 years.

## Conclusions

Our results provide regional-scale evidence of a threshold in oil impact beyond which the resilience of salt marsh ecosystems was compromised, leading to large-scale land loss in the Gulf of Mexico, with a strong potential for irreversible ecosystem collapse, i.e. a tipping point. The resistance threshold of marshes to oil-induced, elevated erosion rates was high, non-linear and occurred at 90–100% stem oiling. This high level of resistance was likely driven by the demonstrated tolerance of belowground plant material to light and moderate levels of oiling. Empirical data such as these that identify levels of stress at which an ecosystem's threshold to disturbance occurs are uncommon, but are critical to understand to better protect and restore valuable coastal systems in the face of global environmental change[30]. Given the elevated importance of salt marshes as part of a first line of defense against the rising seas[6,31,32], our study highlights the need for a more robust understanding of salt marsh edge dynamics and their interactions with intensifying human-induced stressors.

## Materials and Methods

**Field methods.** The CWV survey included multiple types of marsh. Here, we analyzed erosion data only from mainland herbaceous marshes, as 1) our previous experimental and comparative studies were also conducted in mainland herbaceous marshes[3,23], 2) this marsh type was commonly impacted by oiling, and 3) using one marsh type controlled as much as possible for many biotic and abiotic conditions that can vary across different types of wetlands in this region (e.g. salinity, plant species, and tidal range). Mainland herbaceous marshes sampled during the CWV study were located primarily along the inland edges of protected bays and estuaries,

and were dominated by *Spartina alterniflora* in Louisiana[23] and co-dominated by *Juncus roemerianus* and *S. alterniflora* in Mississippi and Alabama[28]. The initial CWV survey of Louisiana marsh sites was conducted based on a stratified random sample of 78 sites from a collection of 713 marsh pre-assessment survey sites[23]. One of the 78 CWV sites was missing data in fall 2012 and fall 2013; the final Louisiana dataset described here therefore included 77 of the 78 CWV sites. Seven of the Louisiana sites were missing erosion data in spring 2011.

The initial CWV dataset, established during fall 2010, was supplemented in spring 2011 with 26 sites in Mississippi and Alabama, which were selected from an additional 114 pre-assessment sites in those states. Four of these sites were missing data in fall 2011. The complete three-state CWV database contained a total of 103 sites, although some analyses were based on a slightly smaller sample sizes because of the missing values. In all cases, strata were defined by the extent of stem oiling observed during the pre-assessment survey (0%, 0.1–10%, 10.1–50%, 50.1–90%, and 90.1–100%), which occurred between late May and early September of 2010[23,28].

Measurements of marsh edge position were made at all sites in fall 2011, fall 2012, and fall 2013. We focused our analysis on annual and cumulative erosion between spring 2011 and fall 2013 at all sites in the CWV survey, because this was the longest period with data from all three states. We also analyzed annual erosion from fall 2010 to fall 2013 for the Louisiana sites, which provides additional insight into the effects of oiling on erosion in the first six months following the spill.

At each site, survey teams established marsh edge and inland stakes using polyvinyl chloride (PVC) poles to demarcate the beginning and end of a line transect perpendicular to the shoreline. The shoreline stake was placed at the marsh edge and the inland stake was placed at the furthest inland point of oiling documented either during the pre-assessment survey or transect installation. At unoiled reference sites, the inland stake was placed at 20 m inland from the marsh edge. On each sampling date, survey teams measured the distance from the inland stake to the current marsh edge to determine cumulative erosion. Complete details on the CWV survey design and field observations can be found in (ref. 22).

In order to account for effects of incident wave energy on erosion rates, we used a measure of relative wind-wave exposure that was quantified for each of the sites[33,34]. This metric, referred to as the mean wave exposure index, is calculated from the product of average wind speed and fetch along each of 8 cardinal directions. A detailed description of how the wave exposure index was calculated can be found in ref. (34).

**Erosion data analysis.** Differences in marsh erosion rate among stem oiling levels were evaluated using Kruskal-Wallis tests[34] and the analysis of means[36,37]. The Kruskal-Wallis test evaluates any difference between stem oiling levels, whereas the analysis of means detects whether one group differs from the others. Both methods are non-parametric procedures because the data did not meet the normality or equal variance assumptions of analysis of variance (ANOVA). For the Kruskal-Wallis statistic, $R_i$ and $n_i$ were the average rank and sample size for each stem oiling level, respectively. The analysis of means[36] compares the erosion rate for each stem oiling level to the overall erosion rate in all sites. The nonparametric version of analysis of means[37] is based on ranks for each stem oiling level. The null distribution of the test statistic was evaluated by randomization, using 9999 randomizations of stem oiling values to erosion values. Differences were considered significant at the level $P < 0.05$. No adjustment for multiple testing was made because of the *a-priori* expectation that the differences would be largest in the 90–100% stem oiling level.

To address the influence of variation in wave exposure among marsh sites, we repeated these analyses after grouping observations by similar wave energy. This approach is an extension of the Skillings-Mack method[38]. Breakpoints between wave energy groups were set at the deciles of mean wave energy, giving 10 groups. Measured erosion rates were then ranked within each wave energy group. We computed the mean and median erosion in each stem oiling level and compared those values to distributions obtained by randomly reassigning erosion values to stem oiling levels within each wave energy group. Mean excess erosion for each stem oiling level was computed as the difference between the mean observed erosion and the mean of the randomly reassigned erosion values. *P*-values and 95% confidence intervals for excess erosion were obtained by randomly permuting erosion values within each wave-energy block using 9999 randomizations. We repeated the analysis using 5 and 15 groups of wave energy. Our results were insensitive to the number of wave energy groups, so we present here only the results from analyses using 10 wave energy groups.

**Effects of oiling on belowground biomass.** The CWV sampling design did not partition total belowground biomass into live and dead components. Thus we do not have direct observational evidence of the impact of oiling on live belowground biomass. In an effort to address this data gap, we followed two approaches. First, we summarized the effects of heavy oiling on total belowground biomass as measured in the CWV study. The belowground biomass in control and heavily oiled Louisiana sites was compared using a t-test. Because one CWV site outside of Louisiana was heavily oiled and there was a regional trend in belowground biomass, we only analyzed belowground biomass in Louisiana. Since total belowground biomass included both live and dead components, this analysis provides a conservative estimate of how oiling might have influenced the live plant roots that are important to soil strength in these habitats. In addition, we conducted a meta-analysis of published observational and experimental studies investigating oiling v. control differences in belowground biomass of the marsh plant genus *Spartina*. We used a Web of Science literature search from September 16, 2015 to assemble the existing studies investigating oiling impacts on *Spartina* belowground biomass using the following search criteria: TS = Spartina AND oil* or oil spill* AND belowground. Our Web of Science search generated 122 publications, and out of those we narrowed the total number of studies to six[3,39–42] that included oil impacts to *Spartina* belowground biomass by either measuring plant live belowground biomass or plant total (i.e., live + dead) belowground biomass. Although our objective was to evaluate the effect of oiling on live belowground biomass, we believe our inclusion of studies that measured total belowground biomass also makes our meta-analysis conservative,

since these studies may underestimate the effect of oiling on live biomass. One study[41] investigated two species of *Spartina*, generating a total sample size of $n = 7$.

For each study, we extracted the mean *Spartina* belowground biomass for oiled and unoiled treatments, along with the standard deviation and sample size. We then used the extracted data to measure the standardized effect size by calculating Hedges' $g$[43] using the *metafor* package[44] in R[45]. A negative Hedges' $g$ value where the 95% CI did not overlap zero indicates as significantly negative effect from oiling. We determined the overall mean effect across all studies using a random-effects model. When studies used multiple treatments (e.g., unoiled, light, medium, and high oiling) we used only the endpoint treatments (i.e., no oiling and high oiling) to look at the maximum possible effects. When multiple core depths were used as a factor in a single study we only used belowground responses of the shallowest layers because we assumed that oiling would have the greatest impact at shallower sediment depths.

## References

1. Dale, V. H. *et al.* Climate change and forest disturbances. *Bioscience* **51,** 723–734 (2001).
2. Wilson, S. K., Graham, N. A. J., Pratchett, M. S., Jones, G. P. & Polunin, N. V. C. Multiple disturbances and the global degradation of coral reefs: are reef fishes at risk or resilient? *Glob. Change Biol.* **12,** 2220–2234 (2006).
3. Silliman, B. R. *et al.* Degradation and resilience in Louisiana salt marshes after the BP – *Deepwater Horizon* oil spill. *Proc. Natl. Acad. Sci. USA* **109,** 11234–11239 (2012).
4. Mendelssohn, I. A. *et al.* Oil impacts on coastal wetlands: implications for the Mississippi River Delta ecosystem after the *Deepwater Horizon* oil spill. *Bioscience* **62,** 562–574 (2012).
5. Folke, C. *et al.* Regime shifts, resilience, and biodiversity in ecosystem management. *Ann. Rev. Ecol. Evol. Syst.* **35,** 557–581 (2004).
6. Silliman, B. R., van de Koppel, J., Bertness, M. D., Stanton, L. E. & Mendelssohn, I. A. Drought, snails, and large-scale die-off of southern US salt marshes. *Science* **310,** 1803–1806 (2005).
7. Angelini, C. & Silliman, B. R. Patch size-dependent community recovery after massive disturbance. *Ecology* **93,** 101–110 (2012).
8. Côté, I. M. & Darling, E. S. Rethinking ecosystem resilience in the face of climate change. *PLoS Biol.* **8,** e1000438 (2010).
9. Dodds, W. K., Clements, W. H., Gido, K., Hilderbrand, R. H. & King, R. S. Thresholds, breakpoints, and nonlinearity in aquatic ecosystems as related to management. *J. North Am. Benthol. Soc.* **29,** 988–997 (2010).
10. Steneck, R. S. *et al.* Kelp forest ecosystems: biodiversity, stability, resilience and future. *Environ. Conserv.* **29,** 436–459 (2002).
11. Silliman, B. R. *et al.* Consumer fronts, global change, and runaway collapse in ecosystems. *Ann. Rev. Ecol. Evol. Syst.* **44,** 503–538 (2013).
12. Tonelli, M., Fagherazzi, S. & Petti, M. Modeling wave impact on salt marsh boundaries. *J. Geophys. Res.* **115,** C09028 (2010).
13. Andren, H. & Angelstam, P. Elevated predation rates as an edge effect in habitat islands: experimental evidence. *Ecology* **69,** 544–547 (1988).
14. Laurance, W. F. & Yensen, E. Predicting the impacts of edge effects in fragmented habitats. *Biol. Conserv.* **55,** 77–92 (1991).
15. Couvillion, B. R. *et al.* Land Area Change in Coastal Louisiana from 1932 to 2010: U.S. Geological Survey Scientific Investigations Map 3164, scale 1:265,000, 12 p. Pamphlet http://pubs.usgs.gov/sim/3164/downloads/SIM3164_Pamphlet.pdf (2011).
16. Day, J. W. *et al.* Restoration of the Mississippi Delta: Lessons from Hurricanes Katrina and Rita. *Science* **315,** 1679–1684 (2007).
17. Kolker, A. S., Allison, M. A. & Hameed, S. An evaluation of subsidence rates and sea-level variability in the northern Gulf of Mexico. *Geophys. Res. Lett.* **38,** L21404 (2011).
18. Peyronnin, N. *et al.* Louisiana's 2012 coastal master plan: overview of a science-based and publicly informed decision-making process. *J. Coast. Res.* **67,** S1–S15 (2013).
19. Michel, J. *et al.* Extent and degree of shoreline oiling: *Deepwater Horizon* oil spill, Gulf of Mexico, USA. *PLoS one* **8,** e65087 (2013).
20. McClenachan, G., Turner, R. E. & Tweel, A. W. Effects of oil on the rate and trajectory of Louisiana marsh shoreline erosion. *Environ. Res. Lett.* **8,** 044030 (2013).
21. Zengel, S., Bernik, B. M., Rutherford, N., Nixon, Z. & J. Miche. Heavily oiled salt marsh following the *Deepwater Horizon* oil spill, ecological comparisons of shoreline cleanup treatments and recovery. *PLOS one* **10,** e0132324 (2015).
22. Hester, M. W. & Willis J. M. *Sampling and Monitoring Plan for the Assessment of MC252 Oil Impacts to Coastal Wetland Vegetation in the Gulf of Mexico, August 4, 2011*. Prepared for National Oceanic and Atmospheric Administration. http://www.gulfspillrestoration.noaa.gov/oil-spill/gulf-spill-data/ (2011).
23. Hester, M. *et al.* Impacts of the *Deepwater Horizon* oil spill on the salt marsh vegetation of Louisiana. *Env. Pollut.* **216,** 361–370 (2016).
24. Lin, Q., Mendelssohn, I. A., Graham, S. A., Hou, A., Fleeger, J. W. & Deis, D. R. Response of salt marshes to oiling from the *Deepwater Horizon* spill: Implications for plant growth, soil surface-erosion, and shoreline stability. *Sci. Total Environ.* **557,** 369–377 (2016).
25. Lin, Q., Mendelssohn, I. A., Suidan, M. T., Lee, K. & Venosa, A. D. The dose-response relationship between No. 2 fuel oil and the growth of the salt marsh grass, *Spartina alterniflora*. *Mar. Pollut. Bull.* **44,** 897–902 (2002).
26. Lin, Q. & Mendelssohn, I. A. Impacts and recovery of the *Deepwater Horizon* oil spill on vegetation structure and function of coastal salt marshes in the northern Gulf of Mexico. *Environ. Sci. Technol.* **46,** 3737–3743 (2012).
27. Feagin, R. A., Lozada-Bernard, S. M., Ravens, T. M., Möller, I., Yeager, K. M. & Baird, A. H. Does vegetation prevent wave erosion of salt marsh edges? *Proc. Natl. Acad. Sci. USA* **106,** 10109–10113 (2009).
28. Willis, J. M., Hester, M. W., Rouhani, S., Steinhoff, M. A. & Baker, M. C. Field assessment of the impacts of *Deepwater Horizon* oiling on coastal marsh vegetation of Mississippi and Alabama. *Environ. Toxicol. Chem.* doi: 10.1002/etc.3450.
29. Khanna, S. *et al.* Detection of salt marsh vegetation stress and recovery after the *Deepwater Horizon* Oil Spill in Barataria Bay, Gulf of Mexico using AVIRIS data. *PLoS one* **8,** e78989 (2013).
30. Silliman, B. R., Schrack, E., He, Q., Cope, R., Santoni, A., van der Heide, T., Jacobi, R., Jacobi, M. & von de Koppel, J. Facilitation shifts paradigms and can increase success of coastal restoration. *Proc. Natl. Acad. Sci. USA* **112,** 14295–14300 (2015).
31. Gedan, K. B., Kirwan, M., Barbier, E., Wolinksi, E. & Silliman, B. R. The present and future role of coastal wetland vegetation in protecting shorelines: answering recent challenges to the paradigm. *Climatic Change* **106,** 7–29 (2011).
32. Temmerman, S. *et al.* Ecosystem-based coastal defense in the face of global change. *Nature* **504,** 79–83 (2013).
33. Keddy, P. A. Quantifying within-lake gradients of wave energy: interrelationships of wave energy, substrate particle size and shoreline plants in Axe Lake, Ontario. *Aquat. Bot.* **14,** 41–58 (1982).
34. Nixon, Z. Wave Exposure Indices and *Deepwater Horizon* Shoreline Oling. DWH NRDA Shoreline Technical Working Group Report. Prepared for National Oceanic and Atmospheric Administration by RPI Available: https://pub-dwhdatadiver.orr.noaa.gov/dwh-ar-documents/901/DWH-AR0270321.pdf (2015).
35. Hollander, M., Wolfe, D. A. & Chicken, E. *Nonparametric Statistical Methods, 3rd edition.* Wiley, New York (2014).
36. Nelson, P. R., Wludyka, P. S. & Copeland, K. A. F. *The Analysis of Means: A graphical method for comparing means, rates, and proportions*. SIAM, Philadelphia, PA (2005).
37. Bakir, S. T. Analysis of means using ranks for the randomized complete block design. *Commun. Stat. Simul. Comput.* **23,** 547–568 (1994).
38. Skillings, J. H. & Mack, G. A. On the use of a Friedman-type statistic in balanced and un-balanced block-designs. *Technometrics* **23,** 171–177 (1981).

39. Culbertson, J. B., Valiela, I., Pickart, M., Peacock, E. E. & Reddy, C. M. Long-term consequences of residual petroleum on salt marsh grass. *J. Appl. Ecol.* **45,** 1284–1292 (2008).
40. Li, Y., Morris, J. T. & Yoch, D. C. Chronic low level hydrocarbon amendments stimulate plant growth and microbial activity in salt-marsh microcosms. *J. Appl. Ecol.* **27,** 159–171 (1990).
41. Michel, J. *et al.* Recovery of interior brackish marshes seven years after the chalk point oil spill. *Mar. Pollut. Bull.* **58,** 995–1006 (2009).
42. Redondo-Gomez, S., Petenello, M. C. & Feldman, S. R. Growth, nutrient status, and photosynthetic response to diesel-contaminated soil of a cordgrass, *Spartina argentinensis. Mar. Pollut. Bull.* **79,** 34–38 (2014).
43. Borenstein, M., Hedges, L. V., Higgins, J. P. & Rothstein, H. R. *Introduction to Meta-Analysis*. Wiley, Chichester, UK (2009).
44. Viechtbauer, W. Conducting meta-analyses in R with the metafor package. *J. Stat. Softw.* **36,** 1–48 (2010).
45. R Core Team. R: A language and environment for statistical computing. R Foundation for Statistical Computing, Vienna, Austria (2013).

## Acknowledgements
We would like to acknowledge funding from the state of Louisiana, U.S. National Oceanic and Atmospheric Administration, U.S. National Science Foundation, The Stolarz Foundation and Gulf of Mexico Research Initiative.

## Author Contributions
B.R.S., P.M.D., C.W., Q.H., P.D., B.B.H., M.R., J.M.W. and M.W.H. contributed to writing, editing and data analysis. M.W.H. and J.M.W. were collaborators in the set-up and monitoring of the CWV survey and participated in collecting the data.

## Additional Information
**Supplementary information** accompanies this paper at http://www.nature.com/srep

**Competing financial interests:** The authors declare no competing financial interests.

**How to cite this article**: Silliman, B. R. *et al.* Thresholds in marsh resilience to the *Deepwater Horizon* oil spill. *Sci. Rep.* **6**, 32520; doi: 10.1038/srep32520 (2016).

This work is licensed under a Creative Commons Attribution 4.0 International License. The images or other third party material in this article are included in the article's Creative Commons license, unless indicated otherwise in the credit line; if the material is not included under the Creative Commons license, users will need to obtain permission from the license holder to reproduce the material. To view a copy of this license, visit http://creativecommons.org/licenses/by/4.0/

© The Author(s) 2016

**EARTHJUSTICE, SIERRA CLUB ENVIRONMENTAL LAW PROGRAM, CENTER FOR BIOLOGICAL DIVERSITY, HEALTHY GULF, TURTLE ISLAND RESTORATION NETWORK**

May 11, 2025

**<u>Via Regulations.gov</u>**
Ms. Michelle Uli Picou
Plans Section Chief MS GM 1053C
Bureau of Ocean Energy Management
Gulf of Mexico Office
1201 Elmwood Park Blvd.
New Orleans, LA 70123-2394

**Re: Comments on BP Exploration & Production Inc.'s Initial Development Operations Coordination Document (DOCD), Kaskida Project, Keathley Canyon Blocks 292 and 293**

On behalf of the undersigned groups, please accept these comments on BP Exploration & Production, Inc.'s (BP) Development Operations Coordination Document (DOCD) for the Kaskida Project in the Gulf of Mexico. According to the DOCD, BP is proposing to develop oil and gas reserves in approximately 5,600-6,200 feet of water, in what is termed "ultra-deep" water under extreme temperature and pressure conditions. The Kaskida Project includes six developmental wells, four back-up wells, and a semi-submersible floating production unit with 12 mooring lines and subsea infrastructure. Notably, it will be one of the first development projects in the region to use well equipment capable of handling pressures up to 20,000 pounds per square inch, which is akin to the weight of a London double-decker bus laid on a postage stamp. The faulty blowout preventer used in Deepwater Horizon could only handle pressures of 15,000 pounds per square inch. If approved, this will be BP's first completely new oilfield development in the Gulf of Mexico since the catastrophic *Deepwater Horizon* disaster on BP's well site. At the same time, BP is not positioned to keep operations safe in these risky conditions; the company is the process of laying off thousands of employees and outsourcing critical engineering jobs to India.

Given the extreme conditions of this new development and the threats to the human, marine, and coastal environments, the Bureau of Ocean Energy Management (BOEM) must disapprove this plan under the Outer Continental Shelf Lands Act (OCSLA). At the very least, BOEM must prepare an Environmental Impact Statement to fully evaluate the impacts of the Kaskida Project under the National Environmental Policy Act (NEPA).

Our organizations and their members believe that it is imperative to minimize the impacts of oil and gas exploration and development in the Gulf of Mexico to protect the well-being of the Gulf Coast's marine ecosystems, reduce the pollution plaguing coastal communities, and abide by our nation's climate commitments. The Gulf is home to a wide range of tropical and subtropical habitats and thousands of ocean species and consequently, provides more than a third of the nation's seafood supply. At the same time, it has experienced considerable degradation

from decades of oil and gas development, including the ongoing damage resulting from the massive *Deepwater Horizon* oil spill.

It is well established that drilling is riskier in deeper waters, with the chances of well blowouts and uncontrolled oil spills increasing exponentially with depth. Experts still understand relatively little about the geology and effects of pressure in ultra-deepwater wells, while industry has not developed safe technology to handle the extreme pressures and temperatures that shape conditions for these operations.

The *Deepwater Horizon* drilling rig, which was also operated by BP, was drilling in ultra-deepwater about 5,000 feet below the surface of the water when it suffered a blowout. The resulting explosion took the lives of 11 workers and spilled 200 million gallons of oil into the Gulf of Mexico, with disastrous consequences for people's livelihoods, the tourism industry, and ocean ecosystems. The economic impact of the Deepwater Horizon oil spill included more than 25,000 lost jobs, as well as financial losses totaling $2.3 billion for industry; $1.2 billion in total value added or gross regional product; $700 million in labor income; $160 million in state and local tax revenues and $160 million in federal tax revenues.

Hurricanes complicate the blowout risks, as the storms are known to "play a large role in the occurrence of large spill events and occurrence of blowouts resulting in loss of well control in the Gulf of Mexico." Meanwhile, climate change has been linked to increased hurricane strength, volatility, and frequency, particularly in the Gulf. Emerging scientific consensus points to high water temperatures enabling the rapid intensifications of hurricanes Helene and Milton.

As BOEM is aware, the critically endangered Rice's whale (*Balaenoptera ricei*) has been significantly impacted by Gulf oil and gas development. With a remaining population of approximately 50 individuals, the Rice's whale is one of the most imperiled marine mammals in existence and is especially vulnerable to low levels of human-caused mortality—in particular from vessel strikes, noise, oil spills, and pollution connected to offshore oil and gas operations in the Gulf. Scientists believe that the loss or harm to even one whale could lead to the species' extinction.

BP's Kaskida Project proposes drilling in ultra-deep waters under extreme pressure in areas which are located near the proposed critical habitat for Rice's whales. BOEM must disapprove this project as a result of the extreme risks and must at least undertake a careful, calculated, and thorough examination of the impacts before approving this action.

## I. LEGAL BACKGROUND

### A. OCSLA

OCSLA governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf (OCS). 43 U.S.C. § 1331 *et seq*. In 1978, Congress amended OCSLA to provide, in part, for the development of resources on the Outer Continental Shelf "subject to environmental safeguards." *Id.* § 1332(3). BOEM's management of the OCS "shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the [OCS]," as well as "the potential impact of oil and gas

exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments." *Id*. § 1344(a)(1).

OCSLA prescribes four, tiered stages to allow for the development of offshore oil and gas deposits: (1) five-year leasing programs; (2) lease sales; (3) exploration plans; and (4) development and production plans. *Id*. §§ 1337, 1340, 1344, 1351. Environmental review under NEPA is required at each stage. *See, e.g., id.* § 1351(h)(1) (NEPA review for development and production plans). Although BOEM may "tier" a later analysis to earlier reviews to eliminate repetitive discussions and focus on the actual issues ripe for decision, it is still required to consider impacts at the third and fourth permitting stages. *See* 30 C.F.R. §§ 550.227 (environmental impact analysis for EPs), 550.261 (same for DOCDs). In fact, OCSLA is clear that BOEM has a duty to consider environmental information for all approvals, including DOCDs:

> The Secretary shall consider available relevant environmental information in making decisions (including those relating to exploration plans, drilling permits, and development and production plans), in developing appropriate regulations and lease conditions, and in issuing operating orders.

43 U.S.C. § 1346(d). Furthermore, BOEM must require modification of an oil and gas development and production plan if "the lessee has failed to make adequate provision in such plan for safe operations on the lease area of for protection of the human, marine, or coastal environment, including compliance with" BOEM's regulations. *Id*. at § 1351(h)(1)(D). And BOEM must disapprove a plan if "the plan would probably cause serious harm or damage to life (including fish and other aquatic life)… or to the marine, coastal or human environments." *Id*.

**B. NEPA**

NEPA is this country's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1 (2019); *see* 42 U.S.C. § 4321 *et seq*. The purpose of the statute is to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. To achieve this, federal agencies must incorporate environmental concerns into the decisionmaking process and provide the public with a meaningful opportunity to participate in the decision. *Id*. § 4331(a)–(b); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The Department of the Interior has implemented its own NEPA implementing regulations. *See* 43 C.F.R. Part 46.

Under NEPA, "agencies must 'take a "hard look" at [the] environmental consequences' of their actions, and 'provide for broad dissemination of relevant environmental information.'" *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1082 (D.C. Cir. 2016) (alteration in original) (quoting *Robertson*, 490 U.S. at 350). In particular, NEPA requires all agencies of the federal government to prepare a "detailed statement" evaluating all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an Environmental Impact Statement (EIS), must analyze and describe the environmental effects of the proposed action as well as a reasonable range of alternatives that are technically and economically feasible and meet the purpose and need of the proposal. *Id*.

Here, BOEM's data center suggests that the agency intends to prepare an environmental assessment (EA) to support its review of the Kaskida Project.[1] As described below, the significant impacts from the Kaskida Project necessitate that BOEM instead prepare an Environmental Impact Statement (EIS).[2]

## II. BOEM MUST CONSIDER THE SITE-SPECIFIC IMPACTS OF DRILLING IN ITS NEPA DOCUMENT

Any NEPA documentation in support of exploration drilling must consider site-specific impacts. OCSLA's "pyramidic" four-layered structure is meant to proceed from "broad-based planning to an increasingly narrower focus as actual development grows more imminent."[3] Typically, BOEM has produced EAs for drilling that rely in part on previous environmental reviews, claiming to "tier" from the multiple existing analyses. But while tiering a project-specific EA from a programmatic document can streamline review, it "may not supplant site-specific analysis."[4] In other words, tiering only obviates the need for an independent environmental impact review if the document tiered from actually addresses the potential impacts of the proposed action.[5]

Close to a dozen marine species listed under the Endangered Species Act (ESA) in the Gulf are affected by oil and gas activities.[6] They include critically endangered Rice's whales, struggling with an estimated population of approximately 50 individuals that are found exclusively in the Gulf of Mexico.[7] Five sea turtle species make use of various Gulf habitats: the endangered Kemp's ridley, leatherback, and hawksbill turtles as well as listed portions of the

---

[1] https://www.data.boem.gov/Plans/Plans/PlanEntry.aspx?Num=10256&Code=N&Lease= G25792.

[2] It does not appear that BOEM will apply a categorical exclusion to its review of the Kaskida Project. Doing so would be illegal. In limited circumstances, an agency may identify categories of actions which do not "individually or cumulatively have a significant effect on the human environment." *See* 40 C.F.R. §§ 1507.3(b)(2)(ii) & 1508.4. These actions are classified as "categorical exclusions" for which neither an EA nor an EIS is required. 40 C.F.R. § 1501.4(a). However, even if a categorical exclusion applies to a given action, agencies have an additional obligation to "evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect," in which case an EA or EIS would be required. *Id*. § 1501.4(b). The Department of the Interior's NEPA regulations contain a list of specific actions that are categorically excluded from NEPA, none of which are applicable here. 43 C.F.R. § 46.210. According to BOEM's own policies, a DOCD that proposes facilities in "areas of high biological sensitivity" do not qualify for a categorical exclusion from NEPA. DOI Manual, Part 516, Chapter 15.4(C)(10).

[3] *California v. Watt*, 668 F.2d 1290, 1297 (D.C. Cir. 1981).

[4] *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002); *see also WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 54 (D.D.C. 2019) ("Put simply, an EA for a specific [agency] action may incorporate program-wide EISs, but must supplement those EISs with more specific environmental analyses of the action at issue.").

[5] *Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768, 784 (9th Cir. 2006) (holding that agency could not rely on "vague prior programmatic statements" but needed to consider "site-specific impacts" at the point which a "critical decision has been made to act").

[6] NMFS, *Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of Mexico* at 155 (tbl.26) (Mar. 13, 2020) (Gulf BiOp); *see also* Multisale EIS, Vol. II at 4-259 to 4-260 (tbl.4-17).

[7] *See, e.g.*, Melissa S. Soldevilla et al., *Acoustic localization, validation, and characterization of Rice's whale calls*, 151 J. Acoustical Soc'y Am. 4264, 4264 (2022); *see also* 88 Fed. Reg. 47,453, 47,460 (July 24, 2023) (proposed critical habitat recognizing that Rice's whales "occur over a broader distribution . . . than was previously understood, which is documented to include both the northeastern and northwestern [Gulf]").

threatened loggerhead and green turtles.[8] Threatened Gulf sturgeon migrate between the Gulf's nearshore waters and the freshwater habitats where they spawn.[9]

The National Marine Fisheries Service (NMFS) considers oil and gas activities to represent a particular threat to Rice's whale and Kemp's ridley sea turtle. The final listing decision for Rice's whales includes a list of threats that is heavily weighted towards oil and gas activity: "energy exploration, development, and production, oil spills and oil spill response, vessel collision, fishing gear entanglement, and anthropogenic noise."[10] Recent studies also suggest that Rice's whales spend approximately 70% of their days within 15 meters of the surface, making them particularly susceptible to ship strikes.[11] NMFS's recovery plan for Kemp's ridley sea turtle noted that "Kemp's ridleys could be impacted by the degradation of water quality resulting from operational discharges, including oil spills and oil-spill response activities."[12] Oil and gas development can adversely affect sperm whales as well,[13] especially given that they are found in the "deeper waters seaward of the continental shelf" where BOEM increasingly authorizes OCS drilling.[14]

The act of drilling wells indisputably harms the surrounding marine environment. The noise from pile driving when installing platforms generates sounds with a "very high source level," and loud noises can disturb wildlife, cause physiological stress, and even impair hearing.[15] Operating and servicing offshore platforms creates multiple sources of pollution, including inevitable smaller oil spills, debris, and other discharges that foul the nearby waters.[16] Drilling requires considerable vessel and helicopter traffic that further floods the marine habitat with noise and, in the case of the additional vessels, risks collisions with animals that can lead to injury or death.[17] To assess what all that means for the immediate area, BOEM must bring to the fore information particular to the drilling location to better understand the site-specific effects.[18] Yet the EIA demonstrates that BP's efforts to document effects for individual locations is insufficient, given the potential impact.

That lack of effort may be a byproduct of BOEM's assumption, at least when considering potential harms to some species, that individuals are uniformly distributed across the Gulf. For

[8] Gulf BiOp at 170.
[9] *See id.* at 218.
[10] 84 Fed. Reg. 15,446, 15,449 (April 15, 2019); *see also* 88 Fed. Reg. at 47,461 (noting the science "on the effects of anthropogenic noise on the behavior and distribution of baleen whales, including [Rice's] whales, demonstrates that the presence of anthropogenic noise can adversely affect the value of marine habitat to [Rice's] whales").
[11] Melissa S. Soldevilla et al., *Spatial distribution and dive behavior of Gulf of Mexico Bryde's whales: potential risk of vessel strikes and fisheries interactions,* 32 Endang Species Res 533, 540 (2017).
[12] NMFS et al., *Bi-National Recovery Plan for the Kemp's Ridley Sea Turtle (*Lepidochelys kempii*), Second Revision* I-62 (Sept. 22, 2011).
[13] Gulf BiOp at 156.
[14] *Id*. at 158, 263 (stating that exploration and development "has moved and will continue to move further offshore into deeper waters of the Gulf").
[15] *See, e.g.*, Gulf BiOp at 455.
[16] *Id*. at 138–39, 313–22, 452–63, 492–524; *see also id*. at 308–12, 313–23, 482–92.
[17] *Id.* at 334–85, 463–68.
[18] As acknowledged by BOEM, a "new lease with new wells being drilled in deep water would need a full suite of site-specific reviews and a site-specific environmental assessment." Gulf of Mexico OCS Oil and Gas, Lease Sales 259 and 261, Final Supplemental Environmental Impact Statement, at C-201 (Jan. 2023) (FSEIS).

example, BOEM concluded in a recent lease sale EIS that, for sea turtles, the "level of impacts" under multiple alternatives "would be the same" because of "the free-swimming ability and wide distribution of species."[19] But readily available information demonstrates that where oil and gas activity occurs and which species it affects matter a great deal. The loggerhead turtle critical habitat designation discusses different habitat types critical to continued existence of loggerheads, including *Sargassum* habitat in the Gulf.[20] Furthermore, the Gulf of Mexico Fishery Management Council's most recent review of Essential Fish Habitat (EFH) designations contains species descriptions, maps of EFH, and discussions of the underlying importance of different habitat types and different locations.[21]

BP's EIA is also at odds with BOEM's own long-standing effort to gather precisely this sort of data for marine life in the Gulf. In 2017, BOEM launched a cooperative program to collect "[i]mproved information . . . on living marine resource abundance, distribution, habitat use, and behavior in the Gulf of Mexico to properly mitigate and monitor for potential impacts of human activities, including related to offshore energy development."[22] That information is all the more important given the profound changes in the Gulf brought about by the *Deepwater Horizon* catastrophe, as BOEM has repeatedly acknowledged.[23] To the extent that any such information remains unknown, BOEM should consider how that impacts its NEPA obligations. The Ninth Circuit has found that "missing or incomplete information that has not been essential to a reasoned choice among alternatives at the lease sale stage may later become essential" when assessing a site-specific project.[24]

Courts have cautioned that it is during the later stages of the OCSLA process, *i.e*., during exploration and development, that BOEM must carefully consider issues such as the "risks of deepwater drilling."[25] Indeed, in the lease sale context, courts have turned away legal challenges with the expectation that those types of site-specific, operational issues "will receive ample review" that "compl[ies] with NEPA at the later exploration and production stages."[26] BOEM

[19] FSEIS at 4-63.
[20] 79 Fed. Reg. 39856, 39880-83 (July 10, 2014); *see also* Iverson *et al*., *Migration Corridors and Threats in the Gulf of Mexico and Florida Straits for Loggerhead Sea Turtles*, Front. Mar. Sci. 7:208 (2020), https://www.frontiersin.org/articles/10.3389/fmars.2020.00208/full.
[21] *See* Gulf of Mexico Fishery Management Council, NOAA, *Final Report 5-Year Review of Essential Fish Habitat Requirements*, Sec. 3.1 (Dec. 2016), https://gulfcouncil.org/wp-content/uploads/EFH-5-Year-Revew-plus-App-A-and-B_Final_12-2016.pdf (overview of species and habitat designations); *see also* NOAA, *Final Amendment 10 to the 2006 Consolidated Atlantic Highly Migratory Species Fishery Management Plan: Essential Fish Habitat and Environmental Assessment* App. G (Sept. 1, 2017), https://www.habitat.noaa.gov/application/efhinventory/docs/a10_hms_efh.pdf.
[22] https://www.boem.gov/gommapps.
[23] *See, e.g*., FSEIS at 4-57 (observing that "the best available information on impacts to GOM marine resources does not yet provide a complete understanding of the population impacts of the oil spill and active response/cleanup activities from the Deepwater Horizon explosion and oil spill on marine resources as a whole in the GOM").
[24] *Native Village of Point Hope v. Jewell*, 740 F.3d 489, 499 (9th Cir. 2014); 40 C.F.R. § 1502.21. *Compare* FSEIS at C-187 (noting that "the Deepwater Horizon explosion, oil spill, and response continue to be assessed" and that consequently "additional analyses will be completed at the site-specific approval stage") *with* Chevron EA at 3-1 (claiming BOEM can make decisions despite the "incomplete or unavailable" information).
[25] *Oceana v. Bureau of Ocean Energy Management*, 37 F.Supp.3d, 147, 167 (D.D.C. 2014).
[26] *Friends of the Earth v. Haaland*, 583 F.Supp.3d 113, 150 (D.D.C. 2022), *vacated*, 2023 WL 3144203 (D.C. Cir. 2023). In recent litigation over Lease Sale 259's oil spill analysis, BOEM asserted that spill risks, such as those associated with reservoir pressure, "are properly considered at a later stage because [the sale] does not by itself

must avoid perpetuating a shell game that avoids ever squarely addressing much needed analyses, including a full accounting of the risk of an oil spill in light of factors such as a well's water depth (*i.e.*, deep water drilling increases the likelihood of an accident); and location (*i.e.*, remote areas may be more difficult to reach while also subject to increasing storm severity).[27]

## III. BOEM MUST EVALUATE ALTERNATIVES IN ITS NEPA DOCUMENT

NEPA requires agencies to consider "a range of reasonable actions which might meet goals of the agency by using different approaches that might reduce the environmental impacts of the agency's action." *See, e.g.*, *Soda Mountain Wilderness Council v. Norton*, 424 F. Supp. 2d 1241, 1265 (E.D. Cal. 2006). *See also* 40 C.F.R. § 1508.25(b) (requiring agency to consider other reasonable courses of action and that include mitigation measures not in proposed action).

Even EAs must assess a "no action" alternative, *i.e.*, the status quo, and a reasonable range of alternatives to the proposed action. *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1022 (9th Cir. 2012); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1053 (9th Cir. 2013) (holding EA on grazing inadequate for lack of reasonable range of alternatives); 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b). The range of "reasonable" alternatives is determined by the purpose and need for the action, which cannot be so narrow as to only allow one alternative to accomplish the goals, and must match the underlying statutory goals. *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010). Further, if the "no action" alternative is not "reasonable"—does not advance the stated goals—then discussion of merely the preferred alternative and "no action" alternative does not meet the NEPA's bare requirement for a brief discussion of reasonable alternatives. *Klamath Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 2019 WL 1553673, at *4 (D. Or. Feb. 20, 2019), *report and recommendation adopted*, 2019 WL 2774317 (D. Or. July 2, 2019).

In the EIA, however, it states that no formal alternatives were evaluated. That violates both NEPA and BOEM's regulations which require EIA's to describe alternatives that were considered and to compare potential environmental impacts. 30 C.F.R. § 550.261(c)(4).

## IV. BOEM MUST CONSIDER THE CUMULATIVE EFFECTS OF EXPLORATORY DRILLING IN ITS NEPA DOCUMENT

An agency's EA must describe all of the environmental impacts of a proposed action. Those include not only direct and indirect effects but also cumulative effects. Importantly, cumulative effects can result from individually minor but collectively significant actions taking place over a period of time.

The requirement to assess cumulative effects is to ensure that agencies consider their decisions within the larger context: while a particular action can "seem unimportant in isolation,"

---

authorize oil and gas drilling." And yet in the EIA, BP nevertheless failed to include any specific analysis of the spill associated with the applicant's estimated potential for a catastrophic spill.

[27] *See, e.g.,* Gulf BiOp, App. G, at 52 (noting that the probability of an accident increases by 8.5% for every 100 feet of increased depth).

it "may have dire consequences when combined with other actions."[28] This assessment "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects."[29] Yet the EIS take a remarkably cavalier approach to cumulative effects with only references to prior NEPA documents and no analysis whatsoever.

BOEM itself has recognized, when it began its 2017 information gathering on marine life in the Gulf, that an "[u]nderstanding of cumulative impacts on protected species in the Gulf from both natural and anthropogenic forcing is required to inform NEPA documents[.]"[30] This is especially true for a species, like Rice's whales, that struggle from the "wide-ranging, combined multiple effects" of stressors that are associated with oil and gas development: vessel strikes, vessel noise, marine debris, oil spills and dispersants, and sound from seismic surveys.[31] Each is estimated to kill or injure individual whales, and serious harm to even a single whale is significant, as "the death of one female . . . would constitute the loss of approximately five percent of the breeding population . . . , making population level effects likely."[32] As such, any one oil and gas project must consider the activities within the greater scheme: the more than 2,000 current leases that lay claim to over 150 million acres of the federal OCS, in addition to the other industrial activity in the Gulf that affect the Rice's whale essential functions.[33]

Finally, an EA must consider the cumulative effects of oil and gas production across the Gulf on the climate and for environmental justice communities. BOEM cannot ignore the fact that exploration drilling is intended to facilitate future development.[34] Although BOEM has attempted in the past to analyze greenhouse gas emissions "from the full life cycle" of oil and gas development for particular lease sales, it has failed to adequately consider key factors such as declining U.S. consumption and failed to appropriately contextualize the massive release of greenhouse gases associated with leasing. Those critical oversights mean that BOEM risks moving forward with production without a complete understanding of the environmental consequences. Even more egregiously, BOEM has utterly failed to examine the harms to environmental justice communities from OCS exploration and development.[35] Onshore residents have long borne the brunt of the Gulf's industrialization and undergirds and relies upon the continued exploration and extraction of oil and gas.[36]

---

[28] *ONRC v. Goodman*, 505 F.3d 884, 893 (9th Cir. 2007).
[29] *Id*. at 993–94.
[30] Gulf of Mexico Marine Assessment Program for Protected Species (GoMMAPPS), https://www.boem.gov/gommapps.
[31] Gulf BiOp at 553-54.
[32] *Id*. at 553. NMFS has found, for example, that noise from existing OCS oil and gas activity, including vessel traffic, "is likely to result in chronic stress and masking of important biological and environmental sounds, both of which may impact individual [Rice's] whale fitness." *Id*. at 547.
[33] *See* https://www.boem.gov/gom-interactive-lease-statistics-dashboard.
[34] *North Slope Borough v. Andrus*, 642 F.2d 589, 606 (D.C. Cir. 1980) ("Evaluating an outer continental shelf project in the light of all contemplated and congruous actions merely reflects that 'pumping oil' and not 'leasing tracts' is the aim of congressional policy.").
[35] *Id*.
[36] A robust cumulative effects analysis is needed for oil spills as well, applied to all of the oil and gas activity happening across the Gulf and considering the variety of factors that may cause spills to increase in the future (e.g., deepwater and ultra-deepwater drilling, increasing storm activity, and aging infrastructure).

## V. BOEM MUST PREPARE AN EIS FOR THE KASKIDA PROJECT

NEPA requires that agencies prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment."[37] Where an agency is unsure whether a proposed action will have significant environmental impacts, it may first prepare an environmental assessment to determine whether an EIS is required. "[A]n EA is intended to help an agency decide if an EIS is warranted; an EA is not meant to replace or substitute for an EIS." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt*., 36 F.4th 850, 872 (9th Cir. 2022).

The Department of the Interior's implementing NEPA regulations at 43 C.F.R. Part 46 were promulgated to ensure that the Department and its agencies comply with both NEPA as well as "[t]he Council on Environmental Quality (CEQ) regulations for implementing the procedural provisions of NEPA (40 CFR parts 1500-1508)."[38] 43 C.F.R. § 46.10(a). Pursuant to the CEQ regulations, whether an action significantly affects the environment is determined through consideration of both the context and intensity of the action. 40 C.F.R. § 1508.27 (2019). When considering context, "significance varies with the setting of the proposed action," whereas intensity "refers to the severity of the impact" and includes analysis of ten specific factors. *Id*. § 1508.27(a), (b). These factors include:

> (2) The degree to which the proposed action affects public health or safety.
> …
> (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
> (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
> …
> (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

*Id*. § 1508.27(b). The presence of any single factor may be enough to demonstrate that the action is significant. *Ocean Advocates v. U.S. Army Corps of Engineers,* 402 F.3d 846, 864-65 (9th Cir. 2005); *Fund for Animals v. Norton*, 281 F.Supp.2d 209, 218 (D.D.C.2003). NEPA demands that the Bureau prepare an EIS if there are "substantial questions" about whether any of the impacts resulting from a project "may" significantly affect the environment. *See Native Ecosystems Council v. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005); *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 171 (D.D.C. 2022).

As discussed below, there are several significant impacts likely to result from the Kaskida Project that require the preparation of an EIS. *See* 42 U.S.C. § 4332(C). These significant impacts include: (1) the increased risks of drilling in ultradeep waters; (2) the increased risk of a

[37] 42 U.S.C. § 4332(C)
[38] CEQ's longstanding NEPA regulations were in effect for several decades before their removal on April 11, 2025, subsequent to the initiation of this NEPA process. *See* 90 Fed. Reg. 10,610 (Feb. 25, 2025).

major oil spill and the resulting impacts; (3) Rice's whale; (4) climate; and (5) impact from decommissioning.

## VI. THE KASKIDA PROJECT IS HIGHLY RISKY AND THREATENS THE MARINE, COASTAL, AND HUMAN ENVIRONMENTS IN THE GULF

The Kaskida Project will take place in ultra-deep waters, greater than approximately 5,000 ft deep.[39] Worse, BP is pushing ultra-deepwater drilling to extreme depths using new technologies.[40] This is concerning, since the likelihood of well blowouts and uncontrolled oil spills increases "exponentially" with depth,[41] making deepwater and ultra-deepwater drilling particularly risky. BOEM must consider the risks and potential impacts associated with the ultra-deepwater drilling proposed in the Kaskida Project.

The likelihood of an oil spill is higher from deepwater and ultra-deepwater drilling than from drilling in shallower waters. Researchers have found that "deep water platforms have a much higher probability of an incident (such as a spill, accident, or injury) reported."[42] In fact, "company-reported incidents (such as blowouts, fires, injuries, and pollution) increase with water depth. … Controlling for these and other characteristics, for an average platform, each 100 feet of added depth increases the probability of a company-reported incident by 8.5%."[43] Various factors—including increased reservoir pressure and temperature when drilling in deeper water, unstable rock and sediment, and increased stresses on pipeline infrastructure when drilling in deeper water—can increase the risk of blowouts.[44]

This risk is not hypothetical. In October 2020, as hurricane Zeta approached Transocean's Deepwater Asgard, the well experienced a "kick"—an eruption of oil, gas, or other fluids from deep underground that can lead to a blowout.[45] Company officials directed the Deepwater Asgard to remain attached to the well, resulting in damage to the rig, a BSEE safety alert, and a lawsuit by workers on the platform.[46] The mile-deep well that the Deepwater Asgard was drilling was

---

[39] According to the BOEM, "The greatest undiscovered resource potential in the OCS is forecast to exist in the deep and ultra-deep waters of the [Gulf]." BOEM, *2023–2028 National Outer Continental Shelf Oil and Gas Leasing Proposed Program* 4-19 (July 2022); Steven A. Murawski et al., *Ch. 2, Deepwater Oil and Gas Production in the Gulf of Mexico and Related Global Trends*, *In* Scenarios and Responses to Future Deep Oil Spills (Jan. 2020).

[40] Javier Blas, *Biden, BP and the High-Stakes Sequel to Deepwater Horizon*, Bloomberg (May 2, 2024); Arielle Samuelson, *Chevron's risky new fossil fuel project*, Heated (Oct. 4, 2024).

[41] 2020 Biological Opinion, App. G, p. 49; *see also id*. at 52 (noting probability of an accident increases by 8.5% for every 100 feet of increasing depth (citing Lucija Muehlenbachs et al., *The Impact of Water Depth on Safety and Environmental Performance in Offshore Oil and Gas Production*, 55 Energy Policy 699 (2013)).

[42] Muehlenbachs et al., *The Impact of Water Depth on Safety and Environmental Performance*, *supra*, at 700.

[43] *Id*. at 704.

[44] Emily Chancellor et al., *Ch. 26 - Comparative Environmental Sensitivity of Offshore Gulf Of Mexico Waters Potentially Impacted by Ultra-Deep Oil Well Blowouts*, *in* Steven A. Murawski et al., *Scenarios and Responses to Future Deep Oil Spills: Fighting The Next War* 518-19 (Springer ed., 2020).

[45] Sharon Kelly, *Exclusive: 2020's Hurricane Zeta Nearly Caused 'Another Deepwater Horizon Catastrophe' in Gulf of Mexico*, DeSmog (April 5, 2021), https://www.desmog.com/2021/04/05/hurricane-zeta-deepwater-horizon-asgard-transocean/.

[46] BSEE, *Inadequate Preparations in Advance of Inclement Weather Results in Excessive Rig Damage and Risk to Personnel* (March 8, 2021), https://www.bsee.gov/sites/bsee.gov/files/safety-alerts/bsee-safety-alert-415-inadequate-preparations-in-advance-of-inclement-weather-results-in-excessive.pdf; Mike Shuler, *Lawsuit Sheds Light on*

capable of spilling 313,100 bbls per day for up to three months, and according to Rick Steiner, a marine conservationist and former professor at the University of Alaska, it could "easily" have become another BP spill.[47] In 2021, an accident involving the Transocean Deepwater Pontus drillship, which involved a blowout preventer falling onto the wellhead during a routine operation, highlighted the potential for a serious accident during deepwater drilling.[48]
The risks are much more severe with ultra-deep and deepwater drilling because of the extreme conditions with high pressures and temperatures. Conventional oil rigs are unable to drill at these ultra-deepwater reservoirs because of the extreme conditions.[49] The extreme pressures encountered in ultra-deepwater drilling, which can exceed 30,000 psi, pose significant challenges to drilling operations, as these conditions complicate well control and increase the likelihood of barrier and control failures, ultimately heightening the risk of catastrophic blowouts and hydrocarbon releases into the marine environment.[50] The extreme temperatures encountered in ultra-deepwater drilling, which can reach up to 300 °C at the bottomhole, present significant challenges for drilling operations, as these high thermal conditions can adversely affect the properties of drilling fluids and cement, leading to increased risks of well control failures and compromised structural integrity of the wellbore.[51]

There are also geological hazards that are intensified in deepwater environments. In the deepwater formations there may be faults, sand, or gas pockets that pose hazards. For example, one operator in the Gulf experienced a sediment washout of one of the drilling legs when it encountered sand.[52] The unexpected geological environment can also cause unexpected pressure events.[53] Additionally, the presence of gas hydrates in deepwater complicates drilling operations, as any disturbance to the environmental conditions—such as those caused by drilling fluids—can lead to hydrate dissociation that may release gas and water into the wellbore, causing reservoir instability, landslides, and potential blowouts.[54] Furthermore, the mechanical stability of the strata above hydrate-bearing reservoirs can be compromised, increasing the risk of well control failures and making the drilling process inherently more hazardous compared to conventional drilling operations.[55]

These extreme settings contribute to nearly two-thirds of all offshore loss of well control events.[56] Deepwater and ultra-deepwater oil spills and accidents are also much more difficult to

---

*Serious Drillship Incident in Gulf of Mexico During 2020's Hurricane Zeta*, gCaptain (April 13, 2021), https://gcaptain.com/deepwater-asgard-incident-gulf-of-mexico-hurricane-zeta/.

[47] Kelly, *Exclusive: 2020's Hurricane Zeta Nearly Caused 'Another Deepwater Horizon Catastrophe'*, *supra*.

[48] Sharon Kelly, *Footage of Offshore Oil Accident Highlights Risks of Deepwater Drilling*, DeSmog (Feb. 8, 2022), https://www.desmog.com/2022/02/08/deepwater-drilling-accident-bop-gulf-of-mexico/.

[49] ABSG Consulting, *Case Study 1: Ultra-Deepwater Drilling* (Sept. 2015); Trent Jacobs, *Chevron's $5.7-Billion Anchor Project Starts Production in the Gulf of Mexico*, J. Petroleum Technology (Aug. 12, 2024).

[50] K. Rose et al., *Risks and Impact Assessment for Deepwater and Ultra-Deepwater Gulf of Mexico Resources*, OTC-25364-MS (May 2014).

[51] *Id*.

[52] Rob Cummings et al., *Beyond Deep—The Challenges of Ultradeep Water*, 26 Oilfield Review 34 (2015).

[53] *Id*.

[54] Yonghai Gao et al., *Risk analysis on the blowout in deepwater drilling when encountering hydrate-bearing reservoir*, 170 Ocean Engineering 1 (Aug. 2018).

[55] *Id.*

[56] *Id.*

respond to and contain.[57] The conditions not only pose a risk of a catastrophic blowout, but they also risk equipment failure. Most of the accidents in deepwater and ultra-deepwater drilling occur because of wellbore instability, such as rock fall, that lead to drilling jams or damage because the equipment and fluids are inadequate for the extreme conditions.[58]

Ultra-deepwater drilling in the Gulf threatens sensitive deep-sea ecosystems and marine life, including endangered species. Among the species at risk are the endangered Kemp's ridley sea turtles, which rely on the Gulf's waters for feeding and nesting. The critically endangered Rice's whale inhabits the waters of the Gulf along the continental shelf break. The fragile deep-sea coral communities, which provide essential and delicate deep-sea habitats, will be harmed and were severely damaged by the BP oil spill.[59] The disturbance and potential oil spills from drilling can devastate these delicate deep-sea ecosystems, leading to long-term impacts on biodiversity.

Worse, BP, along with several other big oil companies, is in the process of implementing laying offs. It is planning to lay off over 4,000 of its employees and 3,000 contractors.[60] With less employees, BP will not be prepared to respond to a major accident or to ensure the safety of this highly risky project. And BP plans to outsource its engineering and safety oversight to lower-cost locations, like India.[61] That means lower-cost employees from across the globe will be monitoring for a blow out or accident. They will not have the same tools to respond and will not be nearby to help control the situation.

Given all these risks, BOEM should disapprove the DOCD or at the very least must require modifications to ensure the safety of the Gulf of Mexico and it communities.

## VII. THE KASKIDA PROJECT THREATENS THE EXISTENCE OF THE HIGHLY ENDANGERED RICE'S WHALE

The critically endangered Rice's whale is found only in the Gulf of Mexico. 88 Fed. Reg. 47,453, 47,460 (July 24, 2023). The species is a baleen whale—a large, filter-feeding whale in the same biological order as the more widely known humpback whale and right whale.[62] Once thought to exclusively inhabit the northeastern Gulf centered in DeSoto Canyon, recent science demonstrates that the whale persistently occurs in other parts of the Gulf in water depths between 100 and 400 meters, a depth that is believed to be conducive to its feeding.[63] More than 40% of

---

[57] ABSG Consulting, *Case Study 1: Ultra-Deepwater Drilling*, *supra*.
[58] Mikhail Dvoynikov et al., *Drilling of deep and ultra-deep wells for prospecting and exploration of new raw mineral fields*, 258 J. Mining Inst. 945 (Dec. 2022).
[59] Charles R. Fisher et al., *How Did the Deepwater Horizon Oil Spill Impact Deep-Sea Ecosystems?*, 29 Oceanography 182 (Sept. 1, 2016).
[60] Ron Bousso, BP cuts over 5% of workforce to reduce costs, Reuters (Jan. 16, 2025), https://www.reuters.com/business/energy/bp-cut-over-5-workforce-ceo-cost-cut-drive-2025-01-16/.
[61] Collin Eaton, Big Oil is Offshoring Its Prized Engineering Jobs to India, The Wall Street Journal (April 22, 2025), https://www.wsj.com/business/energy-oil/big-oil-is-offshoring-its-prized-engineering-jobs-to-india-2e487fd0.
[62] NMFS*, Species Directory: Rice's Whale*, https://www.fisheries.noaa.gov/species/rices-whale/overview (last updated Dec. 21, 2023).
[63] *Id*.; Melissa S. Soldevilla, et al., *Rice's whale occurrence in the western Gulf of Mexico from passive acoustic recordings*, Mar Mam Sci. 2024;1–8 (2024); Melissa S. Soldevilla, et al., *Rice's Whales in the northwestern Gulf of Mexico: call variation and occurrence beyond the known core habitat*, 48 Endang. Species Res. 155 (2022);

the population occurs outside the northeastern Gulf habitat area. *See* 88 Fed. Reg. 916, 944 (Jan. 5, 2023) (stating "core habitat area contains approximately 57 percent of predicted Rice's whale abundance").

In 2019, the National Marine Fisheries Service (NMFS) listed the Rice's whale as endangered under the federal Endangered Species Act (ESA) throughout its range. 84 Fed. Reg. 15,466 (Apr. 15, 2019). This listing was primarily "due to its small population size and restricted range" and harm from "energy exploration, development and production, oil spills and oil spill response, [and] vessel collision." *Id.* Although previously thought to be a subspecies of the Bryde's whale, NMFS formally recognized the Rice's whale as a unique species in 2021. 86 Fed. Reg. 47,022 (Aug. 23, 2021). NMFS has since concluded that "the loss of even a single reproductive female could lead this species to extinction" and that the "[r]ecovery of the species depends upon the protection of each remaining whale."[64] The whale is also listed as "critically endangered"—the most severe rating short of extinction—on the International Union for Conservation of Nature (IUCN) Red List.[65]

NMFS' five-year study, titled "Trophic Interactions and Habitat Requirements of Gulf of Mexico Rice's Whales" was completed in 2021. The study was designed to use multiple lines of research—including photo-identification and mark-recapture analyses, tagging of individual whales, sampling of both the whales' fecal matter and the prey composition of the area they forage, monitoring of potential habitat with passive acoustics, mapping of the distribution of the whales' prey, and determination of the oceanographic features associated with their habitat—to develop "a comprehensive ecological understanding" of the species' habitat use.[66] Together and individually, these multiple lines of evidence demonstrated that the Rice's whale persistently inhabits the western and central Gulf between the 100- and 400-meter isobaths, in addition to occupying the DeSoto Canyon in the eastern Gulf of Mexico as was previously documented.[67]

---

Nicholas A. Farmer, et al., *Modeling protected species distributions and habitats to inform siting and management of pioneering ocean industries: A case study for Gulf of Mexico aquaculture*, 17 PLoS ONE 1 (2022); L.P. Garrison, et al., *The habitat of the critically endangered Rice's whale,* Balaenoptera ricei, *in the Gulf of Mexico*, Endangered Species Research (in review).

[64] Letter from Andrew J. Strelcheck, Reg'l Admin., NMFS, to Tershara Matthews, Chief, Emerging Programs, BOEM, Re: Commercial Leasing Wind Power Development on the Outer Continental Shelf in the Gulf of Mexico—Draft Environmental Assessment Scoping Comments (Feb. 9, 2022) (Matthews Letter) at 6.

[65] P. Rosel et al., *Rice's Whale, Balaenoptera ricei*, IUCN, The IUCN Red List of Threatened Species (Sept. 1, 2021), https://www.iucnredlist.org/species/215823373/208496244.

[66] *Trophic Interactions and Habitat Requirements of Gulf of Mexico Rice's Whales*, NOAA RESTORE Science Program, https://restoreactscienceprogram.noaa.gov/projects/rices-whales; *Trophic Interactions and Habitat Requirements of Gulf of Mexico Rice's Whales*, NOAA Fisheries, https://www.fisheries.noaa.gov/southeast/endangered-species-conservation/trophic-interactions-and-habitat-requirements-gulf-mexico.

[67] *See* M.S. Soldevilla et al., *Rice's whales in the northwestern Gulf of Mexico: call variation and occurrence beyond the known core habitat*, 48 Endangered Species Res. 155 (2022b) [hereinafter "Soldvilla et al. (2022b)"]; M.S. Soldevilla et al., *Rice's whale occurrence in the western Gulf of Mexico from passive acoustic recordings*, Marine Mammal Sci. 1-8 (2024) [hereinafter "Soldvilla et al. (2024)"]; Jeremy J. Kiszka et al., *Critically endangered Rice's whale (*Balaenoptera ricei*) selectively feed on high-quality prey in the Gulf of Mexico*, 13 SCI. REPS. (2023); *see* Nicholas A. Farmer et al., *Modeling protected species distributions and habitats to inform siting and management of pioneering ocean industries: A case study for Gulf of Mexico aquaculture*, 17 Plos ONE 1, 7, 12 (2022) (using data from the five-year study to conduct a habitat suitability analysis).

Based on the five-year study and other evidence, NMFS concluded in 2023 that the "best scientific information available" supported the designation of this area as critical habitat that is "essential to the conservation" of Rice's whales.[68] On July 24, 2023, NMFS proposed to formally designate areas in DeSoto Canyon and in the western and central Gulf as the species' critical habitat under the ESA. 88 Fed. Reg. at 47,453. That designation, when final, carries with it a prohibition on federal activities that destroy or adversely modify this habitat. 16 U.S.C. § 1536(a)(2). NMFS has taken public comment on this proposal and is expected to issue a final rule soon.[69]

Evidence of the species' year-round occurrence in the central and western Gulf appears in NMFS' five-year study.[70] This evidence includes two studies that used passive acoustics to detect Rice's whale vocalizations with hydrophones placed at multiple survey sites along the shelf break. The first of these two studies, conducted from 2016 to 2017, detected Rice's whale vocalizations as frequently as one in every six days at the westernmost survey site ("Flower Garden West") with no obvious evidence of seasonality.[71] The second study, conducted from 2019 to 2020, detected more than twice as many Rice's whale calls at the Flower Garden West site as the first study, detecting Rice's whale long-moan calls on one in every three survey days.[72] Rice's whale long-moan calls were also detected on nearly one in every four survey days at a new survey site in the western Gulf offshore Corpus Christi, Texas.[73] Both studies detected Rice's whale calls in the western Gulf year-round without a strong seasonal cycle, indicating the whale's persistent presence in this area.[74] As further evidence of Rice's whale habitat, the Draft PEIS cites another component of NMFS' five-year study, which demonstrates that the whale's primary prey favors the same shelf-break habitat throughout the northern Gulf of Mexico where the whales have been shown to persistently occur.[75]

There have also been visual detections from the government's large vessel surveys conducted from 2003 to 2019, which included one confirmed Rice's whale detection in the western Gulf of Mexico.[76] This data understates the visual evidence of the whale's presence in the western Gulf.[77] Since 2019 there have been additional confirmed sightings of Rice's whales in the western Gulf, including two confirmed sightings by NOAA Fisheries scientists during

---

[68] 88 Fed. Reg. at 47461.
[69] *See* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202310&RIN=0648-BL86.
[70] Draft PEIS at 4-112.
[71] Soldevilla et al. (2022b), at 157, 172. These findings are likely to underestimate the frequency of Rice's whale calling in the northwestern Gulf, since background noise from shipping traffic and seismic surveys around the three westernmost survey sites may have reduced the detection distance of calls by 50 percent and the area sampled by 75 percent. *Id.* at 171.
[72] Soldevilla et al. (2024), at 3, 4.
[73] *Id.*
[74] *Id.*; Soldevilla et al. (2022b).
[75] Draft PEIS at 4-112 (citing Kiszka et al., *Critically endangered Rice's whale* (2023), *supra*).
[76] G.L. Rappucci et al., *Gulf of Mexico Marine Assessment Program for Protected Species (GoMMAPPS): Marine Mammals – Volume 1: Report* 53, OCS Study BOEM 2023-042 (2023), https://repository.library.noaa.gov/view/noaa/55950.
[77] *See* Soldevilla et al. (2022) (noting that several historic baleen whale sightings and additional unverified public sightings near NOAA's Flower Garden West hydrophone site, where the whales are frequently detected, further support the distribution of Rice's whales in the northwestern Gulf).

aerial surveys conducted in April 2024[78] and one confirmed sighting by NOAA Fisheries scientists in late 2024 during a vessel survey for marine mammal and seabird abundance and distribution.[79] In addition, two fishermen reported seeing a Rice's whale off the coast of Galveston in summer 2023, which they documented in a video.[80]

There have also been two recent habitat suitability analyses from NOAA.[81] Both analyses delineate the same shelf-break waters across the northern Gulf between the 100- and 400-meter isobaths as highly suitable habitat for the whale. The first analysis identified habitat in the northwestern Gulf based on three largely independent lines of information: sightings data from the government's large-vessel surveys (described above), acoustic data from NMFS' multi-year monitoring effort (described above), and a habitat suitability model rooted in salient oceanographic features, including water depth, bottom temperature, and primary productivity.[82] The second NOAA analysis developed a model of the whale's distribution based on bathymetric and oceanographic features and predicted suitable habitat for the whale throughout the Gulf in areas between 100 and 400 meters depth.[83] In addition, NMFS has done spatial estimates of Rice's whale distribution and density across the Gulf.[84] These estimates indicate that at least one third (n=33.3 to 38.8%) of the population occurs in the Central and Western Planning Areas in each season of the year.[85] Importantly, an analysis performed in 2023 with the same density information concluded that about 94% of the population is contained within the same strip of habitat located between the 100- and 400-meter isobaths.[86]

Oil and gas activities in the Gulf pose a serious threat to the continued survival of the Rice's whale.[87] Oil spills can cause physical injury, behavioral changes, or death, depending on the size and duration of the spill. In 2010, the BP *Deepwater Horizon* oil spill disaster "heavily

---

[78] *Rice's Whales Spotted in the Western Gulf of Mexico*, NOAA Fisheries (April 30, 2024), https://www.fisheries.noaa.gov/feature-story/rices-whales-spotted-western-gulf-mexico.
[79] *An Incredible Rice's Whale Encounter*, NOAA Fisheries (Dec. 17, 2024), https://www.fisheries.noaa.gov/science-blog/incredible-rices-whale-encounter.
[80] Michelle Homer*, One of the rarest whales on the planet spotted south of Galveston, fisherman says*, KHOU 11, https://www.khou.com/video/news/local/rare-rice-whale-galveston/285-f4890791-9c63-47f6-b481-69275af4aca8.
[81] *Id*.
[82] Farmer et al., *Modeling protected species distributions and habitats* (2022), *supra*. The suitability model took account of the sightings, but not the acoustic data. Although this paper was not undertaken as part of the five-year study, it made use of some of the data acquired during the study.
[83] Lance P. Garrison et al., *A density surface model describing the habitat of the Critically Endangered Rice's whale* Balaenoptera ricei *in the Gulf of Mexico*, 54 ENDANGERED SPECIES RES. 41 (2024).
[84] Southeast Fisheries Science Center, *Density of Cetaceans and Turtles in the Gulf of Mexico* (2025), https://www.fisheries.noaa.gov/inport/item/70316 (accessed Jan. 14, 2025).
[85] *See* L.P. Garrison et al., *Gulf of Mexico Marine Assessment Program for Protected Species (GoMMAPPS): Marine Mammals, Volume 2: Appendix C: Gulf of Mexico Marine Mammal Spatial Density Models* 154 tbl.C.2-6, OCS Study BOEM 2023-042 (2023). These percentages were calculated from the seasonal abundance estimates reported in *id.* tbl.C.2-6 and equal the seasonal abundance of Rice's whales in the Central Planning Area plus Western Planning Area as a percentage of the total seasonal abundance of Rice's whales for each season. (Winter = 33%, spring = 39%, summer = 34%, fall = 34%). NMFS has stated elsewhere that nearly half the population (about 42 percent) occurs outside the DeSoto Canyon area in the eastern Gulf. *See* Taking Marine Mammals Incidental to Geophysical Surveys in the Gulf of Mexico, 88 Fed. Reg. 916, 944 (Jan. 5, 2023) (stating "core habitat area contains approximately 57 percent of predicted Rice's whale abundance").
[86] Benjamin D. Best, *Spatial analysis of ship-strike risk for Rice's whale in the Gulf of Mexico* (Aug. 10, 2023).
[87] NMFS, *Species Directory: Rice's Whale*, https://www.fisheries.noaa.gov/species/rices-whale/overview.

impacted" the already diminished Rice's whale population.[88] The federally-led Deepwater Horizon Natural Resource Damage Assessment Trustees estimated that the disaster caused a 22% decline in the Rice's whale population.[89] The regular occurrence of Rice's whales in the Western and Central Planning Areas, as detailed above, puts them at greater risk of exposure to a large oil spill. Each one of the blowout scenarios modeled by BOEM in its 2021 analysis of catastrophic spill events—whether they occurred in shallow or deep water, whether near the shelf break or hundreds of kilometers away—would result in contamination of Rice's whale habitat, as illustrated in the figures below.[90]







The figure on the left is taken from BOEM's revised model of oil spill trajectories from a catastrophic spill in the northern Gulf of Mexico (Fig. 2-10, *Gulf of Mexico Catastrophic Spill Event Analysis: High-Volume, Extended-Duration Oil Spill Resulting from Loss of Well Control on the Gulf of Mexico Outer Continental Shelf, 2nd Revision*, 2021), where the triangle marked "LP3" denotes the launch point of the modeled spill. When compared to the figure on the right, which shows NMFS proposed designated critical habitat for Rice's whale, a broad overlap between the projected oil exposure area of Rice's whale habitat can be seen.

Moreover, a recent and ongoing spill, the Garden Island Bay oil spill, is already seeping into critical habitat for Rice's whale. Last month, an 82-year-old well near Louisiana's coast suffered a blowout and spewed oil for over a week. Below are recent maps showing the sheen has reached critical habitat for the Rice's whale. The cumulative impacts of multiple spills over time is an existential threat to the species.

---

[88] *Id*. at 169.

[89] *Deepwater Horizon oil spill: Final Programmatic Damage Assessment and Restoration Plan and Final Programmatic Environmental Impact Statement* 4-631 to 4-632, Deepwater Horizon Natural Resource Damage Assessment Trustees (2016).

[90] *Compare* NMFS, *Proposed Rice's Whale Critical Habitat* (2023) https://www.fisheries.noaa.gov/s3/2023-07/Rices-Whale-Proposed-CH-Map-508-Final.pdf, *with* BOEM, *Catastrophic Spill Event Analysis*, *supra*, at 192–205 (oil trajectory and probability for each of seven modeled spill sites).




In addition to harm from oil spills, Rice's whales are particularly susceptible to serious injury or death resulting from vessel strikes because they spend most of their time near the water's surface.[91] In general, vessel strikes have been identified as one of the top human threats to large whale populations globally,[92] coinciding with a four-fold increase in marine vessel density from the early 1990s through 2012.[93] While larger ships have long been associated with severe strike-related injury, there is increasing recognition that smaller vessels can also cause mortality, particularly when traveling at faster speeds.[94] The biology of the Rice's whale leaves it particularly vulnerable to harm from vessel strikes, because the whale spends a considerable amount of time at night within the upper 15 meters of the water column, placing it within the draft depths of most commercial vessels.[95] This behavior significantly raises the risk of vessel strikes.[96]

According to NMFS' 2020 analysis, oil and gas vessel traffic accounts for about 35% of the total vessel strike risk within Rice's whale habitat.[97] That total increases to 40% when

---

[91] NMFS, *Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of Mexico* (Mar. 13, 2020) (BiOp) at 344-63; Melissa S. Soldevilla et al., *Spatial distribution and dive behavior of Gulf of Mexico Bryde's whales: potential risk of vessel strikes and fisheries interactions,* 32 Endang Species Res 533, 540 (2017).

[92] R.P. Schoeman et al., C. *A global review of vessel collisions with marine animals*, 7 FRONTIERS IN MARINE SCI. (2020).

[93] J. Tournadre, *Anthropogenic Pressure on the Open Ocean: The Growth of Ship Traffic Revealed by Altimeter Data Analysis*, 41 GEOPHYSICAL RES. LETTERS 7924 (2014).

[94] *E.g.*, D.E. Kelley et al., *Assessing the lethality of ship strikes on whales using simple biophysical models*, MARINE MAMMAL SCI. (2021).

[95] Draft PEIS at 4-120 (citing NMFS 2023h, https://www.fisheries.noaa.gov/species/rices-whale/overview); *see also* M.S. Soldevilla et al., *Spatial Distribution and Dive Behavior of Gulf of Mexico Bryde's Whales: Potential Risk of Vessel Strikes and Fisheries Interactions*, 32 ENDANGERED SPECIES RES. 533, 540 (2017) [hereinafter "Soldevilla et al. (2017)].

[96] Soldevilla et al. (2017) at 543.

[97] BiOp at 362.

updated to incorporate NMFS' most recent density estimates for the species.[98] Two studies demonstrate that the behavior of the Rice's whale increases the species' vulnerability to vessel strikes.[99] These studies analyze information on diving, foraging, and resting behavior obtained from two tagged Rice's whales over periods of 25 hours or greater. Both whales were observed within 15 meters of the sea surface for 85% of the time at night, highlighting their vulnerability to vessel strikes.

In addition to vessel strikes, noise from high-energy seismic surveys used in oil and gas exploration causes behavioral disturbance and physical injury, including permanent hearing impairment and chronic interference with communication and other vital activity.[100] Drilling wells causes harm from deafening pile driving when installing platforms and inevitable oil and fluid spills into the water.[101]

Acoustic communication is essential to the life functions of baleen whales like the Rice's whale. Rice's whales require quiet conditions sufficient to "receive and interpret sound for the purposes of navigation, communication, and detection or [sic] prey, predators, and other threats," without significant impediment.[102] For example, masking of the quiet contact calls between baleen whale mothers and their calves, which have been documented in diverse baleen whale species,[103] could lead to separation, with potentially deadly consequences to the calf, or a reduction in calf feeding events leading to energetic consequences. Masking of other calls can result in missed breeding opportunities or affect social cohesion, especially in species that, like Rice's whale, do not always vocalize or can go hours or days without vocalizing.[104] Rice's whales produce low-frequency calls (including the long-moan call), leaving them particularly vulnerable to masking by the low-frequency sounds produced by seismic surveys.[105] Rice's whales' long-moan calls are likely to be of significant import to the species (e.g., for breeding or foraging),[106] given their rate of call production, the distances their calls propagate (20 to 75 kilometers), and their association with groups in at least some instances.

Due to the high energy cost of their foraging strategies, baleen whales are limited in their ability to compensate for impairments in their foraging regimes.[107] Based on the literature

---

[98] B.D. Best, *Spatial analysis of ship-strike risk for Rice's whale in the Gulf of Mexico* (Aug. 3, 2023).
[99] Kok et al., *Kinematics and Energetics of Foraging Behavior in Rice's Whales*, *supra*; Soldevilla et al. (2017).
[100] BiOp at 408–13, 463–66.
[101] *Id*. at 313–22, 452–63, 492–524.
[102] 88 Fed. Reg. at 47461.
[103] Mia L. Nielsen et al., *Acoustic crypsis in southern right whale mother–calf pairs: Infrequent, low-output calls to avoid predation?*, 222 J. EXPERIMENTAL BIOLOGY (2019); Susan E. Parks et al., *Acoustic crypsis in communication by North Atlantic right whale mother-calf pairs on the calving grounds*, 15 BIOLOGY LETTERS (2019); Simone K. Videsen et al., *High suckling rates and acoustic crypsis of humpback whale neonates maximise potential for mother-calf energy transfer*, 31 FUNCTIONAL ECOLOGY 1561 (2017). An example of crypsis in Rice's whales may have been recorded by an archival tag. *See* Melissa S. Soldevilla et al., *Acoustic localization, validation, and characterization of Rice's whale calls*, 151 J. ACOUST. SOC. AM. 4264 (2022) [hereinafter "Soldevilla et al. (2022)"].
[104] Soldevilla et al. (2022) at 4271 (summarizing results from acoustic tags deployed on Rice's whales).
[105] Draft PEIS at 4-116; *see* Soldevilla et al. (2022b) at 170–71.
[106] Soldevilla et al. (2022).
[107] For example, North Atlantic right whales undertake an energetically expensive high-drag ram-filtering foraging strategy that involves filtering large volumes of water at low speeds with a high duty cycle, and the species has evolved to preferentially target high-energy prey that occur in dense aggregations to compensate. Julie M. van der Hoop et al., *Foraging rates of ramfiltering North Atlantic right whales*, 33 FUNCTIONAL ECOLOGY 1290 (2019). A

concerning right, blue, and humpback whales,[108] it can be assumed that Rice's whales have similar requirements to carefully maintain their energy budgets, and that impairment can lead to energetic and fitness consequences for the species, as documented in other marine mammals. Indeed, avoiding impairment may be of particular concern for Rice's whales given what a tagging study has documented of their foraging behavior: deep, energetically costly dives with comparatively low rates of feeding lunges, undertaken in some cases by individuals in poor body condition.[109] As the authors of that tagging study have stated, "any direct impact on their fitness" could lead to the species' extinction.[110]

Rice's whale habitat already experiences persistent elevated levels of ambient noise, particularly in the western and central Gulf of Mexico where seismic activity is the highest.[111] A recent study found that ambient noise levels at Rice's whale call frequencies (i.e., the 60-160 Hz band) were approximately 7 dB re 1µPa2/Hz higher at a recording location in the Rice's whale habitat in the western Gulf relative to the whale's habitat in DeSoto Canyon in the eastern Gulf.[112] Ambient noise levels were even higher at other recording locations across the whale's habitat in the central Gulf.[113] With these levels of ambient noise, as NMFS' expert status review put it, "whales would be unlikely to hear their nearest neighbors."[114] Similar decreases in communication space, resulting from chronic noise, have raised conservation concerns for other baleen whale species.[115]

---

reduction in the availability of dense aggregations of the right whales' primary prey, *Calanus finmarchicus*, has led to significant levels of weight loss and ill health in the species, with consequences for species' fitness. *See*, *e.g.*, Fredrik Christiansen et al., *Population comparison of right whale body condition reveals poor state of the North Atlantic right whale*, 640 MARINE ECOLOGY PROGRESS SERIES 1-16 (2020). Blue whales and humpback whales have likewise been observed to adapt their foraging strategies in response to available prey density. Elliott L. Hazen et al., *Blue whales (*Balaenoptera musculus*) optimize foraging efficiency by balancing oxygen use and energy gain as a function of prey density*, 1 SCIENCE ADVANCES (2015); Yu Akiyama et al., *Leave or stay? Video-logger revealed foraging efficiency of humpback whales under temporal change in prey density*, 14 PLOS ONE (2019). Such adaptations are logical in diving predators that face conflicting metabolic demands of energy intake and oxygen conservation during a breath-hold, even as they work to sustain their large body size through highly demanding life functions, including reproduction and nursing.

[108] *Id.*

[109] Annebelle C.M. Kok et al., *Kinematics and Energetics of Foraging Behavior in Rice's Whales of the Gulf of Mexico*, 13 SCI. REP. (2023).

[110] *Id.* at 7.

[111] *See* BOEM, *Gulf of Mexico Geological and Geophysical (G&G) Activities: Western, Central, and Eastern Planning Areas – Final Programmatic Environmental Impact Statement*, Vol. II, at tbl.3.2-1 (Aug. 2017) (showing projected range of geological and geophysical survey activity by planning area over a 1-year period), https://www.boem.gov/sites/default/files/environmental-stewardship/Environmental-Assessment/NEPA/BOEM-EIS-2017-051_v2.pdf.

[112] Soldevilla et al. (2022b) at 166.

[113] *Id.* at 166.

[114] Rosel et al. (2016) at 55.

[115] *See*, *e.g.*, Danielle Cholewiak et al., *Communicating amidst the noise: Modeling the aggregate influence of ambient and vessel noise on baleen whale communication space in a national marine sanctuary*, 36 ENDANGERED SPECIES RES. 59 (2018); Leila T. Hatch et al., *Quantifying loss of acoustic communication space for right whales in and around a U.S. National Marine Sanctuary*, 26 CONSERVATION BIOLOGY 983 (2012); Rosalyn L. Putland et al., *Vessel noise cuts down communication space for vocalizing fish and marine mammals*, GLOBAL CHANGE BIOLOGY (2017); R. Williams et al., *Acoustic quality of critical habitats for three threatened whale populations*, 17 ANIMAL CONSERVATION 174 (2014).

Seismic surveys for oil and gas exploration contribute significantly to ambient noise levels in the northern Gulf of Mexico. Multiple studies have shown that seismic airguns dominate the soundscape through much of the northern Gulf, including in Rice's whale habitat, with other industrial noise and shipping also contributing.[116] Seismic airgun noise has been demonstrated to propagate long distances in the Gulf of Mexico, over several hundred kilometers.[117] Some individual seismic surveys in the Gulf of Mexico persist for months at a time, operating day and night, and the frequency of activity makes seismic noise a chronic stressor in many parts of the Gulf.[118] It has repeatedly been hypothesized, including by NMFS, that the lower Rice's whale densities detected outside the DeSoto Canyon may be due to higher levels of ambient noise.[119]

Given the Rice's whale's vulnerability to extinction, even a single death, serious injury, or profound behavior disruption from unmitigated noise impacts stemming from the Proposed Action could undermine the ability of the population to recover.[120] Unmitigated noise impacts may cause these consequences.[121] Even with the currently-applied mitigation measures aimed at avoiding seismic blasts when a Rice's whale is observed within 500 meters of an airgun array,[122] seismic noise may cause masking, behavioral changes, or other disruptions to the essential life functions of Rice's whales, as detailed above.

Recognizing the significance of this evidence, federal wildlife agencies have advised BOEM to completely avoid development activities in Rice's whale habitat in the western and central Gulf. Early in 2022, NMFS recommended that "no offshore wind leasing and/or development occur within the boundaries of the currently known distribution of Rice's whales in the western and central [Gulf]."[123] More recently, the Marine Mammal Commission made similar recommendations for future oil and gas leasing in the Gulf. The Commission cited the Soldevilla (2022) study, noted the species' "precarious conservation status" and its "confirmed

---

[116] *See*, *e.g.*, B.J. Estabrook et al., *Widespread spatial and temporal extent of anthropogenic noise across the northeastern Gulf of Mexico shelf ecosystem*, 30 ENDANGERED SPECIES RES. 267 (2016); M.R. Rafter et al., *LISTEN GoMex, 2010-2021: Long-term investigations into soundscapes, trends, ecosystems, and noise in the Gulf of Mexico*, MPL Tech. Memo. No. 662 (2022); S.M. Wiggins et al., *Gulf of Mexico low-frequency soundscape impacts by airguns*, 140 J. ACOUSTICAL SOC'Y AMERICA 176 (2016).
[117] Estabrook et al., *Widespread spatial and temporal extent of anthropogenic noise*, *supra*, at 279.
[118] *Id.*
[119] *See, e.g.*, Endangered Status of the Gulf of Mexico Bryde's Whale, 84 Fed. Reg. 15446, 15474 (Apr. 15, 2019); NMFS, *Endangered Species Act Rice's Whale Critical Habitat Report: Proposed Information Basis and Impact Considerations of Critical Habitat Designation* 19 (2023), https://www.fisheries.noaa.gov/s3/2023-07/Critical-Habitat-Report-508-Final.pdf; P.E. Rosel & L.A. Wilcox, *Genetic evidence reveals a unique lineage of Bryde's whales in the northern Gulf of Mexico*, 25 ENDANGERED SPECIES RES. 19, 31 (2014).
[120] *See* Hayes et al., *U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessments* (2021) *supra*, at 160–67 (finding that the species can only afford to lose one animal about every fifteen years as a result of human impacts if it is to achieve its optimum sustainable population consistent with federal law); Strelcheck Comments at 6 ("the loss of even a single reproductive female could lead [the Rice's whale] to extinction").
[121] Draft PEIS at 4-116 ("The potential effects of underwater sound from an active acoustic source could result in mortality, temporary hearing loss, permanent hearing loss, behavioral disturbance, stress, masking…").
[122] NMFS, *Amended Incidental Take Statement and Revised Appendices to the Programmatic Biological Opinion on the Gulf of Mexico Oil and Gas Program* (Apr. 26, 2021), Appx. A: Seismic Survey Mitigation and Protected Species Observer Protocols, https://www.fisheries.noaa.gov/resource/document/amended-incidental-take-statement-and-revised-appendices.
[123] Matthews Letter at 6.

presence in the western Gulf," and recommended that BOEM therefore "exclude areas with 100 to 400 m depths from proposed lease sales in the [Gulf]."[124]

BOEM has attempted to limit offshore oil and gas activities in Rice's whale habitat.[125] In particular, in March 2023, BOEM's Proposed Notice of Sale for Lease Sale 261 informed bidders that the agency was "considering removing the area comprising the northeastern Gulf of Mexico and continental shelf break between the 100 meters and 400 meters in depth isobaths to protect Rice's Whales that may transit through the area."[126] BOEM issued its Final Notice of Sale in August 2023, offering over 73 million acres of the Gulf for leasing while excluding blocks within Rice's whale's proposed critical habitat. *See* 88 Fed. Reg. 58,300, 58,303–04 (Aug. 25, 2023). BOEM also updated the lease sale's Protected Species Stipulation to require certain speed restrictions and other measures between the 100-meter to 400-meter isobaths.[127]

As BOEM stated, the exclusion of Rice's whale habitat provides a "reasonable balance between protecting the endangered Rice's whale" and "offering a sizeable area for leasing that will continue to meet national energy needs and provide for the well-being of citizens on the Gulf coast."[128] BOEM also found that a lease sale with these protections would comply with its obligations "under Section 7 of the ESA to prevent jeopardy to listed species or adverse modification of designated critical habitat."[129]

Following a challenge by industry groups and the State of Louisiana, the U.S. District Court for the Western District of Louisiana preliminarily enjoined BOEM from implementing the acreage withdrawal for Rice's whale proposed critical habitat and updated species stipulation in conducting Lease Sale 261. *Louisiana v. Haaland*, No. 2:23-CV-01157, 2023 WL 6450134, at *12 (W.D. La. Sept. 21, 2023), order modified, appeal dismissed in part, 86 F.4th 663 (5th Cir. 2023). BOEM eventually held Lease Sale 261 without these protections on December 20, 2023.

However, nothing in the district court's decision precludes BOEM from utilizing its discretion and authority at future steps in the leasing process to protect endangered species. In fact, as the Western District of Louisiana recognized, "if the government finds justification for

---

[124] Letter from Peter O. Thomas, Executive Director, Marine Mammal Commission, to Kelly Hammerle, Chief, National Oil and Gas Leasing Program Development and Coordination Branch, BOEM (Oct. 6, 2022), at 5.
[125] In addition, with regard to offshore wind leasing, BOEM has conceded the risks of ocean energy development in Rice's whale's habitat. In July 2022, consistent with NMFS' recommendation, BOEM decided to eliminate blocks in Rice's whale habitat in the western and central Gulf from 12 offshore wind leasing. In doing so, BOEM determined that Rice's whale habitat in the western and central Gulf is "completely unsuitable" for development activity. Memorandum from Michael Celata, Regional Director, Gulf of Mexico Regional Office, to Amanda Lefton, Director, BOEM, Re: Request for Concurrence on Preliminary Wind Energy Areas for the Gulf of Mexico Area Identification Process Pursuant to 30 C.F.R. § 585.211(b) (July 20, 2022), at 4, 12-13, 34, 44.
[126] BOEM, *Proposed Notice of Sale, Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sale 261* (Mar. 15, 2023) at 7, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/proposed-nos-261.pdf.
[127] BOEM, *Final Notice of Sale Gulf of Mexico Oil and Gas Lease Sale 261: Lease Stipulations* (Aug. 25, 2023).
[128] Memorandum from Laura Daniel-Davis, Principal Deputy Assistant Secretary Land and Minerals Management, BOEM, to Elizabeth Klein, Director, BOEM, re: Recommendations for Decision on the Final Notice of Sale for Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sale 261 (scheduled for September 27, 2023) (Aug. 22, 2023) at 24.
[129] ROD at 13.

additional measures to protect Rice's whale, it may pursue these through the Department of the Interior's oversight of lessees' exploration and production plans." *Louisiana v. Haaland*, 2023 WL 6450134, at *10 (citing 43 U.S.C. §§ 1340(c)(1), 1351(c) (describing Interior's ability to require modifications of exploration and production plans or cancel them to avoid environmental harm)).

BOEM's regulations require the EIA to both describe threatened species and their habitats and to analyze impacts as well as describe potential measures to mitigate impacts. 30 C.F.R. § 550.261(b), (c). And, if there is reason to believe that a protected species will be taken, the DOCD "must" include mitigation measures designed to avoid or minimize the take. Id. § 550.254(b). Yet neither the DOCD or the EIA describes the full extent of impacts to the Rice's whale nor include mitigation measures to address the impacts of the project. All the DOCD states is that transit routes will avoid the whale's "core distribution area" in the Eastern Gulf but says nothing about impacts to the population near the drill site, in the Western or Central Gulf or how it will minimize those impacts. At most, the DOCD includes voluntary measures which will not minimize harm.

To the extent that the DOCD is relying on earlier NEPA reviews to substitute for an analysis of impacts to the Rice's whale, such an argument fails. The 5-year program and lease sale EIS that preceded this DOCD do not evaluate impacts to the Rice's whale. Even BOEM's most recent NEPA reviews for Gulf oil and gas activities do not account for current science and fail to consider the impacts of DOCD activities on the Rice' whale and its proposed critical habitat in the western and central Gulf. For example, in its latest EIS for Lease Sales 259 and 261, released in January 2023, BOEM only considered the species' "core habitat" in De Soto Canyon, ignoring recent evidence and potential impacts to this species in the rest of the Gulf.[130]

NEPA requires BOEM to use high quality, accurate scientific information in its environmental reviews and to ensure the scientific integrity of its analysis. 42 U.S.C. § 4332(2)(C). Where more recent scientific information is available in the record, the agency may not simply dismiss it and instead rely on outdated data. *See Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1034 (10th Cir. 2001) (noting "agencies must take a hard look at the environmental consequences of proposed actions utilizing the best available scientific information" (cleaned up)); *California v. Bernhardt*, 472 F.Supp.3d 573, 624 (N.D. Cal. 2020) ("NEPA mandates that an agency use state of the art science to make sound scientific decisions."). Moreover, courts have turned away legal challenges in the lease sale context with the expectation that site-specific, operational issues "will receive ample review" that "compl[ies] with NEPA at the later exploration and production stages." *Friends of the Earth v. Haaland*, 583 F.Supp.3d 113, 150 (D.D.C. 2022), vacated, 2023 WL 3144203 (D.C. Cir. 2023).

[130] BOEM, Gulf of Mexico OCS Oil and Gas Lease Sales 259 and 261: Final Supplemental Environmental Impact Statement (Jan. 2023) at 4-59 ("Based on vessel and aerial survey sightings, the primary core habitat of Rice's whale (not legally protected under the ESA and MMPA) is in the northeastern GOM, centered in De Soto Canyon in water depths between approximately 100 and 400 m").

## VIII. THE DOCD FAILS TO PROPERLY ADDRESS HARMS TO OTHER IMPERILED WILDLIFE

The DOCD acknowledges that several threatened and endangered species are in the project area in addition to Rice's whales, including the sperm whale, oceanic whitetip shark, giant manta ray, black capped petrel, and five species of sea turtles: the leatherback turtle, Kemp's ridley turtle, hawksbill turtle, loggerhead turtle, and green turtle.[131]

BOEM's regulations require that "[i]f there is reason to believe that" species protected under the ESA "may be incidentally taken by planned development and production activities," the DOCD must "include mitigation measures designed to avoid or minimize that incidental take." 30 C.F.R. § 550.254(b). But the DOCD fails to contain such measures for some species, even though the available information indicates that take of these species is possible.

For example, the EIA accompanying the DOCD states that the project "may affect the Black-capped Petrel" via the "FPU [floating production unit] and vessel presence, marine sound, and lights, support vessel and helicopter traffic; and two types of accidents (a small fuel spill and a large oil spill)."[132] It further notes that "[b]irds migrating over water have been known to collide with offshore structures, resulting in injury and/or death" and that "Black-capped Petrels may be attracted to lights on the FPU, installation vessels, and drilling rig, which could increase the risk of a collision."[133] Indeed, as nocturnal feeders, black-capped petrels are especially vulnerable to harms from lighting on platforms, vessels, and other infrastructure.[134]

Yet the EIA then concludes that "[d]ue to the limited scope and short duration of drilling activities described in this DOCD and the low density of Black-capped Petrels in the Gulf of Mexico, no significant impacts are expected."[135] This answers the wrong question—whether there may be significant impacts on the species as a whole is an issue distinct from whether take of individual members of the species may be taken by development and production activities. The available information indicates that black-capped petrels may be taken during the project, such that BP is required to include mitigation measures to reduce the likelihood of such take during project operations. These mitigation measures could include, for example, minimizing the number of exterior lights on the production unit and large vessels; placing down-shields on exterior lights; using black-out curtains on exterior windows; and using green or blue lights instead of white.[136]

Development and production activities will exacerbate numerous other harms to protected species, such as oil spills that cause death or injury to petrels, turtles, whales, and

---

[131] DOCD at 21.
[132] Kaskida EIA at 66.
[133] *Id.*
[134] *See, e.g.*, Jodice, Patrick G. R., et al. Revising the marine range of the endangered black-capped petrel Pterodroma hasitata: occurrence in the northern Gulf of Mexico and exposure to conservation threats, 46 Endang Species Res 49–65 (2021).
[135] Kaskida EIA at 66.
[136] Marquenie, J., et al., Bird-Friendly Light Sources: Adapting the Spectral Composition of Artificial Lighting. In IEEE industry applications magazine. Vol. 19, Number 2, pp. 56–62 (2013); Miles, W., et al., Effects of artificial lights and moonlight on petrels at St Kilda, 57(2) Bird Study 244–251 (2010).

fish;[137] and more greenhouse gas emissions driving the climate crisis. For example, climate change is causing a loss of sea turtle nesting beaches and nests, changes to incubation temperatures and hatchling sex ratio, and is negatively impacting sargassum habitat, which is critical for juvenile sea turtles.[138] And sea level rise, increased temperatures, and increased storm severity are threatening the nesting habitat of several ESA-protected birds found the Gulf of Mexico region.[139] The DOCD and accompanying environmental analysis must properly account for and minimize these impacts as well.

## IX. BOEM MUST ENSURE BP WILL FULLY DECOMMISSION ALL WELLS AND OTHER INFRASTRUCTURE PRIOR TO APPROVING THE DOCD

BOEM cannot approve BP's DOCD unless and until BP includes information regarding how it intends to decommission all of the infrastructure it intends to use to develop Kaskida, and BOEM guarantees that such decommissioning will actually occur. Indeed, OCSLA's mandate that BOEM reject a development plan "if the lessee fails to demonstrate that [it] can comply with [OCSLA's implementing] regulations,"[140] coupled with OCSLA's regulatory requirements regarding decommissioning, means that BOEM must reject the DOCD unless BP can show that it will decommission all infrastructure used to develop the Kaskida project.

OCSLA's implementing regulations require oil and gas companies to decommission all infrastructure used to develop a well.[141] These decommissioning obligations accrue from the moment a company drills a well or installs a platform, pipeline, or other facility.[142] These obligations extend to all past and current operators if the lease or operating right is transferred.[143] BSEE regulations require oil and gas companies to plug wells and remove platforms and pipelines within one year of lease termination.[144] Companies must also decommission idle

[137] Barron, M. G., et al. Long-Term Ecological Impacts from Oil Spills: Comparison of Exxon Valdez, Hebei Spirit, and Deepwater Horizon. Environmental Science & Technology, 54(11), 6456–6467 (2020); Takeshita, Ryan et al., A review of the toxicology of oil in vertebrates: what we have learned following the Deepwater Horizon oil spill, 24:8 Journal of Toxicology and Environmental Health, Part B 355-394 (2021).

[138] *E.g.*, Calderón-Peña, Ret al., Sex ratio of the green sea turtle Chelonia Mydas (testudines: Cheloniidae) hatchlings in the Guanahacabibes Peninsula, Cuba. Revista de Biología Tropical, 68(3) (2020); Von Holle, Betsy et al., Effects of future sea level rise on coastal habitat, 83 J. Wildlife Mgmt. 694 (2019); Bevan, E., et al., Comparison of beach temperatures in the nesting range of Kemp's ridley sea turtles in the Gulf of Mexico, Mexico and USA, 40 Endangered Species Research 31–40 (2019); Shaver, Donna J. et al., Threats to Kemp's ridley sea turtle (Lepidochelys kempii Garman, 1880) nests incubating in situ on the Texas coast, 13 Herpetology Notes 907 (2020).

[139] *E.g.*, Romañach, S. S., et al., Sea level rise may pose conservation challenges for the endangered Cape Sable seaside sparrow, 10 Frontiers in Ecology and Evolution 1085970 (2023); Woolley, Henry W., Ecological Factors Influencing Population Dynamics of the Mississippi Sandhill Crane, Grus canadensis pulla, University of New Orleans Theses and Dissertations, 2927 (2021); Andes, A. K., et al. Plasticity of Least Tern and Piping Plover nesting behaviors in response to sand temperature, 91 Journal of Thermal Biology, 102579–9 (2020); Lehnen, S. E., et al. Management implications of habitat selection by whooping cranes (Grus americana) on the Texas coast, Ecosphere, *15*(4) (2024).

[140] 43 U.S.C. § 1351(h)(1)(A).

[141] *See* 30 CFR § 250.1700(a); *see also* BOEM, Oil And Gas Lease Of Submerged Lands Under the Outer Continental Shelf Lands Act, Form BOEM-2005, sec. 22.

[142] 30 C.F.R. § 250.1702.

[143] *Id*. §§ 250.1701, 556.604(d), 556.605, 556.805. For the purposes of these comments "lease or operating right" is used broadly to encompass pipeline rights-of-way, or rights-of-use and easements.

[144] 30 C.F.R. §§ 250.1710, 250.1725(a); 250.1010(h).

infrastructure on active leases when it is "no longer useful for operations."[145] An idle well is "no longer useful for operations" if it has not been used for 5 years and the operator has no future plans to use it.[146] Operators must decommission an idle well within 3 years of determining that it is both no longer useful for operations and no longer capable of producing hydrocarbons in paying quantities.[147] Idle platforms and other facilities are "no longer useful for operations" if they have been toppled, destroyed, or have not been used for 5 years and the operator has no future utility for them.[148] Operators must decommission these facilities within 5 years of determining they are no longer useful for operations.[149]

Presumably this is why BOEM's regulations require a DOCD to include "[a] brief description of how [an oil and gas company] intend[s] to decommission [its] wells, platforms, pipelines, and other facilities, and clear [its] site(s)."[150] Yet BP's DOCD fails to contain such description. This failure is particularly glaring given new information indicating that timely decommissioning of oil and gas infrastructure often does not occur.

Indeed, the Gulf is facing an ongoing decommissioning crisis resulting from decades of regulatory failure to implement and enforce strong policies to ensure that the fossil fuel industry promptly removes end-of-life infrastructure from the OCS. As BOEM recently acknowledged, "relatively few major facilities have been decommissioned," but "[a]s more facilities reach the end of their useful life, … decommissioning will be required on a larger scale."[151] As of 2020, there were total of 10,783 unplugged wells in federal Gulf waters, the majority of which (7,302, or 67.7%) were considered candidates for decommissioning because they were inactive, temporarily abandoned, or located on an inactive lease.[152] According to a 2024 GAO report, "[n]early half of the approximately 8,000 wells and 1,600 platforms remaining offshore are approaching or past the end of their useful life," and over 75% of end-of-lease and idle infrastructure in the Gulf was overdue for decommissioning as of 2023, representing over 2,700 wells and 500 platforms.[153] Troublingly, the number of overdue wells could nearly double by 2030.[154]

This delinquent infrastructure creates numerous risks. Unplugged wells, corroded pipelines, and deteriorating platforms all pose a significant and growing threats to the waters of the outer continental shelf and the coastal environment.[155] As BOEM itself has acknowledged:

---

[145] *Id.* § 250.1703.
[146] BSEE, NTL No. 2018-G03, Idle Iron Decommissioning Guidance for Wells and Platforms at 2 (Dec. 11, 2018).
[147] *Id.*
[148] *Id.* at 2, 4.
[149] *Id.* at 4.
[150] 30 C.F.R.
[151] 89 Fed. Reg. 31544, 31548 (Apr. 24, 2024).
[152] Agerton, et al., Financial Liabilities and Environmental Implications of Unplugged Wells for the Gulf of Mexico and Coastal Waters, 8 Nature Energy 536 at 540, tbl. 3 (2023).
[153] Gov't Accountability Off., GAO-24-106229, Offshore Oil and Gas: Interior Needs to Improve Decommissioning Enforcement and Mitigate Related Risks at 1, 12 (Jan. 2024).
[154] Andrew Hartsig, Ocean Conservancy, Protecting the Ocean and Taxpayers by Strengthening Standards for Offshore Oil and Gas Decommissioning 5 (Sept. 2024), https://oceanconservancy.org/wp-content/uploads/2024/09/Decommissioning-Report-Final.pdf.
[155] GAO 2024 at 9.

> Deteriorated facilities increase safety risks to industry personnel and even BSEE inspectors due to degraded boat landings, gratings, ladder wells, and handrails needed to access and traverse platforms. Firefighting and other safety equipment on idle facilities may not function when needed, and the risk of vessel collisions may also increase if lighting and other navigational aids are not maintained on idle platforms. Similarly, deteriorated tanks, piping, storage units, and other equipment may lead to a loss of integrity and leaking of hydrocarbons and other contaminants into coastal and marine waters, which may lead to acute and chronic impacts to seabirds, fish, and other marine protected species in the vicinity of the structure.
>
> Storm-toppled wells and facilities may introduce broad environmental hazards due to hydrocarbon and contaminant leaks from the damaged wells and submerged tanks, piping, and equipment. There are also increased safety risks due to potential impacts to other OCS users from unmarked seabed obstructions and the need for extremely dangerous diving and lifting operations required to gain access to the well conductors for plugging and abandoning activities and to remove the toppled platform decks and jackets, production equipment, and extensive debris fields. Storm systems also have the capacity to unbury and shift pipelines dozens to hundreds of feet outside of their prior routes and several feet up into the water column, making them more susceptible to snagging by anchored vessels and commercial trawlers. These snagged pipelines result in unnecessary space-use conflicts and may lead to potential hydrocarbon leaks and injury to crews.[156]

The expense associated with decommissioning infrastructure in ultra-deep water exacerbates the risk that such decommissioning will not occur for this particular project,[157] thereby enhancing the risks of oil spills and other harms from delayed decommissioning. Because decommissioning is expensive, fossil fuel companies use various tactics to delay, stall, and ultimately avoid fulfilling their decommissioning obligations.[158] These include transferring low-producing properties to smaller, less-resourced companies, which may in turn sell the wells again to even smaller companies.[159] Operators may also allow infrastructure on active leases to sit idle for years and avoid decommissioning by claiming that it is capable of producing hydrocarbons "in paying quantities" or otherwise still useful for operations.[160] Indeed, BSEE has acknowledged that operators may employ "intentional delay tactics—such as by proposing an

---

[156] BOEM, Gulf of Mexico Regional OCS Oil and Gas Lease Sales, Draft Programmatic Environmental Impact Statement (BOEM 2024-032) at J-9 (Dec. 2024).

[157] *See, e.g.*, Agerton, et al., 2023 at 540 ("Deep-water wells are especially expensive to P&A due to their complexity, size and depth, plus the costs of deep-water operations. Only 1,617 deep-water wells represent US$34.5 billion in P&A costs, while 9,166 wells in federal shallow waters represent only around US$7.6 billion in P&A costs.").

[158] Olade, Mark & Arkle, Peter, How Oil Companies Offload Costly Cleanup Onto Taxpayers, ProPublica (Dec. 30, 2024), https://www.propublica.org/article/oil-orphan-wells-cleanup-playbook-siana-tom-ragsdale.

[159] *Id.*; *see also* Schuwerk, Robert, et al., Double or Nothing: How regulators are gambling on the future self-interest of large oil and gas companies to decommission the Gulf of Mexico's aging infrastructure, Carbon Tracker Initiative 7 (2022), https://carbontracker.org/reports/double-or-nothing ("Meanwhile, aging wells and platforms closer to shore — many of which are now owned by smaller operators — are increasingly marginal in value, raising the risk that they will be abandoned by their current operators.").

[160] *See* BSEE Idle Iron Guidance at 2, 4 (requiring decommissioning of idle wells that are both "no longer useful for operations . . . ***and*** no longer capable of producing oil, gas, or sulphur in paying quantities").

alternative use of platforms to BSEE but never submitting the plans to do so."[161] Companies therefore have a strong financial incentive—and a regulatory pathway—to prolong the idled status of wells indefinitely instead of paying the cost of decommissioning.

To prevent this situation for the Kaskida project, if BOEM moves forward with approving this DOCD, BOEM should consider various approval conditions, such as prohibiting the transfer of BP's leases, permits, or infrastructure for the project; and prohibiting BP from deeming Kaskida wells capable of producing oil and gas "in paying quantities" after it has gone idle.

## X. BOEM SHOULD NOT APPROVE THE DOCD UNTIL BP PERMANENTLY PLUGS EXPLORATORY WELLS

BP's proposed DOCD states that BP drilled exploratory wells elsewhere in Keathley Canyon, on Block 336. The DOCD acknowledges that these wells have not yet been plugged, and states that the wells "will be temporarily abandoned and a well cap will be installed on the wellhead." BOEM should not approve the DOCD unless and until BP permanently plugs these wells. Unplugged, temporarily abandoned, and improperly plugged wells are also prone to leaking and blowouts.

For example, the 2010 Macondo deepwater well blowout, which caused the Deepwater Horizon oil spill—one of the largest marine oil spills in the history of the oil industry—occurred during temporary abandonment activities.[162] Decisions to cut corners in the plugging process (including, *inter alia*, using only one cement barrier and failing to follow industry standards in cementing the casing) may have contributed to the well's failure.[163] Aging wells are particularly susceptible to oil spills or other accidents. For example, 30 percent of offshore oil wells in the Gulf experienced well casing damage in the first five years after drilling, and damage increased to 50 percent after 20 years.[164] Wells that have been temporarily abandoned for a long period are particularly concerning, as "[e]ntering these wells is difficult due to the uncertainties related to the conditions of the barriers and unanticipated well pressures."[165] Yet the number of temporarily abandoned wells has ballooned in recent years, and "[u]nless this back-log is reduced, the probability of blowouts from these wells will increase."[166]

Methane leaks from unplugged and temporarily plugged wells are also of concern. For example, a study from the North Sea found that 65 percent (28 out of 43) of decommissioned offshore wells leaked gas into the water column and represented a major source of methane in the sea.[167]

---

[161] GAO 2024 Report at 17.
[162] Bureau of Ocean Energy Mgmt., Regulation & Enf't, Report Regarding the Causes of the April 20, 2010, Macondo Well Blowout (Sept. 14, 2011)
[163] *Id.*
[164] Vengosh, A. et al., A Critical Review of the Risks to Water Resources from Unconventional Shale Gas Development and Hydraulic Fracturing in the United States, 48 Env't Sci. & Tech. 8334 at 8337 (2014).
[165] Holand, Loss of Well Control Occurrence and Size Estimators, Phase I and II (BSEE/TAP-765) at 112 (2017).
[166] *Id.*
[167] Böttner, C. et al., Greenhouse Gas Emissions from Marine Decommissioned Hydrocarbon Wells: Leakage Detection, Monitoring and Mitigation Strategies, 100 Int'l J. Greenhouse Gas Control 103119, 13, 14 (2020).

## XI. BOEM MUST EVALUATE GREENHOUSE GAS EMISSIONS AND THEIR HARMFUL EFFECTS ON PUBLIC HEALTH, SAFETY, AND CLIMATE.

BOEM's review of the Kaskida DOCD necessitates a comprehensive analysis of its greenhouse gas emissions and the resulting environmental consequences. The failure to thoroughly quantify and take a hard look at the impacts of greenhouse gas emissions is unacceptable under the law, and it deprives the agency of informed decision making. The analysis should include not only the direct operational emissions from the offshore activities but also the midstream and significant downstream emissions.

### A. BOEM must calculate greenhouse gas emissions

BOEM must calculate the greenhouse gas pollution from the Kaskida project. The DOCD and Environmental Impact Analysis (EIA) completely neglect to calculate the estimated emissions of certain categories of air pollution— specifically carbon dioxide ($CO_2$) and methane ($CH_4$)— for any stage of the project. Courts have held that an agency must calculate the reasonably foreseeable greenhouse gas emissions from a proposed action, from both direct and indirect emissions.[168]

Further, 30 CFR § 550.261(a)(1) requires a discussion of potential environmental impacts of the proposed development and production activities. The EIA's failure to quantify and analyze greenhouse gas emissions, including both direct operational emissions and indirect emissions from mid- and downstream use of the oil and gas, represents a significant deficiency in the EIA. The conclusory greenhouse gas analysis that says the proposed project will have a negligible contribution to overall OCS emissions is insufficient. The proportion is irrelevant, the omission of quantifying the emissions and their associated public health and climate impacts undermine a thorough understanding of the project's environmental footprint.

Importantly, BOEM must account for significant methane emissions from Kaskida. One recent study, for example, using methane imaging of oil and gas platforms in shallow areas of the Gulf of Mexico, determined these operations have a "methane loss rate"—a calculation of methane pollution relative to reported extraction—of 23 to 66 percent (far greater than 4 percent in the Permian Basin).[169] Methane's has intensive heating effects and produces ground-level ozone.[170] It is a super-pollutant 87 times more powerful than $CO_2$ at warming the atmosphere over a 20-year period,[171] and is second only to $CO_2$ in driving climate change during the industrial era.[172]

---

[168] *Ctr. for Biological Diversity v. Natl. Hwy. Transp. Safety Bd.,*, 538 F.3d 1172 (9th Cir. 2008).

[169] Alana K Ayasse, et al.. Methane Remote Sensing And Emission Quantification Of Offshore Shallow Water Oil And Gas Platforms In The Gulf Of Mexico, 17 Environ. Res. Lett. 084039 (2022).

[170] United Nations Environment Programme & Climate and Clean Air Coalition, Global Methane Assessment: Benefits and Costs of Mitigating Methane Emissions at 11 (2021).

[171] G. Myhre et al., Anthropogenic and Natural Radiative Forcing, in: Climate Change 2013: The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (T.F. Stocker et al. eds., 2013) at Table 8.7.

[172] United Nations Environment Programme & Climate and Clean Air Coalition at 11.

The deepwater developments are responsible for massive amounts of greenhouse gas emissions. See the large magenta dots on the map below. Another BP development in the Gulf of Mexico, Argos, that produces a capacity of 140,000 bbls/day reported emitting 134,118 metric tons of CO2e in 2023.[173] BP's Thunderhorse and Atlantis reported 251,340 and 256,468 metric tons of CO2e that year, respectively.[174] The greenhouse gas emissions are reasonably foreseeable and certainly quantifiable.




*Figure 1 Locations and Reported Emissions (CO2e) for Offshore Production, EPA*

According to news reports, the Kaskida development will start production in 2029, with a capacity to produce 80,000 barrels of oil per day.[175] The estimated recoverable resources are

[173] EPA, GHGRP Petroleum and Natural Gas Systems: Other Industry Segments (2024); https://www.epa.gov/ghgreporting/ghgrp-petroleum-and-natural-gas-systems-other-industry-segments
[174] *Id.*
[175] BP, BP gives go-ahead for sixth operated hub, Kaskida, in the US Gulf of Mexico (July 30, 2024) https://www.bp.com/en/global/corporate/news-and-insights/press-releases/bp-gives-go-ahead-for-sixth-operated-hub-kaskida-in-the-us-gulf-of-mexico.html; see also, French, David and Shadia Nasralla, BP weighs stake sales in two Gulf of Mexico projects, sources say, Reuters (Mar. 26, 2025), https://www.reuters.com/business/energy/bp-weighs-stake-sales-two-gulf-mexico-projects-sources-say-2025-03-26/.

currently at 275 million barrels of oil equivalent,[176] and BP tells investors that Kaskida could access up to 10 billion barrels.[177]

Nothing in President Trump's Executive Order, Unleashing American Energy,[178] excuses BOEM from the analysis required here by OCSLA and NEPA. The directive to end the use of the social cost of carbon—which never accurately reflected the true cost—and limit the scope of environmental reviews does not absolve BOEM from its legal and scientific obligations, which demand a hard look at the environmental impacts, including quantifying the emissions and describing the associated impacts, of the Kaskida project.

## XII. BOEM MUST DESCRIBE THE ENVIRONMENTAL EFFECTS OF GREENHOUSE GAS EMISSIONS

The greenhouse gas emissions from operations contribute significantly to the region's total emissions. BOEM must examine the effects of the proposed action's greenhouse gas emissions that range from human mortality and severe storms to habitat loss and wildlife extinctions.

### A. Greenhouse gas pollution damages and harm.

Fossil fuel emissions and resulting climate harms are already causing hundreds of thousands of premature deaths each year in the US. The fine particulate pollution from fossil fuel combustion alone causes an estimated one in ten deaths each year in the United States, totaling 355,000 premature deaths in 2018.[179] Compared to limiting temperature rise to 1.5°C, warming of 2°C will cause an estimated 153 million more premature deaths worldwide due to increased exposure to fine particulate matter and ozone.[180] Another recent study estimated that every 4,434 metric tons of $CO_2$ added to the atmosphere in 2020—equivalent to the lifetime emissions of 3.5 average Americans—will cause one excess death globally through 2100.[181] The implications of this finding are that failing to limit temperature rise to 1.5°C and instead allowing 2°C warming will cost 169 million additional lost lives.[182]

---

[176] Teodoro, Rocky, BP Makes FID on 6th GOM Project, Rigzone (July 31, 2024); https://www.rigzone.com/news/bp_makes_fid_on_6th_gom_project-31-jul-2024-177588-article/.

[177] BP, BP gives go-ahead for sixth operated hub, Kaskida, in the US Gulf of Mexico (July 30, 2024) https://www.bp.com/en/global/corporate/news-and-insights/press-releases/bp-gives-go-ahead-for-sixth-operated-hub-kaskida-in-the-us-gulf-of-mexico.html.

[178] 90 Fed. Reg. 8353 (Jan. 29, 2025).

[179] Vohra, Karn et al., Global mortality from outdoor fine particle pollution generated by fossil fuel combustion: Results from GEOS-Chem, 195 Environmental Research 110754 (2021).

[180] Shindell, Drew et al., Quantified, localized health benefits of accelerated carbon dioxide emissions reductions, 8 Nature Climate Change 291 (2018).

[181] Bresseler, R. Daniel, The mortality cost of carbon, 12 Nature Communications 4467 (2021).

[182] The difference between the carbon budget needed to limit warming to 1.5°C versus 2°C is 750 Gt $CO_2$, based on the IPCC Sixth Assessment (see IPCC, Climate Change 2021, at Table SPM.2). With each 4,434 metric tons of $CO_2$ estimated to result in one death, the additional 750 Gt $CO_2$ emitted with 2°C versus 1.5°C of temperature rise equates to 169 million additional deaths. *See also* IPCC, CLIMATE CHANGE 2023 Synthesis Report Summary for Policymakers.

Climate change threatens public safety, health and well-being, with particular harms to children, older adults, communities of color, low-income communities, immigrant groups, and persons with disabilities and pre-existing medical conditions.[183] Many of these same communities are also disproportionately impacted by the impacts from upstream oil and gas production.[184]

Health risks from climate change include increased exposure to heat waves, floods, droughts, and other extreme weather events; increases in infectious diseases; decreases in the quality and safety of air, food, and water; displacement; and stresses to mental health and well-being.[185] In the United States, the health costs of air pollution from fossil fuel combustion and climate change are estimated to already exceed $800 billion per year and will become much more expensive without rapid action to curb fossil fuel pollution.[186]

The Gulf region is already ground-zero for many of these impacts. For example, in Texas' record-breaking freeze in the winter of 2021 left millions of people without power and water, resulting the deaths of dozens of people.[42]

Climate change has contributed to an increase in North Atlantic hurricane activity since the 1970s.[187] Hurricane-generated storm surge events — the enormous walls of water pushed onto the coast — have also become more frequent and severe.[188] One study found that large storm surge events of Hurricane Katrina magnitude have already doubled in response to warming during the 20th century, and projected that Atlantic hurricane surge events will increase in frequency by twofold to sevenfold for each 1°C in temperature rise.[189] As the climate warms, Atlantic and eastern North Pacific hurricane rainfall and intensity are projected to increase,

---

[183] Global Change Research Program, Impacts, Risks, and Adaptation in the United States, Fourth National Climate Assessment, Volume II at 548 (2018), https://nca2018.globalchange.gov/; U.S. Global Change Research Program, The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment (2016).

[184] *See, e.g.*, Donaghy and Jiang, Fossil Fuel Racism: How Phasing Out Oil, Gas, and Coal Can Protect Communities (Apr. 2021); Hsu et al., Disproportionate exposure to urban heat island intensity across major US cities. 12 Nature Comms. 2721 (2021); Tuholske et al., Global urban population exposure to extreme heat, PNAS, Vol. 118 No. 41 (2021); Tessum et al., PM2.5 polluters disproportionately and systemically affect people of color in the United States, 7 Science Advances 18 (2021); Goldman et al., Assessment of Air Pollution Impacts and Monitoring Data Limitations of a Spring 2019 Chemical Facility Fire, Env. Justice (2021); Johnston et al., Respiratory Health, Pulmonary Function And Local Engagement In Urban Communities Near Oil Development, Environmental Research, Vol. 197 (2021); World Health Organization, COP26 Special Report on Climate Change and Health (Oct. 2021); Michanowicz, et al., Methane and Health-Damaging Air Pollutants From the Oil and Gas Sector: Bridging 10 Years of Scientific Understanding, PSE (2021).

[185] Fourth National Climate Assessment, Vol. II at 540; USGCRP, Impacts of Climate Change on Human Health.

[186] Medical Society Consortium on Climate and Health, The Costs of Inaction: The Economic Burden of Fossil Fuels and Climate Change on Health in the United States, 5 (2021).

[187] Elsner, James B. et al., The increasing intensity of the strongest tropical cyclones, 455 Nature 92 (2008); Saunders, Mark A. & Adam S. Lea, Large contribution of sea surface warming to recent increase in Atlantic hurricane activity, 451 Nature 557 (2008); U.S. Global Change Research Program, Climate Science Special Report: Fourth National Climate Assessment, Vol. I (2017), https://science2017.globalchange.gov/ at 257; U.S. Global Change Research Program, Impacts, Risks, and Adaptation in the United States, Fourth National Climate Assessment, Volume II at 74 (2018).

[188] Komar, Paul D. & Jonathan C. Allan, Increasing hurricane-generated wave heights along the U.S. east coast and their climate controls, 24 Journal of Coastal Research 479 (2008); Grinsted, Aslak et al., Homogeneous record of Atlantic hurricane surge threat since 1923, 109 PNAS 19601 (2012).

[189] Grinsted, Aslak et al., Projected hurricane surge threat from rising temperatures, 110 PNAS 5369 (2013).

making hurricanes more destructive.[190] Studies of Hurricane Harvey concluded that climate warming made the storm's record rainfall more likely and intense.[191]

Climate change is increasing stress on species and ecosystems — causing changes in distribution, phenology, physiology, vital rates, genetics, ecosystem structure and processes — in addition to increasing species extinction risk.[192] Climate change is already affecting 82 percent of key ecological processes that underpin ecosystem function and support basic human needs.[193] Climate change-related local extinctions are already widespread and have occurred in hundreds of species, including almost half of the 976 species surveyed.[194] Nearly half of terrestrial non-flying threatened mammals and nearly one-quarter of threatened birds may have already been negatively impacted by climate change in at least part of their range.[195] Furthermore, across the globe, populations of terrestrial birds and mammals that are experiencing greater rates of climate warming are more likely to be declining at a faster rate.[196] Genes are changing, species' physiology and physical features such as body size are changing, species are moving to try to keep pace with suitable climate space, species are shifting their timing of breeding and migration, and entire ecosystems are under stress.[197]

---

[190] U.S. Global Change Research Program, Impacts, Risks, and Adaptation in the United States, Fourth National Climate Assessment, Volume II (2018), https://nca2018.globalchange.gov/ at 74.
[191] Emanuel, Kerry, Assessing the present and future probability of Hurricane Harvey's rainfall 2017, 114 PNAS 12681 (2017); Risser, Mark D. and Michael F. Wehner, Attributable human-induced changes in the likelihood and magnitude of the observed extreme precipitation during Hurricane Harvey, 44 Geophysical Research Letters 12,457 (2017); van Oldenborgh, Geert J. et al., Attribution of extreme rainfall from Hurricane Harvey, 12 Environmental Research Letters 124009 (2017).
[192] Warren, Rachel et al., Increasing impacts of climate change upon ecosystems with increasing global mean temperature rise, 106 Climatic Change 141 (2011).
[193] Scheffers, Brett R. et al., The broad footprint of climate change from genes to biomes to people, 354 Science 719 (2016).
[194] Wiens, John J., Climate-related local extinctions are already widespread among plant and animal species, 14 PLoS Biology e2001104 (2016).
[195] Pacifici, Michela et al., Species' traits influenced their response to recent climate change, 7 Nature Climate Change 205 (2017). The study concluded that "populations of large numbers of threatened species are likely to be already affected by climate change, and … conservation managers, planners and policy makers must take this into account in efforts to safeguard the future of biodiversity."
[196] Spooner, Fiona E.B. et al., Rapid warming is associated with population decline among terrestrial birds and mammals globally, 24 Global Change Biology 4521 (2018).
[197] Parmesan, Camille & Gary Yohe, A globally coherent fingerprint of climate change impacts across natural systems, 421 Nature 37 (2003); Root, Terry L. et al., Fingerprints of global warming on wild animals and plants, 421 Nature 57 (2003); Parmesan, Camille, Ecological and evolutionary responses to recent climate change, 37 Annual Review of Ecology Evolution and Systematics 637 (2006); Chen, I-Ching et al., Rapid range shifts of species associated with high levels of climate warming, 333 Science 1024 (2011); Maclean, Ilya M. D. & Robert J. Wilson, Recent ecological responses to climate change support predictions of high extinction risk, 108 Proceedings of the National Academy of Sciences of the United States of America 12337 (2011); Warren, Rachel et al., Increasing impacts of climate change upon ecosystems with increasing global mean temperature rise, 106 Climatic Change 141 (2011); Cahill, Abigail E. et al., How does climate change cause extinction?, 280 Proceedings of the Royal Society B 20121890 (2012).

### B. BOEM cannot discount the climate impacts through a flawed substitution principle

It is inappropriate to assume that not producing US oil results in higher emissions. An analysis of the effects of removing subsidies for U.S. oil and gas production found that decreases in the U.S. oil and gas supply would result in substantial decreases in global oil and gas consumption.[198] Also, modeling results from a BOEM greenhouse gas analysis[199] estimated that leaving U.S. oil and gas undeveloped under the no-leasing alternative would result in a significant decrease in global oil consumption with associated reductions in carbon pollution.[200]

## XIII. BOEM MUST CALCULATE THE MID AND DOWNSTREAM GREENHOUSE GAS EMISSIONS AND EVALUATE THE PUBLIC HEALTH, SAFETY, AND CLIMATE EFFECTS OF THOSE EMISSIONS.

BOEM must comprehensively analyze the midstream and downstream greenhouse gas emissions associated with the Kaskida development and production. The agency has previously conducted lifecycle assessments, though they could use improvement. Given this legal obligation and prior agency practice, BOEM cannot now reverse course and exclude these impacts. Transporting, refining, and ultimately combusting the extracted oil are direct and reasonably foreseeable consequences of approving the project.

BOEM also cannot avoid analyzing the cumulative effects of the Kaskida project in conjunction with other past, present, and reasonably foreseeable oil and gas development activities in the Gulf of Mexico. NEPA requires a comprehensive assessment of cumulative impacts, and the incremental contribution of Kaskida's GHG emissions, when added to the broader context of regional fossil fuel development, is a critical environmental consequence that must be thoroughly evaluated.

## XIV. THE DOCD AND EIA DO NOT ADEQUATELY ASSESS THE IMPACTS OF METHANE EMISSIONS FROM THE PROJECT.

BOEM's regulations require the DOCD to include information about potential emissions and emission reduction measures. 30 C.F.R. § 550.249. Further, 30 CFR § 550.261(a)(1) requires a discussion of potential environmental impacts of the proposed development and production activities. The DOCD itself fails to discuss greenhouse gas emissions, including methane, that

---

[198] Metcalf, G, The Impact of Removing Tax Preferences for U.S. Oil and Gas Production, Council on Foreign Relations, August 2016; Erickson, P., Rebuttal: Oil Subsidies—More Material for Climate Change Than You Might Think, November 2, 2017, https://www.cfr.org/blog/rebuttal-oil-subsidies-more-material-climate-change-you-might-think

[199] Wolvovsky, E. and Anderson, W., OCS Oil and Natural Gas: Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon. BOEM OCS Report 2016-065. 44 pp (2016).

[200] Unfortunately, in direct contradiction to its global oil market model results, BOEM erroneously concludes in this report that producing 3.7 billion barrels of oil would make no difference for GHG emissions, and would even reduce GHG emissions compared to the No Action alternative of no new leasing, by failing to account for the large-scale decrease in global oil consumption and the resulting enormous decrease in GHG pollution under the No Action Alternative. BOEM acknowledged that its GHG analysis was limited in "not fully capturing global market and GHG implications" (at Forward) and in not including the GHG savings from reduced global oil and gas consumption in its emissions estimate for the No Action Alternative (at page 23).

the Project would contribute to the atmosphere. The EIA does not model or otherwise calculate expected methane emissions from the Project. Instead, citing only the outdated BOEM programmatic NEPA analysis from 2016, the EIA claims that "[g]reenhouse gas emissions from this proposed project represent a negligible contribution to the total greenhouse gas emissions from reasonably foreseeable activities in the Gulf of Mexico and are not expected to significantly alter or exceed any of the climate change impacts evaluated in the Programmatic EIS" and that "methane ($CH_4$) emissions from the project would constitute a small incremental contribution to greenhouse gas emissions from all OCS activities."[201] Recent evidence, including BOEM's own findings, shows that the agency's 2016 analysis underestimated methane emissions from OCS oil and gas development. Thus, the EIA cannot rely on these inaccurate analyses to evaluate the impacts of methane emissions from the Project.

Methane is a potent greenhouse gas released into the air during offshore drilling operations through accidental leaks or purposeful venting or flaring. According to the International Energy Agency, "[t]ackling methane emissions from oil and gas operations is one of the most important measures to limit near-term global warming."[202] EPA has estimated that federal offshore oil production in the Gulf resulted in 179,891 metric tons of methane emissions in 2021 (almost 10 percent of total emissions from petroleum systems in the U.S.).[203] BOEM has found that OCS oil and gas operations in the Gulf are "major contributors of anthropogenic methane to the environment at a national level."[204]

Recent studies suggest that U.S. agencies' modeled estimates of methane emissions from offshore oil and gas production significantly underestimate real world methane emissions from offshore oil and gas operations. Several published studies have found that methane emissions from Gulf activities are substantially higher than previously assumed. Based on direct aircraft measurements of methane plumes over the Gulf, Gorchov Negron et al. (2023) found that emissions are triple what BOEM estimates.[205] Other reports on methane emissions in the region support this concerning conclusion.[206]

---

[201] EIA at 25 (citing BOEM, *Final Programmatic Environmental Impact Statement for Outer Continental Shelf Oil and Gas Leasing Program, 2017–2022*, OCS EIS/EA BOEM 2016-060 (2016)).

[202] Int'l Energy Agency, *Financing Reduction in Oil and Gas Methane Emissions: AA World Energy Outlook Special Report on the Oil and Gas Industry and COP28*, at 3 (June 2023), https://www.iea.org/reports/financing-reductions-in-oil-and-gas-methane-emissions.

[203] EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks, 1990-2021 (April 2023) at 3-90, 3-75 (estimating that total methane emissions from petroleum systems in 2021 were 1,791,000 tons).

[204] BOEM, *Draft Programmatic Environmental Impact Statement for Gulf of Mexico Regional OCS Oil and Gas Lease Sales*, OCS EIS/EA BOEM 2024-032, at 4-25 (2024) ("2024 DPEIS").

[205] Alan M. Gorchov Negron et al., *Excess methane emissions from shallow water platforms elevate the carbon intensity of US Gulf of Mexico oil and gas production*, 120 PNAS (Feb. 17, 2023), https://doi.org/10.1073/pnas.2215275120.

[206] *See* Office of Inspector General: U.S. Dep't of the Interior*, Improvements Needed in the Bureau of Safety and Environmental Enforcement's Procedures Concerning Offshore Venting and Flaring Record Reviews,* at 1-2 (June 13, 2022), https://www.doioig.gov/sites/default/files/2021-migration/MA_BSEEOfshoreVentingFlaringRecordsReview_Public.pdf (noting high levels of unreported venting and flaring offshore in the Gulf); Alana K. Ayasse et al., *Methane remote sensing and emission quantification of offshore shallow water oil and gas platforms in the Gulf of Mexico*, 17 Envtl. Res. Letters, at 9 (Aug. 11, 2022), https://iopscience.iop.org/article/10.1088/1748-9326/ac8566 (finding that methane loss rates from production offshore in the Gulf vastly exceeded loss rates onshore in the Permian Basin); Alan M. Gorchov Negron et al., *Airborne Assessment of Methane Emissions from Offshore Platforms in the U.S. Gulf of Mexico*, 54 Envtl. Sci. &

Moreover, BOEM itself has acknowledged that this recent evidence suggests that the agency's prior methane emission analyses are inaccurate. For example, in its 2024 draft programmatic environmental impact statement for the Gulf of Mexico regional OCS oil and gas lease sales, BOEM acknowledges that even its emissions analyses after 2016—such as BOEM's 2017 emissions inventory—underestimates methane emissions.[207]

Because the EIA is based on outdated information, BOEM must reject BP's conclusion in the EIA that the Project will have only negligible impacts to the total greenhouse gas emissions from activities in the Gulf. BOEM must better account for methane emissions before approving the Project. This must include performing accurate modeling and analyses of methane emissions from the Project itself, rather than relying on prior programmatic or lease sale level analyses to assume impacts from the Project. Moreover, to improve future analyses, the agency must update its air quality inventory to rely more on direct measurement rather than its current process of relying almost entirely on emissions factors.

## XV. THE DOCD AND EIA DO NOT ADEQUATELY ANALYZE AIR QUALITY IMPACTS FROM THE PROJECT.

The DOCD and EIA's discussion of air emissions from the Project is flawed because BP fails to accurately describe the region's baseline air quality and uses outdated formulas to estimate air quality impacts from the Project. BOEM must first update its air quality regulations to properly account for air emissions from this Project and other OCS oil and gas activities. BOEM must also perform its own expert analysis to ensure that BP's modeling and conclusions are accurate.

First, BPs failure to provide total air emissions from the project means that the DOCD fails to meet regulatory requirements. Appendix E provides emissions estimates for certain criteria pollutants for a ten-year period, but it fails to calculate the total emissions. This violates the requirement to provide total estimated emissions for all relevant pollutants as mandated by 30 C.F.R. § 550.249(a)(1)(v). Moreover, displaying only ten years of a project with up to a 50-year lifespan fails to "describe the emissions over the duration of production activities." *Id.* This omission prevents a comprehensive understanding of the cumulative air quality impacts.

The DOCD also does not propose any emission reduction measures or describe any monitoring systems, as required by 30 C.F.R. § 550.249(b). It says only that "BP did not utilize any emission reduction measures in calculating emissions for the project. All emissions were calculated using the default values in the BOEM Form 0139.3." The monitoring requirement is further noted in 30 C.F.R. § 550.303(k) and should apply even for emissions below the exemption threshold.

Moreover, the Regional Supervisor, using their authority in 30 C.F.R. § 550.303(j) should require BP to submit additional information to determine if air quality controls are necessary.

---

Tech. 5112 (April 13, 2020), https://doi.org/10.1021/acs.est.0c00179 (indicating under-sampling of facilities with disproportionately high emissions led to underestimates of Gulf basinwide emissions).

[207] 2024 DPEIS at 4-27 to 4-28, 4-31.

Additional air quality controls are necessary because emissions will significantly affect the air quality of onshore areas. BP mischaracterizes the state of air quality in the Gulf of Mexico region. The EIA states that air quality in the Gulf is "relatively good," which is not accurate.[208] As the EIA acknowledges, several counties in coastal Texas and Louisiana are in nonattainment for different pollutants (the Houston-Galveston-Brazoria area in Texas is in nonattainment for the 8-hour ozone standard, and the St. Bernard Parish area in Louisiana is in nonattainment for the 1-hour sulfur dioxide standard), and there are several areas in the region designated as Class I areas under the Clean Air Act.[209] The EIA ignores air quality implications for the Class II areas in the region, including the Breton National Wildlife Refuge, Padre Island National Seashore, and Gulf Islands National Seashore.

BP also ignores that Gulf communities are already overburdened by air pollution from oil and gas infrastructure. Over 48% of total U.S. petroleum refining capacity and 51% of total U.S. natural gas processing plant capacity are located along the Gulf coast.[210] In particular, the petrochemical industry has disproportionately impacted Black, Indigenous, and communities of color.[211] These communities face disproportionate burdens from multiple pollution sources, including toxic air pollution. Additional air pollution from OCS oil and gas sources, including from the Project, will only exacerbate the poor air quality that coastal communities already experience.

Second, the DOCD and EIA for this Project highlight the urgent need for BOEM to update its outdated air quality regulations. BOEM's air quality regulations have not been substantially updated since the 1980s. In fact, BOEM's air quality regulations are not even consistent with EPA's NAAQS program. For example, BOEM's emission exemption thresholds (EETs) use Total Suspended Particulate (TSP) standard and do not incorporate $PM_{10}$ and $PM_{2.5}$, even though EPA has long replaced TSP with $PM_{10}$ and $PM_{2.5}$.[212] The EETs also utilize annual thresholds, even though EPA recognizes the harmful impacts from short-term exposure to criteria air pollutants and thus has adopted short-term NAAQS.[213] In 2019, BOEM released an air quality study of impacts from 10 Gulf lease sales proposed in the 2017–2022 five year program, which found that the lease sales would contribute to criteria air pollution in the Gulf, including to pollutants in nonattainment areas, such as adding up to 14 parts per billion (ppb) to already elevated ozone levels in the Houston region, and would push at least one site in Texas above the 70 ppb NAAQS attainment threshold for ozone and into nonattainment status.[214] The study also found that this pollution would negatively impact visibility at Breton National Wildlife Refuge.[215] In addition, the study determined that the existing EETs were not sufficiently

[208] EIA at 24.
[209] *Id.*
[210] U.S. Energy Information Administration, *Gulf of Mexico Fact Sheet* (Sept. 4, 2024), https://www.eia.gov/special/gulf_of_mexico/.
[211] Earthjustice, *How big oil is using toxic chemicals as a lifeline – and how we can stop it* (Jan. 23, 2024), https://earthjustice.org/features/petrochemicals-explainer.
[212] 30 C.F.R. § 550.303(d).
[213] *Id.*
[214] BOEM, *Air Quality Modeling in the Gulf of Mexico Region*, OCS Study BOEM 2019-057, at xxix–xxx, 209–49 (2019).
[215] *Id.* at xxx, 255.

protective of the short-term NAAQS for any pollutant.[216] In 2019, the National Academies of Sciences, Engineering, and Medicine (NAS) released a review of BOEM's study and found that BOEM "is currently using EETs that were developed in the 1980s, apparently without detailed air quality modeling nor consideration of any long-term NAAQS … They clearly need to be updated to reflect newly regulated pollutants (i.e., $PM_{2.5}$ and $PM_{10}$) and updated (i.e., 8-hour-average ozone, 1-hour-average $NO_2$ and $SO_2$) air quality standards as well as state-of-the-science dispersion and photochemical models."[217] The NAS review agreed with BOEM that new EETs for all criteria pollutants and their precursor pollutants should be developed.[218]

Despite all this, BOEM's current air quality rules retain the EETs and other aspects that the agency itself has acknowledged are outdated. BOEM must update its air quality regulations—including revising its out-of-date EETs, significance levels (SLs), approved modeling, and more—in order to be able to ensure "compliance with" the NAAQS, as OCSLA requires.[219] This is necessary to accurately assess air emissions from the Project. Indeed, BP's air emissions calculations show that, even using the outdated formulas laid out in the current air quality rule, the Project will emit substantial criteria pollutants. BP estimates that the $NO_X$ emissions from the Project would not only exceed the EET but would also almost double the EET value in 2028.[220] It is possible that, with more accurate EETs and SLs and modeling, the impacts from the Project from not just $NO_X$ but other criteria or precursor pollutants as well would be higher than what BP suggests.

Third, BOEM must fully perform its own expert analysis of BP's calculations and modeling regarding air emissions from the Project. As discussed, BP's own air emissions calculations show that $NO_X$ emissions from the Project would substantially exceed the EET.[221] The agency must take a close, hard look at BP's modeling for $NO_X/NO_2$ to ensure that the company's conclusions regarding whether it exceeds the SLs and/or contributes to or causes NAAQS violations are accurate. The agency must also take a hard look at BP's calculations for the other pollutants.

## XVI. THE DOCD AND EIA'S OIL SPILL ANALYSIS IS DEFICIENT.

Oil spills, as observed in the aftermath of *Deepwater Horizon*, can cause long-term contamination to surface waters, deep waters, and bottom sediments.[222] Such impacts can be

---

[216] *Id.* at 306–09.
[217] NAS, *Review of the Bureau of Ocean Energy Management 'Air Quality Modeling in the Gulf of Mexico Region' Study*, Nat'l Academies Press, at 33 (2019), https://doi.org/10.17226/25600.
[218] *Id.* at 6.
[219] 43 U.S.C. § 1334(a)(8).
[220] DOCD at 25.
[221] DOCD at 25.
[222] *See, e.g.*, Gulf Spill Restoration, *Final Programmatic Damage Assessment and Restoration Plan and Final Programmatic Environmental Impact Statement* 4-227, NOAA (2016), https://www.gulfspillrestoration.noaa.gov/sites/default/files/wp-content/uploads/Chapter-4_Injury_to_Natural_Resources_508.pdf ("In general, [benthic] resource recovery is expected to be on the order of decades to hundreds of years, based on the uniformity of environmental conditions and slow progression of change in deep-sea environments, and the fact that some organisms killed by the spill were hundreds of years old (e.g., deep-sea coral)."); Leila J. Hamdan et al., *The impact of the Deepwater Horizon Blowout on historic shipwreck-*

severe and long-term. The 5 million barrels of oil spilled during *Deepwater Horizon*, along with the approximately 47 thousand barrels of chemical dispersants that were applied, remained in the marine environment for many months, harming flora and fauna.[223] The cumulative satellite oil slick footprint covered an estimated area of 149,000 $km^2$ (57,529 $mi^2$).[224] Large areas of the Gulf, however, were exposed to invisible and toxic oil that extended far beyond the boundaries of the satellite footprint.[225] Indeed, a 2020 study concluded that a substantial portion of the *Deepwater Horizon* spill was "toxic and invisible."[226] During *Deepwater Horizon*, hundreds of fish species were exposed to oil, including red snapper, bluefin tuna, and speckled sea trout.[227] The spill killed trillions of larval fish and invertebrates in offshore surface, deep oceanic, and estuarine waters.[228] The number and type of fish species living on the reefs declined significantly, and food in reef systems became less abundant.[229] Oil that reached the shoreline and river water released in response to the spill killed billions of shellfish.[230] Between 56,100 and 102,400 birds, representing dozens of species, died as a direct and indirect result of the spill,[231] and at least 93 different species of birds were injured.[232] Killed and injured birds included federally listed Audubon's shearwater, American oystercatcher, band-rumped storm-petrel, great shearwater, least tern, magnificent frigatebird, masked booby, piping plover, sandwich tern, and Wilson's plover, among others.[233] The population of federally listed sea turtles also declined significantly, with about 4,900 to 7,600 large juvenile and adult sea turtles and about 55,000 to 160,000 small juvenile sea turtles perishing as a result of the spill.[234] Barataria Bay bottlenose dolphins suffered an increased death rate of 35 percent, increased failed reproduction of 46 percent, and increased adverse health impacts, such as adrenal and lung disease and low reproductive success, of 37 percent.[235] The population of Rice's whales declined by about 22 percent, and the population of federally endangered sperm whales declined by about 7 percent.[236] Such losses will have long-term consequences, impairing reproduction and recruitment for multiple generations.[237]

---

*associated sediment microbiomes in the northern Gulf of Mexico*, 8 Sci. Reports, at 1 (June 28, 2018), https://www.nature.com/articles/s41598-018-27350-z.

[223] Hamdan et al. (2018), *supra* note XX, at 1.

[224] Igal Berenshtein et al., *Invisible oil beyond the Deepwater Horizon satellite footprint*, 6 Sci. Advances, at 1 (Feb. 12, 2020), https://advances.sciencemag.org/content/6/7/eaaw8863.

[225] *Id.*

[226] *Id.* at 6.

[227] Gulf Spill Restoration, *supra* note XX, at 4-105 to 4-106.

[228] *Id*. at 4-208 to 4-209.

[229] *Id*. at 4-435 to 4-436, 4-673 to 4-674, 4-681, 5-54, 5-78 to 5-79.

[230] *Id*. at 4-289, 4-379, 5-54.

[231] *Id*. at 4-509 to 4-510.

[232] *Id*. at 4-493 to 4-500.

[233] *Id*.

[234] *Id*. at 4-571, 4-576.

[235] *Id*. at 4-618.

[236] *Id*. at 4-618, 4-631.

[237] *Id*. at 4-211 (recovery of water column species could take decades), 4-260, 4-274 to 4-275 (recovery of benthic resources could take decades to hundreds of years), 4-362, 4-379 (declines in oysters imperil "sustainability of oysters in the northern Gulf of Mexico"), 4-577 (recovery of federally listed sea turtles "will require decades of sustained efforts"), 4-633 to 4-634, 4-636 to 4-637 (recovery of marine mammals, including federally endangered sperm whales, will take decades).

Four years after *Deepwater Horizon*, for example, bottlenose dolphins and sea turtles continued to die in record numbers.[238] This die-off has been attributed to the oil spill.[239] Other studies demonstrate severe lung disease in dolphins, near-record lows of critically endangered Kemp's ridley sea turtle nesting, oil dispersants toxic to corals and jellyfish, and a "bathtub ring" of oil on the seafloor.[240] Further, 8 years after the oil spill, 11 to 30 percent of the spilled oil—approximately 550,000 to 1.5 million barrels—remains unaccounted for and may have been deposited on the seafloor, coastal beaches, and marshes,[241] thereby continuing to threaten water resources. Even projecting forward, it is likely the impacts of the *Deepwater Horizon* oil spill will continue to impair the Gulf ecosystem.[242]

*Deepwater Horizon* is not the only event that has spilled more than 10,000 barrels of oil (bbl). BOEM's reports show that in 2017, there was a 16,152 bbl spill in the OCS caused by damage to a pipeline segment.[243] That same historical data showed that, in addition to *Deepwater Horizon*, there have been three "very large drilling-related blowouts" that have resulted in spills greater than or equal to 10,000 bbl.[244] Those spills released 53,000 bbl, 65,000 bbl, and 80,000 bbl into the Gulf of Mexico.[245] Additionally, there are two other historic catastrophic spills in the Gulf that must be accounted for: *Ixtoc*, which spilled more than 3.4 million barrels of crude oil into the Gulf and was the world's first massive offshore oil spill,[246] and Taylor Energy, which is the longest-running spill in U.S. history.[247] Clean up efforts from the Taylor Energy well site captured more than 1 million gallons of oil (equivalent to 23,000 bbls) over the span of three

---

[238] Christine Dell'Amore, *Gulf Oil Spill "Not Over": Dolphins, Turtles Dying in Record Numbers*, Nat'l Geographic (Apr. 9, 2014), https://www.nationalgeographic.com/news/2014/4/140408-gulf-oil-spill-animals-anniversary-science-deepwater-horizon-science/.
[239] *Id.*
[240] Kathleen M. Colegrove et al., *Fetal distress and in utero pneumonia in perinatal dolphins during the Northern Gulf of Mexico unusual mortality event*, 119 Dis. Aquat. Org. 1 (Apr. 12, 2016), https://www.ncbi.nlm.nih.gov/pubmed/27068499; Danielle M. DeLeo et al., *Response of deep-water corals to oil and chemical dispersant exposure*, 129 Deep-Sea Rsch. II 137 (Jul. 2016), https://schmidtocean.org/wp-content/uploads/DeLeo-D-2015-Response-of-DeepWater-Corals-2.pdf; *Drop in Ridley Sea Turtle Nests on Texas Coast Puzzles Scientists,* NBCDFW (Aug. 12, 2013), https://www.nbcdfw.com/news/local/drop-in-ridley-sea-turtle-nests-on-texas-coast-puzzles-scientists/1955057/; B.S. Echols et al., *The use of ephyrae of a scyphozoan jellyfish, Aurelia aurita, in the aquatic toxicological assessment of Macondo oils from the Deepwater Horizon incident*, 144 Chemosphere 1893 (Feb. 2016), https://pubmed.ncbi.nlm.nih.gov/26547023/; David L. Valentine et al., *Fallout Plume of Submerged Oil from Deepwater Horizon*, 111 Proc. Nat'l Acad. Sci. 15906 (Nov. 11, 2014), https://www.pnas.org/doi/epdf/10.1073/pnas.1414873111.
[241] Hamdan et al. (2018), *supra* note XX, at 1.
[242] Chelsea Harvey, *The Deepwater Horizon spill may have caused 'irreversible' damage to Gulf Coast marshes*, Wash. Post (Sept. 27, 2016), https://www.washingtonpost.com/news/energy-environment/wp/2016/09/27/the-deepwater-horizon-oil-spill-may-have-caused-irreversible-damage-to-marshes-along-the-gulf-coast/ (noting a new study that suggests the spill may have permanently marred the salt marshes along the coasts of Louisiana, Alabama, and Mississippi and that the marshes may never completely grow back); Brian R. Silliman et al., *Thresholds in marsh resilience to the Deepwater Horizon oil spill*, 6 Sci. Reports (Apr. 22, 2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5040145/pdf/srep32520.pdf.
[243] NMFS, *Appendices to the Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of Mexico* 46 (Mar. 13, 2020), https://repository.library.noaa.gov/view/noaa/23738/noaa23738DS2.pdf.
[244] *Id.* at 48.
[245] *Id.*
[246] *See* Luis A. Soto et al., *The environmental legacy of the Ixtoc-I oil spill in Campeche Sound, southwestern Gulf of Mexico*, 1 Frontiers in Marine Sci. (2014), https://www.frontiersin.org/articles/10.3389/fmars.2014.00057/full.
[247] *See Private, public effort contains 1 million gallons of oil at longest U.S. spill*, NOAA (Jul. 12, 2022), https://www.noaa.gov/news-release/private-public-effort-contains-1-million-gallons-of-oil-at-longest-us-spill.

years, and more than 5 million gallons (119,000 bbls) may have released into Gulf waters over the past nearly two decades.[248]

The Exxon Valdez oil spill in Prince William Sound also caused significant harm to wildlife. Eighty-one percent of harbor seals in Prince William Sound were found to be oiled and unusually disoriented and lethargic, making them easy prey for whales; moreover, four months after the spill, 83 to 100 percent of seals were heavily oiled at several haul-outs around the north end of Knight Island in western Prince William Sound.[249] Killer whale pods, some of which fed on oil-contaminated harbor seals, suffered dramatic population declines. In the year after the spill, one pod lost 33 percent of its population and another pod lost 41 percent.[250] The recovery of these pods in the years following the spill was slow, and some whale pods continued to decline nearly two decades later.[251] Twenty-five years after the 1989 Exxon Valdez oil spill, oil from the spill continued to contaminate beaches in Alaska.[252]

Oil-contaminated sediment can travel long distances, transported by both the accident itself and ocean currents.[253] These contaminated sediments can enter the water column and cause large patches of sheen and oil on the surface.[254] Post-spill mitigation, such as burning, exacerbates these problems by introducing hydrocarbon byproducts into the marine environment; surface currents then may transport these hydrocarbon byproducts long distances.[255] Large quantities of spilled oil may alter the chemistry of the ocean "with unforeseeable results."[256] Volatile organic compounds ("VOCs"), such as benzene, toluene, ethylbenzene, and xylenes, dissolve readily in water and "can have acutely toxic effects."[257] Mid-weight organic compounds, such as polycyclic aromatic hydrocarbons, "tend to pose the greatest risk in the environment" because they persist for longer periods of time.[258] These toxic compounds readily attach to particles that have settled or are suspended in the water column and can be ingested by

---

[248] *See* Mike Smith, *More than 1 million gallons of oil – so far – collected from longest-running spill in U.S. history*, NOLA (Jul. 12, 2022, 1:19 PM), https://www.nola.com/news/environment/article3e92bef4-0208-11ed-b9a7-7fe673f3fa28.html.

[249] Craig O. Matkin et al., *Ongoing population-level impacts on killer whales Orcinus orca following the 'Exxon Valdez' oil spill in Prince William Sound, Alaska*, 356 Mar. Ecol. Prog. Ser. 269, 278 (Mar. 2008), https://www.researchgate.net/publication/237336306_Ongoing_population-level_impacts_on_killer_whales_Orcinus_orca_following_the_Exxon_Valdez_oil_spill_in_Prince_William_Sound_Alaska.

[250] *Id.* at 269, 273–76.

[251] *Id.*

[252] Jane J. Lee, *Oil from the Exxon Valdez Spill Lingers on Alaska Beaches*, Nat'l Geographic (Mar. 3, 2014), https://www.nationalgeographic.com/news/2014/3/140301-exxon-valdez-oil-spill-alaska-beaches-ocean-science/; *Lingering Oil from Exxon Valdez Spill*, NOAA (Feb. 26, 2018), https://www.fisheries.noaa.gov/feature-story/lingering-oil-exxon-valdez-spill.

[253] *Catastrophic Spill Event Analysis: High-Volume, Extended-Duration Oil Spill Resulting From Loss Of Well Control On The Gulf Of Mexico Outer Continental Shelf* 29, BOEM (2017) [hereinafter "BOEM, *Catastrophic Spill Event Analysis*"], https://www.boem.gov/sites/default/files/environmental-stewardship/Environmental-Assessment/NEPA/Catastrophic-Spill-Event-Analysis.pdf.

[254] *Id.*

[255] *Id.*

[256] *Id.* at 30.

[257] *Id.*

[258] *Id.*

fish.[259] People who consume large quantities of fish contaminated with polycyclic aromatic hydrocarbons can suffer various health problems, including growth reduction, endocrine alteration, cancer, and birth defects.[260] These toxins are introduced into the marine environment through several pathways, including oil spills and incomplete combustion of fossil fuels.[261] Failing to adequately clean up oil spills, thus, would exacerbate an existing environmental and public health problem. A spill also could release methane into the water column, potentially causing harm to fish.[262]

Nearshore and onshore water quality, including water in bays, estuaries, nearshore, and coastal areas, also degrades as a result of oil spills.[263] The impacts of a spill on these waters could be significant,[264] with contamination arising from a host of sources, including oil, gas, and their respective components and from cleanup and mitigation efforts.[265]

These well-documented adverse effects of oil spills on communities, species, and the environment highlight the necessity of ensuring that BOEM accurately analyzes oil spill risk of OCS oil and gas activities in the Gulf. In order to assess oil spill risk, BOEM must properly evaluate both the probabilities and/or frequencies of oil spills from oil and gas activities as well as the impacts of the activities. BOEM's regulations require the EIA to assess all potential environmental impacts. 30 C.F.R. § 550.261(a)(1). And the DOCD must, at a minimum calculate the worst case discharge, describe the worst case spill scenario and contain a proper oil spill response plan. *Id*. § 550.250. Here, the DOCD and the EIA fail to adequately evaluate oil spill risk from the Project. The DOCD and EIA also do not adequately discuss the oil spill response actions to be taken in the event of a spill.

First, the EIA fails to account for a range of oil spill sizes from the Project. Instead, the EIA looks only at (1) small fuel spills (<1,000 barrels) resulting from a failure related to the storage of oil or diesel fuel and (2) the purported worst case discharge for a large oil spill (4 million barrels (45,000 barrels per day over 90 days)) resulting from a potential blowout of the well which BP estimates has the highest liquid hydrocarbons rate potential in the area).[266] An adequate oil spill analysis must analyze spills from a comprehensive *range* of spill size classes from the various components of the Project, not just a small spill from storage and the purported worst case discharge from well blowout. This comprehensive analysis is crucial for better understanding the scope and extent of the environmental impacts from the spills. Smaller spills than the worst case discharge may impact smaller areas when they occur, but they will have a higher frequency, meaning that they could cause sustained environmental harm that may have cumulative and long-lasting impacts and/or could inhibit recovery from past spills. Moreover, smaller spills than the worst case discharge—here, a spill less than 4 million barrels over 90

[259] E.O. Nwaichi & S.A. Ntorgbo, *Assessment of PAHs levels in some fish and seafood from different coastal waters in the Niger Delta*, 3 Toxicology Reports 167, 168 (2016), https://www.sciencedirect.com/science/article/pii/S2214750016300051.
[260] *Id.* at 171.
[261] *Id*.
[262] BOEM, *Catastrophic Spill Event Analysis*, at 31.
[263] *Id.* at 32.
[264] *Id*.
[265] *Id*.
[266] EIA at 17–21.

days—can have very devastating consequences. Without information regarding the different sizes of spills and corresponding probability of differently-sized spills, as well as information about spills from different components of the Project, it is impossible to adequately evaluate impacts and plan for appropriate mitigation and response plans.

Second, in analyzing a large oil spill, the EIA relies on the 2004 OSRA model (which simulates oil spill trajectories) to estimate conditional probabilities that a spill in the lease area could contact shoreline segments within 3, 10, and 30 days.[267] But the OSRA model is outdated. As an initial matter, BOEM has released more recent OSRA models, and it is unclear—and BP does not explain—why the more recent OSRA models were not used for calculating these oil spill probabilities.[268] For example, BOEM's 2023 OSRA publication notes that the OSRA model simulating oil spill transport "was originally developed by Smith et al. (1982) and enhanced by BOEM over the years (Ji et al. 2014; Ji et al. 2011; Ji et al. 2004; Ji et al. 2002; LaBelle and Anderson 1985)."[269] To the extent that BOEM believes that the 2004 OSRA model is nonetheless appropriate for this Project, the agency must explain why.

The 2004 OSRA model relies on historical data from more than two decades ago. The EIA's analysis ignores that more current data exists which should at a minimum be considered in calculating oil spill probabilities. Past trends from decades ago do not reflect the risk associated with oil and gas development in the Gulf today or in the future. That is particularly true for this Project, which would be set in ultra-deep waters and farther offshore than projects from two decades ago. BOEM should use comprehensive and up-to-date data to properly analyze oil spills from the Project.

As the EIA acknowledges, the 2004 OSRA model does not evaluate the fate of a spill over time periods exceeding 30 days or the fate of a release that continues over a period of weeks or months.[270] The EIA thus cannot claim to truly analyze a "worst case discharge," which the EIA itself states would have the duration of 90 days. The EIA also acknowledges that the OSRA model does not consider the chemical composition or biological weathering of oil spills or the spreading and splitting of oil spills.[271] In addition, the OSRA model does not consider critical variables like water depth (i.e., drilling depth) and transportation distance (which is needed for analyzing spills from transporting oil from offshore areas to the mainland). These failures are particularly problematic because the Project would be located in ultra-deep waters. The EIA also recognizes that the OSRA model does not specify a particular spill size.[272] As explained above, consideration of spill size is a key factor in properly and comprehensively evaluating oil spill probability. Spill size will necessarily affect the probability of spills in the lease area contacting shoreline segments.

---

[267] *Id.* at 19–20; Zhen-Gang Ji et al., *Oil-Spill Risk Analysis: Contingency Planning Statistics for Gulf of Mexico OCS Activities*, OCS Report MMS 2004-026 (2004).
[268] *See* BOEM, Oil Spill Risk Analysis Publications, https://www.boem.gov/environment/environmental-assessment/oil-spill-risk-analysis-publications (last visited May 10, 2025).
[269] BOEM, *Oil Spill Risk Analysis Gulf of Mexico Outer Continental Shelf (OCS) Lease Sales in the Eastern Planning Area, Central Planning Area, and Western Planning Area and Gulf-wide OCS Program*, OCS Study BOEM 2023-026, at 8 (2023).
[270] EIA at 20.
[271] *Id.*
[272] *Id.*

Third, the DOCD and the EIA do not provide an adequate discussion of the appropriate oil spill response actions for the Project. Appendix G to the DOCD (Oil Spill Response Discussion) mischaracterizes the worst case discharge modeled for the Project. The Oil Spill Response Discussion states that the worst case discharge volume is 45,000 barrels, but that is just the volume for one day.[273] The worst case discharge volume modeled by BP is actually 4 million barrels, with the duration being 90 days. Even if a spill of this magnitude is mitigated somewhat by deploying response actions, the Oil Spill Response Discussion does not show that BP's oil spill response actions are appropriate and adequate for a worst case discharge spill.

In determining whether the response actions are appropriate, BOEM must also consider spills that are expected to occur with reasonable certainty, including the largest spill expected to occur, from various components of the Project. As explained above, the EIA does not provide an analysis of a range of oil spills from various components of the Project and thus fails to analyze spills expected to occur with reasonable certainty. This means that BOEM cannot, with the information provided in the EIA, evaluate whether the response actions provided in the Oil Spill Response Discussion are adequate for the Project.

## XVII. THE KASKIDA PROJECT WILL ADD ADDITIONAL BURDENS TO VULNERABLE COASTAL COMMUNITIES

Communities along the Gulf of Mexico are burdened with some of the worst impacts of the offshore oil and gas industry. Over 48% of total U.S. petroleum refining capacity and 51% of total U.S. natural gas processing plant capacity are located along the Gulf coast.[274] In particular, the petrochemical industry has disproportionately impacted Black, Indigenous, and communities of color.[275] These communities face disproportionate burdens from multiple pollution sources, including toxic air pollution, plastic pollution, and groundwater contamination. In a nationwide study mapping the spread of cancer-causing chemicals from sources of hazardous air pollutants, census tracts where a majority of residents were people of color experienced on average about 40% more cancer-causing industrial air pollution than primarily white census tracts.[276] In census tracts where the majority of residents were Black, the estimated cancer risk from toxic air pollution was found to be more than twice the risk of majority-white tracts.[277] Two areas in the Gulf of Mexico have unduly felt the harms of the oil and gas industry: "Cancer Alley," Louisiana and southeastern Texas. These two regions are highlighted to illustrate the severe impact of the offshore oil and gas industry on communities across the Gulf coast.

### 1. *"Cancer Alley," Louisiana*

"Cancer Alley," the 85-mile stretch along the Mississippi River between Baton Rouge and New Orleans, gets its name from the high concentration of petrochemical facilities and high

[273] DOCD, Appx. G at 1–2.
[274] EIA, *Gulf of Mexico Fact Sheet* (Sept. 4, 2024), https://www.eia.gov/special/gulf_of_mexico/.
[275] EARTHJUSTICE, *How big oil is using toxic chemicals as a lifeline – and how we can stop it* (Jan. 23, 2024), https://earthjustice.org/features/petrochemicals-explainer.
[276] Lylla Younes et al., *Poison in the air*, ProPublica (Nov. 2, 2021), https://www.propublica.org/article/toxmap-poison-in-the-air.
[277] *Id.*

cancer risk from toxic pollution.[278] In 2012, the average cumulative cancer risk in Cancer Alley was more than 50% higher than the average cumulative risk in the United States.[279] The burden of this toxic air pollution is felt by Black and low-income communities. President Biden has acknowledged the environmental injustices Black, Indigenous, and people of color face, and has explicitly named Cancer Alley as an area that has been disproportionately harmed.[280] Within ten miles of St. Gabriel, Louisiana, a majority-Black community, there are at least thirty large petrochemical facilities; thirteen of those are within three miles.[281] EPA data from 2014 estimated that nationwide cancer risk from air toxics exposure was thirty in one million.[282] In the census tract in which St. Gabriel sits, the total cancer risk in 2017 was 200 in one million, over six times the national average.[283] St. Gabriel is also home to a chemical manufacturing plant that once ranked in the top ten plants in the country in terms of creating high, toxic levels of cancer-causing chemicals in the surrounding air.[284] A plastics facility across the river from St. Gabriel announced a $1.3 billion facility expansion in 2021.[285] Despite the existing health burdens in the region, many new petrochemical facilities or facility expansions are planned in or near communities that already have some of the most dangerous air in the country.[286]

In St. John the Baptist Parish, the town of Reserve, a small, predominantly Black and low-income community, has a cancer risk rate fifty times the national average.[287] Residents of Reserve and surrounding towns have been concerned about the health effects of high levels of chloroprene emissions from the Denka Performance Elastomer facility, a synthetic rubber plant in the parish.[288] After a 2015 EPA air toxicity report, the Denka plant was determined to be

---

[278] Kimberly A. Terrell & Gianna St Julien, *Air pollution is linked to higher cancer rates among black or impoverished communities in Louisiana*, 17 ENV'T RSCH. LETTERS at 1–2 (2022); *see also*, EPA, *EJScreen*, https://ejscreen.epa.gov/mapper/ (last visited Jan. 14, 2025); Tristan Baurick et al., *Welcome to "Cancer Alley," where toxic air is about to get worse*, PROPUBLICA (Oct. 30, 2019), https://www.propublica.org/article/welcome-to-cancer-alley-where-toxic-air-is-about-to-get-worse; Matt Black*, Cancer Alley: Big industry, big problems*, PULITZER CENTER (Aug. 10, 2015), https://pulitzercenter.org/stories/cancer-alley-big-industry-big-problems.
[279] Julie Schwartzwald Meaders, *Health impacts of petrochemical expansion in Louisiana and realistic options for affected communities*, 34 TULANE ENV'T LAW J. 113, 120 (2021).
[280] THE WHITE HOUSE, *Remarks by President Biden before signing executive actions on tackling climate change, creating jobs, and restoring scientific integrity* (Jan. 27, 2021).
[281] Baurick et al., *Welcome to "Cancer Alley,"*, *supra.*
[282] EPA, *2014 National Air Toxics Assessment: Fact Sheet* 1, https://www.epa.gov/sites/default/files/2018-08/documents/2014_nata_overview_fact_sheet.pdf (last visited Jan. 14, 2025).
[283] EPA, *AirToxScreen Mapping Tool, Iberville Parish, LA Tract ID: 22047953200* (2017) https://epa.maps.arcgis.com/apps/dashboards/fb6e6b70c7e2480c8ef88cc8e9c061ac.
[284] Younes et al., *In a notoriously polluted area of the country, massive new chemical plants are still moving in*, PROPUBLICA (Oct. 30, 2019), https://projects.propublica.org/louisiana-toxic-air/.
[285] State of Louisiana Office of the Governor, *Gov. Edwards and Shintech announce $1.3 billion expansion for plastics facility* (Jan. 26, 2021), https://web.archive.org/web/20231210142117/https://gov.louisiana.gov/index.cfm/newsroom/detail/2936.
[286] Baurick et al., *Welcome to "Cancer Alley,"*, *supra*
[287] Oliver Laughland, *Proposed deal could slash toxic emissions in America's 'Cancer Alley'*, THE GUARDIAN (June 8, 2022), https://www.theguardian.com/environment/2022/jun/08/cancer-alley-louisiana-denka-pollution-consent-decree.
[288] *See Id.*; Concerned Citizens of St. John, *Our Mission and Our Work in Action,* https://www.ccosj.com/ (last visited Jan. 14, 2025).

responsible for the greatest risk of cancer of any manufacturing facility in the United States.[289] Air monitoring around the parish has shown quantities of chloroprene, a likely carcinogenic chemical, dozens of times above EPA's guidance.[290] EPA has stated that emissions of chloroprene above its recommended limit (0.2 micrograms per cubic meter) are unsafe for humans to breathe over the course of a lifetime.[291] The air monitoring station at a local elementary school, on the fenceline of the Denka plant, recorded at one point levels of chloroprene 755 times above EPA's guidance.[292] Over 500 children attend the elementary school daily.[293]

One study of cancer risk in residents living near the Denka plant found that cancer prevalence and non-cancer health conditions associated with chloroprene exposure were unusually high and correlated to proximity to the plant.[294] Cancer prevalence for residents who lived within one-and-a-half kilometers of the plant was 44% higher than the national average.[295]

Of survey respondents who lived within one-and-a-half kilometers of the plant, more than half regularly experienced headaches, dizziness or lightheadedness; nearly half regularly experienced eye pain/irritation and/or watery eyes; more than 40% experienced coughing, sneezing, and/or a sore/hoarse throat most of the time; more than one third regularly experienced skin rash/irritation and/or itchy skin; nearly 40% experienced chest pain, heart palpitations or both; one third regularly experienced wheezing and/or difficulty breathing; and nearly 30% experienced fatigue/lethargy most of the time.[296] In surveyed households within one-and-a-half kilometers of the plant, nearly 50% of the children suffered from headaches, nosebleeds, or both.[297] These health effects are consistent with the short- and long-term health effects EPA has found associated with chloroprene exposure.[298] Additional long-term health effects of chloroprene exposure include cancer, rapid heartbeat and reduced blood pressure, and temporary hair loss.[299]

Due to EPA's concern about high levels of chloroprene emissions in St. John the Baptist Parish, EPA, the Louisiana Department of Environmental Quality, and Denka have made efforts to reduce chloroprene emissions from the facility.[300] Yet between January 6, 2022 and September

---

[289] Jamiles Lartey & Oliver Laughland, *Cancer Town Louisiana: 'Almost every household has someone that died from cancer'*, THE GUARDIAN (May 6, 2019), https://www.theguardian.com/us-news/ng-interactive/2019/may/06/cancertown-louisana-reserve-special-report.

[290] Laughland, *Proposed deal could slash toxic emissions in America's 'Cancer Alley', supra*.

[291] Lartey & Laughland, *'Almost every household has someone that died from cancer', supra*.

[292] *Id.*

[293] Sharon Lerner, *EPA rejects Denka's request to weaken assessment of chloroprene*, THE INTERCEPT (Mar. 17, 2022), https://theintercept.com/2022/03/17/epa-cancer-chloroprene-denka/.

[294] University Network for Human Rights, "*Waiting to die:" Toxic emissions and disease near the Louisiana Denka/DuPont Plant*, at 6–7 (2019).

[295] *Id.* at 7.

[296] *Id.*

[297] *Id.*

[298] Bao Chuong et al., *Improving air quality: EPA should conduct new residual risk and technology reviews for chloroprene- and ethylene oxide-emitting source categories to protect human health, Report NO. 21-P-0129*, at 6, EPA Office of Inspector General, (2021).

[299] *Id.*

[300] Louisiana Department of Environmental Quality, *LDEQ and Denka sign AOC designed to reduce chloroprene emissions at LaPlace facility* (Jan. 10, 2017), https://web.archive.org/web/20240417141744/https://www.deq.louisiana.gov/news/ldeq-and-denka-sign-aoc-designed-to-reduce-chloroprene-emissions-at-laplace-facility; *see also* EPA, EPA in Louisiana, *LaPlace, Louisiana -*

26, 2024, average chloroprene concentrations from 21 monitoring locations on the fenceline of the Denka facility were all still above EPA's recommended level, and EPA's six monitoring sites continue to report chloroprene concentrations over the recommended level.[301]

In St. James Parish, as of 2019, at least four new or expanded petrochemical plants had been planned.[302] Formosa Plastics, a plastics and petrochemicals company, plans to establish a new $9.4 billion plastics complex that would nearly double the amount of toxic chemicals released into the air.[303] The plan would create at least fourteen separate production plants and would have the authority to release 1.6 million pounds of toxic chemicals annually, including 15,400 pounds of ethylene oxide and 73,160 pounds of benzene, both known cancer-causing agents.[304] The burden of this toxic pollution would primarily fall on already overburdened Black communities.[305] Sharon Lavigne, founder of RISE St. James, a faith-based grassroots organization fighting for environmental justice, has said that "Formosa Plastics would be a death sentence for St. James Parish."[306]

In addition to its harmful health impacts, the Formosa plant would cause significant cultural harm to the parish. The graves of people enslaved on former plantations were found on the land that Formosa plans to develop.[307] An independent archaeologist found that there were possibly as many as five other cemeteries on the land.[308] In the efforts to block the Formosa plant

---

*Background Information*, https://www.epa.gov/la/laplace-louisiana-background-information#about-denka (last visited Jan. 14, 2025).

[301] EPA, *Coordinates of Denka Method 325 Monitoring sites, and average Chloroprene and average 1, 3-butadiene concentrations reported for those sites for January thru September 26, 2024*, https://www.epa.gov/system/files/documents/2024-10/denka-fenceline-conc-maps-through-9.26.24.pdf (last visited Jan. 15, 2025); EPA, Map of Denka TO-15 Summa Canister Monitoring sites: Denka has been monitoring for chloroprene using TO-15 Summa Canisters pursuant to a CAA Section 114 request since July 7, 2022. Spreadsheet containing TO-15 monitoring locations and results of ambient sampling for chloroprene for the time period of July 4, 2022, thru November 27, 2024. https://www.epa.gov/system/files/documents/2024-12/denka-summa-monitoring-summary-july-2022-november-2024.xlsx (last visited Jan. 15, 2025).

[302] Younes et al., *In a notoriously polluted area of the country, massive new chemical plants are still moving in* (2019), *supra*.

[303] David J. Mitchell, *For massive new plants, Formosa wants OK to double amount of chemicals released into St. James Parish air*, THE ADVOCATE (July 8, 2019), https://www.theadvocate.com/baton_rouge/news/article_c30d4620-a1be-11e9-837c-13f09466bb79.html.

[304] *Id.*

[305] Steven Mufson, *Huge plastics plant faces calls for environmental justice, stiff economic headwinds*, THE WASHINGTON POST (April 19, 2021), https://www.washingtonpost.com/climate-environment/2021/04/19/huge-plastics-plant-faces-calls-environmental-justice-stiff-economic-headwinds/; Deacon Chris Kellerman SJ, The Roman Catholic Diocese of Baton Rouge, *Environmental racism and Formosa Plastics in St. James* (Jan. 12, 2021), https://diobr.org/news/environmental-racism-and-formosa-plastics-in-st-james; *see also* Antonia Juhasz, *Louisiana's 'Cancer Alley' is getting even more toxic – but residents are fighting back*, ROLLING STONE (Oct. 30, 2019), https://www.rollingstone.com/politics/politics-features/louisiana-cancer-alley-getting-more-toxic-905534/.

[306] Deacon Kellerman SJ, *Environmental racism and Formosa Plastics in St. James*, *supra*.

[307] Center for Constitutional Rights, *RISE St. James – The fight to protect burial sites of enslaved people*, https://ccrjustice.org/home/what-we-do/our-cases/rise-st-james-fight-protect-burial-sites-enslaved-people (last visited Jan. 14, 2025).

[308] *Id.*

from being constructed, Lavigne stated: "Our ancestors are crying out to us from their graves—they are telling us to not let industry disturb their burial sites."[309]

Even without the Formosa project, there are still twelve petrochemical facilities within a ten-mile radius in St. James Parish; the Formosa plant would be the thirteenth.[310] Residents of the Parish and Cancer Alley generally have long been aware of the unusually high number of people who fall ill with cancer and other diseases.[311] One resident of Reserve recalled her niece saying, just before passing away from cancer: "We're just sitting here, waiting to die."[312]

### 2. *Southeastern Texas*

Like Cancer Alley, southeastern Texas is heavily burdened with the toxic pollution and adverse health impacts of oil refineries and the petrochemical industry. The impacts of the industry are acutely felt in the greater Port Arthur and Houston areas, the areas with the second and third largest hot spots of cancer-causing air pollution in the country, respectively, after Cancer Alley.[313]

Gulf Coast refinery and petrochemical facilities have frequently exceeded EPA limits on benzene pollution—as of December 2024, seven facilities were out of compliance.[314] Benzene is a known human carcinogen with harmful health effects from both short- and long-term exposure, including headaches, dizziness, and irritation of the eyes, skin and respiratory tract, as well as harmful effects to bone marrow, excessive bleeding, and damage to the immune system.[315] In Jefferson County, in which Port Arthur is situated, 92% of sulfur dioxide emissions come from one petroleum coke plant; the plant is one of the largest sources of sulfur dioxide pollution in Texas.[316] Exposure to sulfur dioxide can also have short-term and chronic effects. Short-term exposure can cause respiratory problems, including shortness of breath and chest tightness, particularly during physical activity.[317] Chronic exposure can increase susceptibility to respiratory infections and reduce the ability of the lungs to function.[318] Additionally, children, older adults, and people with asthma are at increased risk of hospitalization and emergency room

---

[309] Christina Carrega, *$9.4 billion plastics facility to be built on slave burial grounds, report says*, ABC News (Mar. 15, 2020), https://abcnews.go.com/US/94-billion-plastics-facility-built-slave-burial-grounds/story?id=69555811.

[310] Letter from U.S. House of Representatives Committee on Natural Resources, Raul M. Grijalva, Chair and A. Donald McEachin, Member of Congress to President Biden (Mar. 17, 2021) (regarding Army Corps permits on Formosa Plant).

[311] Lartey & Laughland, *'Almost every household has someone that died from cancer'*, *supra*.

[312] University Network for Human Rights, "*Waiting to die*", at 5.

[313] Younes et al., *In a notoriously polluted area of the country, massive new chemical plants are still moving in*, *supra*.

[314] *See Cancer-Causing Benzene Pollution from U.S. Refineries Down Significantly*, Environmental Integrity Project (May 16, 2024), https://environmentalintegrity.org/news/cancer-causing-benzene-pollution-from-u-s-refineries-down-significantly/.

[315] EPA, *Benzene* (Jan. 2012), https://www.epa.gov/sites/default/files/2016-09/documents/benzene.pdf; Ctr. for Disease Control and Prevention, *Facts about Benzene* (Apr. 4, 2018), https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[316] EIP 2021 Press Release.

[317] Agency for Toxic Substances and Disease Registry, *Medical Management Guidelines for Sulfur Dioxide*, https://wwwn.cdc.gov/TSP/MMG/MMGDetails.aspx?mmgid=249&toxid=46 (last visited Jan. 14, 2025) Am. Lung Ass'n, *Sulfur Dioxide*, https://www.lung.org/clean-air/outdoors/what-makes-air-unhealthy/sulfur-dioxide (last visited Jan. 14, 2025) [hereinafter "ALA Sulfur Dioxide"].;

[318] ATSDR, *Medical Management Guidelines for Sulfur Dioxide*, *supra*; ALA Sulfur Dioxide, *supra*.

visits if exposed to sulfur dioxide.[319] Of the approximately 2,600 residents who live within a three-mile radius of the petroleum coke plant, 98% are people of color and 62% are lower income.[320] The predominantly Black neighborhood of Port Arthur closest to the plant reports a 13.7% asthma rate, above the 10.5% average asthma rate for Port Arthur and the 8% national average.[321] In 2021, EPA recognized the harm that air pollution from the plant was causing the mostly African American community in Port Arthur when it agreed to investigate whether Texas violated the civil rights of residents by allowing the plant to continue emitting harmful air pollution without requiring modern pollution controls.[322]

The greater Houston area is likewise heavily burdened by the oil and gas industry. The area is home to the largest petrochemical manufacturing complex in the western hemisphere as well as 44% of the nation's petrochemical capacity, with 618 chemical manufacturing facilities.[323] Shipping is another major source of pollution for the area: one study found that children living within two miles of the Houston ship channel had a 56% higher risk of developing acute lymphocytic leukemia than children living more than ten miles from the channel.[324] The toxic pollution from these facilities disproportionately harms people of color, low-income communities, and limited-English speaking households.[325]

Some pollutants of concern in the region are emissions of fine particulate matter (PM2.5), coarse particulate matter (PM10), and volatile organic compounds. Exposure to each of these pollutants has been linked to cardiovascular disease, premature death, and damage to bodily systems and organs.[326] A study of the Houston region found that the amount of each of these pollutants emitted per square mile per year was roughly 50% higher for people living in poverty compared to wealthier communities.[327] For communities of color, the burden of these pollutants was twice as much compared to white communities.[328]

Within the region, some communities are hit particularly hard—in the Harrisburg/Manchester neighborhood, a predominantly Hispanic/Latino neighborhood, one study found that air pollution exceeded safe levels for seven of the twelve air pollutants deemed

[319] ALA Sulfur Dioxide, *supra*.
[320] EIP 2021 Press Release.
[321] Savanna Strott & David Leffler, *Small plant, big polluter*, Houston Pub. Media (Nov. 2, 2021), https://www.houstonpublicmedia.org/articles/news/health-science/2021/11/02/412279/small-plant-big-polluter/.
[322] Clarissa Ayala, *EPA agrees to investigate Texas for alleged civil rights violations caused by air pollution from Port Arthur plant*, Lone Star Legal Aid (Oct. 18, 2021), https://www.lonestarlegal.org/news/2021/10/epa-agrees-to-investigate-texas-for-alleged-civil-rights-violations-caused-by-air-pollution-from-port-arthur-plant/.
[323] Yukyan Lam et al., *Toxic air pollution in the Houston ship channel: Disparities show urgent need for environmental justice*, Nat. Res. Def. Council & Tex. Env't Justice Advocacy Servs. (Aug. 31, 2021); Greater Houston Partnership, Data, Insight & Analysis, *Chemical Industry Overview* (April 26, 2021), https://web.archive.org/web/20240417192922/https://www.houston.org/houston-data/chemical-industry-overview.
[324] Younes et al., *Poison in the air*, *supra*; Cindy Horswell & Susan Carroll, *Study: Children near ship channel face more risk*, CHRON. (Jan. 19, 2007), https://www.chron.com/news/houston-texas/article/Study-Children-near-Ship-Channel-face-more-risk-1583566.php.
[325] Lam et al., *Toxic air pollution in the Houston ship channel*, *supra*.
[326] *Id.*; EPA, *Health and environmental effects of particulate matter (PM)*, https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (last updated Jul. 16, 2024); Am. Lung Ass'n, *Volatile Organic Compounds* (2020), https://www.lung.org/clean-air/at-home/indoor-air-pollutants/volatile-organic-compounds.
[327] Lam et al., *Toxic air pollution in the Houston ship channel*, *supra.*
[328] *Id.*

"definite risks."[329] Particulate matter pollution levels in that neighborhood have been found to be fifty to sixty times higher than in the broader region.[330] Another study of the Houston area compared exposure to toxic air pollution and health risk in Harrisburg/Manchester as well as Galena Park, also a primarily Hispanic and low-income community, with Bellaire and West Oaks/Eldridge, two more affluent communities.[331] The results found that the toxic concentration of 1,3-butadiene, a chemical known to cause cancer and other adverse neurological effects, was 174 times higher in Harrisburg/Manchester and 228 times higher in Galena Park than in West Oaks/Eldridge.[332] The study also looked at cancer risk in these four communities. Residents in Harrisburg/Manchester have a 24% and 30% higher cancer risk than residents of Bellaire and West Oaks/Eldridge, respectively.[333] Similarly, in Galena Park, residents face cancer risks 30% and 36% higher than in Bellaire and West Oaks/Eldridge, respectively.[334] These studies highlight how, within the same region, communities of color and low-income communities are disproportionately burdened with the harmful impacts of the oil and gas industry.
In addition to the health risks from exposure to air pollution in southeastern Texas, industrial facility accidents in the oil and gas industry also pose significant risks to surrounding communities. In 2017, Hurricane Harvey damaged two ExxonMobil refineries, resulting in a release of hazardous pollutants, including volatile organic compounds and sulfur dioxide.[335] EPA estimates that approximately 150 catastrophic accidents occur at regulated industrial facilities every year, and less severe accidents happen regularly.[336] As with air pollution, the risk of a chemical spill is higher in BIPOC and low-income communities near the fenceline of these facilities.[337]

BOEM should ensure that the Kaskida Project is subject to robust mitigation measures and stipulations that protect Gulf communities, marine life and ecosystems, and the climate.[338] Mitigation measures are acts taken not only to avoid, minimize, rectify, reduce, or eliminate impacts but also to "compensat[e] for the impact by replacing or providing substitute resources or environments."[339]

Available evidence demonstrates that BOEM should, at a minimum, (1) improve methane emissions data and reporting from oil and gas sites through the incorporation of top-down measurements; (2) collaborate with impacted environmental justice communities and co-develop mitigation measures with these communities; (3) incentivize lessees to enter into community

---

[329] Union of Concerned Scientists & Tex. Env't Just. Advoc. Series, *Double jeopardy in Houston: Acute and chronic chemical exposures pose disproportionate risks for marginalized communities*, at 3 (2016).
[330] *Lam et al., Toxic air pollution in the Houston ship channel, supra.*
[331] Union of Concerned Scientists & Tex. Env't Just. Advoc. Series, *supra*, at 5–7.
[332] *Id.* at 12.
[333] *Id.* at 13.
[334] *Id.* at 14.
[335] Steven Mufson, *ExxonMobil refineries are damaged in Hurricane Harvey, releasing hazardous pollutants*, The Washington Post (Aug. 29, 2017), https://www.washingtonpost.com/news/energy-environment/wp/2017/08/29/exxonmobil-refineries-damaged-in-hurricane-harvey-releasing-hazardous-pollutants/.
[336] Union of Concerned Scientists & Tex. Env't Just. Advoc. Series, *supra*, at 2–3.
[337] *Id.* at 3.
[338] *See, e.g.*, 40 C.F.R. §§ 1502.14(e), 1502.16(a).
[339] *See* CEQ, *Final Guidance for Federal Departments and Agencies on the Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact*, 76 Fed. Reg. 3843, 3847 (Jan. 21, 2011).

benefit agreements with environmental justice communities; (4) evaluate the agency's commonly applied post-lease mitigation measures and incorporate them as mandatory lease stipulations where appropriate; (5) require additional safeguards to prevent blowouts and catastrophic oil discharges; and (6) require BP to decommission idle wells prior to beginning new production.

Communities along the Gulf Coast have had fossil fuel infrastructure that transports, stores, and processes OCS oil and gas imposed upon them. These facilities include ports, pipelines, processing facilities, and refineries, among others. Within the Gulf of Mexico, effects of this oil and gas industrialization are not evenly distributed, with environmental justice communities in Louisiana and Texas bearing the brunt of the harm.[340]

BOEM has previously committed to "advancing meaningful engagement with communities that may potentially be impacted by oil and gas activities" for lease sales from 2024 to 2029, and it has stated that it will consider "community-initiated discussions of potential impacts and community-informed mitigation measures."[341]

Before BOEM proceeds further into approving the Kaskia Project, BOEM must engage meaningfully with vulnerable Gulf communities that suffer the devastating and disproportionate impacts of offshore oil and gas production, including impacts from midstream and downstream oil and gas infrastructure associated with offshore development. Such engagement should include (1) holding in-person meetings with at least 10 to 20 impacted communities in the Gulf of Mexico; (2) collaborating with trusted community-based organizations to help the agency understand community concerns and needs; (3) conducting targeted outreach and disseminating information in a manner that will reach the intended communities; (4) providing translation and interpretation services for materials and meetings in the top languages spoken in the communities; (5) ensuring that materials are in plain language and accessible; and (6) providing incentives for participation in BOEM meetings.

BOEM should identify and fully understand all potential impacts to communities as well as community concerns. In particular, BOEM should evaluate how the Kaskida Project will impact Gulf communities through further midstream and downstream oil and gas infrastructure. BOEM should take the results of this assessment into consideration when deciding whether to approve the Project.

---

[340] *See*, e.g., Kimberly Terrell & Gianna St. Julian, *Air pollution is linked to higher cancer rates among black or impoverished communities in Louisiana*, 17 Env't Rsch. Letters 014033 (Jan. 13, 2022), https://doi.org/article/10.1088/1748-9326/ac4360; Wesley James et al., *Uneven Magnitude of Disparities in Cancer Risks from Air Toxics*, 9 Int. J. Env't. Rsch. Pub. Health 4365 (Dec. 3, 2012); NAACP & Clean Air Task Force, *Fumes Across the Fence-Line* (Nov. 2017), https://naacp.org/resources/fumes-across-fence-line-health-impacts-air-pollution-oil-gas-facilities-african-american; Younes et al., *In a Notoriously Polluted Area of the Country, Massive New Chemical Plants Are Still Moving In, supra*(2019); Env't. Integrity Project, *Nearly Half of U.S. Refineries Releasing Benzene at Levels That Could Pose a Long-Term Health Threat*, *supra*; Savanna Strott, *Nearly all unplanned chemical releases in Texas go unpunished*, Texas Tribune (Aug. 17, 2022), https://www.texastribune.org/2022/08/17/texas-unplanned-chemical-release-air-pollution/.

[341] BOEM, *2024-2029 National Outer Continental Shelf Oil and Gas Leasing Program: Final Programmatic Environmental Impact* Statement, OCS EIS/EA, BOEM 2023-054, at 66 (Sept. 2023).

In collaboration with environmental justice communities, BOEM should also co-develop and adopt mitigation measures that will adequately protect communities from the health, environmental, and social consequences of additional oil and gas development in the Gulf of Mexico. Co-development of measures is necessary to help ensure that the agency is truly addressing community concerns and adhering to community priorities.

Community benefit agreements ("CBAs") are agreements signed by community benefit groups and developers, identifying a range of community benefits the developer agrees to provide as part of the development, in return for the community's support of the project.[342] The goal of CBAs is to ensure that measurable, local benefits will be given to a community.[343] These agreements are enforceable, legally-binding contracts for all parties that stipulate community benefits and are the direct result of substantial community input.[344]

For wind leasing in California, BOEM has provided credits off the lease purchase price to bidders if they entered into qualifying CBAs.[345] Lessees receiving the Lease Area Use CBA 5% credit were required to enter in a CBA with a community, stakeholder group, or Tribal entity whose use of the geographic space of the lease area, or whose use of resources harvested from that geographic space, is expected to be impacted by the lessee's potential offshore wind development.[346] BOEM also provided a General CBA 5% credit "in exchange for an existing CBA or a commitment to enter into a new CBA with one or more communities, Tribes, or stakeholder groups that are expected to be affected by the potential impacts on the marine, coastal, and/or human environment (such as impacts on visual or cultural resources) from activities resulting from lease development that are not otherwise addressed by the Lease Area Use CBA."[347] In the recent Gulf of Mexico wind lease sale, BOEM included in lease provisions that lessees are strongly encouraged to enter into "formal agreements to monitor community impacts and implement community benefits."[348]

BOEM does not make similar efforts for oil and gas leases, but could use this type of incentive system for the Kaskida Project. BOEM should incentivize BP to enter into CBAs with those that use the geographic space of those that would be affected by the impacts of development.[349] Potential CBAs could, for example, stipulate that BP will provide annual funding for coastal habitat restoration projects, emissions reduction programs, health services, school districts, scholarships, and more. These requirements would be consistent with the terms of other CBAs between fossil fuel infrastructure companies and communities.[350]

---

[342] *See* Columbia Law School, Sabin Ctr. for Climate Change Law, *Community Benefits Agreements Database*, https://climate.law.columbia.edu/content/community-benefits-agreements-database (last visited Jan. 21, 2025).
[343] *See id.*
[344] *See id.*
[345] *See, e.g.*, Pacific Wind Lease Sale 1 (PACW-1) for Commercial Leasing for Wind Power on the Outer Continental Shelf in California-Final Sale Notice, 87 Fed. Reg. 64093, 64102–03 (Oct. 21, 2022).
[346] *Id.* at 64102.
[347] *Id.*
[348] *Id.*
[349] Renewable Energy Lease No. OCS-G 37334, at C-5 (effective Nov. 1, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Lease%20OCS-G%2037334-RWE%20Offshore%20US%20Gulf%20LLC.pdf.
[350] Columbia Law School, Sabin Ctr. for Climate Change Law. December 16, 2014, City of Salem and Footprint Power Salem Harbor Development CBA in Massachusetts included "[a]nnual payments for 3 to 10 years will be

BOEM's final multisale environmental impact statement for its 2017 to 2022 oil and gas lease sales contained a list of "commonly-applied" or "standard" mitigation measures that the agency could apply to permits and approvals at the post-lease stage.[351] These mitigations relate broadly to air quality, archaeological resources, artificial reef material, Flower Garden Banks National Marine Sanctuary, topographic features, hydrogen sulfide, hard bottoms/pinnacles, drilling hazards, and more.[352] BOEM notes that "[m]any of these mitigating measures have been adopted and incorporated into regulations and/or guidelines governing OCS oil and gas exploration, development, and production activities."[353] BOEM should take a close look at its entire list of commonly applied mitigation measures and determine which of the measures should be mandatory lease stipulations for the Kaskida Project.

In particular, we recommend that BOEM evaluate and incorporate many of the post-lease commonly applied mitigation measures that relate to air quality—including the use of ultra-low sulfur content fuel, performance of stack testing to verify emission limits of engines, production curtailment during sulfur recovery unit shutdown, and more—into lease stipulations.[354] BOEM should also incorporate the measures regarding anchoring approval in order to protect reef materials.[355] BOEM should also incorporate the "zero discharge" and other practices to mitigate harm to chemosynthetic communities, as well as the measures to protect the Flower Garden Banks National Marine Sanctuary, topographic features, and hard bottoms, pinnacles, and potentially sensitive biological features.[356] We also recommend making the pipeline corrosion inspection requirements mandatory in lease stipulations.[357] Some of the requirements outlined for these mitigation measures are already part of current lease stipulations (for example, some of the topographic features mitigations), and incorporation of more of these post-lease measures into the lease stipulations, as appropriate, will lead to more uniform and transparent mitigation.

## XVIII. BOEM MUST ENFORCE ADDITIONAL SAFETY MEASURES

The 2010 BP *Deepwater Horizon* catastrophe arose from a single accident on an offshore drilling rig involving a failed cement installation, failed cement testing, and a failed blowout preventer system. BSEE has finalized changes to the Well Control Rule,[358] which was first published in 2016 to correct some of the deficiencies that investigators found contributed to the

---

used to fund benefits including but not limited to public harbor access, an off-site emission reduction program, public safety training, funding school districts, and supporting public art initiatives," and Aug. 4, 2014, City of Richmond and Chevron Products Company CBA included "[a]nnual payments … for programs including greenhouse gas reduction programs, scholarships, and public safety programs.").

[351] BOEM, *Gulf of Mexico OCS Oil and Gas Lease Sales: 2017–2022, Final Multisale Environmental Impact Statement* Appx. B: Commonly Applied Mitigating Measures (Mar. 2017), https://www.boem.gov/sites/default/files/environmental stewardship/Environmental-Assessment/NEPA/BOEM-EIS-2017-009-v3.pdf.

[352] *Id.* at B-3.

[353] *Id.*

[354] *Id.* at B-6 to B-10.

[355] *Id.* at B-16 to B-18.

[356] *Id.* at B-21 to B-23, B-25 to B-26.

[357] *Id.* at B-24.

[358] Final rule, Oil and Gas and Sulfur Operations in the Outer Continental Shelf-Blowout Preventer Systems and Well Control Revisions, 88 Fed. Reg. 57334 (Aug. 23, 2023).

*Deepwater Horizon* disaster. Although the final Well Control Rule improved standards for operations using blowout preventers, significant gaps remain. OCSLA requires the DOCD to adequately describe environmental safeguards and show how BP will meet all safety standards. 43 U.S.C. § 1351(c). BOEM should include several additional mitigation measures to require BP to implement safeguards to help prevent another similar catastrophe in the Gulf of Mexico.

First, BP must have the capability to deploy the full range of Source Control and Containment Equipment ("SCCE") to control or contain a blowout. BSEE regulations currently require drilling operations to have access to SCCE generally but do not require that operations have access to specified types of SCCE.[359] The mitigation measure should require drilling operations to have access to *all* eight types of SCCE listed as voluntary in BSEE regulations.[360] Increasing the amount of mandatory SCCE equipment would provide necessary protections for worker safety and the environment. Well control cooperatives were set up after the BP *Deepwater Horizon* spill, and oil and gas companies can join these cooperatives to access the full suite of well control equipment for an annual fee.

Second, BP must have cement evaluation logs for all offshore wells. Cement failure was a root cause of the *Deepwater Horizon* blowout, yet BSEE generally relies on industry volunteering to run cement evaluation logs. Cement evaluation logs are critical to ensuring correct cement placement and verifying cement repairs. They should therefore be required for all offshore wells, and, in particular, for complex wells or wells in environmentally sensitive locations.

Third, BOEM should prohibit BP from using a blowout preventer that is under investigation by BSEE. If a component failure or other issue is serious enough to warrant a BSEE-required investigation, it is serious enough to halt use of that same blowout preventer during that investigation until corrective actions are made and the blowout preventer has been verified fit for service.

## XIX. BOEM MUST DISAPPROVE THE DOCD FOR THE KASKIDA PROJECT UNDER OCSLA.

The Secretary should disapprove the DOCD for the Kaskida Development Project under OCSLA, 43 U.S. Code § 1351(h)(1). As described above, the DOCD does not meet the basic statutory or regulatory requirements. That alone is cause to disapprove the DOCD. The proposed operations also pose significant threats to national security and the marine, coastal and human environment, warranting disapproval under subsections (C) and (D) of this provision.

The 2022 National Security Strategy recognizes that, "[o]f all of the shared problems we face, climate change is the greatest and potentially existential for all nations."[361] A number of other recent reports issued by the Department of Homeland Security, the Department of Defense, the National Security Council, and the National Intelligence Director all highlight the threat that

---

[359] 30 C.F.R. § 250.462(b).

[360] *Id.*

[361] National Security Strategy, Oct. 2022, https://www.whitehouse.gov/wp-content/uploads/2022/10/Biden-Harris-Administrations-National-Security-Strategy-10.2022.pdf.

climate change poses to national security. For example, the Office of the Director of National Intelligence issued a report noting that climate change will increasingly exacerbate a number of risks to U.S. national security interests through (1) increased geopolitical tension as countries argue over who should be doing more, and how quickly, and compete in the ensuing energy transition; (2) cross-border geopolitical flash points from the physical effects of climate change as countries take steps to secure their interests; and (3) climate effects straining country-level stability in select countries and regions of concern.[362]

Furthermore, disapproval is warranted under 43 U.S.C § 1351(h)(1)(D). As described above, there are massive risks to the Gulf of Mexico's marine, coastal, and human environment from proposed ultra deepwater drilling by BP—the same company that caused the catastrophic *Deepwater Horizon* oil spill in 2010. At the very least, BOEM must require BP to modify its DOCD to protect the marine, coastal, and human environment. *Id*.

Finally, the DOCD discusses that it plans to install a floating production unit on Lease Block 293, a lease that has already expired. The DOCD states that BP will obtain a right of use easement for the production unit. However, OCSLA only allows easements or rights of way to "support" production of oil. 43 U.S.C. § 1337(p)(1)(B). It only allows direct production through an easement from sources *other* than oil and gas. Id. 1337(p)(1)(C). The production platform that BP plans to install would be directly producing oil, not "supporting" production. In any event, BOEM must first go through the rigorous process of granting the easement before approving the DOCD. *Id*. 1337 (p)(2)-(10).

## XX. BOEM RELIES ON AN UNLAWFUL BIOLOGICAL OPINION AND INCIDENTAL TAKE STATEMENT.

Section 7 of the ESA imposes an affirmative duty on federal agencies to, in consultation with the relevant wildlife agency/ies, "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" such species' critical habitat.[363] "Formal" consultation with NMFS is required whenever an action "may affect" a listed species, unless NMFS concludes the effects are "not likely to [be] adverse[]."[364] Formal consultation requires NMFS to formulate a "biological opinion" ("BiOp") on whether that action is likely to jeopardize species.[365] Both the action agency and the consulting agency must "use the best scientific and commercial data available" in evaluating the action's effects.[366] If NMFS concludes that the proposed action is likely to jeopardize the species, it must specify reasonable and prudent alternatives that would avoid the likelihood of jeopardy.[367] The ESA also requires NMFS to provide an incidental take statement ("ITS") when the agency anticipates that incidental taking of a threatened or endangered species will occur.[368]

[362] National Intelligence Council's National Intelligence Estimate on Climate Change, Oct. 2021, https://www.dni.gov/files/ODNI/documents/assessments/NIE_Climate_Change_and_National_Security.pdf.
[363] 16 U.S.C. § 1536(a)(2).
[364] 50 C.F.R. § 402.14(a), (b)(1).
[365] 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g).
[366] 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8).
[367] 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).
[368] 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

The Kaskida Project relies on the BiOp and ITS issued by NMFS on March 13, 2020, to meet its obligation to ensure against jeopardy under section 7 of the ESA. However, an action agency is in violation of section 7 when it relies on an unlawful biological opinion,[369] and the 2020 BiOp is unlawful.

On August 19, 2024, the U.S. District Court for the District of Maryland found the 2020 NMFS BiOp unlawful because it underestimated the risk and harms of oil spills to protected species, incorrectly assumed that the populations of Rice's whales and Gulf sturgeon remained the same after the *Deepwater Horizon* oil spill, failed to address all stressors likely to affect the Rice's whale, failed to recognize oil spill take as incidental take, and adopted an "irrational surrogate" to determine take by vessel strikes.[370] An agency cannot satisfy its substantive ESA obligations by relying on a facially flawed biological opinion.[371] As such, BOEM must ensure these failures are remedied in a new consultation and consider any relevant new information. Because the BiOp is unlawful, BOEM may not rely on it to comply with its section 7 obligations for the approval of the Kaskida Project. Indeed, Congress established the section 7 consultation process explicitly "to ensure compliance with the [ESA's] substantive provisions."[372] Therefore, without a valid biological opinion, Interior would be out of compliance with both its procedural and substantive obligations under section 7 of the ESA.

Separately, section 9 of the ESA prohibits "take" of endangered species by any person, including federal agencies.[373] "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."[374] Take that is authorized by a valid ITS is not prohibited under section 9.[375] Without a valid ITS, however, any take resulting from an agency action is unlawful. The invalidation of the BiOp invalidates the associated ITS. Accordingly, the Kaskida Project would cause unauthorized take in violation of section 9 of the ESA.

For the same reasons, the Protective Species stipulation—Stipulation No. 4—which relies on the unlawful BiOp and ITS, is inadequate, and BOEM may not rely on the mitigation measures included within to evaluate the effects on protected species. The Rice's whale, for instance, is a critically endangered species of baleen whale whose entire known range is limited to the Gulf of Mexico. As discussed above, oil and gas activities in the Gulf pose a series of threats to the survival and recovery of this species, including oil spills, noise, and vessel strikes. A number of these threats—including those at issue in the Kaskida Project—were deemed by

[369] *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127–28 (9th Cir. 2012).
[370] *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. DLB-20-3060, 2024 WL 3860211, at *6 (D. Md. Aug. 19, 2024) (vacating the 2020 Gulf BiOp); Order Granting Mot. Am. J., *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. DLB-20-3060 (D. Md. Oct. 21, 2024), ECF No. 220 (delaying effective vacatur date to May 21, 2025).
[371] 16 U.S.C. § 1536(a)(2).
[372] *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985); *see id.* ("The ESA's procedural requirements call for a systematic determination of the effects of a federal project on endangered species. If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result."); *see also Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005) ("The purpose of the consultation process … is to prevent later substantive violations of the ESA."); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1056–57 (9th Cir. 1994) ("Only after the [agency] complies with § 7(a)(2) can any activity that may affect the protected [species] go forward.").
[373] 16 U.S.C. § 1538(a)(1).
[374] *Id.* § 1532(19).
[375] *Id.* § 1536(o)(2).

NMFS' most recent species Status Review, prepared in 2016, as "likely to eliminate or seriously degrade" the population.[376] As the review unanimously concluded, the whales "are at high risk of extinction as a result of their small population size and the suite of anthropogenic threats posed primarily by energy exploration, development and production, and vessel collisions. Small-scale incremental impacts over time or a single catastrophic event could result in extinction."[377] Considering their highly vulnerable status, the greatest possible safeguards should be implemented to protect the Rice's whale from further decline.

Existing mitigation measures for the Rice's whale, detailed in the Protected Species lease stipulation, require lessees to comply with the reasonable and prudent measures (RPMs) and implementing terms and conditions set out in the 2020 BiOp developed in consultation with NMFS under the "ESA.[378] However, it is clear from NMFS' own analysis that these measures are insufficient to protect the Rice's whale from the impacts of oil and gas exploration and development activities in the Gulf of Mexico. For example, according to NMFS, oil and gas activities conducted in the Gulf *with* the reasonable and prudent alternative ("RPA") set out in the BiOp will cause an estimated 16 vessel strikes of Rice's whales over a 50-year period, with 12 of those strikes resulting in serious injury or mortality.[379] This rate of mortality is patently incompatible with the continued survival of the species.[380] As mentioned above, the District of Maryland declared the 2020 BiOp and ITS unlawful, finding that NMFS failed to provide measures to protect the Rice's whale from multiple threats and failed to explain how the provided vessel strike measures would prevent jeopardy to the species.[381] The court ordered vacatur of the biological opinion effective May 21, 2025,[382] and BOEM has reinitiated ESA consultation with NMFS.

BOEM should adopt measures to protect Rice's whales from vessel strikes. We recommend that BOEM require the measures currently recommended in NTL No. 2023-G01, *Expanded Rice's Whale Protection Efforts During Reinitiated Consultation with NMFS*,[383] as binding stipulations for BP. Specifically, these measures would require the following actions for all vessels conducting oil and gas activities (except where otherwise specified):

1. Use trained visual observers to monitor a 500-meter vessel strike avoidance zone.
2. Document and retain records for three years on details of transit within Rice's whale habitat (defined as the entire northern Gulf of Mexico Outer Continental Shelf between the 100- and 400-meter isobaths). Documentation must include what port is used for mobilization and demobilization.

---

[376] Rosel et al. (2016), at 130–32.
[377] *Id.* at iv.
[378] Draft PEIS at F-12 to F-14; 2020 Biological Opinion.
[379] 2020 Biological Opinion, at 363.
[380] *See* Hayes et al., *U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessments* (2021), *supra*, at 160–67 (finding that the Rice's whale can afford to lose only about one whale to human impacts every fifteen years to achieve its optimum sustainable population).
[381] *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. DLB-20-3060, 2024 WL 3860211, at *14–32.
[382] Order Granting Mot. Am. J., *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. DLB-20-3060 (D. Md. Oct. 21, 2024), ECF No. 220.
[383] BOEM, *Expanded Rice's Whale Protection Efforts During Reinitiated Consultation with NMFS*, BOEM NTL No. 2023-G01, at 3 (Aug. 17, 2023), https://www.boem.gov/sites/default/files/documents/about-boem/regulations-guidance/BOEM%20NTL%202023-G01.pdf.

3. Observe on all vessels, regardless of size, at all times a 10-knot or less, year-round speed restriction in Rice's whale habitat (defined as above), except when compliance with such restriction would place the safety of vessel or crew, or the safety of life at sea, in doubt. To the maximum extent practicable, avoid transit through Rice's whale habitat after dusk and before dawn, and during other times of low visibility, to further reduce the risk of vessel strike of Rice's whales.
4. Maintain a minimum separation distance of 500 meters from Rice's whales. If a whale is observed but cannot be confirmed as a species other than a Rice's whale, the vessel operator should assume that the whale is a Rice's whale and take appropriate action.
5. For vessels 65 feet or greater, maintain a functioning Automatic Identification System ("AIS") that is operating at all times, as required by the U.S. Coast Guard.

Moreover, to protect Rice's whales from noise impacts BOEM should require the following measures as binding stipulations for the Project:

1. Restrict deep-penetration seismic surveys such that noise from such surveys does not reach or exceed sound pressure levels of 140 dB (re 1 micPa (RMS)) anywhere within Rice's whale habitat. This is the threshold at which species take begins according to the standard presently applied by NMFS under the Marine Mammal Protection Act.[384]
2. Require use of the best commercially available noise-reduction technologies, such as marine vibroseis, modified airguns, and other alternatives, for all deep-penetration seismic surveys taking place in the northern Gulf of Mexico. Sources and operational standards meeting the criterion "best commercially available technology" will be determined by BOEM.
3. Require that all industry vessels transiting through Rice's whale habitat receive a quiet-vessel notation from an IACS-member ship-classification society.

Thank you for your consideration of these comments.

Sincerely,

Brettny Hardy
Senior Attorney
Earthjustice
bhardy@earthjustice.org

Kristen Monsell
Oceans Legal Director & Senior Attorney

[384] *See* Taking Marine Mammals Incidental to Geophysical Surveys Related to Oil and Gas Activities in the Gulf of Mexico, 86 Fed. Reg. 5322 (Jan. 19, 2021). While this threshold is plainly not conservative given a scientific record showing impacts to baleen whales at much lower exposure levels, and while we would encourage BOEM to consider a more protective standard, it represents, as noted, NMFS' present threshold for estimating take.

Miyoko Sakashita
Oceans Program Director
Center for Biological Diversity
kmonsell@biologicaldiversity.org
miyoko@biologicaldiversity.org

Scott Eustis
Community Science Director
Healthy Gulf
scott@healthygulf.org

Joanie Steinhaus
Ocean Program Director
Turtle Island Restoration Network
joanie@tirn.net

Devorah Ancel
Senior Attorney
Sierra Club Environmental Law Program
devorah.ancel@sierraclub.org

**EARTHJUSTICE, SIERRA CLUB ENVIRONMENTAL LAW PROGRAM, CENTER FOR BIOLOGICAL DIVERSITY, HEALTHY GULF, TURTLE ISLAND RESTORATION NETWORK, PORT ARTHUR COMMUNITY ACTION NETWORK, FOR A BETTER BAYOU, HABITAT RECOVERY PROJECT, FISH**

June 30, 2025

**Via Postage Mail and E-Mail (BOEMGulfPlans@boem.gov)**

Ms. Michelle Uli Picou
Plans Section Chief MS GM 1053C
Bureau of Ocean Energy Management
Gulf of Mexico Office
1201 Elmwood Park Blvd.
New Orleans, LA 70123-2394

**Re: Supplemental Comments on BP Exploration & Production Inc.'s Initial Development Operations Coordination Document (DOCD), Kaskida Project, Keathley Canyon Blocks 292 and 293**

On behalf of the undersigned groups, please accept these comments on BP Exploration & Production, Inc.'s (BP) Development Operations Coordination Document (DOCD) for the Kaskida Project in the Gulf of Mexico.[1] These comments supplement the comments submitted by several of the undersigned groups on May 11, 2025, and incorporate those comments by reference.

For the reasons discussed in the May 11, 2025, comments, and the additional reasons discussed herein, BOEM must disapprove the DOCD for the Kaskida Project under the Outer Continental Shelf Lands Act (OCSLA) and other laws. BOEM's OCSLA regulations require BOEM to disapprove a DOCD that, *inter alia*, fails to demonstrate compliance with the requirements of OCSLA, its implementing regulations, or any other applicable Federal laws or if implementing the DOCD will cause serious harm or damage to life (including fish and aquatic lift), the National security or defense, or the marine, coastal or human environment. Furthermore, the regulations state that a DOCD must "demonstrate that [the company has] planned and are prepared to conduct the proposed activities in a manner that: (a) Conforms to the Outer Continental Shelf Lands Act as amended (Act), applicable implementing regulations, lease provisions and stipulations, and other Federal laws; (b) Is safe; (c) Conforms to sound conservation practices and protects the rights of the lessor; (d) Does not unreasonably interfere with other uses of the OCS, including those involved with National security or defense; and (e) Does not cause undue or serious harm or damage to the human, marine, or coastal

[1] *See* 30 C.F.R. § 550.267(b) ("Comments and recommendations must be received by the Regional Supervisor within 60 calendar days after the DPP or DOCD including its accompanying information is made available."). BOEM staff confirmed that comments on this DOCD are due by June 30, 2025, as the information was made available on May 1, 2025.

environment."[2] BOEM's regulations also note that the agency will regulate all activities under a lease to "(a) Promote the orderly exploration, development, and production of mineral resources; (b) Prevent injury or loss of life; (c) Prevent damage to or waste of any natural resource, property, or the environment; and (d) Ensure cooperation and consultation with affected States, local governments, other interested parties, and relevant Federal agencies."[3] Here, the DOCD does not show that oil and gas development associated with the Kaskida Project complies with OCSLA or the ESA, is safe and will have sound conservation practices, or does not cause undue or serious harm or damage to the environment. BOEM also has not demonstrated that the Kaskida Project will prevent injury or loss of life, prevent damage or waste of natural resources or the environment, or that the agency has coordinated and consulted adequately with all interested parties and relevant federal agencies.

As discussed in the May 11, 2025, comments, BOEM must at the very least prepare an Environmental Impact Statement to fully evaluate the impacts of the Kaskida Project under the National Environmental Policy Act (NEPA). The comments below provide further details as to what an adequate evaluation of the Project under NEPA must look like, and why BOEM must disapprove the Project.

## I. BOEM MUST EVALUATE SPILL RISK FROM THE PIPELINES THAT WOULD TRANSPORT OIL AND NATURAL GAS FROM THE PROJECT.

The DOCD notes that BP has contracted Enbridge Offshore Facilities, LLC to build, own, and operate the Gas Export Pipeline and the Oil Export Pipeline to transport oil and natural gas from the Kaskida floating production unit. The Gas Export Pipeline would tie into Enbridge's existing Magnolia Gas Gathering System, and then into Enbridge's Garden Banks pipeline. The Oil Export Pipeline would tie into a new oil pipeline system, called the Rome Pipeline, from Shell's Boxer platform to onshore.

BOEM must assess the risks and impacts associated with the construction and operation of these new pipelines and the operation of the existing pipelines. For one, Enbridge has a deplorable record of spills and other issues, making the risk of damage from pipeline transport from the Kaskida Project likely.

One analysis found that, from 1999 to 2010, Enbridge pipelines spilled nearly 7 million gallons of crude oil in over 800 different incidents across the United States and Canada.[4] Another analysis calculated that Enbridge spilled 2.8 million gallons of oil across the United States between 2002 and 2018.[5]

In 1991, Enbridge was responsible for the largest inland oil spill in U.S. history: the company's Line 3 pipeline ruptured near Grand Rapids, Minnesota, spilling about 1.7 million

[2] *Id.* § 550.202.
[3] *Id.* § 550.120.
[4] National Wildlife Federation, *Importing Disaster: The Anatomy of Enbridge's Once and Future Oil Spills* (2012), https://www.nwf.org/%7E/media/PDFs/Global-Warming/Reports/NWF_EnbridgeOilSpill_WEB_Final.ashx.
[5] Greenpeace, *Dangerous Pipelines* (Nov. 14, 2018), https://www.greenpeace.org/usa/reports/dangerous-pipelines/.

gallons of crude oil, much of it into the Prairie River, only 2 miles from reaching the Mississippi River.[6]

In 2010, Enbridge's 6B pipeline ruptured, spilling over a million gallons of heavy crude oil into the Kalamazoo River in the lower peninsula of Michigan.[7] Enbridge failed to recognize that the pipeline had ruptured until about 17 hours afterward.[8] Cleanup activities at this site are ongoing and the total cost to the environment, including clean-up costs, remediation, and fines levied against Enbridge, currently exceeds $1.2 billion.[9] The National Transportation Safety Board (NTSB) declared this to be the costliest inland oil spill in American history.[10]

Enbridge's Line 5, which runs between Superior, Wisconsin and Sarnia, Ontario in Canada, has spilled 1.3 million gallons of oil over 33 incidents since 1953.[11] For example, Enbridge never properly cleaned up a spill in the Hiawatha National Forest that occurred around 1980.[12] Field surveys in 2011 detected elevated levels of petrochemicals in the soil and in groundwater, and the U.S. Forest Service has no record that Enbridge notified them of this release before 2012.[13]

Additionally, in 2019, an Enbridge 30-inch natural gas transmission pipeline ruptured in Danville, Kentucky, releasing about 101.5 million cubic feet of natural gas that ignited.[14] The accident resulted in 1 fatality, 6 injuries, and the evacuation of over 75 people, as well as the destruction of 5 residences, damage of 14 additional residences, damage to a nearby railroad

---

[6] Dan Kraker & Kristi Marohn, *30 years later, echoes of largest inland oil spill remain in Line 3 fight*, MPR News (Mar. 3, 2021), https://www.mprnews.org/story/2021/03/03/30-years-ago-grand-rapids-oil-spill. Even after this disaster, Enbridge has had multiple releases in its construction of a new Line 3. On July 6, 2021, near Palisade, Minnesota, 80 to 100 gallons of drilling fluid were released into the Willow River, and the Minnesota Pollution Control Agency later found that there had been more releases of drilling fluid, totaling 28 releases at river crossings from June 8 to August 5, 13 spills into wetlands, and 14 releases in upland areas. *Regulator reports new spills along Line 3 construction route*, AP News (Aug. 10, 2021), https://apnews.com/article/business-environmentand-nature-fcc53cb031a58e4536c1c29bcaec2100.

[7] U.S. Env't Prot. Agency, Enbridge Clean Water Act Settlement, https://www.epa.gov/enforcement/enbridge-clean-water-act-settlement; *see also* Lisa Song & Elizabeth McGowan, *Federal Agency Blames 'Complete Breakdown of Safety at Enbridge' for 2010 Oil Spill*, Inside Climate News (July 10, 2012), https://insideclimatenews.org/news/10072012/national-transportation-safety-board-ntsb-kalamazoo-enbridge-6b-pipeline-marshall-michigan/.

[8] Garret Ellison, *Six years after historic oil spill, feds close the book on Enbridge catastrophe*, MLive (July 20, 2016), https://www.mlive.com/news/2016/07/enbridge_2010_marshall_spill_f.html.

[9] *See* Garrett Ellison, *New price tag for Kalamazoo River oil spill cleanup: Enbridge says $1.21 billion*, MLive (Nov. 5, 2014). https://www.mlive.com/news/grand-rapids/2014/11/2010_oil_spill_cost_enbridge_1.html.

[10] NTSB, *Press Release: Pipeline Rupture and Oil Spill Accident Caused by Organizational Failures and Weak Regulations* (July 10, 2012), https://bloximages.chicago2.vip.townnews.com/madison.com/content/tncms/assets/v3/editorial/6/e3/6e35d803-3843-5976-b2b6-a485aa0641f1/57e4202dc7799.pdf.pdf.

[11] National Wildlife Federation, *Line 5*, https://www.nwf.org/Line5.

[12] *See* Keith Matheny, *30 years later, contamination remained at site of pipeline spill*, Detroit Free Press (May 7, 2016), https://www.freep.com/story/news/local/michigan/2016/05/07/enbridge-line5-oil-spill-hiawatha-nationalforest/83507228/.

[13] *Id.*

[14] NTSB, *Enbridge Inc. Natural Gas Transmission Pipeline Rupture and Fire*, Pipeline Investigation Rep. NTSB/PIR-22/02 (Aug. 15, 2022), https://www.ntsb.gov/investigations/AccidentReports/Reports/PIR22002.pdf.

track, and burning of over 30 acres of land.[15] The NTSB found that Enbridge had failed to identify, investigate, or manage the impact of a gas flow reversal project on the pipeline, which contributed to the failure of the pipeline, and that Enbridge's processes and procedures were inconsistent with government guidance and industry knowledge.[16]

In 2020, an Enbridge natural gas pipeline near Prince George, B.C., Canada, ruptured and caused an explosion due to stress cracks.[17] More than 100 people had to evacuate their homes.[18] The government found that Enbridge had improperly delayed a scheduled hazard management inspection by several months before the explosion occurred.[19]

Enbridge's pipelines in the Gulf of Mexico are equally vulnerable to spills and leaks. Because storms and hurricanes are common in the Gulf, catastrophic flooding and storm surges routinely damage weak and aging onshore pipeline infrastructure.[20] Gulf offshore infrastructure and subsea pipelines are also continuously at the mercy of strong hurricane forces.[21] Indeed, in 2020, following Hurricane Laura, Enbridge declared force majeure on the Garden Banks pipeline—one of the pipelines proposed to transport natural gas from Kaskida—due to damage from the storm; it was closed for about a week and then reopened after repairs.[22] Moreover, offshore pipelines may experience more corrosion than onshore pipelines due to offshore pipelines being placed in a saltwater environment, and when products of higher temperatures, higher pressure conditions, or corrosive elements are transported.[23]

It is unreasonable to allow the Kaskida Project to move forward without first adequately analyzing the actual risks of spills and accidents from the pipelines constructed and operated by Enbridge with its track record.

Similarly, Shell—whose new Rome pipeline is proposed tie to Enbridge's Oil Export Pipeline for the Kaskida Project and export 100% of the oil production from Kaskida—has a long and concerning history of spills and accidents as well. In 2016, an oil spill from a Shell offshore platform released 88,200 gallons of crude oil into the Gulf of Mexico, creating a visible

---

[15] *Id.*
[16] *Id.*
[17] Rhianna Schmunk, *Pipeline explosion near Prince George might have been prevented by more frequent inspection: TSB*, CBC (Mar. 4, 2020), https://www.cbc.ca/news/canada/british-columbia/pipeline-explosion-prince-george-stress-cracks-1.5485082.
[18] *Id.*
[19] *Id.*
[20] Melissa Whaling, *Too Much to Lose: Offshore Drilling & Hurricanes in the Southeast* 4, Southern Environmental Law Center (Oct. 2018), https://www.selc.org/wp-content/uploads/2021/10/Hurricane_Drilling_Report_1021_F_LR.pdf.
[21] *Id.*
[22] *Storm knocks out U.S. Gulf of Mexico natural gas pipeline*, Reuters (Aug. 31, 2020), https://www.reuters.com/article/business/storm-knocks-out-u-s-gulf-of-mexico-natural-gas-pipeline-idUSL1N2FX0LG/; *GOM Offshore Pipeline Lifts Force Majeure After Hurricane Laura*, J. of Petroleum Tech. (Sept. 8, 2020), https://jpt.spe.org/gom-offshore-pipeline-lifts-force-majeure-after-late-august-hurricane.
[23] Johannes Keuter, *In-line Inspection of Pipes Using Corrosion Resistant Alloys (CRA)* 1, Rosen Tech. & Rsch. Ctr. GmbH, Rosen Group (2014), https://www.ppsa-online.com/papers/14-Aberdeen/2014-01-ROSEN-paper.pdf.

2-mile by 13-mile oil slick in the sea about 97 miles south of Port Fourchon, Louisiana.[24] Government officials said the accident occurred near Shell's Glider field, an underwater pipe system connecting four subsea oil wells to the Brutus platform, which floats on top of the water at a depth of 2,900 feet.[25]

Additionally, in 2016, Shell was responsible for around 21,000 gallons of oil spilled near Tracy, California, due to a pipeline crack.[26] In 2015 and 2016, two ruptures occurred at a Shell pipeline in Altamont, California, spilling about 60,000 gallons of crude and resulting in more than $6 million in damage, emergency response, and cleanup costs.[27] Shell was recently convicted of criminal charges by the state of Pennsylvania for covering up spills during construction of its Falcon ethane pipeline in Western Pennsylvania in 2019 and 2020.[28] Shell pleaded no contest to the charges.

Shell has also been involved in numerous oil spills in Nigeria, causing systemic, ongoing, and hazardous oil pollution. According to the United Nations, at least 13 million barrels of crude oil have been spilled since 1958 in at least 7,000 incidents in the Niger Delta region, where Shell is the largest private oil and gas company.[29] A landmark 2011 United Nations Environment Programme (UNEP) report documented the contamination of soil, groundwater, fisheries, agricultural land, and more; the poisoning of drinking water; and the exposure of hundreds of thousands of people to serious health risks from oil pollution in Ogoniland.[30] Although clean-up of contaminated sites in the region have allegedly been occuring for years, evidence shows that the clean-up schemes are suffering from corruption and other issues and are continuing to force the people of Ogoniland to live with the devastating impact of oil pollution.[31]

Given Enbridge's and Shells' track records and the risks associated with pipelines in the Gulf, BOEM must evaluate oil spill risks, including impacts, associated with the new pipelines Enbridge will construct for Kaskida (the Gas Export Pipeline and the Oil Export Pipeline), the new Shell pipeline that will transport oil from Kaskida (Rome Pipeline), as well as the existing pipelines that the new pipelines would tie into (Magnolia Gas Gathering System, the Garden Banks Pipeline, and more) as part of the environmental analysis it will complete under NEPA.

---

[24] Steven Mufson, *Shell's Brutus production platform spills oil into Gulf of Mexico*, The Wash Post, https://www.washingtonpost.com/news/energy-environment/wp/2016/05/13/shells-brutus-production-platform-spills-oil-into-gulf-of-mexico/.
[25] *Shell Oil Spill Dumps Nearly 90,000 Gallons of Crude Into Gulf*, EcoWatch (May 13, 2016), https://www.ecowatch.com/shell-oil-spill-dumps-nearly-90-000-gallons-of-crude-into-gulf-1891130324.html.
[26] Kurtis Alexander, *Oil pipeline near Tracy spills thousands of gallons of crude*, SF Gate (May 23, 2016), https://www.sfgate.com/bayarea/article/Oil-pipeline-near-Tracy-spills-thousands-of-7940489.php.
[27] Ted Goldberg, *Shell Wants to Sell Large, Troubled California Pipeline System*, KQED (Sep. 28, 2018), https://www.kqed.org/news/11694959/shell-wants-to-sell-large-troubled-california-pipeline-system.
[28] Caitlyn Scott, *Shell Falcon Pipeline LP convicted of criminal charges after violating Pennsylvania's Clean Streams Law*, WTAE (Nov. 25, 2024), https://www.wtae.com/article/shell-falcon-pipeline-charged-pennsylvanias-clean-streams-law/63013519.
[29] Simi Jolaoso, *Oil clean-up 'scam' warnings ignored by Shell, whistleblower tells BBC*, BBC News (Feb. 11, 2025), https://www.bbc.com/news/articles/c0rqe85q1jno [hereinafter Jolaoso, *Oil clean-up 'scam' warnings*].
[30] UNEP, *Environmental assessment of Ogoniland* (2011), https://wedocs.unep.org/20.500.11822/7947.
[31] Jolaoso, *Oil clean-up 'scam' warnings*.

This is especially important given the risks associated with both new and aging pipelines in the Gulf. Failure rates in pipelines are commonly depicted as a "bathtub curve"—i.e., there is a higher rate of failure during an early "burn-in" phase of the pipeline's operation, a lower failure rate during the pipeline's second phase, and then again a higher rate of failure during a later phase of the pipeline, which is due largely to age related failures. Thus, the fact that a combination of new and existing pipelines will transport oil and natural gas from Kaskida warrants analysis as to the particular risks associated with new and aging pipelines as well.

## II. BOEM SHOULD DELAY CONSIDERATION OF THE DOCD UNTIL THE PIPELINES THAT WOULD TRANSPORT OIL AND NATURAL GAS FROM THE PROJECT ARE COMPLETE.

As described above, the oil and natural gas produced at Kaskida will be transported by pipelines that have not yet been built. It does not make sense to approve the DOCD for the Kaskida Project when the methods for transport are not in place and will likely not be for years. For example, the Gas Export Pipeline and the Oil Export Pipeline that Enbridge is to build to transport oil and natural gas from the Kaskida Project will not be operational until 2029.[32] Shell's Rome Pipeline is not planned to begin operations until 2028.[33]

Moreover, under 30 C.F.R. § 550.202, a DOCD must demonstrate that proposed activities will be safe, not unreasonably interfere with other uses of the OCS, or cause undue or serious harm to the human, marine, or coastal environment. BOEM should, at a minimum, wait until the Bureau of Safety and Environmental Enforcement (BSEE) and the Federal Energy Regulatory Commission (FERC) have approved these new pipelines and deemed them safe to operate before considering approval of the Kaskida Project.

## III. BOEM MUST ANALYZE IMPACTS TO SENSITIVE AREAS IN THE GULF OF MEXICO.

As discussed in the May 11, 2025, comments, the DOCD fails to properly address harms to imperiled wildlife, including the critically endangered Rice's whale. Relatedly, the DOCD fails to properly address harms from the Kaskida Project to sensitive areas in the Gulf of Mexico. This includes wildlife refuges, wilderness areas, state and national parks, and the Flower Garden Banks National Marine Sanctuary.

First, BP has not properly analyzed impacts from oil spills to the ecosystems and wildlife in the Flower Garden Banks National Marine Sanctuary. Although BP's Environmental Impact Assessment (EIA) notes that "[a] large oil spill in the project area could reach coral reefs at the Flower Garden Banks,"[34] it suggests that a large oil spill would be "unlikely" to contact the corals or impact corals and other imperiled wildlife in the sanctuary due to distance between the

---

[32] Enbridge, *Enbridge Sanctions Pipelines to Support bp's New Deepwater U.S. Gulf of Mexico Development* (Oct. 3, 2024), https://www.enbridge.com/media-center/news/details?id=123829&lang=en.
[33] *Shell issues FID for new Gulf of Mexico crude oil pipeline*, Offshore Magazine (Oct. 6, 2024), https://www.offshore-mag.com/regional-reports/us-gulf-of-mexico/news/55233476/shell-shell-issues-fid-for-new-gulf-of-mexico-crude-oil-pipeline.
[34] EIA at 71.

Project area and the sanctuary. But, as explained in the May 11, 2025 comments, the EIA cannot make this claim because the EIA has not analyzed a range of oil spills, the range of weather-related circumstances that could occur and lead to more expansive impacts, or determined which size spills are reasonably expected to occur from the Project. Moreover, while BP performed a (flawed) worst credible discharge scenario analysis, the EIA does not discuss what this analysis revealed in terms of impacts on the Flower Garden Banks National Marine Sanctuary from a worst credible discharge scenario spill.

Second, BP lists around 53 wildlife refuges, wilderness areas, and state or national parks in the Gulf of Mexico coasts that may be impacted after 30 days of an oil spill, per BP's worst case discharge scenario analysis.[35] Yet BP fails to discuss the specific sensitivities and impacts from such an oil spill for each of these areas. For example, there is no discussion of potential impacts to many of these identified sensitive areas within many counties of Texas and Louisiana. And, although the EIA lists some environmental sensitivities associated with sensitive areas in Cameron Parish, Louisiana (such as the Rockefeller State Wildlife Refuge, Sabine Wildlife Refuge, etc.), it fails to adequately describe the unique and specific sensitivity of these areas and, importantly, how oil spills from the Kaskida Project would impact the ecosystems and wildlife of these areas.

Moreover, the EIA does not adequately discuss other unique, sensitive, and environmentally important areas in the Gulf that would be impacted by oil spills from the Kaskida Project. For example, Sabine Lake—which adjoins the Sabine Wildlife Refuge on the west—is one of the largest lakes in Texas or Louisiana and is unique among Texas estuaries in that, while partly saline throughout, the lake receives considerable freshwater flows from the Neches and Sabine Rivers, creating a wide range of brackish water conditions.[36] Sabine Lake is known for supporting species like red drum, Atlantic croaker, spotted sea trout, white shrimp, brown shrimp, and blue crab, many of whom in turn depend on the benthic species that live on the lake's bottom, such as oysters and clam. All of these species could suffer from oil spills from the Kaskida Project, but the benthic species may suffer most because they are not mobile. Sabine Lake boasts what is likely the largest unharvested oyster reef found anywhere in the United States, with a greater than four-square-mile main complex of reef located near the mouth of the lake.[37] The Lake's oyster reef is so precious that in 2018, Louisiana enacted a law to permanently safeguard it from harvest, matching Texas's longstanding management practice.[38] The Louisiana Department of Wildlife and Fisheries (LDWF) now manages the entire Louisiana side of the lake as a public oyster seed ground.[39] Although the EIA passingly notes that

---

[35] EIA at 93–94.

[36] Dr. Carey Gelpi, *The History and Ecological Value of the Sabine Lake Oyster Reef*, Texas Saltwater Fishing (2019), https://www.texassaltwaterfishingmagazine.com//fishing/education/texas-parks-wildlife-field-notes/the-history-and-ecological-value-of-the-sabine-lake-oyster-reef [hereinafter Gelpi (2019)].

[37] Jaimie A. Nevins et al., *Characterizing Nekton use of the Largest Unfished Oyster Reef in the United States Compared with Adjacent Estuarine Habitats*, 33 J. Shellfish Rsch. 227 (2014), https://www.sportfishcenter.org/sites/default/files/2018-07/Characterizing%20nekton%20use%20of%20the%20largest%20unfished%20oyster%20reef%20in%20the%20U.S.%20in%20comparison%20to%20marsh%20edge%20and%20nonvegetated%20estuarine%20habitats.pdf; Gelpi (2019).

[38] La. R.S. § 56:435.1 (2017); La. Act No. 159, SB No. 451 (2018).

[39] La. R.S. § 56:435.1 ("Oyster harvesting in Sabine Lake shall be prohibited."); LDWF, *Oyster Classification Map*, LDWF, https://gis.wlf.la.gov/oystermap/map.html.

commercial fishing in the Sabine Lake area is an area of socio-economic concern in Cameron Parish, Louisiana, BP does nothing to discuss or analyze the impacts of oil spills from the Kaskida Project on this uniquely important lake.

## IV. BOEM MUST CONDUCT STEP-DOWN CONSULTATION UNDER THE ENDANGERED SPECIES ACT DUE TO KASKIDA'S USE OF NEW AND UNUSUAL TECHNOLOGIES.

Pursuant to the Endangered Species Act (ESA), the National Marine Fisheries Service's (NMFS) Biological Opinion (BiOp) for oil and gas activities in the Gulf of Mexico requires BOEM and BSEE to identify any "new and unusual" oil and gas technologies and perform a project-specific, step-down review for a DOCD that would utilize such technologies.[40] "Step-down review involves the action agency [here, BOEM] and/or NMFS conducting a project-specific review of an activity to determine whether it falls under or is consistent with this programmatic opinion."[41] The BiOp also explains that the need for step-down review varies depending on the level of uncertainty and that "[t]he greater the uncertainty, the greater the need for step-down review."[42] BOEM must complete this review before deciding whether to approve BP's DOCD. Given the uncertainty and risks involved, NMFS should conduct a stand-alone consultation before BOEM makes its decision.

The step-down review process begins with a consistency determination by BOEM or BSEE.[43] Under 30 C.F.R. § 550.243(e), a DOCD must include a description and discussion about any new and unusual technology a lessee plans to use. Once the lessee has provided the required information, it is the responsibility of BOEM and BSEE to review any proposed new and unusual technology and make a consistency determination based on the details of the activity and confer with NMFS if they are unsure about whether an activity is consistent with the program.[44] As part of a consistency determination, BOEM and BSEE must determine: (1) whether the effects of an action or activity are consistent with the effects analyzed in the programmatic opinion; (2) whether there are any different or new effects to ESA-listed species; and (3) whether or not the activity requires further consultation.[45]

NMFS then reviews the consistency determination to assess whether the anticipated effects of actions are consistent with and addressed by the programmatic effects analysis.[46] Where a step-down review indicates activities may have adverse effects to ESA-listed species, NMFS may recommend additional avoidance or mitigation measures, or request more information.[47] NMFS may also determine that the action requires tiered consultation to analyze

---

[40] NMFS, *Endangered Species Act Section 7 Biological and Conference Opinion on Bureau of Ocean Energy Management and Bureau of Safety and Environmental Enforcement's Oil and Gas Program Activities in the Gulf of America* 115 (May 20, 2025).
[41] *Id.* at 112.
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*

all the effects of the action.[48] If an application for a permit or plan is outside the scope of the program, BOEM must indicate the plan or permit is not likely to be approved until a stand-alone consultation is completed with NMFS.[49]

The BiOp states clearly that "[a]ny activity that may use emergent technologies or proposes use of equipment in a non-conventional way requires step-down review if the activity may affect ESA-listed species or their designated critical habitat. BOEM/BSEE should fully describe the new or unusual technology, consider all potential impacts to protected species, and provide clear effects determinations."[50] The BiOp notes that use of new and unusual technologies should be coordinated with NMFS as early as possible.

There is no question that the Kaskida Project would utilize new and unusual technologies. In the DOCD, BP lists several new or unusual technologies that it plans to employ.[51] Yet BP does not provide a discussion about the new technology. And, notably, BP states that it has not yet submitted a new and unusual technology barrier equipment plan that will discuss and describe much of the new technology. BOEM cannot approve BP's DOCD until it receives and reviews that information, completes a consistency determination, and until NMFS assesses and makes any necessary recommendations.

The Kaskida Project is exactly the type of project that requires a project-specific, step-down ESA review and consultation with NMFS. As explained in detail in the May 11, 2025 comments, the Kaskida Project threatens the existence of the Rice's whale and would affect several threatened and endangered species listed under the ESA, the sperm whale, oceanic whitetip shark, giant manta ray, black capped petrel, and five species of sea turtles. Moreover, uncertainties surrounding BP's use of new and unusual technologies as well as uncertainties surrounding BP's expertise and capabilities, as described below, create an even greater need for step-down review. BOEM must perform a step-down review of the Kaskida Project and consult with NMFS—separately from the programmatic consultation—under the ESA, to ensure that the Kaskida Project does not jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of such species' critical habitat.[52]

## V. BP's DOCD DOES NOT DEMONSTRATE THAT BP HAS THE EXPERTISE, EXPERIENCE, OR EQUIPMENT TO DRILL A HIGH PRESSURE HIGH TEMPERATURE WELL OR RESPOND TO A SPILL.

Attached to these comments is a technical review of BP's DOCD, conducted by Susan Harvey[53], a petroleum and environmental engineer with over 38 years of experience working on

---

[48] *Id.*
[49] *Id.*
[50] *Id.* at 114.
[51] DOCD at 10-11.
[52] 16 U.S.C. § 1536(a)(2).
[53] Susan Harvey has over 38 years of experience as a Petroleum and Environmental Engineer. Ms. Harvey owns Harvey Consulting, LLC, a consulting firm providing clients with oil and gas, environmental, and regulatory compliance advice and training. Ms. Harvey held engineering and supervisory positions at Arco and BP, including Prudhoe Bay Engineering Manager and Exploration Manager. Ms. Harvey has planned, engineered, executed, and

oil and gas exploration and development projects.[54] Ms. Harvey found that BP's DOCD content did not meet the DOCD requirements at 30 C.F.R. Part 550, include lessons learned from BP's Macondo well blowout, nor include best available and safest technology recently approved by BOEM for Chevron's recent high pressure high temperature (HPHT) Anchor Project. A summary of Ms. Harvey's findings follow:

1. BP's DOCD lacks sufficient information to confirm BP is qualified to drill the proposed deepwater HPHT wells, that the proposed equipment is appropriate and reliable to meet the 30 C.F.R. §550.202 threshold of "safe" operation, and the information necessary by 30 C.F.R. §550.243(e) describing any new or unusual technology planned for use.

2. BP's DOCD does not demonstrate that BP has the experience, expertise, and equipment to conduct safe drilling and emergency response operations for the proposed HPHT Kaskida drilling operations. BP's DOCD confirms that it intends to pursue, but does not currently have, HPHT qualifications. BP's DOCD proposes a drilling plan for which it is not currently qualified.

3. BP's DOCD does not include a list of deepwater HPHT wells drilled internationally so far, safety records, or whether experienced BP staff and contractors involved in those wells will be assigned to the Kaskida project.

4. BP's DOCD lacks descriptions of key safety and pollution prevention features for all rigs it proposes to use.

5. BP's Macondo well was not designed, implemented, or handled safely, leading to a major well blowout in 2010. BP's DOCD lacks information on the steps BP has taken to address the deficiencies identified in the BP Macondo well blowout investigations, ensuring that those lessons are learned and not repeated at Kaskida.

---

managed onshore and offshore exploration and production operations. She has been involved in the drilling, completion, stimulation, testing, and oversight of hundreds of wells in her career. Ms. Harvey's experience includes air and water pollution abatement design and execution, best management practices, environmental assessment of oil and gas project impacts, oil spill prevention and response planning, and expert witness services for litigation cases. Ms. Harvey has worked on oil and gas projects in Alaska, New York, Pennsylvania, Ohio, West Virginia, Colorado, Texas, New Mexico, California, and Oklahoma, as well as in Canada, Australia, Russia, Greenland, Belize, and Norway. Ms. Harvey has authored numerous technical reports on oil and gas project construction, operation, and abandonment, including best practices for oil and gas well construction, air and water pollution abatement design and execution, environmental assessments of oil and gas projects, and oil spill prevention and response planning. Ms. Harvey holds a Master of Science in Environmental Engineering and a Bachelor of Science in Petroleum Engineering.

[54] The referenced papers in Ms. Harvey's report are protected by copyright and are not produced with the report. BOEM may access these papers at the following links: https://onepetro.org/OTCONF/proceedings-abstract/20OTC/20OTC/D021S023R001/107351; https://onepetro.org/OTCONF/proceedings-abstract/16OTC/16OTC/D011S006R003/84746; https://onepetro.org/SPEKIPC/proceedings-abstract/12KIPC/12KIPC/SPE-163376-MS/159479; https://onepetro.org/OTCONF/proceedings-abstract/24OTC/24OTC/D011S010R003/544822; https://onepetro.org/OTCONF/proceedings-abstract/24OTC/24OTC/D011S010R005/544896.

6. BP proposes two Mobile Offshore Drilling Units (MODUs) to drill the relief wells, the Black Lion and Black Hornet, each equipped with 15,000 psi blowout preventers (BOPs). The contract end dates for both units are in 2027, well before the scheduled completion of the six Kaskida wells by June 30, 2030, indicating that BP has not proposed relief well capability for the entire duration of the drilling operations.

7. BP's DOCD lacks sufficient technical details to support the proposed maximum blowout flow rate of 45,000 bopd for 90 days, with an estimated spill volume of up to 4 million barrels for the HPHT Kaskida deepwater wells. By comparison, BP's Macondo well blowout lasted 87 days, spilling an estimated 4.9 million barrels at a peak flow rate of 62,000 bopd. Chevron's recent HPHT Anchor Project estimated it would take 177 days to mobilize a rig, drill a relief well, and conduct kill operations, with a total worst-case spill volume estimated at 5.9 million barrels. BP's DOCD does not explain how it estimates that a spill from a HPHT Kaskida well would be smaller than the Macondo spill, or Chevron's Anchor Project or how it would be contained within 90 days using one of the two relief well drilling rigs proposed with insufficient 15,000 psi-rated blowout preventers that are not designed for HPHT well control or the Marine Well Containment Company (MWCC) 20,000 psi capping stack, which BP reports may or may not be available.

8. BP's DOCD proposes BOP systems of a lesser standard than Chevron used, and BOEM approved, for Chevron's recent HPHT Anchor Project, which was drilled with the Transocean *Deepwater Titan* drillship using dual 20,000 psi BOP subsea stacks and a 20,000 psi choke manifold.

9. BP's DOCD tentatively, and without guarantee, proposes using MWCC Expanded Containment Response System (ECRS), which is rated with a 20,000 psi well capping capability "when it is available," but provides no evidence of a contract with MWCC to verify this equipment will be available if needed.

10. BP's DOCD lacks proposed technical solutions to identify and correct cement integrity deficiencies, which contributed to BP's Macondo blowout and are identified by experts as a leading HPHT technology gap.

11. BP's DOCD does not address known and well-documented increased blowout risk from deep HPHT wells, which is estimated at six to seven times higher than a non-HPHT well by the International Association of Oil & Gas Producers based on prior U.S. and international drilling records.

12. BP's DOCD acknowledges that mechanical response equipment is limited to 3-foot seas and 20-knot winds. The average sea conditions in the Kaskida drilling location are typically 4-5 feet seas with 14-15 mph winds, making mechanical response ineffective, if not impossible, most of the time. Under U.S. law and regulation, mechanical recovery is the primary mandated response method for oil spills under the Oil Pollution Act of 1990 (OPA 90). Offshore facilities regulated by BSEE must comply with 30 C.F.R. Part 254, which requires drilling operators to demonstrate they have access to sufficient boom, skimmers, vessels, and storage to meet specific oil spill response planning standards for a

worst-case discharge. Dispersants and in-situ burning cannot meet the mechanical recovery requirements of OPA 90 because they do not physically remove oil from the environment. Therefore, BP's proposed DOCD does not demonstrate it has the requisite mechanical response capability for the Kaskida location. According to BP's proposed plan, the environmental conditions in the Gulf will often surpass the operating limits of available mechanical oil spill cleanup equipment, preventing BP from effectively responding to a blowout with mechanical response tools or resulting in minimal actual oil recovery.

***

Thank you for your consideration of these comments.

Sincerely,

Brettny Hardy
Senior Attorney
Earthjustice
bhardy@earthjustice.org

Kristen Monsell
Oceans Legal Director & Senior Attorney
Miyoko Sakashita
Oceans Program Director
Center for Biological Diversity
kmonsell@biologicaldiversity.org
miyoko@biologicaldiversity.org

Scott Eustis
Community Science Director
Healthy Gulf
scott@healthygulf.org

Joanie Steinhaus
Ocean Program Director
Turtle Island Restoration Network
joanie@tirn.net

Devorah Ancel
Senior Attorney
Sierra Club Environmental Law Program
devorah.ancel@sierraclub.org

John Beard, Jr.
CEO
Port Arthur Community Action Network

ljbeardg37s@gmail.com

Alyssa Portaro
Director
Habitat Recovery Project
alyssa@habitatrecovery.org

James Hiatt
For a Better Bayou
www.BetterBayou.net

Travis Dardar
Co-Founder, Co-Director
Fishermen Involved in Sustaining our Heritage (FISH)
Dardartravis68@gmail.com

HARVEY CONSULTING, LLC.

June 26, 2025

Brettny Hardy
Senior Attorney
Earthjustice Oceans Program
bhardy@earthjustice.org
415-217-2142

**Re: BP Kaskida Project – Initial Development Operations Coordination Document**

This letter responds to Earthjustice's request to review the Initial Development Operations Coordination Document (DOCD) for BP Exploration & Production Inc.'s (BP's) Kaskida Project, located in Keathley Canyon Blocks 292 and 293 (KC 292 and KC 293) in the Gulf of America (formerly Gulf of Mexico). BP's Kaskida Project DOCD was submitted to the United States Department of the Interior (DOI), Bureau of Ocean Energy Management (BOEM), on February 14, 2025. Earthjustice requested a technical review of the proposed high-pressure drilling and completion program to identify issues for the DOI's attention. This review was limited in time and scope due to the short public comment period. Below is an initial, not exhaustive, list of recommendations.

## 1. HPHT Drilling and Completion Rating and Equipment

30 CFR §550.202 requires a DOCD applicant to demonstrate its proposal is safe and will not cause undue or serious harm or damage to the human, marine, or coastal environment, among other criteria. The proposed DOCD does not demonstrate BP's experience, expertise, and equipment to conduct safe drilling and emergency response operations for the proposed high-pressure Kaskida drilling and completion operations.

30 CFR §250.105 defines a High-Pressure, High-Temperature (HPHT) environment as one where "one or more of the following well conditions exist: (1) The drilling, completion, workover, intervention, injection, production, or abandonment of the well requires pressure controlling or pressure containing equipment, including well control equipment, assigned a pressure rating greater than 15,000 psia or a temperature rating greater than 350 degrees Fahrenheit; (2) The MASP or SITP is greater than 15,000 psia at the seafloor for a well with a subsea wellhead or at the surface for a well with a surface wellhead; or (3) The flowing temperature is greater than 350 degrees Fahrenheit at the seafloor for a well with a subsea wellhead or at the surface for a well with a surface wellhead.

The DOCD lacks sufficient information on previous exploration and appraisal wells drilled in or near the KC 292 and KC 293 blocks area, which is necessary as a technical basis for estimating the pressures and

temperatures that could be encountered in the proposed Kaskida development wells. A comprehensive inventory of offset well data is crucial for identifying and incorporating maximum conditions into the planned drilling program.

BP's DOCD reported that three exploration wells (KC292-1, KC292-2, and KC291-1) were drilled in or near the KC 292 area in 2008 and 2013, but no pressure or temperature data were provided for these wells.

> *KC 292-1 well in the southeast corner of KC 292 was spud in 2008 and reached a total depth of 32,432 ft TVD…KC 292-2 well in the southern portion of KC 292 was spud in 2013 and reached a total depth of 32,629 ft TVD. KC 291-1 well in the northwestern corner of KC 291 was spud in 2008 and reached a total depth of 31,444 ft TVD"*[1]

BP did not provide a list of appraisal wells in the KC 292 and KC 293 blocks, and it is unclear how many appraisal wells have been drilled. BP briefly mentioned an appraisal well, "K4," which it used as the basis for its estimated Kaskida shut-in tubing pressure of 14,927 psi and flowing temperature range of 270-275°F.

No water or well depth data were reported for the K4 well, nor was there information on how the data from the K4 well compares to the previous three exploration wells (KC292-1, KC292-2, and KC291-1) or other appraisal wells drilled in the area.

BP's DOCD states the expected pressure rating is 16,609 psi based on a shut-in tubing pressure of 14,927 psi (from appraisal well K4), plus a bullhead margin.

BP acknowledges Kaskida wells meet the 30 CFR 250.105 HPHT well definition at pressures exceeding 15,000 psi.

BP estimates that the average flowing temperature range is 270-275°F but does not specify a maximum bottom-hole temperature for the proposed wells. This information is crucial for designing equipment that can withstand higher wellbore temperatures along the wellbore. At depths over 32,000 feet and with an average subsurface temperature gradient of 1.4°F per 100 feet, the bottom temperature could exceed 370°F.

A proposed target depth is necessary to verify BP's shut-in tubing pressure and temperature estimate, but the DOCD does not specify one or include information about the target hydrocarbon reservoir. 30 CFR §550.241(b) requires a DOCD to list each well's location and depth (bottom hole location). Appendix A (Plan Information Forms—Form BOEM-0137) does not include the bottom-hole location for the proposed wells.

BP plans to use a 20,000 psi-rated Blowout Preventer (BOP) on the Atlas drillship. BP also proposed possible drilling with the Invictus drillship or other available drillships, but did not specify the BOP rating. If BP's estimated pressures are accurate and conservative, which still needs verification, a 20,000 psi BOP provides a safety margin of 1.2-1.3.

BP's DOCD does not specify whether the proposed equipment for use on Kaskida is certified for high pressures and temperatures. BP offers to provide this information later in the process; however, this is a critical safety threshold question that must be addressed as part of the DOCD under 30 CFR §550.202, which requires a DOCD applicant to demonstrate that its proposal is safe. Equipment used in HPHT wells must be designed to withstand the maximum expected pressures and temperatures, as metal, cement, seals, batteries, electronics, and other tools can be damaged if they are not suitable.

[1] 2025 Kaskida DOCD, PDF Page 153 of 749.

BP confirmed it still needs to submit an application for HPHT technology development and qualification according to 30 CFR 250 regulations and BSEE's NTLs 2019-G02 and 2019-G03, as well as the individual New and Unusual Technology Barrier Equipment (NUTBE) Plans specified in the letter in Appendix J. Therefore, BP's DOCD confirmed that it is neither qualified nor approved to drill an HPHT well. BP also stated that it has not provided information on the new and unusual technology it proposes or its associated risks; however, 30 CFR §550.243(e) requires a DOCD to describe any new or unusual technology intended for use. Requesting a DOCD approval for HPHT wells that use new or unusual technology is premature if the applicant has not been qualified to drill HPHT wells or to use any proposed new or unusual technology that forms the core of the DOCD application.

Chevron's Anchor Project is a deepwater high-pressure project with a shut-in tubing pressure exceeding 15,000 psi and a flowing tubing temperature up to 275°F, similar to the pressures and temperatures reported by BP for Kaskida. Chevron's Anchor field is located in the Green Canyon, offshore the Gulf of America, approximately 140 miles off the Louisiana coast in 5,000 feet of water.[2] Chevron reports that "after the Macondo incident, BSEE saw a need to address the performance of the equipment and more specifically the verification and validation processes in a more clear and prescriptive manner for HPHT equipment, which BSEE considers as non-conventional technology."[3] DOI required that well control equipment, wellheads, packers, tubulars, threaded connections, seals, seal assemblies, production trees, and chokes exposed to the HPHT environment be designed, tested, and confirmed as suitable for HPHT service. Chevron's Anchor Project found that "many of the challenges in the development of 20k psi rated equipment proved to be in the area of designing for and predicting fatigue life."[4]

In 2019, the BSEE published HPHT Notices to Lessees (NTLs) to clarify and provide guidance on the BSEE's implementation of the HPHT regulations, offer operators flexibility to have plans reviewed before the regulatory-mandated submissions, and give recommendations that, if followed, ease BSEE's review and approval of HPHT equipment and well designs.

BP should seek HPHT qualifications and submit information about the proposed new or unusual technology. Before approving the DOCD, DOI should verify that BP has the experience and expertise to safely drill deepwater HPHT wells in the Gulf of America using any new or unusual technology and ensure that the risks associated with this new technology are managed.

In summary, BP's DOCD lacks sufficient information to confirm that BP is qualified to drill the proposed deepwater HPHT wells, that the proposed equipment is appropriate and reliable to meet the 30 CFR §550.202 threshold of "safe" operation, and the information necessary by 30 CFR §550.243(e) describing any new or unusual technology planned for use.

## 2. Drilling Rig Information

30 CFR §550.241(c) requires a DOCD to include a description of the drilling equipment and related equipment, including key safety and pollution prevention features, as well as a table showing the type and estimated maximum quantities of fuels and oil stored at the facility.

BP's OCS Plan Information Form states it intends to use the "Invictus, Atlas, or available Drillship." BP reports that the Atlas drillship is rated to 20,000 psi but does not specify the ratings for the Invictus drillship or any other "available Drillship" it might suggest.

---

[2] Kusinski, G., Kaculi, J., Chevron, Anchor Project: 20K Regulatory Process and Approval- Challenges and Lessons Learned, Offshore Technology Conference, OTC-35036-MS, 2024 at 2.
[3] Kusinski, G., Kaculi, J., Chevron, Anchor Project: 20K Regulatory Process and Approval- Challenges and Lessons Learned, Offshore Technology Conference, OTC-35036-MS, 2024 at 2.
[4] Meruva, S, Patel, H.N., Gonzalez, A., and Cridland, M., ABS, Challenges in Material Selection and its Qualification for use in HPHT Environment for Drilling Equipment, Offshore Technology Conference, OTC-27266-MS, 2016 at 7.

Air pollution calculations were provided for the Invictus drillship but not for the Atlas drillship, and it is not clear that any other "available Drillship" BP might suggest would be less than or equal to it.

BP's DOCD lacks descriptions of key safety and pollution prevention features for all rigs.

**3. HPHT Relief Well Equipment**.

30 CFR §550.243(h) requires a DOCD to include a blowout scenario for the highest volume over the maximum duration, as well as the availability of a rig to drill a relief well, considering drilling rig package constraints and the time needed to drill a relief well.

BP's DOCD states it will take 3-10 days to get a MODU in place to drill a relief well, 60 days from spud to casing shoe above the blowout zone, and 30 days to intersect and kill the well, totaling 90 days. The 90-day estimate is inconsistent with a 10-day mobilization, a 60-day relief well drill, and a 30-day intersect and kill, which totals 100 days.

BP's DOCD contains limited and inconsistent details about its proposed well control plans. The 749-page DOCD references the 20,000 psi-rated well control equipment only twice.

> *The upper completion system, subsea BOP for the Atlas drillship, OWIR intervention and subsea well response (capping stack) will be rated as 20K equipment.*[5]

> *The 20K BOP MODU used for completion operations has 2 blind shear rams.*[6]

While BP plans to use 20,000 psi-rated well control equipment for the upper completion system, subsea BOP for the Atlas drillship, well intervention, and subsea well response (capping stack) in one part of its DOCD, it proposes an inadequate 15,000 psi-rated BOP to conduct well, capping, and relief well operations in another part.

BP proposes two Mobile Offshore Drilling Units (MODUs) to drill the relief wells, the Black Lion and Black Hornet, each equipped with 15,000 psi BOPs. The contract end dates for both units are in 2027, well before the scheduled completion of the six Kaskida wells by June 30, 2030, indicating that BP has not proposed relief well capability for the entire duration of the drilling operations.

The 30 CFR §550.202 DOCD threshold for confirming that the proposed plan is safe and does not cause undue or serious harm or damage to the human, marine, or coastal environment is not met because BP has proposed relief well rigs that are not suitable for a HPHT well. Additionally, BP does not have rigs with 20,000 psi BOPs lined up that are suitable for relief well operations through 2030.

**4. Blowout Rate, Duration, and Maximum Spill Volume**

30 CFR §550.243(h) requires a DOCD to include a potential blowout scenario, specifying the estimated flow rate, total volume, and maximum duration, and to describe the potential for the well to bridge over and the likelihood of surface intervention to stop the blowout.

BP's DOCD lacks sufficient technical details to support the proposed maximum blowout flow rate of 45,000 bopd for 90 days, with an estimated spill volume of up to 4 million barrels for the HPHT Kaskida deepwater wells. Flow rate test data from previous Kaskida exploration and appraisal wells were not provided to substantiate this estimate. BP's OCS Plan Information Form indicated an estimated uncontrolled blowout of 45,000 bopd, and it marked "no" when asked if it had previously supplied information to verify the calculations and assumptions for its WCD estimate.

[5] 2025 Kaskida DOCD, PDF Page 13 of 749.
[6] 2025 Kaskida DOCD, PDF Page 15 of 749.

The Macondo Flow Rate Technical Group estimated the initial well blowout flow rate to be 62,000 bopd, which exceeds BP's 45,000 bopd estimated blowout rate for the Kaskida wells. BP does not justify the 45,000 bopd estimate for Kaskida wells, which are reportedly deeper and under higher pressure than the Macondo well.

The Macondo well blowout lasted 87 days, spilling an estimated 4.9 million barrels. BP proposes a maximum spill duration of 90 days, resulting in less oil potentially spilled at Kaskida (4 million barrels).

BP's DOCD states that it will take 3-10 days to mobilize and position a MODU to drill a relief well, 60 days from spud to casing shoe above the blowout zone, and 30 days to intersect and kill the well, totaling 90 days. Therefore, the maximum duration is 100 days, not 90. A spill at 45,000 bopd for 100 days would spill 4.5 million barrels, not 4 million. It will likely be substantially higher when the Kaskida worst-case flow rate is properly justified with technical data.

By comparison, Chevron's Anchor Project estimated it would take 177 days to mobilize a rig, drill a relief well, and conduct kill operations, with a total worst-case spill volume estimated at 5.9 million barrels.[7]

BP's DOCD does not explain how it estimates that a spill from a HPHT Kaskida well would be smaller than the Macondo spill, or Chevron's Anchor Project or how it would be contained within 90 days using one of the two relief well drilling rigs proposed (Black Lion and Black Hornet) with insufficient 15,000 psi-rated blowout preventers (BOPs) that are not designed for HPHT well control or the Marine Well Containment Company (MWCC) 20,000 psi capping stack, which BP reports may or may not be available. The Black Lion and Black Hornet MODUs may not even be available, as their contracts reportedly expire in 2027, before the proposed Kaskida drilling operations are scheduled for completion in 2030. Additionally, BP provided no evidence of an agreement with the MWCC to guarantee access to its 20,000 psi capping stack.

BP's DOCD states that its proposed Kaskida drilling program falls under its approved GOM Regional Oil Spill Response Plan (OSRP), filed by BP America Inc. (Operator No. 21372) via cover letter dated October 7, 2024, on behalf of several companies listed in the plan, including BP Exploration & Production Inc. (Operator No. 02481). The DOCD confirms that the OSRP was reviewed for compliance and approved by BSEE on January 10, 2025. However, as mentioned earlier, BP needs to re-evaluate and justify the blowout flow rate and duration estimates. BOEM must verify that the January 10, 2025, plan addresses the maximum spill.

## 5. Best Available BOP Technology

The 2009 Montara well blowout (East Timor Sea, Australia) and the 2010 Macondo well blowout (Gulf of Mexico, USA) underscored the critical need for high-quality, properly functioning BOPs and redundant safety systems.

The Deepwater Horizon BOP failed to seal the well in BP's Macondo well blowout case. It was equipped with a single blind shear ram that failed, lacking a redundant blind shear ram to serve as a backup.

Blowout preventers are essential well control devices, making their age, condition, and configuration critical for their performance and reliability. DOI regulations do not specify a maximum age for BOP systems, allowing them to be decades old. Although post-Macondo regulatory reforms introduced necessary mandatory safety upgrades for future offshore drilling, the requirements were gradually relaxed to let the industry choose less strict measures if proposed by the company and approved by the DOI.

[7] 2020 Chevron Anchor DOCD, PDF Page 16 of 327.

Since BP was responsible for the 2010 Macondo well blowout and has not previously qualified as a deepwater HPHT well operator in the Gulf, it should be held to the highest and safest drilling standards for its upcoming complex Gulf drilling operation. BP must implement all known safety measures to ensure the Kaskida Project is developed with maximum safety and minimal risk. There should be no shortcuts or options for less strict measures.

The Macondo well disaster underscored the need to equip deepwater, offshore drilling BOPs with at least two blind shear rams and a casing shear ram. For Kaskida, BP proposes a BOP that does not incorporate the lessons learned from the Macondo disaster. BP's DOCD suggests using a subsea BOP with two shear rams, only one of which has shearing capability and a casing shear ram.

While BP's DOCD outlines plans for shear ram capability, it largely remains silent on its selected BOP, its capabilities, inspection procedures, and third-party verification program.

Chevron's recent HPHT Anchor Project was drilled with the Transocean *Deepwater Titan* drillship using dual 20,000 psi BOP subsea stacks and a 20,000 psi choke manifold. The upper BOP included two blind shear rams, while the lower BOP had three double ram units. BP has not proposed using dual 20,000 psi BOP subsea stacks, and the DOCD does not specify the pressure rating planned for the choke manifold. Therefore, BP's DOCD proposes BOP systems of a lesser standard than Chevron used, and DOI approved, for Chevron's recent HPHT Anchor Project.

In sum, precautions should be considered for the Kaskida wells, including:

- Dual 20,000 psi BOP subsea stacks to provide redundant well control capability, with at least two blind shear rams and a casing shear ram.
- Best Available Technology designed, implemented, and approved for Chevron's recent HPHT Anchor Project should be required.
- An independent third-party expert should verify shear ram capability before use.
- BOP should have multiple access points to control it in case one access is blocked or fails, along with a way to operate the BOP remotely.
- BOP systems should be thoroughly inspected and verified by an independent third-party expert before drilling the HPHT Kaskida wells and after any major repairs. The expert should produce a report confirming that the planned BOPs meet all DOI regulatory standards, have not been damaged or compromised from prior service, and are safe for the intended HPHT wells.
- The age and condition of the BOP should be disclosed to the public, and DOI should provide a technical justification for its approval.
- Well control experts qualified in HPHT and deepwater drilling should be on the rig during operations, in addition to an equivalent team located at the land base to provide emergency support if staff have to abandon the MODU, as occurred in the BP Macondo blowout.

## 6. Subsea Source Control

BP's 2010 Macondo well blowout lasted 87 days. BP was unprepared to cap and contain the well. After the Macondo incident, regulations for well capping, containment, and response were strengthened; however, they still allow industry discretion to propose and the DOI discretion to approve equipment that is less than what was needed to cap and control the Macondo well.

Since BP was responsible for the Macondo disaster and was unprepared to respond, and considering that the Kaskida wells are reportedly more complex, deeper, and have higher pressure than the Macondo wells, BP should be required to use at least the same equipment necessary to control the Macondo well blowout. No shortcuts or risks should be taken for the Kaskida project.

BP's DOCD states it is a member of the Marine Well Containment Company (MWCC) and currently has access to MWCC's Interim Containment Response System (ICRS) and MWCC's Expanded Containment Response System (ECRS) "when it is available."

> *"bp is a member of the Marine Well Containment Company ["MWCC"), currently has access to MWCC's Interim Containment Response System ["ICRS") and will have full access to MWCC's Expanded Containment Response System when it is available."*[8]

The ICRS was built after Macondo and was designed to contain and control a well blowout while a relief well was drilled for a more permanent solution. The subsea capping stack is rated to 15,000 psi, which is insufficient for BP's proposed HPHT Kaskida wells.

MWCC's ECRS is rated for 20,000 psi and suitable for deeper water depths (up to 10,000 feet) with temperatures up to 400°F, which would be necessary for BP's proposed Kaskida wells. However, BP has not clarified what it means by having access to the ECRS "when it is available." The MWCC ECRS was built in 2015 and appears "available." Chevron's recent HPHT Anchor Project was drilled using MWCC's 20,000 psi Gate Valve Capping Stack approved for emergency intervention.

BP's DOCD proposal to have an HPHT well control system that "might" be available offers insufficient assurance. BP must provide evidence of an agreement with the MWCC to guarantee access to its 20,000 psi capping stack.

BP's tentative and non-guaranteed commitment ("when it is available") does not assure the public that well containment and response equipment will be accessible when needed. BP is unclear whether it expects MWCC equipment to be out of service periodically for maintenance, repair, or inspection, or if it considers the possibility of simultaneous blowouts in the Gulf relying on a single set of MWCC equipment. In either case, BP needs to clarify its plans and ensure that well containment equipment will be available for Kaskida when required. This may involve coordinating drilling schedules with operators relying on MWCC to provide this service, and limiting BP's drilling program at Kaskida to times when the MWCC equipment is guaranteed and confirmed available, and not in use or being serviced.

## 7. High Pressure Drilling Experience and Expertise.

30 CFR §550.120 requires BOEM to regulate lease activity to prevent injury or loss of life and damage to or waste of any natural resource, property, or the environment. The proposed DOCD does not demonstrate that BP has the experience, expertise, and equipment to conduct safe drilling and emergency response operations for the proposed HPHT Kaskida drilling operations.

BP's DOCD confirms that it intends to pursue, but does not currently have, HPHT qualifications.

> *The Kaskida Field is classified as a high-pressure (HP) development, and not high-temperature (HT), in accordance with the HP/HT definitions specified in 30 CFR §250.105. In this regard, bp intends to pursue the HP technology development and qualification in accordance with the applicable sections of the 30 CFR Part 250 and BSEE Notice to Lessee (NIL) 2019-G02 and 2019-G03.*[9]

In BP's Macondo disaster, early signs of hydrocarbon influx (a well kick) were overlooked or ignored, and staff were not adequately trained or qualified to monitor, detect, and respond quickly to well kick issues (e.g., pressure and flow rate changes, mud pit gains). Misinterpreting a failed negative pressure test was a critical mistake.

[8] 2025 Kaskida DOCD, PDF Page 14 of 749.
[9] 2025 Kaskida DOCD, PDF Page 549 of 749.

BP's DOCD lacks detailed information about the training, qualifications, and expertise of BP's in-house and contracted staff to drill and complete deepwater HPHT wells at the depths, pressures, and temperatures anticipated in Kaskida wells using the proposed equipment. While more specific details will appear in the Applications to Drill (APDs), the DOCD does not provide enough information to determine the risks posed by these Kaskida wells, what measures BP has taken to prevent repeating lessons learned from the Macondo blowout, or if BP has trained, qualified, and experienced staff to design, implement, and safely execute these operations.

The investigation into the Macondo incident confirmed that BP staff and contractors lacked proper training, qualifications, and expertise, and that BP did not have written safety procedures for critical operations. The Chemical Safety Board Investigation revealed numerous technical, human, organizational, and regulatory failures. For example, the Macondo investigation confirmed that the crew was not sufficiently trained, qualified, or experienced enough to relate the pressure anomalies in the well to cement integrity failure. The well pressure was monitored by a Well Site Leader "trainee" with no technical expertise or experience in negative pressure testing. Macondo well mudloggers expressed great concern about the mud data to the incident investigation team but did not alert drilling engineers in time to address the abnormalities. BP also lacked written safety procedures for negative pressure tests, displacement of a riser, and diverter use, and did not have Deepwater Operations Plans (DWOPs) or emergency plans suitable for deepwater wells. The Chemical Safety Board Investigation also identified numerous regulatory deficiencies and recommended corrective actions.

Public information on BP's previous HPHT data is reportedly limited to a few wells in the Nile Delta (2011, 2014, 2022) and Oman (2017). The DOCD does not specify how experience from these four HPHT wells relates to the Kaskida project or whether staff involved would be used to drill and complete the Kaskida wells. The DOCD lacks BP's curriculum vitae for drilling a safe HPHT well in the Gulf.

In summary, the DOCD does not include a list of deepwater HPHT wells drilled internationally so far, safety records, or whether experienced BP staff and contractors involved in those wells will be assigned to the Kaskida project.

## 8. BP Macondo Well Blowout Lessons Learned and Improvements Planned for Kaskida

30 CFR §550.202 requires a DOCD to be safe and not cause undue or serious harm or damage to the human, marine, or coastal environment. BP's Macondo well was not designed, implemented, or handled safely, leading to a major well blowout in 2010. The DOCD lacks information on the steps BP has taken to address the deficiencies identified in the BP Macondo well blowout investigations, ensuring that those lessons are learned and not repeated at Kaskida.

Cement integrity deficiencies and a lack of cement evaluation contributed to the BP's Macondo blowout.

Cement is a crucial component of well construction, providing structural integrity and hydrocarbon zone isolation to prevent uncontrolled flow behind the casing. HPHT wells are subject to pressure and temperature variations that can cause the casing to expand and contract, resulting in difficulty placing the cement, cracks and voids once it has hardened, and premature cement setting.

In 2010, the HPHT well summit in London identified cement design as a leading HPHT technology gap. The 2012 summit listed cement design as the HPHT sector's third most critical technology gap, following safety, testing, and seals.

Electronic tools can be lowered into the wellbore to evaluate cement quality. While DOI does not require cement evaluation tools for every well to confirm successful cement placement, it should mandate them for complex deepwater HPHT wells and when an operator (such as BP) has previously failed to identify cement integrity using pressure data (without cement evaluation logging) at Macondo.

30 CFR §550.121 outlines provisions for the DOI Director to require additional measures to ensure the use of Best Available and Safest Technology (BAST), which means "the best available and safest technologies that the Director determines to be economically feasible wherever failure of equipment would have a significant effect on safety, health, or the environment." Cement evaluation tools should be made mandatory for BP's Kaskida wells.

BP's Macondo well was not an HPHT well; it was drilled from a water depth of approximately 5,000 feet to a well depth of about 18,360 feet. BP's DOCD does not show its ability to drill significantly more complex HPHT wells in deeper water, at greater depths, or under higher temperatures and pressures.

DOI is also responsible for reviewing and approving this DOCD to ensure that the regulatory deficiencies and failures identified as causal factors in the Macondo well blowout are not repeated at Kaskida. The Chemical Safety Board recommended "expanding BSEE staff to increase collective experience, diversity, and competencies in technical and safety-critical fields of study, including human and organizational factors and process safety (CSB-2010-10-I-OS-R13)."

DOI must verify to the public that it has addressed its own lack of experience and competencies in technical and safety-critical fields, and that its staff possess sufficient expertise, qualifications, training, and experience to review, approve, and oversee the complex HPHT Kaskida drilling operations.

### 9. Blowout Frequency for HPHT Wells is Six to Seven-fold Greater

30 CFR §550.121 outlines provisions for the DOI Director to require additional measures to ensure the use of Best Available and Safest Technology (BAST), where BAST means "the best available and safest technologies that the Director determines to be economically feasible wherever failure of equipment would have a significant effect on safety, health, or the environment." The DOCD lacks information on BP's proposed use of BAST to mitigate the loss of well control in the proposed Kasida deepwater HPHT wells.

HPHT wells are six to seven times more likely to experience a Loss of Well Control (LOWC) incident than drilling other deepwater wells. HPHT wells are also more susceptible to well kicks that can lead to LOWC, with an estimated occurrence of one kick per well, compared to a wildcat exploration well, which averages one kick per 10 wells.

A blowout during drilling starts with a well kick; HPHT wells experience more frequent kicks because of the narrow margin between the fracture gradient and the pore pressure. HPHT wells are at a higher risk of kicks because drilling mud overbalance needs to be kept low, given the limited margin between fracture gradient and pore pressure. When a kick occurs in an HPHT well, well kill operations become more difficult because the kill mud weight and rate must be carefully selected to control bottom hole pressure and prevent losses.

The SINTEF Offshore Blowout Database has collected data on 711 offshore blowouts worldwide since 1955, along with overall exposure data from the US Gulf of Mexico Outer Continental Shelf and North Sea drilling activities. ExproSoft published the latest report summarizing the SINTEF blowout data in 2017 for BSEE. The ExproSoft report used BSEE's definition of Loss of Well Control (LOWC), which refers to the uncontrolled flow of formation or other fluids (underground blowout or surface blowout), flow through a diverter, or uncontrolled flow caused by surface equipment failure. The 2017 ExproSoft report updated LOWC frequency data for 2000-2015 for the US GOM and Pacific OCS, North Sea, Canada, Brazil, Australian offshore regions, and other areas with similar regulatory regimes.

From 2000 to 2015, the US GOM experienced 82 LOWC events. Forty occurred during drilling (45%), 21 during well workovers (26%), and the rest during production operations.

US GOM LOWC statistics during drilling operations did not compare favorably to other nations, where the UK and Norway combined had 7 drilling LOWC events in the same period; the Netherlands, Canada, Australia, Denmark, and Brazil together had 5, and the rest of the world recorded 9. Similarly, US GOM Loss of Well Control incidents during well workovers did not compare favorably, with the UK and Norway reporting 5 events in the same period; the Netherlands, Canada, Australia, Denmark, and Brazil combined had 3, and the rest of the world accounted for 4.

ExproSoft concluded that DOI BSEE does not require sufficient operator reporting on well kicks to enable a more detailed analysis of kick frequency by well type; however, Norway does. Norway's kick reporting data from 2009-2014 showed that HPHT wells have nearly one kick per well drilled. While each kick did not result in a LOWC to the surface, a kick (if improperly managed) can cause a LOWC and pose a serious risk factor. In comparison, Norway's wildcat well kick frequency is only one kick for every 10 wells, highlighting the significantly higher kick risk in HPHT wells, especially those drilled deeper than 12,000 feet.

ExproSoft also found that a blowout (surface flow) from a deep zone has the highest risk of severe consequences. They reported 38 surface blowouts in the US between 2000 and 2015, with 30 occurring in the US GOM OCS. The three deep zone blowouts that caused significant pollution included the 2009 Montara well blowout in Australia, the 2010 BP Macondo well blowout in the US GOM OCS, and the 2011 Frade blowout in Brazil. The Macondo spill released 140 times more oil than the Montara spill and 1,150 times more than the Frade spill.

ExproSoft also concluded LOWC events include equipment and human failures:

> *Shallow zone incidents typically occur due to unexpected high well pressure or while the cement is setting. For the deep zone drilling incidents, the well may kick for various reasons. Approximately 50% of the kicks were detected late. For floating drilling blowout (surface flow) LOWC events, the BOP failed to close in 50% of the incidents, and the formation and/or the cement failed for the remaining. For bottom fixed drilling, leaks developed below the BOP in one third of the incidents, and the BOP was nippled down for installing casing seals in 22% of the incidents.*[10]
>
> *Humans are important in the occurrence and development of LOWC events, and human errors have contributed to many of the LOWC events. Personnel skills and proper procedures and practices are always important.*[11]

Using the SINTEF blowout database for 2000-2015, the US GOM OCS LOWC frequency (blowouts to the surface in development well drilling) was estimated at 0.32 wells per 1000 wells drilled, or $3.1 \times 10^{-4}$.

The International Association of Oil & Gas Producers estimates the blowout frequency for deep HPHT production and exploration wells to be six to seven times higher than that of a non-HPHT well:

- The blowout frequency for a deep HPHT exploration appraisal well is seven times higher ($1.1 \times 10^{-2}$) than a deep (non-HPHT) exploration appraisal well ($1.5 \times 10^{-3}$) for offshore operations in the US Gulf.[12]

[10] Loss of Well Control Occurrence and Size Estimators, Phase I and II, ExproSoft, prepared for USDOI, BSEE, May 2017 at 15.
[11] Loss of Well Control Occurrence and Size Estimators, Phase I and II, ExproSoft, prepared for USDOI, BSEE, May 2017 at 16.
[12] International Association of Oil & Gas Producers, Risk Assessment Data Directory, Blowout Frequencies, Report No. 434-02, September 2019, PDF Page 11 of 28.

- The blowout frequency for a deep HPHT production well also seven times higher ($3.4 \times 10^{-3}$) than a deep (non-HPHT) wells ($4.6 \times 10^{-4}$) offshore operations offshore operations in the US Gulf.[13]

- The blowout frequency for a deep HPHT exploration appraisal well is six times higher ($7.6 \times 10^{-4}$) than a deep (non-HPHT) exploration appraisal well ($1.2 \times 10^{-4}$) for offshore operations of North Sea Standard.[14]

- The blowout frequency for a deep HPHT production well is six times higher ($2.1 \times 10^{-4}$) than a deep (non-HPHT) well ($3.4 \times 10^{-5}$) offshore operations of North Sea Standard.[15]

## 10. Mechanical Oil Spill Response Gap

30 CFR §550.250(a) requires oil and hazardous substance spill information to accompany the DOCD, including an Oil Spill Response Plan (OSRP) prepared in accordance with 30 CFR §550.254, Subpart B. BP's DOCD notes that an OSRP was approved in January 2025, but it was not included in the DOCD and was not available for review.

30 CFR §550.250(b) requires a spill modeling report to be included in the DOCD; however, no model was included in the DOCD and was not available for review.

The Oil Pollution Act of 1990 (OPA 90), enacted after the *Exxon Valdez* spill, requires oil spill response plans to include capabilities for mechanical response to physically remove oil from the water.

Offshore facilities regulated by BSEE must comply with 30 CFR 254, which requires drilling operators to demonstrate they have access to sufficient boom, skimmers, vessels, and storage to meet specific oil spill response planning standards for a worst-case discharge.

Dispersants and in-situ burning cannot meet the mechanical recovery requirements of OPA 90 because they do not physically remove oil from the environment. Dispersants break down oil into smaller droplets dispersed in the water column, while in-situ burning causes air pollution. Under U.S. law and regulation, mechanical recovery is the primary mandated response method for oil spills under OPA 90.

While the Federal On-Scene Coordinator can approve dispersants and in-situ burning during an actual response, they cannot be used to meet the response planning obligations of an operator that must demonstrate sufficient mechanical response capability for a worst-case discharge.

BP's DOCD acknowledges that mechanical response equipment is limited to 3-foot seas and 20-knot winds. The average sea conditions in the Kaskida drilling location are typically 4-5 feet seas with 14-15 mph winds, making mechanical response ineffective, if not impossible, most of the time. Therefore, BP's proposed DOCD does not demonstrate it has the requisite mechanical response capability for the Kaskida location.

BP's DOCD does not specify the amount of spilled oil—currently estimated at 4,000,000 barrels—that would be removed from the environment using its proposed mechanical response system, which is limited to 3-foot seas and 20-knot winds, while average conditions at the Kaskida drilling site are typically 4-5 foot seas with 14-15 mph winds. The DOCD clearly shows a "response gap" between the mechanical

[13] International Association of Oil & Gas Producers, Risk Assessment Data Directory, Blowout Frequencies, Report No. 434-02, September 2019, PDF Page 11 of 28.
[14] International Association of Oil & Gas Producers, Risk Assessment Data Directory, Blowout Frequencies, Report No. 434-02, September 2019, PDF Page 9 of 28.
[15] International Association of Oil & Gas Producers, Risk Assessment Data Directory, Blowout Frequencies, Report No. 434-02, September 2019, PDF Pages 9-10 of 28.

system required by OPA90 and what BP has proposed. BP should provide a realistic estimate of the oil that would be recovered and how much would remain in the environment.

According to BP's proposed plan, the environmental conditions in the Gulf will often surpass the operating limits of available mechanical oil spill cleanup equipment, preventing BP from effectively responding to a blowout with mechanical response tools or resulting in minimal actual oil recovery.

BP provides no mechanical oil spill response equipment near the drilling location while drilling through the hydrocarbon zone. BP's DOCD states that mobilizing the required mechanical response equipment will take three days (74 hours) and that it may only "attempt" to skim oil when weather conditions allow.

> *"Offshore response strategies may include attempting to skim utilizing CGA and MSRC spill response equipment, with a total derated skimming capacity of 762,567 barrels. Temporary storage associated with skimming equipment equals 227,496 barrels. If additional storage is needed, various storage barges with a total capacity of 1,134,000+ barrels may be mobilized and centrally located to provide temporary storage and minimize off-loading time."*[16]

BP's response plan relies heavily on dispersants that do not effectively remove oil from the sea, or on in situ burning, which releases the oil into the air. BP provides no estimate of how much oil and dispersant chemicals will remain in the water column, nor does it estimate the pollution potential from in situ burning.

In summary, the proposed oil spill response plan, which relies mainly on dispersants and in-situ burning, does not meet OPA90 or the regulations at 30 CFR 254.

Please contact me at (907) 854-8998 if you have any questions on this memorandum.

Sincerely,



Susan L. Harvey

[16] 2025 Kaskida DOCD, PDF Pages 559-560 of 749.

and approved by BSEE on January 10, 2025, as noted in Section 9.1 of the EIA. Per 30 CFR part 254, the OSRP addresses a range of spill sizes and sources, including the WCD, and includes required response strategies, equipment, and personnel. A detailed oil spill response discussion addressing topics like resource identification, release modeling, response technologies, and source containment is available in Appendix G of the DOCD.

BP indicated in its plan that while bridging over (or 'bridging') is possible due to generally low formation strengths in the Gulf of America, no bridging over was assumed in the worst-case discharge scenario calculations.

In the event that a relief well is required due to a blowout, BP indicates in its plan that there are two drilling rigs currently available that have the capability to drill the relief well if needed (BP Exploration & Production Inc. 2025). For this project, BP estimates that it would take approximately 3 to 10 days to mobilize the necessary equipment and spud; 60 days from spud to casing shoe above the WCD zone, plus 30 days for ranging, intersection, and kill operations; for a total of approximately 90-100 days to drill and complete a relief well. There are no existing facilities/platforms nearby from where the relief well can be drilled. Additional details related to the proposed activities can be found in BP's Initial DOCD (BP Exploration & Production Inc. 2025).

**Oil-Spill Risk and Assessment**

Spills with volumes greater than 10,000 bbl are uncommon. From 2001 to 2023, there have been only three spills greater than 10,000 bbl in the Gulf of America OCS. One was the *Deepwater Horizon* oil spill at 4.9 MMbbl (ABS Consulting Inc. 2016), which is categorized as a low-probability catastrophic spill, which is not reasonably foreseeable. In October 2017, a subsea wellhead jumper (KAA-0120) in Mississippi Canyon Block 209, about 53 miles southeast of the Louisiana coast, failed and released an estimated 16,000 barrels of oil into the Gulf of America. The unintended release occurred after Delta House platform operations were restarted following Hurricane Nate due to a crack in the flowline discovered through remotely operated vehicle inspection. Carried southwest by ocean currents, the spill did not reach shore (BSEE 2019). There was also a pipeline spill in November 2023 near the mouth of the Mississippi River. As of December 2023, approximately 26,000 bbl were estimated to have been released. Details regarding the cause and source are not yet available, however, the use of dispersants have not been reported and there have been no reported wildlife or shoreline impacts.

In the event of a spill, there is no single method of containing and removing the oil that would be 100 percent effective. Removal and containment efforts to respond to an ongoing spill would likely require multiple technologies, including mechanical cleanup, chemical dispersant application, and less frequently, in-situ burning of the